# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ALISON ENDICOTT-QUIÑONES,
Guardian ad Litem, on behalf of
A. D., R. B., E. B., and M. B.,
minor children,

        Plaintiffs,

vs.                                           No. 21-cv-00368 KG/JHR

PATRICIA GARZA, in her individual
and official capacity; REBECCA LIGGETT,
in her individual and official capacity; BRENDA
SALDANA, in her individual and official capacity;
NEW MEXICO CHILDREN YOUTH &
FAMILIES DEPARTMENT; and DOES 1-50,

        Defendants.

## FIRST AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS AND FOR DAMAGES AND INJUNCTIVE RELIEF

A. D., R. B., E. B. and M. B. (collectively, "Plaintiffs"), through their guardian ad litem Alison Endicott-Quiñones, complain against Patricia Garza ("Garza"), Rebecca Liggett ("Liggett"), Brenda Saldana ("Saldana"), the New Mexico Children Youth and Families Department ("CYFD"), and Does 1-50 ("Doe Defendants") (collectively, "Defendants") as follows:

## INTRODUCTION

1.      This is an action to recover damages and injunctive relief under 42 U.S.C. § 1983.

2.      The claims arise from the acts of CYFD employees Garza, Liggett, Saldana, and other CYFD employees who disregarded Plaintiffs' constitutional rights, safety and wellbeing in a cynical, concerted effort to get rid of their case.

3.      As alleged below, Defendants engineered a scheme to remove Plaintiffs from an appropriate foster home and leave them with their wholly unfit biological parents on a trial home visit, despite having actual knowledge that the trial home visit created substantial risk to Plaintiffs'

health, safety and wellbeing. Indeed, Garza's stated hope was that the children would be kidnapped during the trial home visit by the parents so that the case would not go on for years.

4.     Plaintiffs were subsequently kidnapped by their biological parents. All Plaintiffs suffered trauma because of the ordeal, and M. B. suffered catastrophic brain damage.

5.     Plaintiffs seek recovery from Defendants on all causes of action available under state and federal law.

**JURISDICTION**

6.     Jurisdiction is proper in New Mexico as all, or substantially all, facts giving rise to Plaintiffs' claims occurred in New Mexico and all parties reside in New Mexico.

**PARTIES**

7.     Plaintiff A. D. is a minor child currently residing in Bernalillo County, New Mexico. Her name is abbreviated in this Complaint to protect her privacy.

8.     Plaintiff R. B. is a minor child currently residing in Bernalillo County, New Mexico. His name is abbreviated in this Complaint to protect his privacy.

9.     Plaintiff E. B. is a minor child currently residing in Bernalillo County, New Mexico. Her name is abbreviated in this Complaint to protect her privacy.

10.    Plaintiff M. B. is a minor child currently residing in Bernalillo County, New Mexico. Her name is abbreviated in this Complaint to protect her privacy.

11.    Alison Endicott-Quiñones is, presently, guardian ad litem appointed by a New Mexico state district court to represent Plaintiffs. She resides in Bernalillo County, New Mexico.

12.    Defendant Patricia Garza is a CYFD employee. She manages CYFD's Lea County office. She was responsible for supervising Plaintiffs' abuse and neglect case and was also personally involved in the affirmative actions giving rise to this lawsuit. She resides in Lea County, New Mexico. She is sued in her official and individual capacities.

13.    Defendant Brenda Saldana is a CYFD employee. She works in CYFD's Lea County office. She was involved in the daily care of the children during the trial home visit. She resides in Lea County, New Mexico. She is sued in her official and individual capacities.

14.     Defendant Rebecca Liggett is a CYFD employee. She instructed another CYFD employee to lie to the abuse and neglect court in an effort to facilitate the trial home visit taking place. She works and resides in Santa Fe County, New Mexico. She is sued in her official and individual capacities.

15.     Defendant New Mexico Children, Youth & Families Department ("CYFD") is a department of the New Mexico state government. It administers foster placement programs pursuant to the New Mexico Children's Code and has the exclusive authority under New Mexico law to determine the proper placement of foster children and to operate, monitor, supervise, regulate and otherwise manage child placement when children in state custody are placed.

16.     Doe Defendants are CYFD employees or agents whose identities are not yet known. Through actions undertaken in their official and individual capacities, are legally responsible for the injuries to Plaintiffs complained of here. Plaintiffs will amend this complaint once their identities are ascertained.

## FACTUAL ALLEGATIONS

17.     In late April or early May 2019, CYFD employees Yvette Lucero ("Lucero"), Rosa Alvarez ("Alvarez"), and Elizabeth Parrish ("Parrish") were at a Walmart in Hobbs, New Mexico during their lunch break. Upon their return to the CYFD office, they told Patricia Garza, Ivy Woodward ("Woodward"), Kelly Mazy and other CYFD employees that they had seen "a family of Gypsies" with three children and a heavily pregnant mother pan handling and begging for food for the children in the Walmart parking lot.

18.     Lucero stated that the children were ragged and dirty.

19.     She also informed Garza and others that the parents were holding signs that stated that they had no money to feed their children.

20.     Lucero stated that she, Parrish and Alvarez had discussed the matter and agreed that they would have to call it in if the family did not leave. According to Alvarez, she approached the family and told them that they worked for CYFD and they would have to call the police and

(possibly) have their children removed if they did not leave. According to Alvarez, the family began to gather their belongings and pile into their minivan to leave.

21.     This "family of Gypsies" were Plaintiffs and their biological parents.

22.     Parrish stated that CYFD had "dodged a bullet" because a report based on the facts observed by CYFD employees Lucero, Alvarez and Parrish would have likely resulted in the removal of the children from the custody of their parents, and more work for CYFD.

23.     Lucero and Alvarez were employed as CYFD investigators at the time. Parrish was employed as a permanency planning supervisor.

24.     Garza applauded the CYFD employees' efforts to avoid removing the children from their parents.

25.     CYFD requests that the general public make reports of abuse or neglect.

26.     CYFD's website implores that the general public make reports when they know or reasonably suspect that a child is being neglected or abused:

> Every person who knows or has reasonable suspicion that a child is being abused or neglected in New Mexico must report the matter immediately to CYFD's Statewide Central Intake child abuse hotline (**1-855-333-SAFE [7233] or #SAFE from a cell phone**), or to law enforcement or the appropriate tribal identity. Specific professionals mentioned under the law as mandated reporters are: licensed physicians, residents or interns, law enforcement officers, judges presiding during a proceeding, nurses, schoolteachers, school officials, social workers, and members of the clergy who have information not privileged as a matter of law."

Retrieved on August 1, 2021, at 3:14 PM, from https://cyfd.org/child-abuse-neglect/reporting-abuse-or-neglect.

27.     NMSA 32A-4-3 creates a mandatory reporting obligation. Garza breached this mandatory reporting obligation by not taking action on the information provided to her to initiate a formal investigation or moving to immediately take the Badea children into CYFD custody.

28.     Between the CYFD employees' contact with the Badea family and June 3, 2019, multiple concerned citizen reports were made regarding the children being in unsafe and unsanitary conditions in the Walmart parking lot in Hobbs to CYFD Statewide Central Intake ("SCI"). CYFD

received these reports and did not act on them. Defendant Garza had the ability and moral and legal responsibility to act on these reports and intentionally did not do so.

29.     On June 3, 2019, police performed a welfare check on the Badea family in the same Walmart parking lot in Hobbs, New Mexico that CYFD had encountered them a month or so prior. The officers found Plaintiffs with their biological mother, Luiza Badea ("Badea") and their biological father, Andrei C. Ducila ("Ducila"). The family was living out of a van, and the children were in poor health.

30.     June 3, 2019, was a hot summer day. The Badea children were not wearing shoes when police encountered them and were walking barefoot on hot asphalt.

31.     As the police were standing by with the Badea children for CYFD to seek custody of the children, a pre-filing staffing was done by Woodward, Jennifer De Los Santos ("De Los Santos")**,** Lucero**,** Parrish, and CYFD attorney Paul Boras ("Boras").

32.     When Boras was made aware that the family was undocumented, he immediately shut down all efforts to keep the children in custody.

33.     De Los Santos and Woodward argued that this case would easily be adjudicated based on medical neglect alone.

34.     Woodward pointed out to Boras that the children were in poor health and that they were barefoot on hot asphalt. Boras did not care.

35.     Boras contacted Liggett and briefed her on the situation – including his preference that the children not be taken into CYFD custody due to the immigration status of the parents. Liggett does not normally work in Hobbs or work as a line attorney. She is the Chief Children's Court Attorney for CYFD. Her office is in Santa Fe, NM. She was Boras' boss on June 3, 2019.

36.     De Los Santos then called Liggett.

37.     Liggett agreed with Boras that the children should not be taken into CYFD custody despite the profound and obvious neglect observed by multiple CYFD employees on two separate occasions, multiple reports made to CYFD SCI by citizens who had observed the public abuse and

neglect of Plaintiffs by their parents, and observations from Hobbs Police Department officers that Plaintiffs were being abused and neglected.

38.     Garza also asked why Woodward and De Los Santos were "fighting against Santa Fe."

39.     CYFD's head office is in Santa Fe where high ranking employees such as Liggett work.

40.     Liggett and Garza indicated that if an abuse and neglect case was filed, they would immediately motion to dismiss the case.

41.     As Liggett argued with Woodward about whether to take the children into custody, Hobbs Police remained at the Walmart with the Badea children. They were waiting at the Walmart for several hours. Eventually someone contacted a district court judge regarding the situation. The district court judge contacted CYFD and indicated that they were expecting to receive the requisite filings from CYFD to initiate an abuse and neglect case.

42.     The children went into CYFD custody on June 3, 2019.

43.     Plaintiffs were diagnosed with a litany of severe medical conditions, including tooth decay that was so advanced they had to be placed on a soft food diet. All four children were extremely malnourished and sunburned.

44.     After being placed into CYFD custody, M.B. was additionally diagnosed with thrush in the mouth, severe diaper rash, and dehydration. M.B. unlike her siblings was not diagnosed with decay of the teeth – this is likely due to her being an infant.

45.     E.B. was diagnosed with decay of the teeth, a urinary tract infection, and a first degree sunburn.

46.     R.B. was diagnosed with severe tooth decay.

47.     A.B. was diagnosed with tooth decay and abrasions on the right side of her face.

48.     On or about June 11, 2019, Lucero followed up with Ducila and Badea in regard to medical care of the children and they indicated no concern whatsoever with regard to the children's lack of medical care. Lucero advised a Hobbs Police Officer that the family had not provided any

type of medical care to their children and stated Badea and Ducila had no concerns for the children's health.

49.     After the children were taken into custody, Ducila showed Hobbs Police and Lucero that he had over $300 cash in his wallet. He had previously stated that he had no money and had to beg for money to feed his children.

50.     After the vehicle was seized by police, Ducila told Hobbs Police and Lucero that he would buy a new vehicle.

51.     Ducila and Badea had no explanation as to how they actually had earned any of the money which they had. Neither of them were employed.

52.     Garza and Liggett knew that Ducila and Badea had failed to provide any medical care to their children, knew of the Badea children's aforementioned injuries and health conditions, and still maintained their fervent opposition to keeping the children in CYFD custody.

53.     The Fifth Judicial District Attorney's Office filed criminal charges against Ducila and Badea for child abuse and neglect based on the observations of Hobbs police officers on June 3, 2019. With the criminal complaint filed and arrest warrants issued, there was no choice but for CYFD, Garza, and Liggett to pursue adjudication of the abuse and neglect case.

54.     The children were placed in CYFD's custody because Badea and Ducila were manifestly unfit parents.

55.     Ducila and Badea each had probable cause determinations which transferred their cases to State District Court. Badea's case is currently stayed for a competency evaluation. Ducila pled guilty to committing felony child abuse against each Plaintiff.

56.     Following the children's placement into CYFD's custody in June 2019, Plaintiffs continuously remained in CYFD's legal custody and have never left CYFD's legal custody.

57.     CYFD maintained physical custody at all material times by placing the children in foster care and tasking CYFD employees, including Saldana, to provide essential personal care to Plaintiffs including, but not limited to, cooking meals for them, bathing them, getting them ready for bed and transporting them to and from school, and other essential appointments.

58.     Plaintiffs were placed in foster homes shortly after CYFD took them into custody. Upon information and belief, those foster homes were adequate and safe placements for Plaintiffs.

59.     CYFD assigned one of its employees, Woodward, to manage Plaintiffs' care and evaluate whether their biological parents were fit to regain legal custody based on their performance in a treatment plan created by CYFD. Garza was Woodward's supervisor.

60.     When the children came into custody, it was discovered that both E.B. and A.B. were positive for tuberculosis ("TB"). In June 2019, the children were placed with foster parents who had other children in the home.

61.     E.B. and A.B. were also enrolled in a public daycare by CYFD or by the foster parents at CYFD's direction or with CYFD's consent in June 2019. The daycare indicates on their website that they typically serve between 100-150 children a day.

62.     Woodward was instructed by Garza to not disclose E.B.'s medical condition to the foster parents. This was dangerous and irresponsible in and of itself. In addition, the foster parents had a child in their house that was known to have severe asthma. Woodward informed Garza that she did not agree with Garza's order and the two argued about it for some time. Woodward pointed out that other children in daycare and the foster home could catch TB and become gravely ill. Woodward pointed out that one child in particular was at greater risk if they caught a serious respiratory illness.

63.     Garza told Woodward that TB was an old disease and that if other children contracted it that they would "most likely recover and be fine."

64.      Garza reiterated that Woodward was not allowed to disclose the untreated TB to the foster family because Garza anticipated that they would ask for the children to be moved and since "all of the foster parents gossip," per Garza, it would be very difficult to find a new foster placement for them.

65.     At this time, Garza had no plans in place to actually have E.B. and A.B. treated for TB as that would reveal their condition to their foster family – which Garza anticipated would create more work for CYFD.

66.     Woodward refused to endanger E.B. and A.B., as well as the children they would come into contact with. She defied Garza's orders and informed the foster family that E.B. and A.B. had TB.

67.     The foster family immediately took E.B. and A.B. to see a doctor. Fortunately, medical personnel swiftly realized that E.B. was in extreme danger. She had gone so long without treatment for her TB that it had caused meningitis of the brain and she required prolonged hospitalization in Lubbock to save her life.

68.     CYFD had in their possession at this time, June 2019, medical records and paperwork from the Texas Department of Health that stated that a nurse had informed Badea and Ducila that a lapse in treatment or stopping E.B.'s TB treatments could result in death.

69.     Badea and Ducila had, in spite of this dire warning, not followed through with E.B.'s treatment.

70.     Additionally in June 2019, Ducila admitted to Woodward that he was infected with TB and was the cause of his children being infected with TB. He was incarcerated at Lea County Detention Center ("LCDC") at this time. Ducila further told Woodward that he had not received treatment for his TB.

71.     Garza also instructed Woodward that she was not permitted to contact LCDC regarding Ducila's TB infection.

72.     Woodward argued that this was a contagious disease that could cause a pandemic in an enclosed population. Garza replied by making jokes about Woodward's ancestors (Native Americans) dying in droves of tuberculosis at Ft. Marion, then challenged Woodward to cite a fatality that, "like, didn't die in the 1800's."

73.     Woodward in multiple interviews with Ducila and Badea was able to piece together a story as to how they came into the United States.

74.     Ducila and Badea married in Romania. Ducila was 17. Badea was 12.

75.     Their marriage was performed according to Roma Gypsy tradition and was not recognized as legal by any governing agencies in Europe, therefore they did not have a marriage license, nor any other proof of identification.

76.     Ducila claimed that he had a very rich uncle in California who purchased airline tickets for him, Badea and the two children to travel from Paris, France to Cancun, Mexico so that they could join the migrant caravans entering the US at the time.

77.     Woodward found this exceedingly odd and never could get an answer as to why said rich uncle would not just buy their tickets for a US destination or how they boarded an international flight with no identification for themselves or the children.  Also, said uncle allegedly helped them get out of jail and gave them money to buy a new van within days of getting out of jail because they didn't want the one that was in the police impound anymore.

78.     The van used by Ducila and Badea in the police impound also had several blank birth certificates in it.

79.     Woodward tried to follow up on how the children could have boarded an international flight without identification and to discern why Ducila and Badea were in possession of blank birth certificates, but Garza ordered Woodward to not investigate any further into these topics. In Garza's words, the ability to get the children on an international flight without identification and the blank birth certificates was "background noise" in the case.

80.     The Badea family made their way to the border at Brownsville, TX. Ducila told Woodward that he was unsure whether or not they would pass as refugees seeking political asylum since they were claiming to be Latin American refugees. Consequently, he left Badea, who was now pregnant with E.B., and their child R.B. in Mexico. M.B. had not yet been born at this time.

81.     Ducila then proceeded to make a declaration of political asylum for himself and A.B. Once in the US, they stayed with relatives in Houston, then they went to New York for a short period of time. Ducila claimed that they were moving for work, but never provided Woodward an answer as to what work was.

82.     Woodward conveyed the information she had gathered on the parents to Garza and other CYFD employees, including CYFD's head of immigration affairs, Megan Velasquez**.**

83.     Upon information and belief, Velasquez began reaching out to various entities to try to assist Badea and Ducila with getting their charges dropped in order to avoid deportation.

84.     During Woodward's time working this case as an investigator, Garza would on multiple occasions call Woodward into her office to ask Woodward why she couldn't just do what Santa Fe asked without question.

85.     Woodward would always reply that what they were doing was wrong. Garza would then, unfailingly, remind her that the State of New Mexico signs her paychecks and she needs that paycheck so she will do what they ask of her.

86.     In October 2019, CYFD scheduled a psychological diagnostic appointment for Ducila and Badea. The appointment was scheduled to occur in Roswell, New Mexico. Woodward was tasked with transporting Ducila and Badea to the appointment.

87.     Prior to leaving for Roswell from Hobbs, Woodward was told by Megan Finno-Velazquez, a fellow CYFD employee, to conceal the parents' identities from law enforcement if she was pulled over. Ducila and Badea were Romanian nationals in the United States illegally, and subject to deportation. Believing that the request was unethical and likely illegal, Woodward reported the event to Garza. Garza also ordered Woodward not to disclose the parents' identities.

88.     An email was sent by Megan Velasquez on October 8, 2019, stating that an immigration attorney had consulted with Ducila on his asylum claim. The immigration attorney assessed in her opinion that there was no hope of obtaining asylum or other relief that would allow Ducila to stay in the United States legally.

89.     Velasquez directed Woodward, Garza and others to protect the family's confidentiality and not expose them to ICE or other law enforcement that could call immigration authorities for the duration of the case.

90.     Velasquez also stated in this email that CYFD would not seek Special Immigrant Juvenile (SIJ) status for the children. Under appliable immigration law, the children were eligible for this status precisely because they had been abused and neglected by their parents.

91.     Despite the sea of red flags that would inform any reasonable person, let alone any reasonable social worker, that working towards a family reunification would gravely endanger the children, CYFD pursued a plan to eventually reunify the family.

92.     Over the following months, Ducila and Badea made no progress on CYFD's treatment plan. These repeated failures were reported by Woodward to Garza and other CYFD employees. However, on every occasion Garza and other CYFD employees waived the treatment plan's requirements.

93.     The treatment plan obligated Ducila and Badea to obtain and maintain employment or a source of income. Woodward noted that both Badea and Ducila always had ready cash and could never report where they got it from. When they would visit their children at CYFD, they always brought McDonalds meals, large bags of chips, cookies, juice, new clothing and toys for them.

94.     When questioned by Woodward on how and where they obtained this money, they never disclosed the source of their money and always claimed not to have any.

95.     The abuse and neglect court judge allowed respondent's counsel to cancel the treatment plan's work requirements because obtaining a job that wasn't exploitive was deemed impossible given their immigration situation.

96.     The treatment plan also required Ducila and Badea to address issues pertaining to their immigration status. Upon information and belief, neither Ducila or Badea ever addressed their immigration status issues and are still deportable from the United States.

97.     The treatment plan required Badea and Ducila to address all issues pertaining to their 2019 criminal child abuse case. At the time Badea and Ducila kidnapped their children and at the time of the trial home visit, they each had their 2019 criminal case pending.

98.     The treatment plan required Badea and Ducila to undergo psychological evaluations and follow all subsequent recommendations. The psychological evaluation was requested by Woodward to be part of the treatment plan due to concerns Badea may possess a developmental deficit, as she frequently made statements to Woodward that were out of context and at inappropriate times. Some of those statements led Woodward to believe that there may have been other children that they didn't have with them or that she may have been a victim of human trafficking at some point.

99.     Upon information and belief, the psychological evaluation was never completed – although it was a part of the treatment plan.

100.    The parents were ordered to engage in therapy and follow all therapist recommendations. This portion of the treatment plan was not followed.

101.    The plan required Ducila and Badea to attend all Plaintiffs' medical, dental and vision appointments. In her time working the abuse and neglect case, Woodward observed that neither Ducila nor Badea ever attended any medical appointments for Plaintiffs.

102.    During Ducila's visits, he could not interact with all of the children. E.B. and A.B. would frequently run up and down the hall and flash the lights on and off, while M.B., an infant, would scream.

103.    Woodward mentioned Ducila's profound inability to supervise or meaningfully interact with his children to the guardian ad litem on numerous occasions.

104.    Garza instructed Saldana to begin having the visitations in a room that did not have a recording device installed so that the children's court would not have access to them.

105.    Garza also hired a temp, Rebecca Gascon ("Gascon"), to be Saldana's assistant and to provide a counter narrative to anything that Woodward might say about the case.

106.    Gascon's directive was for her story to always match Saldana's regardless of what Woodward reported.

107.    After the initial placement with their first foster family the Badea children were placed with foster parent Jill Jones ("Jones").

108.    Dental appointments for the children were scheduled in January 2020. CYFD delayed scheduling these appointments because they did not want to pay for dental care for the children. A.B. had been on a soft food diet since coming into custody.

109.    In December 2019, Jones called Saldana to ask her what she should do at the border patrol check points on the way to the dental appointment, as the dental appointment was in Las Cruces and there was no way out of Las Cruces without going through one and R.B. was still active on Badea's deportation warrant.

110.    CYFD employee Yolandrao Castro ("Castro") instructed Woodward to tell the Jones family to lie to border patrol about the immigration status of the children and to not provide their real names.

111.    Jones told Woodward that she would not lie to law enforcement for CYFD.

112.    Castro stated that perhaps the children should be moved to "a more cooperative family."

113.    In October through December 2019, it came to light that A.B. was making extremely disturbing disclosures during play therapy.

114.    Play therapy is a structured theoretically based approach to therapy that builds on the normal communicative and learning processes of children. Therapists strategically utilize play therapy to help children explain what is troubling them when they lack the verbal language to express their thoughts and feelings.

115.    A.B. began making disclosures of witnessing domestic violence in play therapy and also began demonstrating sexually reactive behaviors.

116.    A.B. also disclosed that her father had her and R.B., siblings, kiss each other on the lips.

117.    A.B. also arranged a family in the living room of the play therapy area and had the father doll come in and hit and kick everyone until they hid, then the father doll proceeded to kill the family dog.

118.    The therapist compiled this information and made a CYFD SCI report.

119.    Garza dismissed these play therapy disclosures by speculating that A.B. was reenacting things she had seen on the news. Garza then had the therapist removed from the case and had a new therapist assigned.

120.    Upon information and belief, Garza relayed Woodward's reports to other CYFD employees including, but not limited to, Liggett.

121.    In February and March 2020, the parents' conditions of release on their felony child abuse cases were modified to allow supervised visits with Plaintiffs at CYFD. Woodward observed these visits and saw that Ducila and Badea were plainly incapable of caring for Plaintiffs. Woodward documented the parents' manifest unfitness in reports submitted to her superiors at CYFD.

122.    On one occasion, Ducila and Badea tried to leave the office with the children. The police were called and Ducila and Badea locked themselves in a room at the CYFD office with the children and Hobbs Police Department had to force entry to get them out. Garza verbally reprimanded De Los Santos, the calling party, for "being dramatic." Garza also gave the directive that no charges were going to be pressed against Ducila and Badea for that incident and that visitation would continue as scheduled.

123.    During one supervised visit at CYFD, Ducila offered Woodward a cash bribe to look the other way while the parents absconded with the children. Ducila stated he had a lot of money and asked how much of it he would need to pay to make all of this go away. Woodward refused and reported the incident to her superiors at CYFD, including Garza.

124.    Garza replied to the report of attempted bribery to obtain the children in CYFD's care by laughing and asking how much Ducila had offered.

125.    Ducila also offered a cash bribe on one occasion to Kelly Mazy. She did not accept the bribe.

126.    Ducila also attempted to bribe CYFD investigator Lucero to have his children returned to him.

127.    On another occasion, Woodward observed that Ducila was holding M.B. with his forearm on his back and holding the back of her head like a basketball. He was swinging M.B. around trying to catch E.B. as E.B., R.B. and A.B. were running around slamming doors and generally engaging in mayhem.

128.    Woodward observed that Ducila was visibly enraged by Plaintiffs' behavior. Breathing in through the mouth and out through the nose to try to calm himself with a vein throbbing in his forehead.

129.    In early March 2020, Garza held a meeting on Plaintiffs' case. Garza stated, "If we don't send these kids home, it will be another Everhart case." The Everhart case was a CYFD case that had gone on for over ten years.

130.    Woodward stated that the plan for the children should be shifted towards adoption and termination of Ducila and Badea's parental rights because Badea was incarcerated and Ducila had done nothing to demonstrate that he could care for the children on his own.

131.    Saldana and Gascon simultaneously stated that Ducila had complied with everything that the department had asked of him. Woodward reminded everyone of the multiple failures to comply with their treatment plan.

132.    Saldana stated that the visits with Ducila were going very well. Woodward replied that one week before this meeting, Woodward had to intercept E.B. as she bolted from the room while Ducila nearly dropped M.B. in an attempt to stop her. Woodward sat in an empty office with E.B. because she refused to go back in the room, while Gascon chased A.B. down the hall after she bolted and Saldana attempted to get R.B. to stop running and throwing things at Ducila because he was holding a hysterical M.B. Woodward observed that Ducila was the one inciting these reactions in the children because none of the children acted like that prior to his arrival in the visitation room and left quietly and happily when the foster parents picked them up.

133.    Garza and Saldana then agreed amongst themselves that, rather than the visitation taking place at the office, where in Garza's words, "everybody could stick their nose in the case,"

they should start visiting with Ducila in the home. Garza was looking at Woodward when she made the comment about people sticking their nose into the case.

134.    Garza then stated, "Maybe they'll take the kids and run and we won't have to deal with them." Realizing that Woodward had heard that, Garza and Saldana locked eyes and then Garza stated, "just kidding, sorry, that wasn't funny."

135.    Woodward reported Garza's "joke" to Plaintiffs' guardian ad litem in the abuse and neglect case. Based on Woodward's concerns, the guardian ad litem motioned the court for a hearing, where Woodward would be the sole witness. The intention of the hearing was to stop the trial home visit from going forward based on the numerous concerns discussed in the preceding paragraphs that Woodward had observed and the "joke" Garza had made about the parental kidnapping.

136.    Garza attempted to dissuade Woodward from telling the court about the danger to the safety of the children including, but not limited to, the play therapy disclosures of A.B. involving the father doll coming home and hitting other members of the family, Woodward's observations that Ducila had on at least one occasion looked like he was going to throw M.B. or drop her due to being enraged by his children's chaotic misbehavior, concerns about sexual abuse from the parents,  Garza's stated desire to have Ducila and Badea kidnap the children, and other facts of the case discussed in the preceding paragraphs that would cast CYFD in a bad light.

137.    When Woodward indicated that she would testify truthfully, Garza told Woodward that Woodward would be receiving a call from Liggett.

138.    Upon information and belief, Garza conveyed the anticipated substance of Woodward's testimony in its entirety to Liggett.

139.    On March 13, 2020, Woodward received a phone call from Liggett.

140.    Liggett was not an attorney of record on the case and the matter was being handled by a CYFD line attorney.

141.    Liggett asked Woodward what she planned to testify to at the hearing. Woodward stated she would testify truthfully about Ducila's inability to control the children, the children's troubling disclosures, and the anger Ducila demonstrated during visits with the children.

142.    Liggett told Woodward that her testimony would make it look like CYFD was misleading the court about Ducila's readiness for a trial home visit.

143.    Liggett then stated, "Let me remind you that you are an employee of the State of New Mexico and as such it is your obligation to align and censure yourself with the needs of the organization that employs you." Woodward replied, "No, ma'am, it is not. Especially when this organization is asking me to lie for them." Liggett became agitated and stated, "nobody told you to lie, I just told you to censure yourself so that we are all on the same page." Liggett then stated that she was going to do everything in her power to keep Woodward from taking the stand and that there would be, "no limits" to what she would do to keep her from testifying.

144.    Liggett and Garza both told Woodward that due to Coronavirus and the fact that Woodward lived just over the state line in Texas that they would bar her from entering the courthouse and providing testimony.

145.    Neither Liggett nor Garza were concerned about Woodward travelling to testify in court until after Woodward indicated she would testify truthfully and would refuse to omit facts that undercut CYFD's goal of moving forward with a trial home visit.

146.    Liggett and Garza both conspired to use a court process in an attempt to bar Woodward, the only witness, from testifying.

147.    Woodward reported the conversation with Liggett to the attorney acting as Plaintiffs' guardian ad litem at the time. The guardian ad litem decided that she would not be able to prevail at the hearing without Woodward's testimony because Woodward was her sole witness. The guardian ad litem was also concerned that CYFD would fire Woodward if she testified at the hearing. The guardian ad litem called off the hearing, and the hearing was never reset.

148.    Woodward was removed from the Badea case by CYFD shortly after her conversation with Liggett.

149.    In April 2020, Garza, Saldana, and Doe Defendants sent Plaintiffs to live at Ducila's home on a trial home visit.

150.    Saldana and Garza had actively worked to facilitate the trial home visit by manufacturing evidence to contradict the credible and objective evidence that the parents were unfit and that future abuse was likely.

151.    Shortly after the trial home visit started, Megan Gallegos, an employee with Court Appointed Special Advocates ("CASA"), observed Ducila encouraging Plaintiffs to engage in inappropriate sexual activity. These observations were reported to CYFD employees including Garza. Garza and Saldana did not terminate the trial home visit after receiving this report.

152.    Garza, Liggett, Saldana, and other CYFD employees worked together to alter the status quo for Plaintiffs through formal legal process to compel Plaintiffs into the trial home visit. They did this with the knowledge that Plaintiffs would be subject to abuse and neglect by Ducila. In making this arrangement, Garza, Liggett, Saldana and other CYFD employees continued to deprive Plaintiffs of their liberty as Plaintiffs had no choice but to follow CYFD directions as to where they would be housed and who would provide for their basic needs.

153.    Saldana personally provided for Plaintiffs' essential needs. This included, but was not limited to, bathing Plaintiffs, preparing their meals, and transporting them to school. Saldana performed these tasks even though the purpose of a trial home visit is to determine whether the parent can care for children unassisted. Saldana performed these tasks specifically because it was known to the Defendants that Ducila was unfit and incapable of adequately caring for the children.

154.    CYFD intended to report that the trial home visit had gone well and to pursue a formal and final reunification with the Badea children and their parents as the final resolution of the abuse and neglect case. To further that goal, Saldana was involved in the day-to-day care of the children and provided essential care to them.

155.    Garza and Liggett had previously fought vehemently against the idea of taking the children into custody. Saldana was in agreement with Garza and Liggett's outlook on the case. The

trial home visit was intended as a means to present inaccurate and misleading information to the abuse and neglect judge in the hopes that the case could end with reunification.

156.    Garza had also expressly stated that she hoped the Badea children would be kidnapped by their parents as that would also bring an end to the case as well.

157.    Either outcome would be manifestly detrimental to the safety and wellbeing of Plaintiffs and any reasonable person would know this based on the facts available to Garza, Saldana and Liggett before and during the trial home visit.

158.    Garza, Liggett and Saldana conspired and abused formal legal process to set up the trial home visit in the first instance, which was a breach of their individual and collective duties to keep Plaintiffs safe. Garza, Liggett and Saldana all acted contrary to their professional responsibility and worked to create a result that they found desirable for CYFD over the health and safety of children in their custody.

159.    In April 2020, Badea was released from jail. Within days of her release from jail the parents kidnapped Plaintiffs and disappeared.

160.    On information and belief, Badea and Ducila kidnapped Plaintiffs in April 2020.

161.    On information and belief, Saldana was aware that Plaintiffs were missing during April 2020, but waited until May 2, 2020, to inform Hobbs Police that the children could not be found. For the next twelve days, Garza, Saldana, and other CYFD employees refused to tell the Hobbs Police Department that CYFD's custodial rights were being interfered with, and claimed that Plaintiffs were not in danger.

162.    As a result, the police did not issue an Amber Alert on May 2, 2020.

163.    Garza and Saldana actively hindered law enforcement's efforts to locate Plaintiffs. Garza and Saldana did not cooperate with the Hobbs Police Department's efforts to issue an Amber Alert. Garza and Saldana refused to report Plaintiffs missing, and initially blocked the District Attorney from pressing custodial interference charges by claiming that CYFD's custodial rights were not being interfered with. Garza and Saldana and other CYFD employees also withheld

documents from Hobbs Police Department investigators executing a search warrant. These documents would have assisted police in ascertaining the family's whereabouts.

164.    Defendants' actions had the effect of cutting off Plaintiffs from public and private aid.

165.    Hobbs Police were in contact with CYFD on a daily basis seeking permission to proceed with a custodial interference investigation. CYFD employees, including Garza and Saldana, stonewalled the police and refused to act or offer any assistance for ten days.

166.    On May 14, 2020, the District Attorney for the Fifth Judicial District decided to proceed with the case despite CYFD's refusal to cooperate, and caused arrest warrants to be issued for Badea and Ducila. CYFD had prior to this point in time not rendered any assistance to law enforcement and had refused to allow an Amber Alert to be ordered or to formally claim that their custodial rights were being interfered with or make any assertion that the children were in danger.

167.    In November 2020, M. B. was dumped at a North Carolina hospital by Badea. M. B. had suffered a fractured skull and brain damage. Her injuries have left her permanently blind. Ducila and Badea, along with M. B.'s siblings, were later found in Houston, Texas. Shortly afterwards, CYFD's spokesperson issued a statement to an Albuquerque television station falsely claiming that CYFD had promptly reported Plaintiffs missing and had cooperated with law enforcement's efforts to locate them.

168.    CYFD had in fact stonewalled police efforts to locate the children for roughly two weeks and had ignored at least one report on the suspected whereabouts of the Badea children and their parents.

169.    After M.B. was left by her parents at the hospital, she was also observed to have circular shaped burns on her skin. These burns were likely caused by persons pressing the lit end of cigarettes against M.B.'s skin.

170.    Even though its scheme had already resulted in one of the children suffering permanent brain damage, CYFD continued to interfere with law enforcement's efforts to hold the parents accountable and to keep the Badea children safe. On November 10, 2020—several days

after the children were found—Garza ordered a CYFD employee familiar with the matter to not comply with a Fifth Judicial District Attorney subpoena.

171.    In November 2020, Ducila and Badea were transported to New Mexico. They have remained in custody continuously either in jails in New Mexico or North Carolina as both parents face felony child abuse charges in North Carolina for causing M.B.'s life-altering injuries.

172.    CYFD maintains custody of Plaintiffs and has had custody of Plaintiffs at all material times.

173.    Saldana, Garza, and Liggett were acting pursuant to Secretary Blalock's directive to expedite cases under consideration for trial home visits in 2020. These policies and/or customs were a moving force behind the injuries each Plaintiff suffered as the policies or customs further enabled Defendants to ignore obvious and severe safety risks to the Plaintiffs.

174.    Saldana, Garza, and Liggett were acting pursuant to official or unofficial CYFD policies that favor parental reunification. These policies and/or customs were a moving force behind the injuries each Plaintiff suffered as the policies or customs further enabled Defendants to ignore obvious and severe safety risks to the Plaintiffs.

175.    Saldana, Garza, and Liggett were acting pursuant to official or unofficial CYFD policies to shield illegal immigrants from federal immigration law and authority. These policies and/or customs were a moving force behind the injuries each Plaintiff suffered as the policies or customs further enabled Defendants to ignore obvious and severe safety risks to the Plaintiffs. Because of these policies and customs, CYFD employees initially refused to take the Badea children into custody in direct contravention of New Mexico law.

### FIRST CLAIM FOR RELIEF
**42 U.S.C. § 1983 – Violation of the Fourteenth Amendment – Special Relationship**
**(Against Defendants Saldana, Garza, and Liggett in their individual and official capacities)**

176.    Plaintiffs incorporate and reassert the allegations as set forth in the foregoing paragraphs as though fully stated herein.

177.    Plaintiffs and Defendants are all persons for purposes of 42 U.S.C. § 1983.

178.    The Fourteenth Amendment of the United States Constitution vested Plaintiffs with a clearly established procedural and substantive due process right to be protected by Defendants while in State custody.

179.    Defendants violated the duties created by the special relationship they had with Plaintiffs by, among other things, removing Plaintiffs from safe and appropriate foster homes and providing Ducila and Badea with access to Plaintiffs and the opportunity to kidnap Plaintiffs while Plaintiffs were still in CYFD's custody.

180.    While CYFD facilitated a trial home visit, they had not actually formally transferred physical or legal custody of Plaintiffs back to Ducila or Badea. CYFD maintained custodial rights over Plaintiffs including the ability to determine who they lived with and where.

181.    CYFD utilized their legal custody to determine where the Badea children would live, who would care for them, and who would have access to them from June 3, 2019 to the present.

182.    Plaintiffs did not have a choice with regard to who they lived with once they came into CYFD's legal custody. The nature of the relationship between Plaintiffs and CYFD was involuntary and the children were completely dependent upon CYFD to satisfy their basic human needs.

183.    CYFD policy defines "legal custody" as:

[A] legal status created by order of the children's court or other court of competent jurisdiction or by operation of the New Mexico Children's Code, Section 32A-4-1 et seq or 32A-3B-1 et seq, NMSA 1978, that vests in a person, department or agency the: (1) right to determine where and with whom a child shall live; (2) right and duty to protect, train and discipline the child and to provide the child with food, shelter, personal care, education and ordinary and emergency medical care; (3) right to consent to major medical, psychiatric, psychological and surgical treatment and to the administration of legally prescribed psychotropic medications pursuant to the Children's Mental Health and Developmental Disabilities Act; and (4) right to consent to the child's enlistment in the armed forces of the United States. N.M. Admin. Code 8.10.7.7(X)(emphasis added).

This policy, which imposes affirmative duties on CYFD employees to protect Plaintiffs, was continuously in force and effect at all relevant times.

23

184.     Defendants undertook affirmative acts in furtherance of their scheme, including creating a false narrative that Plaintiffs' biological parents were fit for a trial home visit, instructing Woodward to mislead the court to further this false narrative, removing people who advocated for the children and their safety from providing continuing care to the children and replacing these individuals with others who would blindly follow CYFD directives,  and misusing the legal process to keep critical and relevant information from the abuse and neglect court. Defendant Garza intentionally created this dangerous situation because she wanted Ducila and Badea to kidnap Plaintiffs. Each Defendant's individual actions shock the conscience.

185.     Defendants owed Plaintiffs a continuing legal duty because of the special relationship. Saldana and Garza breached that continuing duty after the children went missing due to their failure to immediately report the children missing and permit the issuance of an Amber Alert. Saldana and Garza breached that duty again by hindering police efforts to locate the family.

186.     Defendants had actual knowledge that the children would be endangered by a trial home visit. Defendants failed to exercise professional judgment regarding that danger. To the contrary, Defendants worked to create the danger in the first place and also took affirmative acts to cut Plaintiffs off from aid and assist the parents in the kidnapping.

187.     As a proximate result of Defendants' actions, M. B. suffered a catastrophic brain injury as well as other physical injuries. All Plaintiffs have suffered extreme emotional distress. Upon information and belief, all Plaintiffs suffered from further abuse and neglect similar to what the Hobbs Police Department observed on June 3, 2019.

188.     Plaintiffs are entitled to damages, injunctive relief barring Defendants from committing further violations of their constitutional rights, punitive damages, reasonable attorneys' fees, and costs of suit.

189.     CYFD's refusal to provide medical care to E.B. for her TB and willingness to expose over a hundred other children and their families to a potentially life threatening and highly contagious respiratory disease was also a breach of their special relationship with E.B. E.B. has

24

suffered damages including a prolonged hospitalization. The full extent of her damages are still being discovered.

190.    CYFD's refusal to immediately treat E.B., A.B, and R.B. for severe tooth decay is a separate breach of their special relationship with the children. Garza and Saldana knew that immediate medical treatment was needed.  A.B. in particular was especially harmed by this breach because A.B. had been on a soft food diet since June 2019. A dentist appointment was eventually scheduled by Saldana for A.B. in January 2020.

191.    CYFD engaged in other discrete breaches of their special relationship to keep the children safe and affirmatively protect them from harm as described in the preceding paragraphs.

192.    The Defendants' conduct shocks the conscience.


### SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Violation of the Fourth and Fourteenth Amendments – State Created Danger
### (Against Defendants Saldana, Garza, and Liggett in their individual and official capacities)

193.    Plaintiffs incorporate and reassert the allegations as set forth in the foregoing paragraphs as though fully stated herein.

194.    Plaintiffs and Defendants are all persons for purposes of 42 U.S.C. § 1983.

195.    The Fourteenth Amendment of the United States Constitution vested Plaintiffs with a clearly established procedural and substantive due process right to be protected by Defendants while in their care. Plaintiffs also possessed a constitutional right to not be harmed by private persons as a result of a state created danger.

196.    Defendants created a dangerous situation for Plaintiffs. They removed Plaintiffs from both parents' custody, placed them in a foster home, and then placed them in a trial home visit with just their father.

197.    The status quo for the children preceding the trial home visit was safe. The children were in a good foster home and their essential needs were being met.

198.   Defendants modified this status quo by removing the Plaintiffs from a place of safety, foster care, and starting trial home visits.

199.   Defendants could reasonably foresee that they were removing the Plaintiffs from a safe foster home placement and subjecting them to dangerous conditions which included being physically struck by Ducila. In play therapy, one of the children indicated that Ducila would come home, hit, kick and strike all members of the family, and on one occasion killed a family pet. On another occasion, Woodward observed Ducila holding M.B. like a basketball and demonstrating an appearance which suggested strongly that he was going to drop her, shake her or throw her.

200.   Defendants could also reasonably foresee that the children would be subject to neglect – including neglect that could lead to death or serious injury.

201.   Defendants could also reasonably foresee that Ducila would attempt to kidnap the children if given the opportunity due to the multiple instances of attempted bribery of CYFD employees and the occasion in which he tried to take the children from CYFD's office. Defendants Garza and Saldana in fact hoped that Ducila would abscond with the children.

202.    Defendants took affirmative acts to create this danger, including creating a false narrative that Ducila and Badea were fit parents and retaliating against and removing people who were acting in the children's best interest from the children's case and denying the children the ability to receive care from them.

203.   Plaintiffs are members of a limited and specifically definable group as they are the biological children of the two private actors who abused them.

204.   Defendants' conduct put Plaintiffs at substantial risk of serious, immediate, and proximate harm. This risk was obvious and known.

205.   Defendants acted recklessly and in conscious disregard of the known risks the trial home visit posed for Plaintiffs.

206.   Even after the risk came to pass, Plaintiffs were kidnapped, Defendants continued to act recklessly by refusing to timely report the children missing and refusing to tell the Hobbs

Police Department that their custodial rights were being interfered with. Each Defendant's conduct was conscience shocking.

207.    As a proximate result of Defendants' actions, M. B. suffered a catastrophic brain injury. All Plaintiffs have suffered extreme emotional distress.

208.    Plaintiffs are entitled to damages, injunctive relief barring Defendants from committing further violations of their constitutional rights, punitive damages, reasonable attorneys' fees, and costs of suit.

### PRAYER FOR RELIEF

Plaintiffs pray that judgment be entered against Defendants as follows:

1.    For general and special damages according to proof;

2.    For punitive damages according to proof;

3.    For costs of suit;

4.    For attorneys' fees;

5.    For pre-judgment interest; and

6.    For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

GUBERNICK LAW P.L.L.C.

/s/ Benjamin Gubernick
BENJAMIN GUBERNICK
New Mexico Bar No. 145006
Ben@gubernicklaw.com
734-678-5169
10720 W. Indian School Rd.
Ste. 19 PMB 12
Phoenix, AZ 85037

---and---

<u>/s/ Todd J. Bullion</u>
Todd J. Bullion
Law Office of Todd J. Bullion
300 Central Ave SW, Suite 1000E
Albuquerque, NM  87102
(505) 452-7674
todd@bullionlaw.com

---and---


<u>/s/ Robert Gorence</u>
Robert Gorence
Gorence & Oliveros
300 Central Ave SW, Suite 1000E
Albuquerque, NM  87102
(505) 244-0214
gorence@golaw.us

---and---

<u>/s/ Jason Bowles</u>
Jason Bowles
Bowles Law Firm
P.O. Box 25186
Albuquerque, NM 87125-0186
(505) 217-2680
jason@bowles-lawfirm.com

*Attorneys for Plaintiffs*


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 9th day of August, 2021, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

**Alfred A Park**
Park & Associates, LLC
3840 Masthead St., N.E.
Albuquerque, NM 87109
505-246-2805
Fax: 505-246-2806
Email: apark@parklawnm.com

**Lawrence M Marcus**
Park & Associates, LLC
3840 Masthead St. N.E.
Albuquerque, NM 87109
505-246-2805
Fax: 505-246-2806
Email: lmarcus@parklawnm.com

**James J Grubel**
Park & Associates, LLC
3804 Masthead Street NE
Albuquerque, NM 87109
505-246-2805
Fax: 505-246-2806
Email: jgrubel@parklawnm.com

_/s/ Robert J. Gorence_
Robert J. Gorence
Gorence Law Firm