**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

ALISON ENDICOTT-QUIÑONES,
Guardian ad Litem, on behalf of
A. D., R. B., E. B., and M.
B., minor children,

        Plaintiffs,

vs.                                   No. 21-cv-00368 KG/JHR

PATRICIA GARZA, in her individual
and official capacity; REBECCA LIGGETT,
in her individual and official capacity; BRENDA
SALDANA, in her individual and official
capacity; NEW MEXICO CHILDREN YOUTH
& FAMILIES DEPARTMENT; and DOES 1-50,

        Defendants.

**<u>PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS</u>**

      Plaintiff, ALISON ENDICOTT-QUIÑONES, Guardian ad Litem, on behalf of A. D., R.

B., E. B., and M. B., minor children by and through their attorneys of record hereby respond to the

Defendants' motion to dismiss. Plaintiffs allege in the complaint that Defendants removed their

children from their parents due to profound neglect. Plaintiffs allege that the children were taken

into foster care by CYFD and that the children remained foster children under the laws of New

Mexico from June 3, 2019 to the present day. Importantly, the children never exited foster care.

Defendants Garza, Saldana and Liggett each violated the Plaintiff children's substantive due

process rights by knowingly placing them in a position of danger and increasing each

child's vulnerability to danger. *T.D. v. Patton*, 868 F.3d 1209, 1212 (10th Cir. 2017).

    Each Defendant knew that the children would not be safe in a trial home visit due to specific

facts known to each of the individual Defendants, yet the individual Defendants pursued the trial

home visit which would have the Plaintiff children live with their parents for up to six months

1

while receiving services from CYFD. Each Defendant engaged in affirmative acts to bring the placement about and each Defendant engaged in affirmative acts to conceal relevant information as to the danger the children would face during the trial home visit from the court in the abuse and neglect case. It is alleged that Defendant Garza prioritized ending the abuse and neglect case and ending CYFD's involvement with the children above the children's safety and wellbeing. Additional allegations are made against Defendants Saldana and Garza that they obstructed police efforts to aid and locate the children after they were kidnapped by their parents.  Tenth Circuit case law clearly establishes that the individual Defendants each violated the Plaintiff children's constitutional rights.

*Currier v. Doran* and *T.D. v. Patton*, discussed below, clearly establish that social workers violate a child's substantive due process rights when they either 1) knowingly place a child in a position of danger or 2) knowingly increasing a child's vulnerability to danger:

> Viewing the facts in the light most favorable to T.D., we conclude that, under Currier, Ms. Patton violated T.D.'s clearly established substantive due process constitutional right to be free of a state official's creation of danger from a private actor.

> We agree with the district court that Ms. Patton violated T.D.'s substantive due process right by knowingly placing T.D. in a position of danger and knowingly increasing T.D.'s vulnerability to danger.3 She recommended to the juvenile court that T.D. be placed and remain in Mr. Duerson's temporary custody despite her admitted concerns about T.D.'s safety in the home, her knowledge of Mr. Duerson's criminal history that included a conviction for attempted sexual assault against a minor in his care, and notice of evidence that Mr. Duerson was potentially abusing T.D. She failed to inform the juvenile court about her concerns and knowledge of Mr.  Duerson's criminal history and made her affirmative recommendations out of fear of being fired.

> She also failed to investigate whether Mr. Duerson was abusing T.D. despite her awareness of evidence of potential abuse. This evidence included T.D.'s report that Mr. Duerson had hit him with a wooden mop handle and school officials' reports that T.D. was spending significant time in the nurse's office complaining of body aches and appearing fearful of his father. In the face of this information, she recommended to the juvenile court that T.D. remain with his father. Ms. Patton

acted recklessly and in conscious disregard of a known and substantial risk that T.D. would suffer serious, immediate, and proximate harm in his father's home. Her conduct, taken as a whole, shocks the conscience and thus amounts to a substantive due process violation under the Fourteenth Amendment.

Based on the facts and legal determination in this court's Currier decision, a reasonable official in Ms. Patton's shoes would have understood she was violating T.D.'s constitutional rights. In both Currier and here, county social workers removed children from their mothers' homes and placed them in their fathers' homes, where the children were abused. The social workers in both cases failed to alert the juvenile court of relevant facts undermining the fathers' fitness as caretakers and recommended that the fathers assume custody of the children—despite being on notice that the fathers' homes were places of danger. And, in both cases, the social workers failed to investigate whether the fathers were abusing their children, despite being on notice of evidence suggesting abuse. Ms. Patton's conduct sufficiently resembles the conduct we held unconstitutional in Currier such that a reasonable official in her position would have known that her actions violated T.D.'s clearly established right. She was therefore not entitled to qualified immunity.

*Patton*, 868 F.3d at 1212–13 (10th Cir. 2017).  At this stage the facts pled in the complaint must be taken as true and those facts merit denial of this motion, under the Currier and Patton line of cases.

I.      Facts

A.  Facts Relevant to the Decision to Place the Children in a Trial Home Visit

At the time the Plaintiff children were taken into custody CYFD social workers had previously observed the children being neglected, multiple reports of child neglect were made, and the police observed that the children were being neglected. FAC at ¶¶ 17-31. The children were observed by multiple people to be living in a van, without car seats for all of the children, and without appropriate food and clothing. *Id*. Following the children being taken into CYFD custody it was learned that they had serious medical problems including severe tooth decay for which the children had not received dental treatment. *Id*.  at ¶¶ 44-49. E.B. was discovered to have tuberculosis which was previously discovered and treated by physicians in Texas. *Id*.  at ¶¶ 60, 68. The medical professionals in Texas had warned the children's biological parents that a lapse in

treatment or stopping E.B.'s tuberculosis treatment could result in her death. *Id.* at ¶ 68. Despite this warning the biological parents did not continue E.B.'s tuberculosis treatment. *Id.* at ¶ 67. Prolonged hospitalization was required to save E.B.'s life due to her parents' medical neglect. *Id.* A CYFD employee involved with this case, Ivy Woodward, observed that the biological parents did not comply with the portion of their treatment plan to attend medical appointments for their children. *Id.* at ¶ 101. Woodward had observed and voiced to Garza and Saldana that the parents had failed to comply with their treatment plan in multiple respects and also voiced that the father was incapable of caring for the children. *Id.* at ¶¶ 92-103.

One of the children, A.B., made disclosures during play therapy that indicated to the child's therapist that A.B. had witnessed domestic violence while living with her father and mother, that she may have been abused, and that she may have been subjected to inappropriate sexual behavior at her father's direction. *Id.* at ¶¶ 113 – 117. A.B. specifically arranged a family living room in her play therapy area and had a doll that represented her father enter the room, hit and kick everyone until they hid, and then acted out the doll representing her father kill the family dog. *Id* at. ¶¶ 116-117. The therapist compiled this information into a report and submitted it to CYFD. *Id.* at ¶ 118. Garza disregarded the report by claiming that A.B. was "reenacting things she had seen on the news[.]" *Id.* at ¶ 119. Garza then removed the therapist from the case and had a new therapist assigned. *Id.*

During supervised visits at CYFD offices on at least three occasions the biological father of the plaintiff children offered cash bribes to CYFD employees to look the other way to facilitate him kidnapping the children from the CYFD office. *Id.* at ¶¶ 123, 125 - 126. When a CYFD employee reported one of the attempted bribes, Defendant Garza laughed and asked how much the father had offered. *Id.* at ¶ 124. The father and mother did actually attempt to kidnap their children

from CYFD's office building during a supervised visit. *Id*. at ¶ 122. Garza knew of this incident and gave a directive that no charges would be pressed against the parents by CYFD and that the supervised visits would continue without interruption. *Id*.

Defendant Garza made it clear on multiple occasions that she wanted the Plaintiff children to be reunited with their parents because it would be less burdensome than CYFD actually doing their job to keep the children safe. Defendant Garza said in Woodward's presence, "If we don't send these kids home, it will be another Everheart case[.]" *Id*. at ¶ 129. The Everheart case was a CYFD abuse and neglect case that took over a decade to close. *Id*. In response to Woodward's statements that the parents were not complying with their treatment plan and that supervised visits were not going well Defendant Garza proposed and Saldana agreed that the father's visits with the children occur with the father outside of CYFD's office so Woodward would lack the ability to observe the visits. *Id*. at ¶¶ 130 – 133. Garza opined that she hoped that the children would be kidnapped by the parents so "we won't have to deal with them[.]" *Id*. at ¶ 134.

Finally, Defendants Garza and Liggett worked in tandem to obstruct the guardian ad litem ("GAL") from calling Ivy Woodward at a hearing to suspend visits with the parents in the abuse and neglect case. *Id*. at ¶¶ 103 – 106, 129 – 148. Woodward had reported the above information to the GAL and intended to testify at the hearing regarding the profound and repeated failures of the parents to comply with the treatment plan. *Id*. at ¶ 129-148. This included suspicion that father had previously abused the children and that father had abused mother in front of children, inappropriate sexual behavior among the children which occurred at father's behest, her observation that father had on at least one occasion looked like he was about to throw M.B. due to being enraged by his children's chaotic behavior during a supervised visit, the multiple attempts of bribery by father to regain his children, and the previous kidnapping attempt by father, and

Garza's stated desire that the children be kidnapped from CYFD custody by their parents. *Id*. at ¶ 114 – 117, 127, 128, 141. Woodward recommended that the father not be allowed a trial home visit due to the aforementioned risks to the children that were known to Woodward, Garza, Saldana and all other CYFD employees who had knowledge of this case. *Id*. at ¶ 130. Garza attempted to persuade Woodward to not testify truthfully because Garza felt it would endanger her plan. *Id*. at ¶¶ 134 – 150.

When Garza was not successful in persuading Woodward to withhold information from the court she informed Woodward that she would be receiving a call from Defendant Liggett. Liggett told Woodward that her testimony would make it look like CYFD was misleading the court about the father's readiness for a trial home visit. *Id*. at ¶ 142. When Woodward refused to go along with Liggett's requests to alter her testimony Liggett stated that there would be "no limits" to what she would to do to keep her from testifying. *Id*. at ¶ 143. They were ultimately successful in keeping Woodward from testifying. None of Woodward's testimony was presented to the court. *Id*. at ¶ 147-148. Shortly after the trial home visit started, Megan Gallegos, an employee with Court Appointed Special Advocates ("CASA"), observed Ducila encouraging Plaintiffs to engage in inappropriate sexual activity. Id. at ¶ 151. These observations were reported to CYFD employees including Garza. *Id*. Garza and Saldana did not terminate the trial home visit after receiving this report. *Id*.

B.  Facts and Clearly Established Law Relevant to Garza and Saldana Cutting Plaintiff
Children off from Aid Following the Parental Kidnapping

*Matthews v. Bergdorf*, 889 F.3d 1136 (10th Cir. 2018) explains that when a social worker affirmatively acts to cut off a child from private or public aid they enhance the child's susceptibility to private violence and violate clearly established law. *Id*. at 1152. The Tenth Circuit explained that there was no meaningful difference between the affirmative act of warning an individual to

stop reporting evidence of abuse and the affirmative act of warning an individual so the individual might cover up evidence of abuse because "[b]oth acts effectively impede access to protective services, and perhaps additional sources of assistance, otherwise available to the victims." *Id.* The *Matthews* court stated that social workers could violate a child's children's 14th Amendment rights by engaging in affirmative acts to cut children off from aid after *Currier v. Doran* was decided in 2001. To show the law was clearly established, "the plaintiff does not have to show the specific action at issue had been held unlawful;" rather the alleged unlawful "conduct must have been apparent in light of preexisting law." *Armijo ex rel. Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1260 (10th Cir. 1998). In the instant case, like *Currier* and *Matthews*, the individual Defendants engaged in affirmative acts which enhanced the danger each of the Plaintiff children faced. Those facts are discussed at length below.

During the trial home visit Saldana personally cared for the children to meet their basic needs because their father was incapable of caring for the children himself. FAC at ¶ 153. The parents kidnapped the children from the trial home visit by the parents sometime in April of 2020 *Id.* at ¶ 161. Saldana was aware of this but waited until May 3, 2020 to inform Hobbs Police that the children could not be found. *Id.* Garza and Saldana refused to tell the Hobbs Police Department that CYFD's rights were being interfered with and claimed that the Plaintiff children were not in danger. *Id.* Consequently Hobbs PD did not immediately issue criminal charges or warrants for the parents and no amber alert was issued. This effectively cut the children off from both public and private aid and made them more susceptible to the danger their parents posed to them. *Id.* at ¶ 164. Hobbs Police were in contact with CYFD on a daily basis seeking permission to proceed with a custodial interference investigation – CYFD through statements made to the police by Garza and

Saldana repeatedly refused to allow an investigation to go forward as they continually claimed that CYFD's custodial rights had not been interfered with. *Id*. at ¶ 165.

Given the parents' neglect of the children before going into custody and the fact that they did not complete their treatment plans the parents engaging in the same type of neglect that initially brought the children into custody was foreseeable. *Id*. at ¶¶ 92 - 106. Given the disturbing disclosures made by A.B. in play therapy Saldana and Garza knew that the children were at risk of suffering violence at the hands of the biological father. *Id*. at ¶ 117. Despite these foreseeable risks CYFD refused to investigate the disappearance of the family, claimed that the children "were not in danger" and stonewalled a custodial interference investigation which would have resulted in warrants for arrest of the parents being issued. *Id*. at ¶¶ 161 – 168.

CYFD's custodial rights were clearly interfered with by the parents kidnapping the children and the parents not communicating with CYFD. *Id*. at ¶¶ 166. Furthermore, CYFD is obligated to remove the children from the home of the parent, guardian or custodian who is engaged with CYFD in a trial home visit if the trial home visit is unsuccessful. N.M. Admin. Code 8.10.8.13(E)(a) ("If the trial home visit is unsuccessful, then the child shall be removed"). The parents kidnapping the children made it impossible for CYFD to provide services to the children and family to address risk factors and ensure the safety of the child. CYFD is required to provide services to address risk factors and ensure the safety of children during a trial home visit. N.M. Admin. Code 8.10.7.7(KK). CYFD could also not discharge its "right and duty to protect, train and discipline the child and to provide the child with food, shelter, personal care, education and ordinary and emergency medical care." N.M. Admin. Code 8.10.7.7(X)(2). CYFD unequivocally was obligated to protect the children by virtue of having removed the children from the parents' legal and physical custody due to the profound neglect that was observed by CYFD employees

and police. CYFD was not relieved of these obligations during the trial home visit as the regulation on trial home visits plainly states CYFD is to ensure the safety of the children.

Garza and Saldana had sufficient information to know that the Plaintiff children of school age would not be educated, that the children and their parents would in all likelihood return to their transient existence of living out of a vehicle, that the children would lack adequate access to food, shelter and personal care, and that the parents would continue to medically neglect their children. FAC at ¶¶ 154 - 156. Garza and Saldana had actual knowledge that if E.B. did not continue in her tuberculosis treatments that she could die or suffer grievous setbacks in her health. *Id*. at ¶¶ 65-70. Given the disturbing disclosures made by A.B. in play therapy Saldana and Garza knew that the entire family was at risk of suffering violence at the hands of the biological father. *Id*. at ¶ 117. The danger to the children was apparent – yet Saldana and Garza actively interfered with and obstructed the police's attempts to locate and render aid to the Plaintiff children. *Id*. at ¶¶ 161-162. Had an Amber Alert been issued the general public and other law enforcement agencies would have received information on the biological parents' description, the description of the children, and a description of the vehicle that CYFD had last observed the family using. Had Garza and Saldana followed CYFD's own policy to immediately end the trial home visit the M.B. may have been spared her life altering brain injury.

In addition to Garza and Saldana refusing to state that CYFD's custodial rights were being interfered with, Garza and Saldana did not produce responsive documents to a search warrant executed by the Hobbs Police department. *Id*. at ¶ 163. Woodward actually knew that several documents existed which may help locate the children which contained information about the parents and their known associates and relatives, among the documents she identified to the Hobbs Police detective were her personal notes on the case. *Id*. Following Woodward's refusal to follow

9

Garza's and Liggett's instructions on how to testify and to omit information from her testimony Woodward was taken off of the case and encouraged to work from home. *Id*. at ¶ 148. She had left her notes in her office at CYFD's building in Hobbs, New Mexico.

## II.     Legal Standard for 12b6

"[M]otion[s] to dismiss for failure to state a claim [are] viewed with disfavor, and [should] rarely [be] granted." *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004). The dismissal of a complaint is a "harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Summum v. Callaghan*, 130 F.3d 906, 913 (10th Cir. 1997) (quotations omitted). A motion to dismiss should be granted only in extreme cases and used "as a weapon of last, rather than first, resort." *Meade v. Grubbs*, 841 F.2d 1512, 1520 (10th Cir.1988).

The purpose of a complaint is: (1) to give a defendant fair notice of the nature and basis of the claims against him so that the defendant is able to respond to the complaint; and (2) to allow the court to conclude that the plaintiff is legally entitled to the relief sought. *Robbins v. Okla.*, 519 F.3d 1242, 1247-48 (10th Cir. 2008); *Monument Builders of Greater Kansas City, Inc. v. Am. Cemetery Ass'n*, 891 F.2d 1473, 1480 (10th Cir. 1989). A complaint setting forth a claim for relief is sufficient when it contains "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). This requires the complaint to contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 544 (2007); *Robbins*, 519 F.3d at 1247.

A court may not dismiss a complaint on the grounds that a plaintiff's ability to prove her allegations is unlikely or improbable or that a plaintiff's likelihood of recovery is remote. *Twombly*, 550 U.S. at 555; *Robbins*, 519 F.3d at 1247. The complaint is to be liberally construed

with all well-pleaded factual allegations assumed to be true and all reasonable inferences that can be drawn from the pleading being drawn in favor of the plaintiff. *Twombly*, 550 U.S. at 555; *Robbins*, 519 F.3d at 1247. Moreover, "the degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context: 'Context matters in notice pleading.'" *Robbins*, 519 F.3d at 1248. In other words, "the 12(b)(6) standard does not require that [p]laintiff establish a prima facie case in [his] complaint, [but] the elements of each alleged cause of action help to determine whether [p]laintiff has set forth a plausible claim." *Ehireman v. Glanz*, 2014 WL 5431202, *4 (N.D.Okla. 2014)(*citing Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir.2012)). The issue on a 12(b)(6) motion "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* (*citing Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002)).

The affirmative defense of qualified immunity is best assessed at the summary judgment stage, though courts in the Tenth circuit will still hear qualified immunity challenges as part of a motion to dismiss. *Peterson v. Jensen*, 371 F.3d 1199, 1201–02 (10th Cir. 2004). In reviewing a Rule 12(b)(6) motion in the context of qualified immunity, a district court should not dismiss a complaint "for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* citing *Currier v. Doran,* 242 F.3d 905, 917 (10th Cir.2001) (internal quotations omitted).

In the event that the Court determines there are deficiencies in Plaintiffs' Complaint, Plaintiffs respectfully request the Court grant leave to amend the Complaint to correct any such deficiencies. The grant of leave to amend pleadings is within the discretion of the trial court. *See Ketchup v. Cruz*, 961 F.2d 916, 920 (10th Cir. 1992). However, "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Further, the Court should grant leave to amend "if it is

at all possible that the party against whom the dismissal is directed can correct the defect in the pleading or state a claim for relief." *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1131 (10th Cir. 1994) (*quoting* 6 C. Wright & A. Miller, Federal Practice & Procedure § 1483, at 587 (2d ed. 1990) (internal quotations omitted); *United States v. McGee*, 993 F.2d 184, 187 (9th Cir. 1993). Refusing leave to amend is generally justified only upon a showing of "undue delay, bad faith or dilatory motive, . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). None of these issues are present in this matter. Granting Plaintiffs leave to amend the Complaint would provide an opportunity to add more factual allegations in support of their claims should the Court deem such additional allegations necessary and proper.

III.    Special Relationship

"Due-process claims built on the special-relationship doctrine have four elements. First, the plaintiff must demonstrate the existence of a special relationship, meaning that the plaintiff completely depended on the state to satisfy basic human needs. *DeAnzona v. City & Cty. of Denver*, 222 F.3d 1229, 1234 (10th Cir. 2000). Second, the plaintiff must show that the defendant knew that the plaintiff was in danger or failed to exercise professional judgment regarding that danger. *Schwartz*, 702 F.3d at 583. Third, the plaintiff must show that the defendant's conduct caused the plaintiff's injuries. *Id.* And finally, fourth, the defendant's actions must shock the conscience. *Id.*" *Dahn v. Amedei*, 867 F.3d 1178, 1185–86 (10th Cir. 2017). The Plaintiff children have pled sufficient facts as listed in their FAC and the Facts Section of this response to satisfy each and every element of the Special Relationship Doctrine.

A.  A Special Relationship Existed Between the Plaintiff Children and CYFD

1.  Legal Custody with The Specific Facts of this Case Creates a Special

Relationship

The Defendants argue at length that the Plaintiff children "were not in the *physical* custody of CYFD" and that this purported fact asserted by the Defendants defeats any special relationship claim. Def. Mot. at 2. The Defendants also use the term "legal custody" throughout their brief. However, Defendants do not actually define "physical custody" or "legal custody," and do not cite to any legal authority definitively establishing the contours of either term, or otherwise develop this argument aside from arguing that the parents had sufficient control of the children during the trial home visit to effect what is described *in arguendo* as a *de facto* transfer of custody from CYFD to the parents. *Id*. at 11.

Defendant cites extensively to *Hernandez v. Rapp*, an unpublished district court case that has never been cited by any other court to support their special relationship argument. The Defendants represent that this unpublished case creates a *per se* bar to liability on a special relationship claim because while the children were in the legal custody of CYFD they were in the physical custody of their parents. *Id*. The court in *Hernandez* does not say that it is dispositive that the children were placed with a biological parent in their special relationship analysis. The court did consider this fact in making their ruling noting that there was a biological relationship and legal rights between the child and parent that preceded any intervention by the state – but in no way shape or form does the court say or imply that placing a child with a biological parent is an absolute bar to liability. In fact, the court in *Hernandez* actually found that there was claim stated for state created danger despite the fact that the children were placed with the same parent who had previously abused them.  No. CV 00-1456 MCA/WDS, 2003 WL 27385396, at *7 (D.N.M. Mar. 31, 2003) (where child was removed from both parents and placed in the custody of a single parent).

13

The facts in *Hernandez* do not appear to be sufficiently described in that opinion to provide a detailed comparison to this case. It is stated that physical custody of the children was transferred to the father while CYFD retained legal custody, and despite ongoing reports of abuse and neglect of the children based on a report by a CYFD social worker both physical and legal custody were transferred to father from CYFD. *Id*. We do not know in *Hernandez* if the abuse that the Plaintiffs complained of in that case occurred during a trial home visit and there are no facts stated in Hernandez as to what CYFD employees were doing with regard to providing services to the family, what their interactions were with the plaintiff children, and what degree of control, if any, CYFD employees could exert over the children's day to day activities and what CYFD was doing, if anything, to make sure the basic needs of the children were being met.

The ruling in *Hernandez* does not create a bright line rule that legal custody without physical custody is always insufficient to create a special relationship – the trial court specifically said that "Legal custody **without day-to-day physical control of a child's ability to satisfy his or her basic needs**" was not sufficient to create a special relationship. *Hernandez,* 2003 WL 27385396 at *10 (emphasis added). The Defendants cannot rely on an unpublished district court opinion when this issue is also squarely addressed by *Booker* and *Goodwin*.

The defendants in *Booker* argued that they should not be held liable under the special relationship doctrine because the government did not have "custody" of the child.  This is effectively the same argument made by the Defendants in the instant case. *See* Def. Mot at 2 (claiming that the children "were not in the physical custody of CYFD."); *and*  Def. Mot. at 11 ("Defendants could not exercise any restraint over Plaintiffs and, therefore, there can be no special relationship"). The Tenth Circuit in *Booker* described this argument as "unpersuasive" and rejected it because:

> Here, Chandler was removed from his biological mother's custody and placed in the legal and physical custody of JCDHS which in turn placed Chandler in a foster home" and "As a foster child, Chandler relied upon the State and its county departments, via its placement of him in a foster home, for his basic human needs.

Schwartz v. Booker, 702 F.3d 573, 584 (10th Cir. 2012).

In the instant case the Plaintiff children were all foster children when they are placed on the trial home visit, and retained that status throughout the visit. The state never relinquished custody of the children and the custody status of the children did not change when placed on the trial home visit. The state maintained custody and merely delegated the responsibilities of caring for the children to a different custodian who happened to be the children's biological parent.

    2.  New Mexico State Law Creates a Special Relationship As Applied to Plaintiff Children

Furthermore, the instant case is squarely distinguished from *Hernandez* because the plaintiff children were in foster care. In *Hernandez* the court describes the children in that case as *not* being in foster care.  2003 WL 27385396, at *10. CYFD's own regulations establish that the children were foster children: See N.M. Admin. Code 8.10.8.7(K):

> "**Foster child**" or "**child in foster care**" as **referred to as "child" herein, means a child who is placed in the care and custody of children, youth and families department protective services division either under the legal authorization of the Children's Code** or through a voluntary placement agreement signed by the parent or legal guardian, or a child who is placed with a licensed child placement agency under the authority of the Child Placement Agency Licensing Act. **If the court orders legal custody to a relative**, person, facility, or agency other than the children, youth and families department protective services division, the child is not a foster child of protective services division.

N.M. Admin. Code 8.10.8.7(K) (emphasis added). The definition plainly establishes the children are foster children as only a transfer of "legal custody" takes the children out of foster care status. *Id*.

The children do not stop being foster children due to a change in what CYFD has described as "physical custody". The trial home visit regulation likewise does not terminate a child's foster child status – the regulation makes no mention whatsoever of legal custody. N.M. Admin. Code 8.10.8(HH). The words legal and physical custody are not even used in this regulation, which merely defines a "trial home visit" as "the period of time, not to exceed six months, in which a child with a plan of reunification resides with their parent or guardian while services are provided to the child and family to address risk factors and ensure safety of the child." *Id*.

In New Mexico "Legal Custody" as defined in the CYFD regulations means

> [A] legal status created by order of the children's court or other court of competent jurisdiction or by operation of the New Mexico Children's Code, Section 32A-4-1 et seq or 32A-3B-1 et seq, NMSA 1978, that vests in a person, department or agency the: (1) right to determine where and with whom a child shall live and (2) right and duty to protect, train and discipline the child and to provide the child with food, shelter, personal care, education and ordinary and emergency medical care[.]

N.M. Admin. Code 8.10.7.7(X)

Moreover, the New Mexico Court of Appeals has explained:

> In the present case, the Department could not establish that Father was unfit or that he neglected Child**. According to Mother,** *In re Mary L.* **is distinguishable because in that case, the department had physical custody of the children, while in the instant case, Child was living with Mother as a part of a reunification plan implemented by the Department. We find this distinction to be without merit.** Mother does not dispute that Child remained in the Department's legal custody. **Despite the trial home visit, there was no guarantee that Child would remain in Mother's care or that Mother would ultimately receive custody of Child at the conclusion of the proceedings.**

*State of N.M. ex rel. CYFD v. Lisa A.,* 2008-NMCA-087, ¶ 9, 144 N.M. 324, 327, 187 P.3d 189, 192 (emphasis added). The New Mexico Court of Appeals has plainly stated in *Lisa A*. that the individual Defendant's argument regarding physical custody and trial home visits is an argument without merit.

The reasoning of the New Mexico Court of Appeals in *Lisa A.* tracks the logic of the only treatise published in New Mexico on abuse and neglect cases:

> The term "legal custody" is defined in the Children's Code. It should be read in harmony with the definitions of "guardian" and "parent." Whoever has legal custody of a child is empowered to make decisions regarding, among other things, where and with whom the child shall live, that is, the physical placement of that child. If legal custody is given to CYFD, placement is in the discretion of CYFD and not the court; CYFD's placement decisions are reviewable by the courts under the abuse of discretion standard. The term "physical custody" can confuse the two concepts and is no longer used.

New Mexico Child Welfare Handbook: A Legal Manual on Child Abuse and Neglect Section 3.5 Legal Custody and Placement. http://www.scacnm.org/wp-content/uploads/2020/09/2018-child-welfare-handbook.pdf page 56.[1]

3.   The Individual Defendants Mischaracterize the Law on Requisite Restraint – The Plaintiff Children are Foster Children and Have the Right to be Free from Harm

Defendants claim the dispositive factor on the special relationship claim "is the physical control and restraint exercised by CYFD". Def. Mot. 15. The defense also attempts to create an issue as to *when* harm was caused during the pendency of the abuse and neglect case. They state that "one of the children" was harmed in North Carolina and that "[b]ecause the complaint alleges that Defendants had no control over the location of the Plaintiffs after April 2020, Defendants could not exercise any restraint over Plaintiffs and, therefore, there can be no special relationship. *Id*. at 11. Defendants also claim that there is "no legally sustainable argument that [the children] were not in the physical control and custody of their parents once placed on the trial home visit"

---

[1] The publishers of the Handbook state that is intended to serve as a current, convenient secondary source of law, policy and practice for child abuse and neglect cases. The publishers do caution against relying on the Handbook for legal authority and suggests that readers consult primary sources of law. https://childlaw.unm.edu/resources/publications/index.html

and that "Plaintiffs' allegation is a futile attempt to avoid the implications between physical and

legal custody." Def. Mot. 12. The Defendants do not actually offer a definition of physical custody

and they cite to no case law, no statutes in New Mexico's children's code and no CYFD regulation

to explain what these "implications between physical and legal custody" actually are. Plaintiffs

have discussed CYFD regulations and New Mexico case law on this subject at length – the children

are clearly foster children and have the clearly established right to be reasonably safe. *Booker.*

In the *Youngers* case the government defendants made the same argument regarding a lack

of actual physical control being a stumbling block to a special relationship claim:

> The Individual DOH Defendants assert that, in *Briggs,* Judge Miles–Lagrange
> stated that "legal custody without physical custody is insufficient to create
> a special relationship." Tr. at 49:19–20 (Constanteras) (citing *Briggs,* 472
> F.Supp.2d at 1301–02). Quoting this line from *Briggs,* the Individual DOH
> Defendants advance a two-part argument: (i) once A.M. was transferred to the
> Homestead House, they no longer had physical custody over her; and (ii) because
> they   no   longer   had   physical   custody   over   A.M.,   there   was
> no special relationship between them and A.M. that triggered substantive due-
> process obligations. Although the Individual DOH Defendants accurately quote
> Judge   Miles–Lagrange's special-relationship test,   they   misapply   it…Notably,
> Judge Miles–Lagrange did not define "physical custody." **By noting that foster
> children are in the state's legal and physical custody, however, Judge Miles–
> Lagrange indicated that physical custody neither turns on physical presence
> nor day-to-day control.**

*A.M. ex rel. Youngers v. New Mexico Dep't of Health*, 65 F. Supp. 3d 1206, 1258 - 1259 (D.N.M.
2014)

Tenth circuit opinions on special relationship cases decided since *Hernandez* have not

described the special relationship to be limited to foster children being free from harm from foster

parents – it is a right of *foster children to be free from harm*. "[C]ase law has clearly established

that foster children have a Fourteenth Amendment constitutional right to be reasonably safe while

in the State's custody. *Schwartz v. Booker*, 702 F.3d 573, 587–88 (10th Cir. 2012) (internal

citations omitted); *see also Dahn v. Amedei*, 867 F.3d 1178, 1186 (10th Cir. 2017) ("As our case law makes clear, the special relationship exists between the State and foster child…")

In *Schwartz v. Booke*r the child was removed from mother's custody and placed with a foster dad with no biological relation to him. He was abused, this was investigated and the child was temporarily removed from the foster home. The child was then returned *to the same foster parent* and was killed. In *Booker* the 10th circuit denied qualified immunity even though the child in that case was returned to his abuser by government actors. *Booker* highlights the key distinguishing fact between *Deshaney* and the instant case – affirmative action undertaken by the government to bring a child into care on a more than temporary basis. *Id*.

    4. *Schawrtz v. Booker* clearly establishes the Defendants committed a constitutional violation

The Defendants argue that "placing the Children back with their parents" cannot amount to a violation of clearly established law for a special relationship claim. Def. Mot. at 21. The Defense cites to *zero* cases from the Tenth Circuit to support this sweeping proposition of immunity from liability. They do cite to several district court cases and an 11th Circuit case from 1995 – the holdings asserted are all derivative from language in *Deshaney.*

In *Deshaney* Joshua was temporarily removed from his father's home, protective services workers determined there was insufficient evidence to initiate an abuse and neglect case and returned Joshua to his father. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 192, 109 S. Ct. 998, 1001, 103 L. Ed. 2d 249 (1989). While Joshua was in the sole legal and physical custody of his father in "the free world" the defendant social workers either knew or should have known that Joshua was being abused. *Id*. They did not act to take Joshua into state custody or

otherwise act to protect Joshua before he was beaten severely by his father. In *Deshaney* there was no liability for state action because the state had only taken temporary custody of Joshua for three days in January of 1982 and from the point in time when the temporary custody ended he was not in the involuntary legal or physical custody of the state.  He remained in this "free world," free of any state custody, until November of 1983 when his father beat him nearly to death. *Id*. This pattern of facts is why the Court stated that a special relationship claim did not apply. *Id*. The Plaintiffs in *Deshaney* notably did not even contend that Joshua was in the State's custody when he was harmed. *Id*. The Court also stated that under that set of facts the State had not created any danger to Joshua or rendered him any more vulnerable to them – it was this language that was the genesis of the State Created Danger Doctrine which is discussed in a separate portion of this response. *Id*.

In *Booker* there are two meaningful differences from *Deshaney*: 1) the state had legal custody of the child by virtue of its affirmative act of removing the child from his parent; and 2) 2) the government actually engaged in affirmative acts by removing the child from "the free world" and placing the child with a person of their choosing. *Booker*, 702 F.3d 573. In *Booker* subsequent to the child's placement in foster care there were allegations that the foster parent had abused the child. *Id*. The child was temporarily removed and returned to the same foster parent. *Id*. The foster parent then killed the child. *Id*. The child, like in *Deshaney*, was temporarily removed from the person who committed violence against the child. *Id*. Unlike *Deshaney*, the state had custody of the child when the child was harmed.

The Defendants in *Booker* were able to determine where and with whom the child could live by virtue of their custodial rights over the child. *Id*. The individual defendants exercised their custodial rights to place the child with a foster parent that they had reason to believe would pose a danger to the child. *Id.* In the instant case CYFD also had the right to determine where and with

whom the Plaintiff children could live. N.M. Admin. Code 8.10.7.7(X)(2). The Plaintiff children's parents necessarily were not able to determine where and with whom they lived. *Id*. CYFD's custodial rights were initially exercised to place the Plaintiff children with foster homes to meet their day-to-day needs; CYFD then exercised its custodial rights again to place the children with their biological father on a trial home visit. The CYFD regulations on foster children, legal custody, and trial home visits compels this factual conclusion.

In *Deshaney*, because the government had not taken Joshua into the custody of the state the government actors in *Deshaney* could not control where and with whom Joshua would live – any ability they had to control Joshua's living arrangements ended when the State's temporary custody of Joshua ended when the abuse and neglect case was dismissed by the government for insufficient evidence. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 192, 109 S. Ct. 998, 1001, 103 L. Ed. 2d 249 (1989)("**[Defendants determined] that there was insufficient evidence of child abuse to retain Joshua in the custody of the court**…**Based on the recommendation of the Child Protection Team, the juvenile court dismissed the child protection case** and returned Joshua to the custody of his father.") That is the key difference, and that is why liability existed in *Booker* but did not exist in *Deshaney* despite the child in each case being "placed" with an abuser whom government actors had reason to suspect of posing a danger to the child in each case.

It is actually a misnomer to say that the government actors in *Deshaney* "placed" or "returned" Joshua with his father following suspicions that the father had abused Joshua. The government defendants in *Deshaney* had no legal authority *to do anything* to affect Joshua's living arrangements following the end of their three day temporary custody hold – they did not affirmatively act to "place" Joshua with his father; the situation merely reset to the status quo ante

because of the government defendant's omissions and inaction. In *Booker* the government maintained legal custody over the child at all material times and they exercised that custodial right to engage in the affirmative act of placing the child with the same foster parent suspected of abusing the child. In *Booker* the individual defendants could have placed the child with anyone of their choosing, they chose to return the child to the abusive foster parent. *Id*. This is in sharp contrast to *Deshaney* where the government truly had no say whatsoever in what would happen to or become of Joshua after the end of the three-day temporary custody hold. *Id*.

These affirmative actions in *Booker* were held to violate clearly established law. "Since 1985, case law in this circuit and the established weight of authority has clearly established that state officials could violate foster children's substantive due process rights if they knew of an asserted danger to a foster child or failed to exercise professional judgment with respect thereto… [I]t was apparent, in light of pre-existing law, to [Defendants] that failing to investigate the child abuse referrals and dismissing Chandler's case without investigation was an abdication of duty that would violate Chandler's substantive due process right to be reasonably safe from harm as a foster child. [Defendants] are not entitled to qualified immunity." *Schwartz v. Booker*, 702 F.3d 573, 588 (10th Cir. 2012).

During the trial home visit the parents kidnapped the children. FAC  at ¶¶ 97, 159. Given the parents' neglect of the children before going into custody and the fact that they did not complete their treatment plans, the parents engaging in the same type of neglect that initially brought the children into custody was foreseeable. *Id*. at ¶¶ 92 - 106. Given the disturbing disclosures made by A.B. in play therapy Saldana and Garza knew or should have known that the entire family was at risk of suffering violence at the hands of the biological father. FAC at ¶ 117. Despite these foreseeable risks CYFD refused to investigate the disappearance of the family, claimed that the

children "were not in danger" and stonewalled a custodial interference investigation which would have resulted in warrants for arrest of the parents being issued. FAC at ¶¶ 161 – 168.

These facts are strikingly similar to the fact pattern in *Booker* where Colorado's protective services analogue to CYFD knew of a dangerous situation with the child in that case, Chandler, did not investigate and left him to die. *Booker*, 702 F.3d 573, 588. In the instant case Garza and Saldana actually knew that the children had been kidnapped, they actually knew that neither they nor any other CYFD employee could continue to provide services to the children to make sure their essential needs are being met, and sufficient facts existed to put them on notice that the children were in fact in danger of suffering from abuse and neglect. The facts in the instant case are even worse for the Defendants than in *Booker* because the defendants in *Booker* at least did not also cut off Chandler from aid in addition to abdicating their professional responsibilities.

When a child remains in the legal custody of the state post-placement a "special relationship exists between the State and foster child, which triggers an accompanying, continuing duty imposed on state custodial officials thereafter." *Est. of Goodwin by & through Alvarado v. Connell*, 376 F. Supp. 3d 1133, 1156, footnote No. 14 (D. Colo. 2019), *appeal dismissed sub nom. Goodwin v. Connell*, No. 19-1180, 2019 WL 5884512 (10th Cir. Aug. 5, 2019) (citing *Schwartz v. Booker*, 702 F.3d 573, 581 (10th Cir. 2012). The Defendants' reliance on *Hernandez*, an unpublished district court case that has never been cited by another court, is clearly misplaced in light of the weight of published authority in this circuit.

At bottom the Defendants' motion to dismiss on the special relationship claim contends that the children were not actually in the state's custody as described in *Booker*. Plaintiffs have contended in their complaint that they were in State custody by virtue of being in CYFD's custody and CYFD exercising its rights and duties during the trial home visit to provide services to the

child and family to address risk factors and ensure safety of the child. N.M. Admin. Code 8.10.7.7(KK). CYFD and the individual defendants in this case utilized the right and duty described in CYFD's own definition of legal custody "to protect, train and discipline the child and to provide the child with food, shelter, personal care, education and ordinary and emergency medical care." N.M. Admin. Code 8.10.7.7(X). The individual defendants cannot prevail on a motion to dismiss by disputing the well-pled facts in the complaint. All allegations pled in the complaint must be taken as true on a motion to dismiss. *Twombly*. The plaintiff children have pled a special relationship claim. The law is also clearly established through *Booker* and *Dahn* that children in foster care should be reasonably safe while in the State's custody.

IV.    The conduct of each individual defendant is sufficient to shock the conscience of judges

When determining whether an individual defendant's conduct shocks the conscience of federal judges the conduct of each individual Defendant is viewed "in total". *Schwartz v. Booker*, 702 F.3d 573, 586–87 (10th Cir. 2012). On a motion to dismiss, even when qualified immunity is raised as an affirmative defense by an individual defendant, all allegations are taken as true, with all inferences construed in the plaintiff's favor, if the alleged facts, which include affirmative acts as well as an individual's omissions or failures to act, could be conscience shocking Plaintiff's have met their burden on a 12(b)(6) challenge. *See Currier v. Doran,* 242 F.3d 905, 920 (10th Cir.2001) (finding caseworker's failure to investigate bruises and continued allegations of abuse, as well as responsibility for court order granting custody to caretaker, could be conscience-shocking behavior sufficient to survive dismissal); *see also Armijo,* 159 F.3d at 1264 (finding that returning a suicidal special-education student to his home, where he had access to firearms, "could be construed as conscience-shocking" behavior sufficient to render summary judgment

inappropriate). In *Booker* the plaintiff's allegation that the social workers "ignored known or likely injuries and abuse to Chandler, chose not to further investigate such possible abuse, and ignored the danger posed by his continued residence in Jon Phillips's home" stated sufficient facts under *Currier* to allege facts when viewed in the totality met the conscience shocking element. *Schwartz v. Booker*, 702 F.3d 573, 587 (10th Cir. 2012). In this case as alleged in the FAC and the facts in this motion similar facts are alleged as in *Currier, Armijo, Patton* and *Booker* all of which held that plaintiffs had alleged adequate facts on the conscience shocking element.

## V.     State Created Danger Claim

"[S]tate officials can be liable for the acts of third parties where those officials 'created the danger' that caused the harm." *Seamons v. Snow*, 84 F.3d 1226, 1236 (10th Cir.1996) (*quoting Uhlrig,* 64 F.3d at 572). In *Uhlrig,* the Tenth Circuit created a five point test to evaluate whether the state created danger theory applies, Plaintiff must demonstrate that (1) [Plaintiff] was a member of a limited and specifically definable group; (2) Defendants' conduct put [Plaintiff] ... at substantial risk of serious, immediate and proximate harm; (3) the risk was obvious or known; (4) Defendants acted recklessly in conscious disregard of that risk; and (5) such conduct, when viewed in total, is conscience shocking64 F.3d at 574. *Armijo* added to this test by focusing the court's inquiry on whether the state took affirmative acts increasing possible danger: "a plaintiff must also show that the charged state entity and the charged individual defendant actors created the danger or **increased the plaintiff's vulnerability to the danger in some way**." 159 F.3d at 1262 (emphasis added).

> The key to the state-created danger cases . . . lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, **or cutting off potential sources of private aid**. Thus the **environment created by the state actors**

> **must be dangerous**; they must **know** it is dangerous; and, to be liable, they must have used their authority to create an opportunity that would not otherwise have existed for the third party's [acts] to occur.

*Id*. (*quoting Johnson v. Dallas Independent School Dist*., 38 F.3d 198, 201 (5th Cir. 1994)) (emphasis added). Thus, the key to whether a state actor's conduct meets the state created danger exception lies in whether the agent did something to prevent a victim of abuse from receiving aid or rescue. In *Briggs*, the Tenth Circuit confirmed that when DHS employees actively "imped[e] access to protective services or other sources of assistance," the state has created a danger in violation of a child's due process rights.

> [T]he act of instructing individuals to cease reporting abuse has the effect of impeding access to protective services or other sources of assistance otherwise promptly available to the victim at the time of the abuse. Thus, if true, Defendants' actions imposed an immediate threat of harm to [plaintiffs.] Accordingly, we conclude [plaintiffs have] sufficiently alleged that Defendants created or increased [plaintiffs] vulnerability to abuse by their alleged act of discouraging the reporting of additional incidents of abuse.

*Briggs*, 274 F. App'x at 736 (internal citations omitted).

The facts alleged in the Complaint fit the *Armijo* elements of a state created danger for all the Children. Starting with the original five part test from *Uhlrig*, (1) the Children are part of a specifically definable group, i.e. the children which are the subject of a single abuse and neglect case handled by the individual Defendants; (2) Employee Defendants' total abdication of their duty, including multiple affirmative acts, caused M.B. to suffer permanent brain damage and the loss of her sight and  caused  A.D., R.B. and E.B. to be neglected and suffer emotional trauma as they saw their baby sister be horrifically abused; (3) the risk to the Children was known to each of the individual Defendants; (4) the individual Defendants acted recklessly in conscious disregard of these risks by placing the children in a trial home visit with their biological parents when they

knew they were not ready for said trial home visit and substantial facts existed to put them on notice that the parents would kidnap the children, when the risk came to pass Saldana and Garza had actual knowledge that the parents had kidnapped the children and they affirmatively acted to cut the plaintiff children off from aid; and (5) Each individual Defendants' acts, when viewed in total including their actions and inaction, shocks the conscience. *Currier v. Doran,* 242 F.3d 905, 920 (10th Cir.2001) (stating that a social worker's failure to act could be conscience-shocking under a danger-creation theory).

Further, the affirmative acts of Defendants Garza, Saldana, and Liggett are the type of conduct described in *Armijo* as crucial to the state created danger test. F.3d at 1262. They knowingly placed the children into a dangerous situation – Garza actually expressed a desire that the children be kidnapped. In the instant case CYFD and the individual Defendants possessed the ability to exercise the state's custodial power over the Plaintiff children to place them in a trial home visit without court approval. *State ex rel. Child., Youth & Fams. Dep't v. Senaida C.*, 2008-NMCA-007, ¶ 11, 143 N.M. 335, 338, 176 P.3d 324, 327.

In *Patton* the Tenth  Circuit held the defendant social worker violated clearly established law placing the child into a dangerous situation by recommending a foster placement despite concerns she had for the child's safety and failing to inform the court about her concerns and her knowledge of the foster parent's criminal history. *Patton*. Unlike the fact pattern in *Deshaney* the government could control where and with whom the child could live and engaged in state action to actually control where the child lived. When the government exercises that power over a foster child they may not place them into a dangerous situation. *Currier v. Doran*, 242 F.3d 905, 921 (10th Cir. 2001). In this case sufficient facts have been pled for the court to find that the placement of the children in the trial home visit violates the clearly established law as described in *Currier*

and *Patton*.

Garza and Saldana withholding information they should have shared with the abuse and neglect court and affirmatively acting to create a counter narrative to Woodward's reports also violates clearly established law under *Patton* (finding liability for a social worker failing to provide a juvenile court with information relevant to safety of a placement and not sharing concern about that placement.) *T.D. v. Patton*, 868 F.3d 1209, 1212–13 (10th Cir. 2017). Likewise, Garza and Liggett's affirmative acts in preventing Woodward from testifying and providing relevant information to the court as well as her concerns regarding the trial home visit violates clearly established law as described in *Patton*. *Id*.  Barring Woodward's testimony also had the practical effect of cutting the children off from aid as the Children's court may have ruled that CYFD had engaged in an abuse of discretion in pursuing a trial home visit. *See Senaida C*.

When the children were in fact kidnapped Garza and Saldana took affirmative acts as described in Section I(B) of this brief to cut the children off from aid. Any reasonable social worker should have known that effectively aiding the biological parents in their kidnapping by giving them a head start to escape law enforcement violates the substantive due process rights of the children. *See Matthews v. Bergdorf*, 889 F.3d 1136, 1152 (10th Cir. 2018). These acts included withholding documents that would be helpful in locating the children from a search warrant executed at CYFD's Office by the Hobbs Police Department. FAC 163. Hobbs police wanted to act to aid the children but were stonewalled by Saldana and Garza's refusal to state to the Hobb's police department that CYFD's custodial rights were being interfered with. FAC 160 – 166. Garza and Saldana also refused to say the children were in danger despite the facts known to them which would put any reasonable person on notice that the children were in fact in danger.

## CONCLUSION

For the above stated reasons, Plaintiffs respectfully requests that the Court deny

Defendants' Motion to Dismiss in its entirety and grant all other relief deemed appropriate.

Respectfully submitted,

**GUBERNICK LAW P.L.L.C.**

/s/ Benjamin Gubernick
BENJAMIN
GUBERNICK
New Mexico Bar No.
145006
Ben@gubernicklaw.com
734-678-5169
10720 W. Indian School
Rd. Ste. 19 PMB 12
Phoenix, AZ 85037


--and--


*/s/ Todd J. Bullion*
Todd J. Bullion
Law Office of Todd J. Bullion
300 Central Ave SW, Suite
1000E Albuquerque, NM
87102
(505) 452-7674
todd@bullionlaw.com

---and---


*/s/ Robert Gorence*
Robert Gorence
Gorence &
Oliveros
300 Central Ave SW, Suite
1000E Albuquerque, NM
87102
(505) 244-0214
gorence@golaw.us

---and---

29

/s/ Jason Bowles
Jason Bowles
Bowles Law
Firm
P.O. Box 25186
Albuquerque, NM 87125-0186
(505) 217-2680
jason@bowles-lawfirm.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of October, 2021, I filed the foregoing

electronically through the CM/ECF system, which caused the following parties or counsel

to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

**Alfred A Park**
Park & Associates,
LLC 3840 Masthead
St., N.E. Albuquerque,
NM 87109
505-246-2805
Fax: 505-246-2806
Email: apark@parklawnm.com

**Lawrence M Marcus**
Park & Associates,
LLC 3840 Masthead
St. N.E. Albuquerque,
NM 87109
505-246-2805
Fax: 505-246-2806
Email: lmarcus@parklawnm.com

**James J Grubel**
Park & Associates, LLC
3804 Masthead Street
NE Albuquerque, NM
87109
505-246-2805

Fax: 505-246-2806
Email: jgrubel@parklawnm.com



*/s/ Todd J. Bullion*
Todd J. Bullion
Law Office of
Todd J. Bullion