IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ALISON ENDICOTT-QUIÑONES,
Guardian ad Litem, on behalf of
A. D., R. B., E. B., and M. B.,
minor children,

    Plaintiffs,

vs.                                                No: 1:21-cv-00368 KG/JHR

PATRICIA GARZA, in her individual
and official capacity; REBECCA LIGGETT,
in her individual and official capacity; BRENDA
SALDANA, in her individual and official capacity;
NEW MEXICO CHILDREN YOUTH &
FAMILIES DEPARTMENT; and DOES 1-50,

    Defendants.

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

COME NOW New Mexico Children, Youth and Families Department ("CYFD"), Patricia Garza, Rebecca Liggett, and Brenda Saldana (collectively "Defendants"), by and through their attorneys, Park & Associates, LLC (Alfred A. Park, Lawrence M. Marcus, and James J. Grubel), and for their Reply in Support of Motion to Dismiss state as follows:

There is no dispute that the circumstances of this matter are tragic, particularly for M.B. However, Plaintiffs' assertions that their constitutional rights were violated by Defendants are without merit. Plaintiffs' Response (Doc. 28) conflates case authority concerning placement of children in foster care and those cases, like exists here, where children were returned to the biological parents from whom they were originally removed. Defendants cannot be held to have violated Plaintiffs' constitutional rights as a matter of law based on the facts set forth in the First Amended Complaint (Doc. 21).

1

Plaintiffs' Response asserts that the children were placed into foster care and never left foster care. Id. at 1. However, that distinction is not relevant to whether Defendants had a constitutional duty to ensure the health and safety of the Plaintiffs. Rather, it is a futile attempt to escape the legally inevitable conclusion that Plaintiffs cannot prevail because they were harmed by their parents after the *status quo ante* had been restored. Plaintiffs' assertions are dependent on their misplaced reliance on case authority where children were harmed by foster parents or by parents who would not have been in a position to harm their children but for the actions of state officials. Here, the Plaintiffs were removed from their parents and then returned to their parents. Pursuant to DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 196 (1989) and additional authority from the Tenth Circuit, Plaintiffs' claims fail. None of the case law identified by Plaintiffs alters this conclusion.

    1. **The cases cited by Plaintiffs do not support their claims**.

The Due Process Clause of the Fourteenth Amendment provides, "No State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." DeShaney at 989. Accordingly, "[a]s a general matter, ... a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." Id. at 197, see also Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995) ("[S]tate actors are generally only liable under the Due Process Clause for their own acts and not for private violence."). Plaintiffs cite to multiple cases to support the contention that Defendants had a special relationship with Plaintiffs or created or enhanced the danger that harmed Plaintiffs. None of the cited cases support this position.

a. TD v. Patton and Currier v. Doran

Plaintiffs cite to TD v. Patton 868 F.3d 1209 (10th Cir 2017) for the proposition that social workers violate a child's due process rights when they knowingly place that child in danger or knowingly increase a child's vulnerability to danger. Doc. 28 at 2. However, Patton does not alter the conclusion here because it only applies when, but for the intervention of state employees, a child would not be placed with a particular custodian. In contrast to the facts of Patton and Currier, the Plaintiffs in this matter were returned to the same parents from which they were removed.

In Patton, the child, TD, was living with his mother. Patton at 1212. After Denver Department of Human Services ("DDHS") was informed that there where issues with the mother's ability to care for TD, he was removed from her custody and placed in the custody of his biological father. Id. TD was eventually removed from his father's home after DDHS received reports that TD had sexual contact with his half-brother. DDHS later determined that during TD's placement with father, TD had suffered severe physical and sexual abuse at the hand of his father. Id.

TD sued DDHS and its employees for violation of his substantive due process pursuant to the danger creation theory. The defendants moved for summary judgment on the grounds of qualified immunity. The district court denied the motion for qualified immunity and the Tenth Circuit affirmed that determination. The Tenth Circuit held that there were clearly established rights pursuant to Currier v. Doran, 242 F.3d 905, 917 (10th Cir. 2001) that precluded qualified immunity.

In Currier, the Tenth Circuit also found that qualified immunity was not applicable. Like Patton, a child was taken from a mother's home and placed in the home of the child's father. The father then abused the child. The social workers in both cases failed to alert the juvenile court of relevant facts undermining the fathers' fitness as caretakers and recommended that the fathers

assume custody of the children—despite being on notice that the fathers' homes were places of danger. And, in both cases, the social workers failed to investigate whether the fathers were abusing their children, despite being on notice of evidence suggesting abuse.

However, the facts of Currier and Patton are distinguishable from those present here. Specifically, here the children were not moved from the care of one parent to the care of another. Rather, the Plaintiff children were removed from their parents and returned to those parents. Indeed, both Currier and Patton explicitly recognize this distinction.  The Tenth Circuit in Currier reasoned:

> Defendants, relying on DeShaney, argue that Plaintiffs have not alleged a constitutional violation because custody was simply transferred from one natural parent to another; thus, Defendants' claim, they did not create the danger. DeShaney does not, however, compel this conclusion. In this case, Anthony and Latasha were removed from their mother and placed with their father. In DeShaney, Joshua was removed from his father and then returned to his father. See DeShaney, 489 U.S. at 192, 109 S.Ct. 998. Anthony and Latasha would not have been exposed to the dangers from their father but for the affirmative acts of the state; the same cannot be said for Joshua in DeShaney.

Currier at 918

Moreover, in her concurring opinion in Patton, Judge Briscoe noted that the holding in both Currier and Patton directly conflicted with DeShaney.  Judge Briscoe found that the test for a state created danger has been applied too broadly.  Patton, 868 F.3d 1209, 1236.  Judge Briscoe noted that the Supreme Court recognized that "in certain *limited circumstances* the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." Id. (quoting DeShaney, 489 U.S. 189, 198 (emphasis supplied)).  Significantly, the Tenth Circuit "attempted to avoid the controlling precedent in DeShaney by drawing a distinction that *returning a child to the same parent* did not increase the child's vulnerability to danger from violence at the hands of that parent, but returning a child to a different parent did." Patton at 1238-1239 (quoting Currier at 918 (emphasis supplied)).

4

Plaintiffs' Complaint asserts, at most, that Defendants failed to act to protect them from the danger that their parents posed. Significantly, the existence of that danger predated the removal of the Plaintiffs from their parents. Plaintiff do not, and indeed cannot, allege that the actions of Defendants somehow increased or enhanced the danger posed by Plaintiffs' parents.[1] Indeed, the Response asserts that "Garza and Saldana had sufficient information to know that the Plaintiff children of school age would not be educated, that the children *and their parents would in all likelihood return to their transient existence* of living out of a vehicle, that the children would lack adequate access to food, shelter and personal care, and that the parents would continue to medically neglect their children. FAC at ¶¶ 154 – 156." Doc. 28 at 9 (emphasis supplied). Plaintiffs concede they were returned to the danger that existed prior to the removal of their parents. Pursuant to DeShaney, the State does not become the permanent guarantor of an individual's safety by having once offered him shelter." DeShaney at 201. The facts here clearly fit withing the parameters of DeShaney and are distinguishable from all the other cases Plaintiffs cite where children were moved from one custodian to another. Defendants cannot be found to have created a danger as a matter of law.

    b. Matthews v. Bergdorf

Plaintiffs assert that Matthews v Bergdorf, 889 F.3d 1136 (10th Cir. 2018) supports their contention that Defendants enhanced the danger or cut off aid to Plaintiffs. Plaintiffs are incorrect. Specifically, Plaintiffs allege that the inactions of Ms. Saldana and Ms. Garza delayed informing the Hobbs police that the Plaintiffs were missing and then stated they did not believe the children were in danger. Doc. 28 at 7. "This effectively cut the children off from both public and private

---

[1] Plaintiffs make various factual assertions that are red herrings. Plaintiffs assert that one of the children witnessed domestic violence when they lived with their parents; that one of the children may have been subjected to inappropriate sexual behavior; that Defendants worked to prevent the GAL from obtaining testimony, etc. Doc. 28 at 4-5. This litany of facts all relates to returning the Plaintiffs to their parents and the pre-existing danger.

aid and made them more susceptible to the danger their parents posed to them." Id. Plaintiffs' reasoning is flawed.

In essence, Plaintiffs are alleging that Defendants failed to act to remove them from a dangerous preexisting situation. Moreover, Plaintiffs specifically recognize the danger was not new. Plaintiffs assert "[g]iven the parents' neglect of the children b*efore going into custody* and the fact that they did not complete their treatment plans the parents engaging in the *same type of neglect* that initially brought the children into custody was foreseeable." Id. at 8 (emphasis supplied). Importantly, "[f]oreseeability alone does not create an affirmative duty to protect on behalf of the State. This means a state actor, absent some prior affirmative act by the actor giving rise to a duty to protect, cannot be held liable under the state-created danger exception for the failure to protect a plaintiff from harm." Matthews at 1150 (internal quotations omitted). Plaintiffs' assertions that Defendants knew of the danger posed by the parents is not relevant to whether there was a duty, nor is it considered dispositive by the authority cited by Plaintiffs[2].

Plaintiffs attempt to create a duty by citing to state statutes and regulations. Plaintiffs assert CYFD is obligated to remove the children from the home of the parent, guardian, or custodian who is engaged with CYFD in a trial home visit if the trial home visit is unsuccessful. N.M. Admin. Code 8.10.8.13(E)(a) ("If the trial home visit is unsuccessful, then the child shall be removed"). Doc. 28 at 8. However, "even if defendants' conduct clearly violated New Mexico statutes, they would still be entitled to immunity from liability under § 1983 if their actions did not clearly violate

---

[2] Plaintiffs cite to Schwartz v Booker, 702 F.3d 573 (10th Cir. 2012) to support their argument that the distinction between physical and legal custody is without merit. However, in Booker, the child was placed with a foster parent. That is fundamentally different because foster parents are employed by or are agents of the state. A special relationship would arise.

Similarly, Plaintiffs cite to State of N.M. ex rel. CYFD v. Lisa A., 2008-NMCA-087, ¶ 9, 144 N.M. 324, 327, 187 P.3d 189, 192. However, the issue at bar there was whether a mother could obtain custody of her child from the biological father. Neither a special relationship nor danger creation was at issue. The case has no bearing here.

federal due process." Starko, Inc. v. Gallegos, 2006-NMCA-085, ¶ 27, 140 N.M. 136, 145, 140 P.3d 1085, 1094.

> 2. **The location of Plaintiffs' physical placement is the determinative factor in the determination of a special relationship, rather than their alleged status as foster children.**

Plaintiffs assert that New Mexico regulations would define the Plaintiffs as being in foster care. Specifically, Plaintiffs contend that, under applicable regulations, "a "foster child" or "child in foster care" as referred to as "child" herein, means a child who is placed in *the care and custody* of children, youth and families department protective services division either under the legal authorization of the Children's Code." Doc 28 at 15 (emphasis supplied). Plaintiffs use this reasoning in an attempt to distinguish the facts from Hernandez v. Rapp, 2003 WL 27385396, (D.N.M. Mar. 31, 2003), wherein Plaintiffs claim the court determined the children were not in foster care. The applicable regulation does not determine the appropriate standard. The Tenth Circuit has established that the level of restraint it key. "[I]f the state restrains an individual's freedom to act to protect himself or herself through a restraint on that individual's personal liberty, the state may thereby enter into a 'special relationship' during such restraint to protect that individual from violent acts inflicted by others." Armijo v. Wagon Mound Pub. Schs., 159 F.3d 1253, 1261 (10th Cir. 1998)   As set forth in Starko, the state law determination of special relationship is not relevant.

Furthermore, Plaintiffs misread the cited regulation. The regulation states that a foster child is one in the care *and* custody of CYFD. Here, the Plaintiffs were in the legal custody of the state, but were in the care of their parents at the time the parents fled New Mexico. Hernandez made it clear that children in the care of their biological parents were not in the care of the state.

Plaintiffs also criticize Defendants' reliance on Hernandez, asserting that it is an unpublished, older, and only a district court case. However, Hernandez specifically addressed the issue of legal versus physical custody. Plaintiffs fail to explain why its holding that there is no special relationship when a parent has physical control over his or her child would not dictate the same result here. Further, while Hernandez did find that, as to some of the defendants, there was a stated cause of action for danger creation, the facts are distinguishable. There the state took children from both parents and then returned them to the sole custody of one parent who injured them. Here, the children were taken from both parents and then returned to both parents. This case is similar to DeShaney.

More recent Tenth Circuit authority directly contradicts Plaintiffs' assertions that a special relationship or danger creation would apply here. In Hubbard v. Oklahoma ex rel. Oklahoma Dep't of Hum. Servs., 759 F. App'x 693, 707 (10th Cir. 2018), the Tenth Circuit found that the facts, which involved the death of a child, did not state a claim for either danger creation or for breach of the special relationship. In Hubbard, there were nine reports made to the Oklahoma Department of Human Services expressing concern that three children were being abused and neglected by their biological parents. The allegations were that the home was horribly fifthly, there was a convicted sex offender in the home, open drug abuse, and apparent unaddressed mental health issues. Hubbard at 696. There was also evidence, and an apparent admission, that the children were subjected to physical abuse and witnessed other domestic violence. Despite this, the state officials initially determined the home was suitable.

A few weeks later, local police determined the home was not suitable and directed that the children be removed. A state court determined the children to be "deprived." Id. State officials formulated Individualized Service Plans for the biological parents, but before those plans were

8

implemented, and before the unsuitable home conditions were corrected, DHS employees recommended a trial reunification. The state court adopted the trial reunification plan in May 2013, and the children were returned to their biological parents' home. Id. at 696-697. The biological parents did not remediate any of the issues, and in August 2013, the children were again removed and then placed with foster parents. Id.

The placement with the foster parents did not ameliorate the situation. Indeed, the children were placed in equally terrible circumstances. One of the children suffered a broken vertebrae and skull fracture resulting in death. At this point, the surviving children were removed and placed with their great aunt and uncle, the Hubbards. The Hubbards sued numerous employees of the Oklahoma Department of Human Services ("DHS") under 42 U.S.C. § 1983 for violations of the children's substantive due process rights under the Fourteenth Amendment. The district court dismissed the federal claims and the Tenth Circuit affirmed.

In affirming the district court, the Tenth Circuit found

> [T]he Hubbards have not pled sufficient facts to show that the state created the danger of private violence to the children. "[I]f the danger to the plaintiff existed prior to the state's intervention, then even if the state put the plaintiff back in that same danger, the state would not be liable because it could not have created a danger that already existed." Armijo, 159 F.3d at 1263. Even if the pre-foster-care defendants put the children in danger by restoring them to their biological parents' home, they did not create the danger.

Id. at 709.

Here, the same reasoning would apply. According to the Complaint, the Plaintiffs were removed from their parents and then returned. Moreover, the Complaint does not allege any facts that would indicate that the parents posed a new danger once the Plaintiffs were initially removed from their care. Indeed, the Complaint alleges that family retuned to its transient existence. Doc. 28 at 9. Defendants did not create a danger as a matter of law.

In relation to the allegations that the Oklahoma officials breached the special relationship to the children in Hubbard, the Tenth Circuit made short shrift of that allegation. The special relationship exception applies when a child is placed in foster care. Schwartz, 702 F.3d 573 at 580. It does not apply when the children are in the custody of their biological parents. See Yvonne L., By & Through Lewis v. New Mexico Dep't of Hum. Servs., 959 F.2d 883, 891 (10th Cir. 1992) ("[T]here is no affirmative duty of the state to protect a child who is in his parents' custody." (citing DeShaney, 489 U.S. at 201, 109 S.Ct. 998)). Accordingly, the Tenth Circuit found that the Hubbards did not a state a claim for relief under this theory. Id at 709. For the same reasons Plaintiffs fail to sate a claim here. Further, assuming *arguendo* that Plaintiff can show the existence of a special relationship or that Defendants created or enhanced a danger, those actions would not shock the judicial conscience.

3. **The decision to place the children with their parents does not rise to the level of being conscience shocking**

Despite the tragic outcome for one of the Plaintiffs, the allegations asserted against the Defendants, even when assumed to be true, do not rise to the level of conscience shocking. Under either the special-relationship or danger-creation exceptions to the DeShaney rule, the plaintiff must show that the defendant's conduct "shocks the conscience." Hubbard at 708. "Conduct that shocks the judicial conscience ... is deliberate government action that is 'arbitrary' and 'unrestrained by the established principles of private right and distributive justice.' " Seegmiller v. LaVerkin City, 528 F.3d 762, 767 (10th Cir. 2008) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). "To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or employ[ed] it as an instrument of oppression. The behavior complained of must be egregious and outrageous." Hernandez v. Ridley, 734 F.3d 1254, 1261 (10th Cir. 2013) (alteration in original)

10

(quotations omitted). A defendant's "conduct as a whole"—including "both action and inaction"—are relevant in evaluating whether it "shocks the conscience." Estate of B.I.C., 710 F.3d at 1174. The Tenth Circuit considers the following principles when evaluating substantive due process claims in this context: "(1) the general need for restraint; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policy decisions impacting public safety." Currier, 242 F.3d at 920.

"Conscience-shocking" is often defined by what it is not, or what it exceeds. See, e.g., County of Sacramento v. Lewis, 523 U.S. at 849, 118 S.Ct. 1708 ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."); Gutteridge v. Oklahoma, 878 F.3d 1233,1238-43 (10th Cir. 2018) ("[A] social worker who simply makes a mistake of judgment under what are admittedly complex and difficult conditions will not find herself liable in damages under § 1983." (quoting Schwartz, 702 F.3d at 583)); DeAnzona v. City & Cty. of Denver, 222 F.3d 1229, 1235 (10th Cir. 2000) ("Even knowingly permitting unreasonable risks to continue does not necessarily rise to the level of conscience shocking."); Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 528 (10th Cir. 1998) ("[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." (quotations omitted)).

In Hubbard, the Tenth Circuit found that the allegations against various social workers, while very likely negligent, were not so egregious to violate constitutional requirements. The allegations against the defendants included vague assertions such as employees "took no action to protect or safeguard the children." Hubbard at 710. More specifically, the state defendants allegedly failed to ensure that foster parents ensured that the children were taken to therapy. The Tenth Circuit found that the failure to confirm therapy attendance was poor job performance, but

not conscience shocking. Id. at 711. Further, the Tenth Circuit concluded that a social worker was not informed that the foster parents spanked the children. This lack of information, and perhaps even if the worker had known, did not lead to the conclusion that one of the children would be killed months later. Id.

Here, the allegations are that "Defendants engineered a scheme to remove Plaintiffs from an appropriate foster home and leave them with their wholly unfit biological parents on a trial home visit..." Doc. 21 at ¶ 3. The Complaint further alleges that the Plaintiffs were subsequently kidnapped by their parents and one suffered catastrophic injuries. Id. at ¶ 4. Significantly, the Complaint asserts that Plaintiffs were originally removed from their parents because they were begging in the parking lot of a Walmart, were living out of a van, and the Plaintiffs were in poor health. Id. at ¶¶ 28-30. Specifically, the Complaint alleges that Plaintiffs were suffering from tooth decay, urinary tract infection, a first-degree sunburn, malnourishment, and tuberculosis. The fact that the parents fled and that one of the children suffered a skull fracture, does not flow from allegations of medical neglect. There are no allegations, while the Plaintiffs were in New Mexico, that there was any evidence that they were being physically abused. At worst, Defendants simply made a mistake of judgment under what are admittedly complex and difficult conditions. *See* Schwartz.

In Hubbard, the facts included indications of drug abuse, inappropriate sexual interaction among the children, mental health issues, a filthy home, and corporal punishment. Corporal punishment can be more easily extrapolated to lead to physical child abuse than failing to provide dental services and living a transient lifestyle. Plaintiffs have the benefit of hindsight. However, at the time the decision to allow a trial home visit was made, Defendants did not have knowledge

of what would occur in North Carolina. The circumstances here are tragic, but they do not shock the judicial conscience as a matter of law.

> **4. The Individual Defendants are entitled to qualified immunity, as there was not clearly established right that children placed back with the parents from whom they were removed would violate due process.**

Upon the filing of a motion to dismiss on the basis of qualified immunity, a plaintiff's response must meet a "heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10thCir. 2001). Specifically, "[o]nce a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff ... [to] show that (1) the official violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established when the alleged violation occurred." Baumeister v. N.M. Comm'n for the Blind, 425 F.Supp.2d 1250, 1268 (D.N.M. 2006) (quoting Verdecia v. Adams, 327 F.3d 1171, 1174 (10thCir. 2003)).

Plaintiffs have failed to satisfy their burden to overcome the defense of qualified immunity. Plaintiffs have cited no authority that would support a claim for the violation of Plaintiffs' constitutional rights pursuant to the special relationship exception, when the alleged injuries occurred while Plaintiffs were in the care of their parents in a trial home visit. Plaintiffs also argue, without any legal support, that there is no distinction between physical and legal custody. However, Plaintiffs fail to explain how the authority cited by Defendants is not relevant  Ex. Briggs v. Oklahoma ex rel. Oklahoma Department of Human Services, 472 F.Supp.2d 1294 (W.D.Okla.2007); A.M. ex rel. Youngers v. New Mexico Dep't of Health, 65 F. Supp. 3d 1206, 1232 (D.N.M. 2014); A.S. v. Tellus, 22 F.Supp.2d 1217, 1221 (D.Kan.1998); Wooten v. Campbell, 49 F.3d 696 (11th Cir.1995); Clark v. City of Philadelphia, 2006 WL 2321574 (E.D.Pa. Aug. 8, 2006).

Significantly, Plaintiffs rely on cases where children were abused or otherwise injured while they were in the care of foster parents. Foster parents are agents of the state and in New Mexico are considered state employees. Accordingly, while children are in the care of foster parents, there is a special relationship. However, that is fundamentally different from the facts here. There are no allegations in the Complaint that the parents of the Plaintiffs were employed by the state. To the contrary, the Plaintiffs allege that the Defendants had insufficient control over the parents and that allowed them to abscond with the children. Lastly, the special relationship does not exist when the children are in the custody of their biological parents. Yvonne L., By & Through Lewis v. New Mexico Dep't of Hum. Servs., 959 F.2d 883, 891 (10th Cir. 1992). Plaintiff's allegations do not support a claim for the breach of the special relationship. Moreover, because there is no breach, Plaintiffs cannot and do not identify on point Supreme Court, Tenth Circuit, or other authority that would put the Patricia Garza, Brenda Saldana, or Rebecca Liggett on notice that their actions violated Plaintiffs' established rights.

Similarly, Plaintiffs fail to distinguish the facts here from those in DeShaney. In both instances, children were taken from their parents, placed into state custody, and then returned to the same parents. This does not support danger creation as a matter of law. Accordingly, qualified immunity is appropriate.

**5. Plaintiffs should not be permitted to yet again amend their complaint.**

Plaintiffs request that the Court grant leave for them to file an amended complaint should it be inclined to grant Defendants' motion to dismiss. However, Plaintiffs have already amended their Complaint once. Moreover, and more importantly, any amendment would be futile because the dispositive facts will not change. A court may properly deny leave to amend if amendment would prove futile. See Mountain View Pharmacy v. Abbott Laboratories, 630 F.2d 1383, 1389 (10th Cir.1980)(Futility might warrant denial of leave to amend if the amended complaint would

be subject to dismissal.) Plaintiffs were removed from their parents and then placed back in the care of their parents. This fundamental fact will not change.

      WHEREFORE, Defendants respectfully request that the Court enter an order dismissing with prejudice Plaintiff's First Amended Complaint for failure to state a claim, or alternatively, based on qualified immunity, and for such further relief as the Court deems appropriate.

Respectfully Submitted:

PARK & ASSOCIATES, LLC

By /s/ James J. Grubel
Alfred A. Park
Lawrence M. Marcus
James J. Grubel
3840 Masthead Street, N.E.
Albuquerque, NM 87109
505-246-2805 ext. 104
jgrubel@parklawnm.com
*Counsel for Defendants*

I hereby certify that a true and correct
copy of the foregoing was served via
CM/ECF filing system to all counsel
of record on this 19th day of October, 2021.

/s/ James J. Grubel
James J Grubel