# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ALISON ENDICOTT-QUIÑONES,
Guardian ad Litem, on behalf of
A. D., R. B., E. B., and M. B.,
minor children,

        Plaintiffs,

vs.                                  No. 21-cv-00368 DHU/JHR

PATRICIA GARZA, in her individual
and official capacity; REBECCA LIGGETT,
in her individual and official capacity; BRENDA
SALDANA, in her individual and official capacity;
JENNIFER DE LOS SANTOS, in her individual and
official capacity; and DOES 1-50,

        Defendants.

## SECOND AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS AND FOR DAMAGES AND INJUNCTIVE RELIEF

A. D., R. B., E. B. and M. B. (collectively, "Plaintiffs"), through their guardian ad litem Alison Endicott-Quiñones, complain against Patricia Garza ("Garza"), Rebecca Liggett ("Liggett"), Brenda Saldana ("Saldana"), Jennifer De Los Santos ("De Los Santos"), the New Mexico Children, Youth & Family Department ("CYFD") and Does 1-50 ("Doe Defendants") (collectively, "Defendants") as follows:

### INTRODUCTION

1. This is an action to recover damages and injunctive relief under 42 U.S.C. § 1983 and the New Mexico Tort Claims Act.

2. The claims arise from the acts of Defendants, all of whom disregarded Plaintiffs' constitutional rights, safety and wellbeing in a cynical, concerted effort to get rid of their case.

3. As alleged below, Defendants engineered a scheme to move Plaintiffs from an appropriate foster home to a "trial home visit" with their wholly unfit biological father. Defendants acted with actual knowledge that the trial home visit created substantial risk to Plaintiffs' health,

1



safety and wellbeing. Indeed, Garza's stated hope was that the children would be kidnapped during the trial home visit so the case would not go on for years. As a result, all four Plaintiffs were kidnapped by their biological parents, and the youngest, M.B., suffered catastrophic injuries.

4.      In furtherance of their scheme, Defendants: (1) concealed and misrepresented information about Plaintiffs' biological parents in New Mexico state family court; (2) threatened, coerced, and retaliated against CYFD employees who tried to alert third parties to the danger the trial home visit posed; (3) allowed the trial home visit to continue even when it had obviously failed and Defendants were legally obligated under their own regulations to end the trial home visit and remove the children from the trial home visit; and (4) actively hindered law enforcement's attempts to locate Plaintiffs after their biological parents kidnapped them during the trial home visit.

5.      Plaintiffs seek recovery from Defendants on all causes of action available under state and federal law.

## JURISDICTION

6.      Jurisdiction is proper in New Mexico as all, or substantially all, facts giving rise to Plaintiffs' claims occurred in New Mexico and all parties reside in New Mexico.

7.      This Court has original jurisdiction over this matter because Plaintiff's seek relief under 42 U.S.C. § 1983.

## PARTIES

8.      Plaintiff A. D. is a minor child currently residing in Bernalillo County, New Mexico. Her name is abbreviated in this Complaint to protect her privacy.

9.      Plaintiff R. B. is a minor child currently residing in Bernalillo County, New Mexico. His name is abbreviated in this Complaint to protect his privacy.

10.     Plaintiff E. B. is a minor child currently residing in Bernalillo County, New Mexico. Her name is abbreviated in this Complaint to protect her privacy.

11.     Plaintiff M. B. is a minor child currently residing in Bernalillo County, New Mexico. Her name is abbreviated in this Complaint to protect her privacy.

12.     Alison Endicott-Quiñones is a guardian ad litem appointed by a New Mexico state district court to represent Plaintiffs. She resides in Bernalillo County, New Mexico.

13.     Defendant Patricia Garza is a CYFD employee. She resides in Lea County, New Mexico. She is sued in her official and individual capacities.

14.     Defendant Brenda Saldana is a former CYFD employee. She resides in Texas. She is sued in her official and individual capacities.

15.     Defendant Rebecca Liggett is a retired CYFD employee. She resides in Santa Fe County, New Mexico. She is sued in her official and individual capacities.

16.     Defendant Jennifer De Los Santos was a CYFD employee at all material times. She resides in Lea County, New Mexico. She is sued in her official and individual capacities.

17.     Defendant CYFD is a subsidiary of the State of New Mexico. It is responsible for providing child protective services to children in New Mexico.

18.     Doe Defendants are CYFD employees or agents whose identities are not yet known. Through actions undertaken in their official and individual capacities, are legally responsible for the injuries to Plaintiffs complained of here. Plaintiffs will amend this complaint once their identities are ascertained.

## FACTUAL ALLEGATIONS

19.     June 3, 2019, started out as just another day panhandling outside the Walmart in Hobbs for Luiza Badea ("Badea") and Andrei C. Ducila ("Ducila"). For at least a month they had been living out of a van that would frequently stop in the Walmart parking lot. They would sleep in an old van at night and panhandle by the Walmart entrance during the day.

20.     The couple's four young children—Plaintiffs—were with them. All four were malnourished and had severe sunburns. The three older children had severe tooth decay. E.B. had tuberculosis. A doctor in Texas had given Ducila and Badea medication to treat E.B. The doctor even told them E.B. could die if they did not stick to the treatment regimen. But the parents had left Texas months ago and had stopped giving E.B. her pills around the same time.

3

21.     In the weeks leading up to June 3, CYFD's abuse and neglect hotline had gotten numerous calls about the family. It made sense that people would call: CYFD's job was to protect kids, and it was plain to see that Plaintiffs needed help. No one came, though. That was because CYFD already knew about the family.

22.      Back in late April or early May of 2019, three workers from CYFD's Hobbs office had gone to the Walmart for lunch. They saw Plaintiffs wearing tattered clothes, walking barefoot on the hot asphalt, and they saw Badea and Ducila with a cardboard sign asking strangers for money. The case workers should have called in a report or personally addressed this situation. NMSA 32A-4-3 mandates reporting of child abuse for social workers who knows or has a reasonable suspicion that a child is being abused or neglected to immediately report the matter. Not to mention it was the right thing to do.

23.     Instead of addressing the abuse and neglect going on before their very eyes the case workers approached Plaintiffs' parents on their way into Walmart and told them to not be there when they came back because they would need to open an abuse and neglect case. When the workers left Walmart, the family was gone.

24.     After lunch the workers told Garza about the incident. They said CYFD had "dodged a bullet." After all, it was a lot of work to take abused children into custody. Garza was their boss—she managed the Hobbs office. She agreed with them completely about the family outside the Walmart. Hopefully they would just move on from Hobbs and make themselves someone else's problem.

25.     But within the next few days, the family was back at the Walmart. And as summer came and the weather got hotter, things only got harder for Plaintiffs. That, changed, though, on June 3, 2019, when someone called the police.

26.     When officers from the Hobbs Police Department arrived, they did not tell the family to leave. Instead, they arrested Badea and Ducila, and charged them with felony child abuse.

27.     Ivy Woodward ("Woodward"), one of CYFD's permanency planning supervisors, was dispatched to the parking lot to assess the situation. When she arrived, she saw an open-and-

4

shut case of medical neglect. Plus, the parents had been arrested. She figured CYFD had no choice but to take Plaintiffs into custody.

28.     But Garza and CYFD's chief children's court attorney, Liggett, saw things differently. From their perspective, the problem was that Badea and Ducila were in the country illegally—if they were deported, CYFD could be stuck taking care of Plaintiffs until they found someone to adopt them.

29.     Liggett was a high-level administrator stationed at CYFD's headquarters in Santa Fe. She rarely appeared on cases and did not work in the Hobbs office at all. She was one of Brian Blalock's ("Blalock") top lieutenants. Blalock, CYFD's cabinet secretary, pushed an unwritten policy of reducing caseloads by reuniting parents with their children whenever possible. During the first two years of his administration, CYFD's case load had plummeted.

30.     At the parking lot that June evening, Liggett and Garza laid down the law for Woodward: the high-ups had spoken. CYFD would not take the children into custody.

31.     To Woodward, the edict made no sense. The children had nowhere else to go. Liggett had also initially supported taking the children into CYFD's custody, until she learned that the parents were not in the country legally. Woodward continued to argue with Liggett and Garza, while the police and Plaintiffs waited nearby.

32.     The stalemate was broken after several hours when someone called a state district court judge. The judge then contacted CYFD and asked when the filings from CYFD to initiate an abuse and neglect case would arrive. After that, Garza and Liggett backed down. The papers were filed and the children were placed in CYFD's custody on June 3, 2019.

33.     Intake at CYFD confirmed what was apparent in the Walmart parking lot: Plaintiffs and been abused, and Ducila and Badea were unfit parents. Medical personnel diagnosed Plaintiffs with a litany of medical conditions. E.B., R.B., and A.D. had such advanced tooth decay they needed soft food diets. R.B. required surgery to treat his tooth decay. All four children were severely malnourished and sunburned. M.B. was suffering from severe diaper rash and dehydration. Something had caused abrasions on A.D.'s face. To make matters worse, Ducila and

Badea told a CYFD investigator that they were unconcerned about Plaintiffs' medical conditions. The parents then offered the investigator and the police a cash bride to be on their way.

34.     Garza and Liggett wanted to find a way to dismiss the abuse and neglect case and return Plaintiffs to their biological parents. However, that became impossible when the Fifth Judicial District Attorney's Office filed felony child abuse charges against Ducila and Badea. As the parents' conditions of release prohibited them from residing with Plaintiffs, CYFD no longer had anyone it could return the children to.

35.     Unable to jettison Plaintiffs' case for the time being, CYFD assigned Plaintiffs to a foster home and enrolled E.B. and A.D. in daycare. CYFD also assigned Woodward to formulate a permanency plan.

36.     Shortly after being assigned to the case, Woodward learned that the police had found an empty bottle of tuberculosis medicine in the parents' van. Further investigation revealed that E.B. and A.D. were positive for tuberculosis. Woodward immediately notified Garza, and stated that the children needed to be removed from daycare before they infected other students. Woodward was also worried that they posed a threat to the foster family's children, one of whom was immunocompromised.

37.     Garza ordered Woodward to withhold the tuberculosis diagnosis from the daycare and the foster family. Garza said she was worried about finding other foster parents who would house E.B. and A.D. For her, the nightmare scenario was that CYFD would have to devote time and resources to taking care of the children itself. Garza was unconcerned with getting E.B. and A.D. treatment for their tuberculosis.

38.     Woodward disobeyed Garza by notifying the foster family, who then drove E.B. and A.D. to Lubbock, Texas to obtain treatment. The doctors discovered that E.B.'s tuberculosis had caused meningitis of the brain, and immediately hospitalized her for several days. Eventually E.B. recovered and went back into foster care with her siblings.

39.     Over the next few weeks, Woodward undertook the daunting task, assigned to her by Garza, of crafting a "treatment plan" to transform Badea and Ducila into fit parents.

40.     In October 2019, CYFD scheduled a psychological diagnostic appointment for Ducila and Badea. The appointment was scheduled to occur in Roswell, New Mexico. Woodward was tasked with transporting Ducila and Badea to the appointment.

41.     Prior to leaving for Roswell from Hobbs, Woodward was told by Megan Finno-Velazquez, CYFD's director of Immigration Affairs, to conceal the parents' identities from law enforcement if she was pulled over. Ducila and Badea were Romanian nationals in the United States illegally, and subject to deportation. Believing that the request was unethical and likely illegal, Woodward reported the event to Garza. Garza also ordered Woodward not to disclose the parents' identities.

42.     An email was sent by Megan Velasquez on October 8, 2019, stating that an immigration attorney had consulted with Ducila on his asylum claim. The immigration attorney assessed in her opinion that there was no hope of obtaining asylum or other relief that would allow Ducila to stay in the United States legally.

43.     Over the following months, Ducila and Badea made no progress on CYFD's treatment plan. These repeated failures were reported by Woodward to Garza and other CYFD employees. However, on every occasion Garza and other CYFD employees waived the treatment plan's requirements.

44.     The treatment plan required Ducila and Badea to address issues pertaining to their immigration status. However, neither Ducila nor Badea ever addressed their immigration status issues and are still deportable from the United States.

45.     The treatment plan required Badea and Ducila to address all issues pertaining to the felony criminal child abuse charges filed by the Fifth Judicial District Attorney. At the time Badea and Ducila kidnapped their children and at the time of the trial home visit, the criminal cases were still pending.

46.     The treatment plan required Badea and Ducila to undergo psychological evaluations and follow all subsequent recommendations. The psychological evaluation was never completed.

47.    The parents were ordered to engage in therapy and follow all therapist recommendations. This portion of the treatment plan was not completed.

48.    The plan required Ducila and Badea to attend all Plaintiffs' medical, dental and vision appointments. Ducila and Badea failed to do that.

49.    During Ducila's visits at CYFD's office in Hobbs, he could not interact with or supervise the children. E.B. and A.D. would frequently run up and down the hall and flash the lights on and off, while M.B., an infant, would scream.

50.    Woodward mentioned Ducila's profound inability to supervise or meaningfully interact with his children to Garza and the guardian ad litem on numerous occasions.

51.    Garza instructed Saldana to begin having the visitations in a room that did not have a recording device installed so that the abuse and neglect court would not have access to them.

52.    Garza also directed a temp, Rebecca Gaston, to be Saldana's assistant and to provide a counter narrative to anything that Woodward might say about the case.

53.    Gascon's directive was for her story to always match Saldana's regardless of what Woodward reported.

54.    On one occasion, during a supervised visit at CYFD, Ducila and Badea tried to leave the office with the children. The police were called and Ducila and Badea barricaded themselves in a room with Plaintiffs. Eventually, Hobbs Police Department officers had to make a forced entry to the room.

55.    Garza gave the directive that no charges would be pressed against Ducila and Badea for the incident and that visitation would continue as scheduled.

56.    During one supervised visit at CYFD, Ducila offered Woodward a cash bribe to look the other way while the parents absconded with the children. Ducila stated he had a lot of money and asked how much of it he would need to pay to make all of this go away. Woodward refused and reported the incident to her superiors at CYFD, including Garza.

57.    Garza replied to the report of attempted bribery to obtain the children in CYFD's care by laughing and asking how much Ducila had offered.

8

58.     Ducila also offered a cash bribe on one occasion to Kelly Mazy ("Mazy"), a CYFD investigator. She did not accept the bribe.

59.     A.D. struggled while at school due to difficulty hearing. Woodward told Garza that CYFD should schedule an audiology appointment for A.D., and to order tests to determine whether A.D.'s hearing troubles stemmed from a traumatic brain injury. Garza refused this request.

60.     In early March 2020, Garza held a meeting on Plaintiffs' case. By that time, Badea had been incarcerated by ICE. Garza stated, "If we don't send these kids home, it will be another Everhart case." The Everhart case was a CYFD case that had gone on for over ten years.

61.     Woodward stated that the plan for the children should be shifted towards adoption because Badea was incarcerated and Ducila had done nothing to demonstrate that he could care for the children on his own.

62.     Saldana claimed that Ducila had complied with everything that the department had asked of him. Woodward reminded everyone of the multiple failures to comply with their treatment plan.

63.     Saldana stated that the visits with Ducila were going very well. Woodward replied that one week before this meeting, E.B. and A.B. tried to bolt from a visitation room to get away from Ducila, and that Ducila had nearly dropped M.B.

64.     Garza and Saldana then agreed amongst themselves that, rather than the visitation taking place at the office, where in Garza's words, "everybody could stick their nose in the case," they should start visiting with Ducila in the home. Garza was looking at Woodward when she made the comment about people sticking their nose into the case.

65.     Garza then stated, "Maybe they'll take the kids and run and we won't have to deal with them." Realizing that Woodward had heard that, Garza and Saldana locked eyes and then Garza stated, "just kidding, sorry, that wasn't funny."

66.     In February and March of 2020 A.D. and R.B. began making disturbing disclosures during play therapy.

67.     Play therapy is a structured activity designed to build on the normal communicative and learning processes of children. Therapists strategically utilize play therapy to help children explain what is troubling them when they lack the verbal language to express their thoughts and feelings. Play therapy is an evidence-based practice endorsed by the American Counseling Association.

68.     A.D. disclosed witnessing domestic violence by Ducila.

69.     A.D. also disclosed that Ducila had made her and R.B. kiss each other on the lips.

70.     A.D. also arranged a family in the living room of the play therapy area and had the father doll come in and hit and kick everyone until they hid. The father then killed the family dog.

71.     A.D. disclosed that she had witnessed Ducila strike R.B. in the head.

72.     R.B. described his father to his therapist as being mean and during a play therapy session locked a doll representing his father outside of a room, stating if they let him in that he would hurt them.

73.     R.B. also disclosed to his therapist unequivocally that his father had hit him in the head "a lot."

74.     The therapist compiled this information and made a CYFD SCI report.

75.     Garza dismissed the play therapy disclosures regarding the dog being killed by speculating that A.D. was reenacting things she had seen on the news. No explanation or excuse was ever given to explain away the reports of physical abuse from both A.D. and R.B..

76.     Following the SCI report by the therapist, Garza and other CYFD employees contacted the therapist's supervisor. The organization that employed the therapist is separate from CYFD. However, much of its workload comes from clients referred to it by CYFD. Garza threatened to stop sending clients to the therapist if she continued to report in a way that was counter to CYFD's objectives.

77.     The SCI report regarding Ducila striking R.B. in the head and sexual activity with A.D was investigated by Mazy.

78.     Within two days of being assigned as the investigator for the SCI report referrals, Mazy faced pressure from both Garza and Mazy's direct supervisor, De Los Santos, to close the case by finding that the disclosures could not be substantiated.

79.     Mazy informed De Los Santos and Garza that there were additional people she wanted to interview, including the children's therapist.

80.     Mazy also informed Garza and De Los Santos that she wanted to have the children participate in additional therapy and that she planned to interview the children again after they had discussed the abuse at greater length with their therapist.

81.     Mazy also informed Garza and De Los Santos that it was difficult interviewing A.D. because of her hearing issue and she wanted to speak with A.D. again after that issue was addressed.

82.     Defendant De Los Santos replied to Mazy's requests for additional time to investigate and perform additional interviews as follows, "you're probably right but Trish [Garza] really wants this closed."

83.     Mazy told De Los Santos that there was sufficient evidence to substantiate that physical abuse had occurred based on the initial statements made by R.B. and A.D. in therapy. De Los Santos and Garza ignored these disclosures and continued to pressure Mazy to close the investigation.

84.     De Los Santos ultimately ordered Mazy to unsubstantiate the abuse allegations.

85.     Patricia Garza gave this direction to De Los Santos that the report needed to be unsubstantiated.

86.     Mazy, acting under fear of losing her job, followed the directive from De Los Santos and issued a report saying the disclosures were unsubstantiated and closed the investigation.

87.     Garza, Saldana, and Liggett communicated to the abuse and neglect court that the allegations underlying the SCI report had been fully investigated and had been unsubstantiated.

88.     Defendants did not disclose to the abuse and neglect court that Garza and De Los Santos had ordered Mazy to unsubstantiate the report.

89.     Had the abuse and neglect court been provided with accurate information about therapist's SCI report and CYFD's investigation of the report, the court would not have allowed a trial home visit with the children's biological parents to take place.

90.     Defendants suppressed the circumstance surrounding CYFD's investigation of the SCI report even though they knew a significant risk existed that Ducila would continue to abuse his children and strike one or more of them in the head.

91.     In March 2020, Woodward reported Plaintiff's guardian ad litem in the abuse and neglect case at the time, Laura Castillo ("Castillo"), that Garza had made a "joke" about wanting Plaintiffs to be kidnapped. Woodward also informed Castillo that CYFD's decision to start a trial home visit would endanger the children.

92.     Based on Woodward's concerns, Castillo motioned the abuse and neglect court for a hearing, where Woodward would be the sole witness she would call. The purpose of the hearing was to stop the trial home visit from going forward based on Woodward's concerns, the play therapy disclosures, and Garza's "joke" about the parental kidnapping.

93.     Garza attempted to dissuade Woodward from telling the court about the danger the trial home visit posed to Plaintiffs. Garza wanted Woodward to omit information including the play therapy disclosures, Woodward's observations that Ducila had on at least one occasion looked like he was going to throw M.B. or drop her due to being enraged by his children's chaotic misbehavior, concerns about sexual abuse from the parents,  Garza's stated desire to have Ducila and Badea kidnap the children, and other facts that would impede CYFD's plan to start  a trial home visit.

94.     When Woodward indicated that she would testify truthfully, Garza told Woodward that Woodward would be receiving a call from Liggett.

95.     Upon information and belief, Garza conveyed the anticipated substance of Woodward's testimony in its entirety to Liggett.

96.     On March 13, 2020, Woodward received a phone call from Liggett.

12

97.     Liggett was not an attorney of record on the case and the matter was being handled by a CYFD line attorney. Liggett was the chief children's court attorney for CYFD and did not handle individual cases or a docket as part of her normal job duties.

98.     Liggett asked Woodward what she planned to testify to at the hearing. Woodward stated she would testify truthfully about Ducila's inability to control the children, that the children would not be safe from abuse or neglect with Ducila, the children's troubling disclosures, the anger Ducila demonstrated during visits with the children, and that the investigation into the disclosures the children made in therapy was rushed by Garza and De Los Santos and was closed before an adequate investigation could be done.

99.     Liggett told Woodward that her testimony would make it look like CYFD was misleading the court about Ducila's readiness for a trial home visit.

100.    Liggett instructed Woodward that she was to refrain from testifying to her own personal or professional opinions and was to instead parrot CYFD's institutional position.

101.    Liggett directed Woodward to conceal her professional opinion that placing the children into a trial home visit would be dangerous contrary to the children's interests, even if directly asked to provide her professional opinion in court. Liggett instructed Woodward to respond to any question seeking her professional opinion as follows: CYFD's decision was to engage in a trial home visit.

102.    When Woodward said that she would not omit the truth and would answer questions honestly Liggett told Woodward that she would object to Woodward providing her opinion in court.

103.    Liggett then stated, "Let me remind you that you are an employee of the State of New Mexico and as such it is your obligation to align and censure yourself with the needs of the organization that employs you." Woodward replied, "No, ma'am, it is not. Especially when this organization is asking me to lie for them." Liggett became agitated and stated, "nobody told you to lie, I just told you to censure yourself so that we are all on the same page." Liggett then stated

that she was going to do everything in her power to keep Woodward from taking the stand and that there would be, "no limits" to what she would do to keep her from testifying.

104.    Liggett threatened Ms. Woodward on this phone call and intimated that Woodward would lose her job if she testified truthfully in the hearing.

105.    Woodward also received a phone call from Brian Blalock. Mr. Blalock told Ms. Woodward that she "needed to remember who her employer was" and also told her that she could lose her job if she was insubordinate. Ms. Woodward told Mr. Blalock that she felt her job was being threatened because she was doing her job, to protect children, and refused to go along with a coverup of CYFD's malfeasance in the Badea case. Mr. Blalock then hung up on her.

106.    Liggett and Garza told Woodward that due to Coronavirus and the fact that Woodward lived just over the state line in Texas that they would use coronavirus protocols to bar her from entering the courthouse and providing testimony.

107.    Neither Liggett nor Garza were concerned about Woodward travelling to testify in court until after Woodward indicated she would testify truthfully and would refuse to omit material facts and withhold professional opinions that undercut CYFD's goal of moving forward with a trial home visit.

108.    Woodward reported the conversation with Liggett to Castillo. Castillo decided that she would not be able to prevail at the hearing without Woodward's testimony, because Woodward was her sole witness. Castillo was also concerned that CYFD would fire Woodward if she testified at the hearing. Castillo called off the hearing, and the hearing was never reset.

109.    Woodward was removed from the Badea case by Garza shortly after her conversation with Liggett. Following Woodwards efforts to keep the Badea children safe CYFD engaged in a pattern of retaliation against Woodward that forced her to resign her position.

110.    In March of 2020 a no contact order was in place between Ducila and his children in his felony child abuse case, D-506-CR-2019-00391.To accomplish its plan of starting a trial home visit, the criminal court overseeing Ducila's case had to be convinced to amend his conditions of release to remove the no contact order.

14

111.     On March 23, 2020 Ducila's attorney filed a motion to review conditions of release to permit the trial home visit to take place. The motion stated, "CYFD is prepared to allow the children to reside with the Defendant since he has kept up with his parenting plan through their office". This information was false and came from CYFD. On information and belief, Liggett directed the children's court attorney assigned to the case to misrepresent to Ducila's attorney how much progress Ducila had made.

112.     The motion itself states, "Defendant, by and through his attorney of record, respectfully requests this Court lift the "no contact" order in this matter and allow the Defendant's children to reside with him per request of CYFD."

113.     Liggett induced Ducila's criminal defense attorney to make false statements to the District Court judge overseeing Ducila's child abuse case. At the time Liggett induced the criminal defense attorney to make this false statement Liggett, De Los Santos, and Garza each had actual knowledge of the disclosures of physical abuse that were made in play therapy by the children that Ducila struck R.B. in the head "a lot".

114.     In April 2020, Garza, Saldana, and Doe Defendants sent Plaintiffs to live at Ducila's home on a trial home visit.

115.     Saldana and Garza actively worked to facilitate the trial home visit by manufacturing evidence to contradict the credible and objective evidence that the parents were unfit and that future abuse was likely. This included ordering Mazy to unsubstantiate credible disclosures that Ducila had physically abused R.B. by striking him in the head on multiple occasions.

116.     Garza, Liggett, Saldana, and other CYFD employees worked together to alter the status quo for Plaintiffs through formal legal process to compel Plaintiffs into the trial home visit. They did this with the knowledge that Plaintiffs would be subject to abuse and neglect by Ducila. Plaintiffs were entirely dependent on Defendants to provide for their basic needs.

117.     When the trial home visit started, Defendants repeatedly breached their own policies and procedures to mislead the abuse and neglect court about its progress. The purpose of

15

a trial home visit is to see, in a supervised setting, whether the parents can provide for the child's essential needs. Yet Saldana personally provided for Plaintiffs' essential needs during the trial home visit. This included, but was not limited to, bathing Plaintiffs, preparing their meals, making the children brush their teeth, and transporting them to school. Saldana performed these tasks specifically because it was known to the Defendants that Ducila was unfit and incapable of adequately caring for the children.

118.    Saldana also assisted Ducila in staging the apartment he was living it, to make it appear that it was suitable for Plaintiffs. Saldana also provided Ducila with advanced notice over the phone that she would be visiting, even though such visits were supposed to be unannounced.

119.    In April 2020, Badea was released from jail. Within days of her release from jail the parents kidnapped Plaintiffs and disappeared.

120.    On information and belief, Badea and Ducila kidnapped Plaintiffs in April of 2020.

121.    On information and belief, Saldana was aware that Plaintiffs were missing during April 2020, but waited until May 2, 2020, to inform Hobbs Police that the children could not be found. For the next twelve days, Garza, Saldana, and other CYFD employees refused to tell the Hobbs Police Department that CYFD's custodial rights were being interfered with, and claimed that Plaintiffs were not in danger.

122.    As a direct result of CYFD's refusal to state that they wanted the children returned and their refusal to say the children were in danger, the police were unable to issue an Amber Alert.

123.    Garza and Saldana actively hindered law enforcement's efforts to locate Plaintiffs. Garza and Saldana sabotaged the Hobbs Police Department's efforts to issue an Amber Alert. Garza and Saldana refused to report Plaintiffs missing, and initially blocked the District Attorney from pressing custodial interference charges by claiming that CYFD's custodial rights were not being interfered with. Garza and Saldana also withheld documents from Hobbs Police Department investigators who executed a search warrant on CYFD's office. These documents contained information on the family collected by CYFD and would have assisted police in ascertaining the family's whereabouts.

16

124.   Liggett later learned that Garza had concealed documents from Hobbs PD. No action was taken by her to arrange for the documents to be provided.

125.   The Hobbs Police Department told CYFD officials in a meeting in May of 2020 that they could not take action to locate the children, issue warrants, or issue an amber alert due to CYFD's refusal to state that it wished to enforce its custodial rights. This meeting included CYFD officials Karla Young, Mary McQueency, Defendants Garza, Saldana, Liggett, and two officers with the Hobbs Police Department.

126.   Liggett stated that she did not know why the department needed to state that they actually wanted the children returned to CYFD. At the time Liggett made this statement CYFD regulation required the children to be removed from the trial home visit.

127.   CYFD Officials Young and McQueeny indicated that depending on the situation the children were found in that CYFD may not actually want the children returned to them.

128.   At all relevant times, CYFD had custody Plaintiffs. As such, CYFD had the right and obligation to decide where and with whom Plaintiffs would reside. See N.M. Admin. Code 8.10.7.7(X) (granting CYFD the "right and duty to protect, train and discipline the child[ren] and to provide the child[ren] with food, shelter, personal care, education and ordinary and emergency medical care.")

129.   Defendants subjected Plaintiffs to a manifestly dangerous situation by forcing them to live with Ducila on a trial home visit.

130.   After Plaintiffs were kidnapped, Defendants cut them off from private and public aid by refusing to enforce CYFD's parental rights and by actively hindering the Hobbs Police Department's attempts to locate Plaintiffs.

131.   In November 2020, M. B. was dumped at a North Carolina hospital by Badea. M. B. had suffered a fractured skull and brain damage due to her suffering abusive head trauma during the extended trial home visit in which CYFD and Defendants knowingly left plaintiffs in a danger. Her injuries have left her permanently blind. Ducila and Badea, along with M. B.'s siblings, were later found in Houston, Texas. Shortly afterwards, CYFD's spokesperson issued a statement to an

Albuquerque television station falsely claiming that CYFD had promptly reported Plaintiffs missing and had cooperated with law enforcement's efforts to locate them.

132.    After M.B. was left by her parents at the hospital, she was also observed to have circular shaped burns on her skin. These burns were likely caused by persons pressing the lit end of cigarettes against M.B.'s skin. Both Ducila and Badea face felony child abuse charges in North Carolina for causing M.B.'s life-altering injuries.

133.    In 2021, CYFD ordered tests to determine the cause of A.D.'s hearing loss. These tests, which are the ones Woodward recommended, revealed brain injuries consistent with physical abuse.

134.    CYFD maintains legal custody of Plaintiffs and has had legal custody of Plaintiffs from June 3, 2019 to the present.

135.    CYFD employees colluded together and engaged in a conspiracy to make false statements to the abuse and neglect court, the criminal court handling Ducila's criminal case, to threaten and coerce individuals who tried to help Plaintiffs, and other conscience shocking activity described in the foregoing paragraphs all for the common purpose of getting the children out of CYFD's legal custody as soon as possible despite the knowledge of each individual Defendant that they would be placing the children into an extremly dangerous situation.

136.    There is manifest evidence of this conspiracy which include numerous emails exchanged by the individual Defendants and other high ranking CYFD employees discussing their desire to end this case. The case was handled in CYFD's words as a team which included the individual defendants as well as Brian Blalcok and other high ranking CYFD officials.

137.    The trial home visit was always intended to be a farce as evidenced by an email sent by Megan Velasquez to Patricia Garza, Brenda Saldana, CYFD Secretary Brian Blalock and others on March 5, 2020, where the following was stated, "I understand that we are trying to move towards a trial home visit with dad (and hopefully mom at some point). And that we are facing resistance from foster parents, GAL and possibly the judge. Hopefully for our call on Tuesday we

can cover: making sure we pull together a strong legal argument for the home visit, and how we can make it a short trial visit before we close the case…"

138.    Each of the individual Defendants acts should be imputed to each of the other individual Defendants by virtue of their conspiracy to violate the law and Plaintiffs constitutional right to be free from harm while in foster care.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Violation of the Fourteenth Amendment – Special Relationship**
**(Against Defendants Saldana, Garza, De Los Santos, and Liggett in their individual and official capacities)**

139.    Plaintiffs incorporate and reassert the allegations as set forth in the foregoing paragraphs as though fully stated herein.

140.    Plaintiffs and Defendants are all persons for purposes of 42 U.S.C. § 1983.

141.    The Fourteenth Amendment of the United States Constitution vested Plaintiffs with a clearly established procedural and substantive due process right to be protected by Defendants while in State custody.

142.    Defendants violated the duties created by the special relationship they had with Plaintiffs by, among other things, removing Plaintiffs from safe and appropriate foster homes and providing Ducila and Badea with access to Plaintiffs and the opportunity to kidnap Plaintiffs while Plaintiffs were still in CYFD's custody.

143.    While CYFD facilitated a trial home visit, no custodial rights had been transferred to Ducila or Badea. CYFD maintained custodial rights over Plaintiffs including the ability to determine who they lived with and where. CYFD possessed the ability to immediately end the trial home visit at their discretion without engaging in any legal process. CYFD also had the ability and obligation to terminate the trial home visit if the visit was not a success.

144.    CYFD utilized their legal custody to determine where the Badea children would live, who would care for them, and who would have access to them from June 3, 2019 to the present.

145.     Plaintiffs did not have a choice about who they lived with once they came into CYFD's legal custody. The nature of the relationship between Plaintiffs and CYFD was involuntary and the children were completely dependent upon CYFD to satisfy their basic human needs.

146.     CYFD policy defines "legal custody" as:

> [A] legal status created by order of the children's court or other court of competent jurisdiction or by operation of the New Mexico Children's Code, Section 32A-4-1 et seq or 32A-3B-1 et seq, NMSA 1978, that vests in a person, department or agency the: (1) right to determine where and with whom a child shall live; (2) **right and duty to protect, train and discipline the child and to provide the child with food, shelter, personal care, education and ordinary and emergency medical care**; (3) right to consent to major medical, psychiatric, psychological and surgical treatment and to the administration of legally prescribed psychotropic medications pursuant to the Children's Mental Health and Developmental Disabilities Act; and (4) right to consent to the child's enlistment in the armed forces of the United States.

N.M. Admin. Code 8.10.7.7(X)(emphasis added). This policy, which imposes affirmative duties on CYFD employees to protect Plaintiffs, was continuously in force and effect from June 3, 2019 to the present.

147.     Defendants undertook affirmative acts in furtherance of their scheme, including creating a false narrative that Plaintiffs' biological parents were fit for a trial home visit, suborning perjury, and withholding material information from the abuse and neglect court. Each Defendant's individual actions shock the conscience.

148.     Defendants owed Plaintiffs a continuing legal duty because of the special relationship. Saldana and Garza breached that continuing duty after the children went missing by refusing to report the children missing and permit the issuance of an Amber Alert. Saldana and Garza breached that duty again by hindering police efforts to locate the family.

149.     Defendants had actual knowledge that the children would be endangered by a trial home visit. Defendants failed to exercise professional judgment regarding that danger. To the contrary, Defendants worked to create the danger in the first place and also took affirmative acts to cut Plaintiffs off from aid and assist the parents in the kidnapping.

150.     As a proximate result of Defendants' actions, M. B. suffered a catastrophic brain injury as well as other physical injuries. All Plaintiffs have suffered extreme emotional distress. Upon information and belief, all Plaintiffs suffered from further abuse and neglect similar to what the Hobbs Police Department observed on June 3, 2019.

151.     Plaintiffs are entitled to damages, injunctive relief barring Defendants from committing further violations of their constitutional rights, punitive damages, reasonable attorneys' fees, and costs of suit.

152.     Garza's refusal to provide medical care to E.B. for her tuberculosis was also a breach of their special relationship with E.B. As a result of Garza's refusal, E.B. suffered damages the full extent of her damages are still being discovered.

153.     CYFD's refusal to immediately treat E.B., A.B, and R.B. for severe tooth decay is a separate breach of their special relationship with the children. Garza and Saldana knew that immediate medical treatment was needed.  A.D. in particular was especially harmed by this breach because A.D. had been on a soft food diet since June 2019. A dentist appointment was eventually scheduled by Saldana for A.D. in January 2020.

154.     CYFD engaged in other discrete breaches of their special relationship to keep the children safe and affirmatively protect them from harm as described in the preceding paragraphs.

155.     The Defendants' conduct shocks the conscience.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Violation of the Fourth and Fourteenth Amendments –**
**State Created Danger**
**(Against Defendants Saldana, Garza, De Los Santos, and Liggett in their individual and official capacities)**

156.     Plaintiffs incorporate and reassert the allegations as set forth in the foregoing paragraphs as though fully stated herein.

157.     Plaintiffs and Defendants are all persons for purposes of 42 U.S.C. § 1983.

158.     The Fourteenth Amendment of the United States Constitution vested Plaintiffs with a clearly established procedural and substantive due process right to be protected by Defendants

while in their care. Plaintiffs also possessed a constitutional right to not be harmed by private persons as a result of a state created danger.

159.   Defendants created a dangerous situation for Plaintiffs. They removed Plaintiffs from both parents' custody, placed them in a foster home, and then placed them in a trial home visit with just their father.

160.   The status quo for the children preceding the trial home visit was safe. The children were in a good foster home and their essential needs were being met.

161.   Defendants modified this status quo by removing the Plaintiffs from a place of safety, foster care, and starting a trial home visit with a person they knew was dangerous. Defendants each knew Ducila was dangerous because of the disclosures made in therapy by A.D. and R.B..

162.   Defendants could reasonably foresee that they were removing the Plaintiffs from a safe foster home placement and subjecting them to dangerous conditions which included being physically struck by Ducila. In play therapy, one of the children indicated that Ducila would come home, hit, kick and strike all members of the family, and on one occasion killed a family pet. On another occasion, Woodward observed Ducila holding M.B. like a basketball and demonstrating an appearance which suggested strongly that he was going to drop her, shake her or throw her.

163.   Defendants could also reasonably foresee that the children would be subject to neglect – including neglect that could lead to death or serious injury.

164.   Defendants could also reasonably foresee that Ducila would attempt to kidnap the children if given the opportunity due to the multiple instances of attempted bribery of CYFD employees and the occasion in which he tried to take the children from CYFD's office. Defendants Garza and Saldana in fact hoped that Ducila would abscond with the children.

165.    Defendants took affirmative acts to create this danger, including creating a false narrative that Ducila and Badea were fit parents and retaliating against and removing people who were acting in the children's best interest from the children's case and denying the children the ability to receive care from them.

166.    Plaintiffs are members of a limited and specifically definable group as they are the biological children of the two private actors who abused them.

167.    Defendants' conduct put Plaintiffs at substantial risk of serious, immediate, and proximate harm. This risk was obvious and known.

168.    Defendants acted recklessly and in conscious disregard of the known risks the trial home visit posed for Plaintiffs.

169.    Even after the risk came to pass, Plaintiffs were kidnapped, Defendants continued to act recklessly by refusing to timely report the children missing and refusing to tell the Hobbs Police Department that their custodial rights were being interfered with. Each Defendant's conduct was conscience shocking.

170.    As a proximate result of Defendants' actions, M. B. suffered a catastrophic brain injury. All Plaintiffs have suffered extreme emotional distress.

171.    Plaintiffs are entitled to damages, injunctive relief barring Defendants from committing further violations of their constitutional rights, punitive damages, reasonable attorneys' fees, and costs of suit.

### THIRD CLAIM FOR RELIEF
### New Mexico Tort Claims Act
### (Against Defendants CYFD, Saldana, Garza in their individual and official capacities)

172.    Plaintiffs incorporate and reassert the allegations as set forth in the foregoing paragraphs as though fully stated herein.

173.    At all times CYFD, Saldana, and Garza were responsible for providing Plaintiffs a safe living place.

174.    Defendants decided to house Plaintiffs with biological parents who had pending felony child abuse charges, and who Defendants knew or should have known were unfit.

175.    Saldana provided material assistance in operating Ducila's home by bathing Plaintiffs, providing further assistance at mealtimes, and transporting Plaintiffs to school. Upon information and belief, Saldana acted under Garza's direction and supervision.

176.     Saldana and Garza breached their duty to maintain a reasonably safe living place for the children while the children were in CYFD's legal custody.

177.     As a proximate result of Defendants' actions, M. B. suffered a catastrophic brain injury. All Plaintiffs have suffered extreme emotional distress.

178.     Plaintiffs are entitled to damages, injunctive relief barring Defendants from committing further violations of their constitutional rights, punitive damages, reasonable attorneys' fees, and costs of suit.

## PRAYER FOR RELIEF

Plaintiffs pray that judgment be entered against Defendants as follows:

1.      For general and special damages according to proof;

2.      For punitive damages according to proof;

3.      For costs of suit;

4.      For attorneys' fees;

5.      For pre-judgment interest; and

6.      For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

GUBERNICK LAW P.L.L.C.

/s/ Benjamin Gubernick
BENJAMIN GUBERNICK
New Mexico Bar No. 145006
Ben@gubernicklaw.com
734-678-5169
10720 W. Indian School Rd.
Ste. 19 PMB 12
Phoenix, AZ 85037

---and---

*/s/ Todd J. Bullion*
Todd J. Bullion
Law Office of Todd J. Bullion
4811 Hardware Dr NE
Bldg D, Suite 5
Albuquerque, NM  87109
(505) 452-7674
todd@bullionlaw.com

---and---

*/s/ Robert Gorence*
Robert Gorence
Gorence & Oliveros
300 Central Ave SW, Suite 1000E
Albuquerque, NM  87102
(505) 244-0214
gorence@golaw.us

---and---

*/s/ Jason Bowles*
Jason Bowles
Bowles Law Firm
4811 Hardware Dr NE
Bldg D, Suite 5
Albuquerque, NM  87109
(505) 217-2680
jason@bowles-lawfirm.com

*Attorneys for Plaintiffs*