**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**ALISON ENDICOTT-QUIÑONES,**
**Guardian ad Litem, on behalf of**
**A. D., R. B., E. B., and M. B.,**
**minor children,**

      **Plaintiffs,**

**vs.**               **No: 21-cv-00368 DHU/JMR**

**PATRICIA GARZA, in her individual**
**and official capacity; REBECCA LIGGETT,**
**in her individual and official capacity; BRENDA**
**SALDANA, in her individual and official capacity;**
**JENNIFER DE LOS SANTOS in her individual and**
**official capacity; NEW MEXICO CHILDREN YOUTH**
** & FAMILIES DEPARTMENT; and DOES 1-50,**

      **Defendants.**

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW New Mexico Children, Youth and Families Department ("CYFD"), Patricia

Garza, Rebecca Liggett, Jennifer De Los Santos, and Brenda Saldana (collectively "Defendants"), by

and through their attorneys, Park & Associates, LLC (Alfred A. Park and James J. Grubel), and for

their Motion for Summary Judgment  state as follows[1]:

## I.     SUMMARY

Plaintiff are four minors who became enmeshed in abuse and neglect proceedings when their

parents were found panhandling in a Walmart Parking lot in Hobbs New Mexico on June 3, 2019.

The parents were itinerant and were apparently passing through New Mexico.  The Children were

taken into CYFD custody based on concerns that the parents  were failing to provide for the Children's

basic needs including shelter, clothing, and medical treatment.  The Children were deemed neglected

by a state district court judge, placed into foster care, and their parents were ordered to complete a

---

[1] Pursuant to Rule 7.1, Plaintiffs' counsel was contacted and indicated that this Motion is opposed.

treatment plant, the goal of which was to remedy the conditions that led to the Children being placed into state custody.

In late March 2020, CYFD placed the three oldest children on a trial home visit with their biological parents. The youngest child was placed in her parents' home in April of 2020. About that time, the Children's mother was released from incarceration. Shortly thereafter, the parents fled New Mexico and took the Children with them, even though CYFD retained legal custody of the Children. More than six months after the family disappeared, in October 2020, the youngest child was left in a North Carolina hospital with serious injuries.

Plaintiffs' filed suit alleging that Defendants disregarded the constitutional rights and well-being of the Plaintiff children in "a concerted effort to get rid of their case." Doc 53 at ¶ 2. Plaintiffs generally assert that returning the Children to the physical care of their parents violated their rights because CYFD knew or should have known that the parents intended to "kidnap" them. The first claim of relief set forth in the Complaint asserts that, by placing the children back in the care of their biological parents, CYFD violated the special relationship it had with Plaintiffs, thus violating their Fourteenth Amendment rights. Count Two of the Complaint alleges that the Defendants created a dangerous situation by removing the Children from the safety of a foster parent home and returning them to the home of their biological parents. Count Three asserts that Defendants violated the New Mexico Tort Claims Act because Defendants decided to house Plaintiffs with their parents who they allegedly should have known were unfit.

In the First Claim of Relief, Plaintiffs assert that Defendants "violated the duties created by the special relationship they had with Plaintiffs by, among other things, removing Plaintiffs from safe and appropriate foster homes and providing [the parents] with unsupervised access to Plaintiffs while Plaintiffs were still in CYFD's custody." Doc 53 at ¶142. However, at set forth below, the Children were not in the physical custody of CYFD, so there was no special relationship as a matter of law.

Accordingly, Plaintiffs have not stated a claim upon which relief can be granted under 42 U.S.C. § 1983. Moreover, even assuming, *arguendo*, that a special relationship existed between Defendants and the Children, it was not clearly established, during any time relevant to the instant case, that such a relationship existed. As such, Defendants are entitled to qualified immunity.

In their Second Claim for Relief, Plaintiffs assert that Defendants "created a dangerous situation for Plaintiffs. They removed Plaintiffs from both parents' custody, placed them in a foster home, and then placed them in a trial home visit with just their father." Doc 53 at ¶159. Plaintiffs also allege that in "[i]n April 2020, [Mother] was released from jail. Within days of her release from jail the parents kidnapped Plaintiffs and disappeared." Id. at ¶119. However, because CYFD returned the Children to their biological parents and, the *status quo ante*, CYFD cannot be found to have created the danger. Again, even assuming, *arguendo*, that these actions could constitute creation of a danger, it was not clearly established, during any time relevant to the instant case, that such actions would be considered danger creation. As such, Defendants are entitled to qualified immunity.

In their Third Claim for Relief, Plaintiffs assert that Defendants violated the New Mexico Tort Claims Act. However, Plaintiffs fail to identify any waiver of immunity as the basis for tort liability against the state. Accordingly, Plaintiffs fail to state a claim as their assertion under the Tort Claims Act are barred by sovereign immunity.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

1. On June 3, 2019, Plaintiff minors A.D., R.B., E.B., and M.B ("Children" or "Plaintiffs") were observed by the Hobbs Police sitting outside a Walmart in 91-degree weather as their parents held signs asking for rent, money, gas, food, and formula. See Affidavit for Ex Parte Custody Order, ¶ 2 attached as Ex. A.; Corrected 2nd Amend. Complt at ¶19 (Doc 53).

2. The parents of the Children, A. D. and L.B. were from Romania and claimed they were seeking political asylum in the United States. Ex. A at ¶¶ 6, 7.[2]

3. CYFD requested the state court grant it custody based on allegations that "Mr. Ducila and Ms. Badea are failing to provide for the children's basic needs including shelter, clothing, and medical/mental treatment for the children. Mr. Ducila and Ms. Badea are going to be arrested for felony credit card fraud leaving no care taker for the children." Ex. A at p. 5.

4. In an order filed on August 20, 2019, the Children were adjudicated as "neglected" by a judge in the New Mexico Fifth Judicial District Court. *See* Stipulated Adjudicatory Judgment and Dispositional Order, attached as Ex. B. at ¶2 p. 5.

5. The Children were ordered to remain in foster care. Ex. B at p. 4 ¶10

6. Additionally, the parents were ordered to complete a Family Treatment Plan and Predispositional Study. Ex, B, p. 3, ¶8; p. 5 ¶5.

7. The Children were represented by a Guardian Ad Litem ("GAL"), Laura Castillo, throughout the abuse and neglect proceedings. See Ex. B. at p. 1.

8. The Childrens GAL filed an "Emergency Motion to Suspend Visitations" on January 28, 2020. See Motion, attached as Exhibit C.

9. The GAL's motion asserted "minor child, [AD] who is only five years old made certain disclosures to her therapist related to emotional trauma caused by father's direct actions; she has further exhibited sexualized behaviors in her foster home with other children in the home." Ex. C at ¶3.

10. The state court found in its order following a hearing on March 16, 2020, that "The emergency motion to suspend visits filed by the Guardian ad Litem is withdrawn, following CYFD

---

[2] The Exhibits referenced herein are filed separately under seal. *See* Doc 69.

hosting and filming special visit & investigating concerns raised by therapist." See Initial Permanency Order, attached as Exhibit D at p. 5.

11. The state court judge also found that the Children were to be transitioned home within a reasonable period depending on the facts and circumstances of the case not to exceed six months. Ex. D at ¶11

12. On April 16, 2020 notices were filed indicating that "the three older children were placed back with their parents on a trial home visit" on March 31, 2020. A similar notice indicated that MB "will be placed with her parents on a trial home visit" on or after April 20, 2020. *See* Notice of Change of Placement, attached as Exhibit E. *See also* Corrected Second Amended Complaint (Doc. 53) at ¶114.

13. In April 2020, Luiza Badea, mother of Plaintiffs, was released from detention. Doc. 53 at ¶119.

14. In late April or early May 2020, the parents fled New Mexico with the Children. Doc 53. At ¶119; *See also*, Status Conference Order, attached as Ex. F

15. In October 2020, MB was left at a hospital in North Carolina with serious injuries. Doc. 53 at ¶13; See also, Emergency Notice of Change of Placement, attached as Ex. G.

## III.     STANDARD OF REVIEW

### A. SUMMARY JUDGMENT STANDARD

When a defendant asserts qualified immunity at the summary judgment stage, it is the plaintiff's burden to prove (1) the defendant violated his constitutional rights; and (2) the law was clearly established at the time of the alleged violation. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The court has discretion to decide the order in which these two prongs should be addressed, and, when appropriate, does not need to address both. Pearson,

555 U.S. at 236–37, 129 S.Ct. 808 (2009). Only when a plaintiff satisfies this heavy burden must the defendant then satisfy the traditional summary judgment standard. <u>Estate of Ceballos v. Husk</u>, 919 F.3d 1204, 1212 (10th Cir. 2019); <u>Soza v. Demsich</u>, 13 F.4th 1094, 1099 (10th Cir. 2021)

Summary judgment is appropriate where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Such a finding is mandated when, after adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an element essential to that party's case and upon which that party will bear the burden of proof at trial. <u>Breen v. Black</u>, 709 Fed. Appx. 512, 513 (10th Cir. 2017) (unpublished); <u>Johnson v. Mullin</u>, 422 F. 3d 1184, 1187 (10th Cir. 2005). An issue is "genuine" if sufficient evidence exists on each side of an issue that a rational trier of fact could resolve the issue either way. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim. <u>Id.</u> While disposal of a case by summary judgment prior to trial can be considered a drastic means of disposing of litigation, it is appropriate when the no material issue of fact exists such that no jury could reasonably conclude in favor of the non-movant. <u>Bones v. Honeywell Intern., Inc.</u>, 366 F. 3d 869, 876 (10th Cir. 2004); <u>Jones v. Nelson</u>, 484 F. 2d 1165, 1168 (10th Cir. 1973).

In order to avoid summary judgment, the party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Indeed, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Id.</u> Although a plaintiff need not prove his entire claim at summary judgment, he is still required to present "specific facts showing that there is a genuine issue of trial." <u>Celotex Corp., v. Catrett</u>, 477 U.S. 317, 325 (1986).

The nonmovant's facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein. Fed. R. Civ. P. 56(c)(1)(A). See Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1024 (10th Cir. 1992). "[M]ere speculation, conjecture, or surmise" is insufficient to defeat a properly supported motion for summary judgment. Bones, 366 F.3d at 876.

## B. Standard of Review for Qualified Immunity

Government officials who perform discretionary functions are entitled to the defense of qualified immunity from claims brought pursuant to 42 U.S.C. § 1983 when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citing Procunier v. Navarette, 434 U.S. 555, 565, 98 S.Ct. 855, 861(1978); Wood v. Strickland, 420 U.S.308, 322, 95 S.Ct.992, 1001 (1975)). If the law at the time of the alleged conduct is not clearly established, "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." Harlow, 457 at 818, 102 S.Ct. at 2738.

Upon the filing of a motion to dismiss on the basis of qualified immunity, a plaintiff's response must meet a "heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10thCir. 2001). Specifically, "[o]nce a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff ... [to] show that (1) the official violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established when the alleged violation occurred." Baumeister v. N.M. Comm'n for the Blind, 425 F.Supp.2d 1250, 1268 (D.N.M. 2006) (quoting Verdecia v. Adams, 327 F.3d 1171, 1174 (10thCir. 2003)).

The first prong of the qualified immunity analysis requires a determination of whether the facts as alleged state a claim for a constitutional violation. Gomes v. Wood, 451 F.3d 1122, 1134

(10th Cir. 2006); Perez v. Elington, 421 F.3d 1128, 1131 (10th Cir. 2005)(quoting Mitchell v. Forsyth, 472 U.S. 511, 528, 105S.Ct. 2806, 2817 n.9 (1985)). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10thCir. 1994). Sufficiency of a complaint is a question of law for this Court to decide, accepting as true all well-pleaded factual allegations, viewing those allegations in the light most favorable to the non-moving party, and drawing all reasonable inferences in Plaintiff's favor. See Moore v. Guthrie, 438 F.3d 1036, 1039 (10thCir. 2006); Housing Auth. of Kaw Tribe v. City of Ponca City, 952 F.2d 1183, 1187 (10thCir. 1991).

The second prong of the qualified immunity analysis requires a determination of whether the right allegedly violated was clearly established at the time of the alleged unlawful conduct. Smith v. Cochran, 339 F.3d 1205 (10th Cir. 2003). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Mullenix v. Luna, 136 S.Ct. 305, 308 (2015) (quoting Reichle v. Howards, 566 U.S.658, 664, 132 S.Ct. 2008, 2093 (2012)) (the constitutional rule applied must be "beyond debate").

"The law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains." Roska v. Peterson, 328 F.3d 1230, 1248 (10th Cir. 2003) (citing Farmer v. Perrill, 288 F.3d 1254, 1259 (10thCir.2002)). "[T]he contours of the right must be sufficiently clear such that an objectively reasonable officer would understand that what she is doing violates that right." Id,328 F.3d at 1247 (citing Anderson v. Creighton, 483 U.S. 635, 639-40, 107 S.Ct. 3034,3039 (1987)).

In determining whether a defendant's conduct violated clearly established rights, the Court may consider only those decisions decided prior to the allegedly unlawful conduct in question. Stewart v. Donges, 915 F.2d 572, 581 (10th Cir.1990); Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131

S.Ct. 2074, 2083 (2011) (precedent existing at the time of the challenged conduct must have placed the constitutional question beyond debate). "The plaintiff carries the burden of convincing the court that the law was clearly established." <u>Pueblo Neighborhood Health Centers, Inc. v. Losavio</u>, 847 F.2d 642, 645 (10th Cir.1988).

In meeting this burden "a plaintiff must do more than identify in the abstract a clearly established right and allege that the defendant has violated it." <u>Romero v. Fay</u>, 45 F.3d 1472, 1475 (10th Cir. 1995). In fact, while a right to some process may be clearly established, "the clearly established law must be 'particularized' to the facts of the case." <u>Lee. V. Univ. of N.M.</u>, 2020 WL 1515381 at *42 (D.N.M. Slip Copy, March 30, 2020) (Browning, J.) citing <u>White v. Pauly</u>, 137 S. Ct. 548, 552 (2017).

"Because the doctrine of qualified immunity represents a balance that has been struck between competing values, 'the trial judge is burdened with a responsibility at an early stage, to make determinations of law based upon what the clearly established law governing the case was at the time of the challenged acts.'" <u>Id</u>., 847 F.2d at 646 (quoting <u>Dominque v. Telb</u>, 831 F.2d 673, 677 (6th Cir.1987)).

This Court has the discretion to decide which of the two prongs of the qualified immunity analysis to address first, "in light of the circumstances of the particular case at hand." <u>Pearson v. Callahan</u>, 555 U.S. 223, 236, 129 S.Ct. 808, 818 (2009).

**C.  <u>Legal Standard for Special Relationship</u>**

The Due Process Clause "generally confer[s] no affirmative right to governmental aid, even when such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." <u>DeShaney v. Winnebago County Dep't of Social Servs</u>., 489 U.S. 189, 196 (1989). Similarly, "state actors are liable only for their own acts, and not the violent acts of third parties." <u>Liebson v. New Mexico Corrections Dep't.</u> 73 F.3d 274, 276 (10th Cir.1996).

There are, however, two relevant exceptions to this general rule. First, "state officials can be liable for the acts of third parties where those officials 'created the danger' that caused the harm." <u>Seamons v. Snow</u>, 84 F.3d 1226, 1236 (10th Cir. 1996) (quoting <u>Uhlrig v. Harder</u>, 64 F.3d 567, 572 (10th Cir. 1995)). Second, "if the state restrains an individual's freedom to act to protect himself or herself through a restraint on that individual's personal liberty, the state may thereby enter into a 'special relationship' during such restraint to protect that individual from violent acts inflicted by others." <u>Armijo v. Wagon Mound Pub. Schs.</u>, 159 F.3d 1253, 1261 (10th Cir. 1998). Absent involuntary restraint, however, no duty to protect arises under the special-relationship theory. <u>Armijo</u>, 159 F.3d at 1261.

### D. <u>Legal Standard for Danger Creation</u>

As stated above, "state officials can be liable for the acts of third parties where those officials 'created the danger' that caused the harm." <u>Seamons v. Snow</u>, 84 F.3d 1226, 1236 (10th Cir. 1996) (quoting <u>Uhlrig v. Harder</u>, 64 F.3d 567, 572 (10th Cir. 1995)). This "danger creation" exception to the general rule applies only when a state actor "affirmatively acts to create, or increases a plaintiff's vulnerability to, danger from private violence." <u>Currier v. Doran</u>, 242 F.3d 905, 923 (10th Cir.2001). To state a *prima facie* case, the plaintiff must show that (1) state actors created the danger or increased the plaintiff's vulnerability to the danger in some way, (2) the plaintiff was a member of a limited and specifically definable group, (3) the defendants' conduct put the plaintiff at substantial risk of serious, immediate, and proximate harm, (4) the risk was obvious or known, (5) the defendants acted recklessly in conscious disregard of that risk, and (6) the conduct, when viewed in total, shocks the conscience. <u>Ruiz v. McDonnell</u>, 299 F.3d 1173, 1182–83 (10th Cir.2002); <u>Robbins v. Oklahoma</u>, 519 F.3d 1242, 1251 (10th Cir. 2008). The danger creation theory focuses on the affirmative actions of the state in placing [an individual] in harm's way. <u>Currier v. Doran</u>, 242 F.3d 905, 919 (10th Cir.2001).

Under a danger creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm." Uhlrig v. Harder, 64 F.3d at 573. A plaintiff must show "sufficient[ ] 'affirmative conduct on the part of the state in placing the plaintiff in danger.' " Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d at 916). In determining whether the danger creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm. See Christiansen v. City of Tulsa, 332 F.3d at 1281. The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk." Medina v. City & Cty. of Denver, 960 F.2d 1493, 1496 (10th Cir.1992), overruled on other grounds by Morris v. Noe, 672 F.3d 1185 (10th Cir.2012). The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences." Medina v. City & Cty. of Denver, 960 F.2d at 1496.

### E. Legal Standard for Conscience Shocking

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience. See Cty. of Sacramento v. Lewis, 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."). "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." Camuglia v. City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir.2006) (quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir.2006)) (internal quotation marks omitted). "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly

conscience shocking." <u>Camuglia</u> at 1222–23 (quoting <u>Uhlrig v. Harder</u>, 64 F.3d at 574) (internal quotation marks omitted).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

<u>Camuglia v. City of Albuquerque</u>, 448 F.3d at 1223 (quoting <u>Uhlrig v. Harder</u>, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." <u>Pena v. Greffet</u>, 922 F.Supp.2d at 1227 (citing <u>James v. Chavez</u>, 830 F.Supp.2d 1208, 1276 (D.N.M.2011) (Browning, J.) (finding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), <u>aff'd</u>, 511 Fed.Appx. 742 (10th Cir.2013)).

### F. <u>Legal Standard Claims Pursuant to the New Mexico Tort Claims Act</u>

The New Mexico Legislature has declared that the "public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that Act." TCA at §41-4-2A. New Mexico courts have held that the TCA is the exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the TCA and no other claim, civil action or proceeding for damages, by reason of the same occurrence, may be brought against a governmental entity or against the public employee or his estate whose act or omission gave rise to the suit or claim. <u>Id.</u> at §41-4-17A. In other words, a plaintiff may not sue a governmental entity of New Mexico, or its employees or agents, unless the plaintiff's cause of action fits within one of the

exceptions to immunity granted in the TCA. See Begay v. State, 1985-NMCA-117, 104 N.M. 483, 486, 723 P.2d 252, 255 (Ct. App. 1985) ("Consent to be sued may not be implied, but must come within one of the exceptions to immunity under the Tort Claims Act."), rev'd on other grounds by Smialek v. Begay, 1986-NMCA-049, 104 N.M. 375, 721 P.2d 1306 (1986). A plaintiff also may not sue a governmental entity or its employees for damages arising out of violations of rights under the New Mexico Constitution, unless the TCA contains a waiver of immunity.[3] See Barreras v. N.M. Corr. Dep't, 2003-NMCA-027, ¶24, 133 N.M. 313, 62 P.3d 770 ("In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act.")

It is Plaintiff's burden to identify which of the specific statutory sections allegedly waive immunity. See Rubio v. Carlsbad Municipal School District, 1987-NMCA-127, 106 N.M. 446, 448, 744 P.2d 919, 921 (Ct. App. 1987).

## IV.  ARGUMENT

### A. Plaintiffs cannot maintain a cause of action for violation of the Fourteenth Amendment because there was no special relationship.

Plaintiffs cannot meet their heavy burden of demonstrating that CYFD's conduct violated their Fourteenth Amendment rights.  More specifically, courts have found that there is no special relationship when children in the legal custody of the state are placed in the physical custody of their biological parents, as CYFD would lack the necessary ability to physically restrain the children. Accordingly, Plaintiffs fail to sufficiently state a §1983 claim for a constitutional deprivation and the first claim for relief must be dismissed for failing to state a claim based upon qualified immunity. Holland, 268 F.3d at 1186; Baumeister, 425 F.Supp.2d at 1268.

---

[3] While the Legislature has now created a cause of action for claims brought under the New Mexico Constitution against public bodies, it does not apply retroactively and thus, cannot apply to this case. NMSA 1978 § 41-4A-12.

1. <u>There is no evidence of the requisite restraint</u>

Plaintiffs' focus on CYFD retaining legal custody to support the creation of a special relationship is misplaced. The fundamental element that establishes a special relationship is whether the state restrains an individual's freedom to protect himself. In <u>Armijo</u>, the Tenth Circuit explained that, if a state restrains an individual's freedom to protect himself, "the state may thereby enter into a 'special relationship' <u>during such restraint</u> to protect that individual from violent acts inflicted by others." 159 F.3d at 1261 (emphasis added). Here, placing the children on a trial home visit with their parents does not constitute a restraint on the Children, but rather a lack of restraint on their biological parents. Moreover, the alleged harm occurred nearly six months after the parents fled New Mexico when was injured in North Carolina. **SMF 15**. Because Defendants had no control over the location of the Plaintiffs after April 2020, Defendants could not exercise any restraint over Plaintiffs and, therefore, there can be no special relationship.

The undisputed facts do not support a claim for the creation or breach of a special relationship. Plaintiffs argue that "Defendants violated the duties created by the special relationship they had with Plaintiffs by, among other things, removing Plaintiffs from safe and appropriate foster homes and providing [Father] and [Mother] with access to Plaintiffs and the opportunity to kidnap Plaintiffs while Plaintiffs were still in CYFD's custody. <u>Doc 53.</u> at ¶142. Plaintiffs also assert that Defendants had not formally transferred physical or legal custody of the Plaintiffs back to the parents. <u>Id</u>. at ¶143. Plaintiffs' allegation is a futile attempt to avoid the implications between legal and physical custody. Even read in a light most favorable to Plaintiffs, they were transferred to the home of their parents. There is no legally sustainable argument that they were not in the physical control of their parents once placed on the trial home visit. Indeed, if they were not under the parents' control, the Children could not have been removed from the state.

Plaintiffs also assert that Defendants took affirmative actions in furtherance of their scheme [to return the Plaintiffs to their parents]. Id. at ¶147. Quite simply, despite asserting multiple facts that are immaterial to their claims, Plaintiffs contend that CYFD failed to exercise control over the Children's location.[4]

None of the undisputed facts Complaint support the conclusion that Plaintiffs were restrained or that any restraint rose "to the same level of involuntary restraint as arresting, incarcerating, or institutionalizing an individual." Armijo at 1261. Defendants did not have day-to-day physical control of the Children's ability to satisfy their basic needs; that was the role of the biological parents. Bathing and transporting a child on occasions does not rise to the requisite level of restraint. Moreover, these allegations are precluded by the fact that the Children were injured when they were outside New Mexico. There are no allegations supporting CYFD provided care in any form to the Children outside of the state and the injuries did not occur during a time of restraint.

2. CYFD's legal custody of Plaintiffs does not create a special relationship.

The fact that Defendants did not have physical custody of the children resulting in the lack of physical control and restraint, is dispositive. Indeed, Judge Armijo of the Federal District of New Mexico, in a factually similar but more egregious case, found there was no special relationship when CYFD, who retained legal custody, placed children in the physical custody of their biological father. Hernandez v. Rapp, No. CV 00-1456 MCA/WDS, 2003 WL 27385396, at *1 (D.N.M. Mar. 31, 2003).

---

[4] The Corrected Second Amended Complaint cites to examples of state law that Plaintiffs assert create a duty for Defendants to protect Plaintiffs. See, e.g. Doc. 53 . at ¶¶ 128. 146 However, a violation of state law does not, in itself, give rise to a § 1983 claim. See, e.g., Robison v. Via, 821 F.2d 913, 922 (2d Cir.1987) (violation of state law neither gives plaintiff a § 1983 claim, nor deprives defendants of the defense of qualified immunity); see also Davis v. Scherer, 468 U.S. 183, 197 & n. 11, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

In Hernandez, the children's father, Ralph Hernandez, beat and shot at their mother, Dora Hernandez, in the presence of the children. Ralph Hernandez was subsequently arrested, convicted of aggravated assault with a deadly weapon, and given a four-year prison sentence. Id. at *2. CYFD thereafter took physical and legal custody of the children. While the father was incarcerated, no action was taken to terminate the parental rights of Ralph and Dora Hernandez or to ensure that the Hernandez children would be adopted during this period. Eventually, the father was released from prison. While the Hernandez children remained in the legal and physical custody of CYFD, CYFD employees began receiving information that the father had started drinking alcohol again, and they knew this information meant that the children would be in imminent danger of serious harm if placed in his custody. Nevertheless, CYFD employees approved and facilitated the delivery of all six Hernandez children to the physical custody of Ralph Hernandez. Id. at *3.

Later, a CYFD employee conducted a cursory investigation of the Hernandez family, which resulted in a memorandum that vouched for Ralph Hernandez's parenting abilities and discounted or omitted information from other sources indicating that the children were in jeopardy. CYFD then used the report to justify relinquishing CYFD's legal and physical custody of the children to their father. Id. The Children's Court granted the father both legal and physical custody of the children. The children would eventually be again removed because of sexual abuse perpetrated by the father on them. Id.

In Hernandez, the plaintiffs asserted that CYFD retained legal custody of the Hernandez children during part of the time they were abused by their biological father. Id. at *10. Judge Armijo found that these allegations were insufficient to maintain a cause of action under the special relationship theory and found dispositive the fact that the children were placed with a biological parent, as opposed to a foster parent. Id. Specifically, Hernandez found:

> A different situation is presented by relinquishing the physical custody of a child to a
> parent whose biological relationship and legal rights with respect to that child precede

16

any intervention by the State on the child's behalf. In this situation, the fact that the State retains legal custody of the child is not sufficient to establish a "special relationship" for purposes of asserting a claim under the substantive component of the Due Process Clause. Legal custody without day-to-day physical control of a child's ability to satisfy his or her basic needs is more akin to the mere undertaking or proclamation of intent to protect a child, which the Supreme Court found insufficient to establish such a special relationship in <u>DeShaney</u>, 489 U.S. at 197-98, or to the limited custodial responsibilities imposed by state compulsory school-attendance statutes, which the Tenth Circuit found insufficient to establish such a relationship in <u>Maldonado v. Josey</u>, 975 F.2d 727, 732-33 (10th Cir. 1992), <u>Seamons</u>, 84 F.3d at 1235-36, and Armijo, 159 F.3d at 1261-62.

<u>Hernandez</u> at * 10-11.

In <u>Hernandez</u>, the defendants failed to investigate the father's alleged alcohol abuse, as well as allegations that the father was physically abusing the children. The court in <u>Hernandez</u> found that, "[l]egal custody without day-to-day physical control of a child's ability to satisfy his or her basic needs is more akin to the mere undertaking or proclamation of intent to protect a child, which the Supreme Court found insufficient to establish such a special relationship in <u>DeShaney</u>, 489 U.S. at 197-98." <u>Hernandez</u> at *10.

The same reasoning applies here, where the crux of Plaintiffs' argument is that CYFD failed to ensure that the children were kept safe from their parents. Plaintiffs allege that CYFD retained legal custody of them, but that they were placed in the physical custody of their biological parents, or at least initially with just the Father. Pursuant to the reasoning of <u>Hernandez</u>, legal custody is insufficient to establish that a special relationship existed. The dispositive factor is the physical control and restraint exercised by CYFD. At its essence, Plaintiffs assert that the failure to restrain the parents was the cause of injuries to the Children. That failure to restrain does not support a claim for a breach of a special relationship.

The Eleventh Circuit employed similar reasoning when it dismissed a substantive due-process claim under circumstances "where a public agency is awarded legal custody of a child, but does not control that child's physical custody except to arrange court-ordered visitation with the non-

custodial parent." <u>Wooten v. Campbell</u>, 49 F.3d 696, 699 (11th Cir. 1995). In particular, the Eleventh Circuit rejected the analogy to a foster care situation and instead analogized the situation of private physical custody and state legal custody to the circumstances presented in <u>DeShaney</u> and <u>Maldonado</u>. <u>See</u> <u>Wooten</u>, 49 F.3d at 699-701.

Further, this matter is likewise distinguishable from a case in which CYFD placed a child with a foster parent and that child is subsequently harmed. The foster parent is licensed and controlled by CYFD. The child, whether placed voluntarily or involuntarily, is dependent on the state, by means of its agent foster parent, for basic needs. When a child is placed with a biological parent, state control is lacking. <u>Hernandez</u> specifically distinguished biological and foster parents. Moreover, <u>DeShaney</u> noted that the Supreme Court might have ruled differently had the issue at bar been abuse by a foster parent rather than a failure to remove a child from an abuse biological parent. The Supreme Court reasoned:

> Had the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect. Indeed, several Courts of Appeals have held, by analogy to <u>Estelle</u> and <u>Youngberg</u>, that the State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents.

<u>DeShanney</u>, 489 U.S. 189, 201, n. 9, 109 S. Ct. 998, 1006, 103 L. Ed. 2d 249 (1989)

Lastly, to the extent that the Complaint alleges facts claiming CYFD had knowledge that the biological parents posed a danger to Plaintiffs, this is irrelevant. The Tenth Circuit has held that the defendants' knowledge of a risk of harm to the plaintiff was "not relevant to the determination of whether a special relationship existed." <u>Armijo By & Through Chavez v. Wagon Mound Pub. Sch.</u>, 159 F.3d 1253, 1262 n.5 (10th Cir. 1998). Likewise, the allegations that Defendants knew the parents would flee or otherwise posed a danger, even if assumed to be true, is a red-herring and does not establish there was a special relationship.

**B. Plaintiffs' allegation of danger creation fails because they were placed back in the custody of their biological parents.**

Plaintiffs cannot meet their heavy burden of demonstrating that CYFD's conduct violated their Fourteenth Amendment rights and fail to allege facts that would support all of the required elements of danger creation. Plaintiffs allege that "Defendants acted recklessly and in conscious disregard of the known risks the trial home visit posed for Plaintiffs. Even after the risk came to pass, Plaintiffs were kidnapped, Defendants continued to act recklessly by refusing to timely report the children missing and refusing to tell the Hobbs Police Department that their custodial rights were being interfered with." Doc 53 at ¶¶ 168, 169. This allegation, even assumed true, is insufficient to rise to the level of being conscience shocking. Plaintiffs allege that the alleged actions of Defendants were done recklessly and in disregard. At most, this might meet the fourth element of establishing danger creation. However, this alone is simply does not rise to the level of conscious shocking and is foreclosed by <u>Camuglia</u>.

Moreover, the facts here are similar to those of <u>DeShanney,</u> where the United States Supreme Court found there was no due process violation when the state took a child from an abusive father and later returned the child to that abusive parent. The United States Supreme Court held that because "the State once took temporary custody of [the child] does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect [the child]." <u>DeShaney v. Winnebago Cty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 201, 109 S. Ct. 998, 1006, 103 L. Ed. 2d 249 (1989). "While the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." <u>Id</u>. at 201, 109 S.Ct. 998. The Court noted that "[t]he most that

can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." Id. at 203, 109 S.Ct. 998.

At its core, the Plaintiffs asserts that they were removed from their parents and then later returned to the parents. **SMF 4, 5 , 14** While the Complaint asserts other facts in an apparent attempt to show conscience shocking behavior, that is all irrelevant to whether Defendants created a danger for the Children. The law is clear that Defendants did not create a danger by returning the Children to their parents, even if they knew the parents posed a threat to the safety of the Children. To hold otherwise would be turning Defendants into the guarantors of the Children's safety. This theory of liability is explicitly rejected by DeShaney. Accordingly, because the Children were returned to their parents and the *status quo ante*, Defendants cannot be liable for damages suffered by the Children because new or enhanced dangers were not created as a matter of law.

Plaintiffs' attempt to distinguish the facts from DeShaney by focusing on the wrong time period to define the status quo. Of note, before Defendants intervened, Plaintiffs were with their biological parents. But for the actions of the state, Plaintiffs would not have been in foster care. If the Defendants had done nothing, they would have always been in the custody of their parents. The but for action is not the removal from foster care but placement in foster care

This conclusion is supported by case authority. In Currier, two young children were removed from their mother's home and a court granted legal custody to the state. 242 F.3d at 909. The court then gave the father physical custody, and later legal custody, despite knowledge on the part of social workers that the father regularly failed to pay child support and was likely to be an inadequate caregiver. Id. During the father's custody of the children, social workers received repeated reports of abuse from the children's mother, but no steps were taken to end the father's custody. Id. at 909–10. Ultimately, one of the children died of burns after his father poured boiling water over him. Id. at 910.

The plaintiffs brought claims against three social workers who had been assigned to the case; each asserted qualified immunity. Id. at 908.

The Tenth Circuit held that a social worker had not committed a constitutional violation because the social worker's failures occurred only after the children were in the father's legal custody. Id. at 920. Thus, he had not created any danger and he had "no constitutional duty to rescue the children," even assuming that he knew that other actors had created a danger to the children and he had "a clear opportunity to rescue [them]." Id. at 921.

A second social worker, Doran, was sued because he was responsible for the state court's award of custody to the father and because of "various allegations as to [his] involvement after legal custody was awarded to [the father.]" Currier, 242 F.3d at 919. The Tenth Circuit rejected qualified immunity for Doran with respect to his role in placing the children with the father because his assistance in their placement did create a danger to the children. Id. at 919–20. The Tenth Circuit distinguished DeShaney because *the state had not returned the children to the same person (the children's mother) from whom it had taken custody*. Here, the Children were returned to the parents from whom they were removed. Accordingly, Defendants did not create the danger.

Plaintiffs attempt to avoid the application of DeShaney by asserting that CYFD did not simply return the Children to the *status quo ante*. Plaintiffs assert that the Children were placed in the home of just their father as opposed to both parents. However, this assertion is immaterial, because Plaintiffs also aver that the mother was released from jail and within days of the release the parents kidnapped Plaintiffs and disappeared. **SMF 13, 14.**. First, Plaintiffs admit that the kidnapping did not take place until the mother came home, and also admit that the mother participated in the kidnapping. Thus, the kidnapping was not proximately caused by the fact that the Children were returned to the father alone. Further, Plaintiffs admit the mother was in jail at the time the Children were initially placed with the father. Even if CYFD had not taken custody of the Children in the first place, the fact

that the mother was incarcerated meant that the father would have been the only parent having physical custody regardless of CYFD's intervention.

Moreover, Plaintiffs appear to be asserting that the damage they suffered was that they were placed in the control of their biological parents rather than foster parents, who provided a more stable and better environment. But Defendants did not create the danger. Plaintiffs were born to their parents and lived with their parents until CYFD took custody. The trial home visit did not expose Plaintiffs to any greater danger than they would have been exposed but for the interactions of Defendants. Rather, Plaintiffs would have been in their biological parents' care and control. They were only in the care of foster parents but for the actions of Defendants.

Lastly, Plaintiff MB was injured in October of 2020, approximately six months after she was taken from New Mexico. **SMF 15**. A six-month gap between an alleged act and the harm caused by that act cannot reasonably be considered "an immediate, and proximate harm,' as required by <u>Currier</u> Defendants' actions did not place the Plaintiffs in danger as a matter of law and ewre not the cause of her injuries in North Carolina.

**C. Defendants are entitled to qualified immunity, as it was not evident that placing children back with their biological parents violated a clearly established statutory or constitutional right when the alleged violation occurred.**

Even assuming that Plaintiffs have stated a plausible claim that Defendants committed any constitutional violations within the pleadings, Defendants are still entitled to qualified immunity. When targeted by an action brought under 42 U.S.C. § 1983, a government official can assert the defense of qualified immunity. When acting in the scope of their duties, "officials 'are shielded from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Davis v. Scherer</u>, 468 U.S. 183, 191, 104 S. Ct. 3012, 3017 (1984), citing <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S. Ct. 2727, 2739 (1982).

The second prong of the qualified immunity analysis requires a determination of whether the right allegedly violated was clearly established at the time of the alleged unlawful conduct. Smith v. Cochran, 339 F.3d 1205 (10th Cir. 2003). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Mullenix v. Luna, 136 S.Ct. 305, 308 (2015) (quoting Reichle v. Howards, 566 U.S. 658, 664, 132 S.Ct. 2008, 2093 (2012)) (the constitutional rule applied must be "beyond debate"). The pleaded facts simply fail to show that Defendants' conduct violated a clearly established law of which a reasonable person would have known. See Pueblo Neighborhood Health Ctrs. v. Losavio, 847 F.2d 642, 646 (10th Cir. 1988).

1. <u>There was no clearly established right that placing the Children back with their parents violated duties created by a special relationship.</u>

Plaintiffs cannot establish that their actions violated a clearly established right because case authority does not support a finding that CYFD's retention of legal custody is sufficient to establish a special relationship. In Hernandez, the court found that the defendants were entitled to qualified immunity because it was not clear that the children plaintiffs' rights were violated by virtue of a breach of the special relationship. Hernandez at *10. Other courts have similarly held that "legal custody without physical custody is insufficient to create a 'special relationship." Briggs v. Oklahoma ex rel. Oklahoma Department of Human Services, 472 F.Supp.2d 1294 (W.D.Okla.2007); A.M. ex rel. Youngers v. New Mexico Dep't of Health, 65 F. Supp. 3d 1206, 1232 (D.N.M. 2014); A.S. v. Tellus, 22 F.Supp.2d 1217, 1221 (D.Kan.1998); e.g., Wooten v. Campbell, 49 F.3d 696 (11th Cir.1995) (no special relationship where state has legal custody, mother has physical custody, and child injured by natural father); Clark v. City of Philadelphia, 2006 WL 2321574 (E.D.Pa. Aug. 8, 2006) (absent physical custody, no special relationship exists).

Multiple courts have held that legal custody without physical custody is insufficient to create a special relationship. Therefore, Plaintiffs cannot cite to any decision or authority that would have

put Defendants on notice that any of the conduct alleged to have occurred violated the Fourteenth Amendment. Pueblo Neighborhood, 847 F2d at 645 (plaintiff bears burden of convincing court that the law was clearly established). Accordingly, all of the Defendants named in their individual capacities are entitled to qualified immunity and to dismissal of the first claim for relief.

2. There was no clearly established right that placing the Children back with their parents created a danger.

Plaintiffs cannot demonstrate that Defendants' actions violated a clearly established right because case authority does not support a finding that CYFD's return of the Children to their biological parents for a trial home visit is sufficient to establish that Defendants created a danger that harmed the Children. Indeed, as noted above, case authority, including DeShaney and Currier, require a finding that Defendants did not create a danger to the Children by returning them to the parents from whom they were removed.

Tenth Circuit case law clearly establishes that "reckless, conscience shocking conduct that altered the status quo and placed a child at substantial risk of serious, immediate, and proximate harm was unconstitutional." Currier, 242 F.3d at 924. Denying qualified immunity requires more, however. It requires that every reasonable official in the Defendants' shoes would have known that the actions in question violated clearly established law. See Currier at 925 (granting qualified immunity, because the "particular theory of danger creation on which Plaintiffs have stated a claim ... is substantially less established in the case law"). In Currier, the state formally removed a child from a mother's custody and legally placed the child with the father. See 242 F.3d at 918–19 ("When the state affirmatively acts to remove a child from the custody of one parent and then places the child with another parent, DeShaney does not foreclose constitutional liability.")(emphasis added). The Tenth Circuit's opinion is predicated on the fact that the state placed the child with a new parent. See 242 F.3d at 918–19. No case in the Tenth Circuit or elsewhere establishes that returning children to their biological parents affirmatively creates a danger and violates a child's constitutional rights. The closest case is Currier,

but there: (i) the State had formal, legal custody over the child; and (ii) the State placed a child with a different parent. See Kerns v. Bader, 663 F.3d at 1188 (stating that the law is not clearly established where "a distinction might make a constitutional difference")(emphasis in original).

Accordingly, even if the Court were to find that placing the Children back with their parents could constitute danger creation, there is no analogous binding case authority that would provide Defendants notice that such an action constituted a constitutional violation. Therefore, Defendants are entitled to qualified immunity.

**D. There is no applicable Tort Claims waiver for the acts alleged**

There are no provisions within the TCA that impose a duty on CYFD or its employees to obtain or retain custody of children from biological parents. Additionally, there is no waiver of immunity pursuant to the TCA that would allow for a claim to move forward when the claim is based on injuries to a child over whom CYFD does not have physical custody.

At no point within the four corners of the Complaint does Plaintiff even cite to an applicable waiver of the TCA. Rather, Plaintiffs merely states that, "CYFD, Saldana, and Garza were responsible for providing Plaintiffs a safe living place. Defendants decided to house Plaintiffs with biological parents who had pending felony child abuse charges, and who Defendants knew or should have known were unfit." See Doc. 53 at ¶ 173-174. Plaintiffs further allege "Saldana and Garza breached their duty to maintain a reasonably safe living place for the children while the children were in CYFD's legal custody." Doc. 53 at ¶176

Assuming *arguendo,* given the reference to a safe living space*,* that Plaintiffs are relying on the operation of a public building waiver NMSA §41-4-6, such an argument fails. This statutory provision does not provide for a cause of action against Defendants. In reviewing a similar argument, the New Mexico Court of Appeals reasoned:

> We borrow from Judge Black's introduction in <u>M.D.R. v. State ex rel.</u> <u>Human Servs. Dep't</u>, 114 N.M. 187, 188, 836 P.2d 106, 107 (Ct.App.1992), to the interplay between CYFD action and immunity:
>
>> It is true that employees of the Department have a responsibility to oversee and supervise the safety and well-being of children entrusted to [the Department]. But it does not necessarily follow that the Department may be held liable under the [Tort Claims] Act for a breach of that duty. The Act declares that governmental entities and public employees shall only be liable within the limitations of its provisions. Governmental entities and public employees, while acting within the scope of their duties, are immune from tort liability except as waived by the Act. The right to sue and recover is therefore specifically limited to the rights, procedures, limitations, and conditions of the Act.

<u>Young v. Van Duyne</u>, 2004-NMCA-074, ¶ 12, 135 N.M. 695, 699, 92 P.3d 1269, 1273 (first alteration in original) (internal quotation marks and citations omitted.)

Plaintiffs set forth an inconsistent argument that conflates two diametrically opposed fact patterns. Plaintiff contends that Defendants failed to protect the Plaintiffs by placing them in the custody of their biological parents. However, Plaintiffs also assert that the "parents kidnapped Plaintiffs and disappeared." Doc. 53 at ¶119. Accordingly, the harm that allegedly occurred did not happen in a building controlled or operated by Defendants, but necessarily occurred somewhere other than a place in CYFD control. <u>See</u> Doc. 53 at ¶131. Moreover, the Complaint admits that CYFD lost control over the Plaintiffs. Doc. 53, ¶¶ 119-120.

Plaintiffs further muddle the issue by asserting "Saldana provided material assistance in operating Ducila's home by bathing Plaintiffs, providing further assistance at mealtimes, and transporting Plaintiffs to school. Upon information and belief, Saldana acted under Garza's direction and supervision." Doc. 53 at ¶175. This allegation has no bearing on whether the waiver for operation of a building is applicable because, even assuming that CYFD operated the parents' home, which is denied, the harm did not take place in the home. The harm was not caused directly by any CYFD employee and occurred months after the Plaintiffs left New Mexico.

As a matter of law, there is no applicable waiver of immunity pursuant to the TCA that would support the allegations against Defendants. See Young, 2004-NMCA-074, ¶ 30. In Young, the Court of Appeals determined that there was no authority for interpreting § 41-4-6 so broadly as to intend the building waiver to apply to a private home. Id. at ¶ 29. Young addressed the issue of CYFD's duty in connection with supervision, oversight, operation, or maintenance of a home into which a child is placed for adoption. The court's analysis was predicated on the fact the legal relationship of the adopted child to the adoptive parents was the same as if he were a biological child. Young, ¶ 25. Accordingly, the same analysis is appropriate here, where the Plaintiffs were in the physical custody of their biological parents. Plaintiffs cite to no authority or allege any facts supporting their novel claim that the home of the biological parent was somehow a foster home.

Plaintiff's Complaint fails to include any other waiver provision of the TCA. Because there is no applicable waiver of sovereign immunity for the negligence alleged in the SAC, the causes of action pursuant to the TCA are futile and leave to file the SAC should be denied.

WHEREFORE, Defendants respectfully request that the Court enter summary judgment in Defendants' favor as to all claims asserted in Plaintiff's Corrected Second Amended Complaint for failure to identify a constitutional violation, or alternatively, based on qualified immunity, to dismiss the state tort claims based on sovereign immunity and for such further relief as the Court deems appropriate.

Respectfully Submitted:

PARK & ASSOCIATES, LLC

By _/s/ James J. Grubel_____
Alfred A. Park
James J. Grubel
3840 Masthead Street, N.E.
Albuquerque, NM 87109
505-246-2805 ext. 104
jgrubel@parklawnm.com

*Counsel for Defendants*

I hereby certify that a true and correct

copy of the foregoing was served via
CM/ECF filing system to all counsel
of record on this  22nd  day of May, 2023.


*/s/ James J. Grubel_____*
James J Grubel