IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ALISON ENDICOTT-QUIÑONES,
Guardian ad Litem, on behalf of
A. D., R. B., E. B., and M. B.,
minor children,

      Plaintiffs,

vs.                                              No. 21-cv-00368 DHU/JMR

PATRICIA GARZA, in her individual
and official capacity; REBECCA LIGGETT,
in her individual and official capacity;
BRENDA SALDANA, in her individual and
official capacity; JENNIFER DE LOS SANTOS,
in her individual and official capacity, the NEW
MEXICO CHILDREN, YOUTH & FAMILY
DEPARTMENT; and DOES 1-50,

      Defendants.

**PLAINTIFFS' CORRECTED OPPOSITION TO DEFENDANT REBECCA LIGGETT'S MOTION FOR JUDGMENT ON THE PLEADINGS BASED ON ABSOLUTE IMMUNITY**

      Plaintiffs A. D., R. B., E. B. and M. B. (collectively, "Plaintiffs"), through their guardian ad litem Alison Endicott-Quiñones, file this response to Rebecca Liggett's ("Defendant" or "Liggett") "Motion for Judgment on the Pleadings Based on Absolute Immunity" (Dkt. No. 57, "Def. Mot." or "the Motion). As explained below, the Motion warrants denial.

**I.    INTRODUCTION**

      This case stems from a conscious-shocking scheme by New Mexico's Children, Youth & Family Department ("CYFD") personnel to reduce their workloads at the cost of the safety of children. As alleged in the Second Amended Complaint (Dkt. No. 52, the "SAC"), Liggett and her co-conspirators presented false information to multiple state court judges, buried credible evidence of violent abuse by Plaintiffs' biological father, and used the threat of termination to bully

1

concerned coworkers into silence. As a direct result of the scheme, the youngest child, M.B., was kidnapped and later dumped at a North Carolina hospital with catastrophic brain injuries.

Liggett and the other defendants were not guided by professional judgment, but rather a desire to get Plaintiffs' abuse and neglect case dismissed quickly. Part of the plan involved duping the state court into allowing a "trial home visit", even though Liggett and the other defendants knew Plaintiffs' biological parents were dangerous. From the perspective of Liggett and the other CYFD personnel involved in the scheme, a trial home visit was a necessary step towards closing out Plaintiffs' case—if harm came to Plaintiffs as a result, so be it.

Patricia Garza ("Garza"), one of the scheme's principals, even hoped that Plaintiffs would be kidnapped by their biological parents during the visit. And that is exactly what happened. In Spring 2020, after the trial home visit started, the parents disappeared with Plaintiffs. But Liggett and the others were not done. They then used CYFD's custodial powers to block the police from issuing an Amber Alert. And when the police department executed a search warrant on CYFD's office to try and obtain information that would assist them in locating Plaintiffs, Liggett did not provide the records. The scheme was only abandoned in late 2020, after the youngest child, M.B., was dumped by her mother at a North Carolina hospital with catastrophic brain injuries.

Now, Defendant demands that this Court grant her absolute immunity. Defendant thinks she is entitled to that protection because one of the bad things she is alleged to have done in furtherance of the scheme "stem[ed] from her position as an attorney for CYFD acting in her role as an advocate in a legal proceeding." Def. Mot. at 3. Specifically, Defendant contends Liggett was engaged in conduct "closely related to the judicial process" when she presented a subordinate with the choice of lying at a hearing or losing her job. *Id*. at 6.

Defendant's motion lacks merit. To start with, Defendant's characterization of her conduct as "preparation of a witnesses and presentation of evidence to a tribunal", *id*. at 3, twists the SAC's allegations beyond recognition. Moreover, the Motion is entirely silent on Defendant's other bad acts.  Even if Defendant does enjoy immunity for that discrete action—and to be clear, she does

2

not—she cannot claim immunity for any others. "[T]he absolute immunity that protects the prosecutor's role as an advocate is not grounded in any special esteem for those who perform these functions, and certainly not from a desire to shield abuses of office[.]" *Kalina v. Fletcher*, 522 U.S. 118, 127, 118 S. Ct. 502, 508, 139 L. Ed. 2d 471 (1997) (quotations omitted). Defendant's motion should be denied.

## II.     FACTUAL BACKGROUND

Rebecca Liggett's involvement in this matter started on June 3, 2019, when Plaintiffs' biological parents were arrested for felony child abuse in Walmart parking lot in Hobbs, New Mexico. SAC at ¶ 26. Plaintiffs' parents were arrested because they were panhandling with their children, living out of a van, and medically neglecting Plaintiffs. *Id*. at 27. At the time, Liggett was a top lieutenant of CYFD's cabinet secretary Brian Blalock. *Id*. at ¶ 29. In that capacity, she helped Blalock enforce the administration's "unwritten policy of reducing caseloads by reuniting parents with their children whenever possible." *Id*.

Once Plaintiffs' parents were placed under arrest, and the Hobbs Police Department had taken custody of Plaintiffs, a permanency planner from CYFD's Hobbs office, Ivy Woodward ("Woodward") arrived at the Walmart. *Id*. at ¶ 27. Woodward wanted CYFD to take custody of the children, but Liggett and Patricia Garza ("Garza"), the manager of the Hobbs CYFD office, ordered her not to. *Id*. at ¶¶ 24, 28-30. After arguing with Woodward for some time in the parking lot, Liggett and Garza backed down and CYFD took custody of Plaintiffs. *Id*. ¶¶ 31-32. The parents were arraigned and were given conditions of release that prohibited them from residing or having contact with Plaintiffs. *Id*. ¶¶ 34, 110. Plaintiffs were placed in foster case. *Id*. at ¶ 38.

From that point forward, Liggett, Garza, and several other CYFD employees worked together to find a way to send Plaintiffs back to their parents, who they knew to be abusive. *Id*. ¶¶ 116, 136. Two primary roadblocks existed: (1) the state court overseeing the civil abuse and neglect case would have to be convinced that Plaintiffs' biological parents were something other than unfit (*id*. ¶ 33); and (2) the order preventing contact between Plaintiffs and their parents would have to be removed or modified. *Id*. ¶ 34.

While Plaintiffs were in foster care, their biological mother was incarcerated and their biological father failed to make any progress on his treatment plan. *Id*. ¶¶ 39, 43-49, 61. Additionally, two of the children disclosed that their father frequently struck R.B. in the head. *Id*. at ¶¶ 68-74. Moreover, the professional judgment of the permanency planner assigned to the case, Woodward, was that the parents were unfit. *Id*. at ¶¶ 61-62, 91, 107.

Nonetheless, by March 2020 the CYFD employee defendants decided to start a "trial home visit" as a step towards closing Plaintiffs' case. *Id*. at ¶¶ 91-93. Plaintiffs' guardian ad litem, Laura Castillo ("Castillo"), attempted to call a hearing in the civil abuse and neglect to case to stop the trial home visit from going forward. *Id*. at ¶ 91. Castillo planned to call Woodward as her sole witness at the hearing to testify about the danger the visit posed to Plaintiffs. *Id*. at ¶ 92.

Once Garza learned that Castillo planned to call Woodward as a witness, she tried to convince her to omit information from her testimony about: (1) Plaintiffs' abuse disclosures; (2) Garza's stated hope that Plaintiffs would be kidnapped; and (3) the biological father's demonstrated unfitness to care for Plaintiffs. *Id*. at ¶ 93. When Woodward refused to perjure herself, Garza told her that she would be receiving a call from Liggett. *Id*. at ¶ 94.

On March 13, 2020, Liggett called Woodward. Liggett was not an attorney of record on the civil abuse and neglect case. *Id*. at ¶ 97. Rather, the CYFD was represented by one of its line attorneys. *Id*. Indeed, as chief children's court attorney, Liggett's normal job duties did not include handling individual cases. *Id*. Liggett ordered Woodward to withhold her professional opinions from her testimony, as they would make it look like CYFD was attempting to mislead the court. *Id*. at ¶ 98-101. Liggett also ordered Woodward to conceal her professional opinion that the trial home visit would endanger Plaintiffs. *Id*. at ¶ 101. Liggett further intimated that Woodward would lose her job if she testified truthfully. *Id*. at ¶ 104. Woodward also received a call from Blalock, who made similar threats. *Id*. at ¶ 105.

Liggett and Garza later told Woodward that they would use the pretext of coronavirus protocols to keep Woodward from attending the hearing. *Id*. at ¶ 106. This, along with a fear of Woodward losing her job, caused Castillo to call off the hearing.

4

Also in March 2022, the defense attorney for Plaintiffs' biological father motioned the state criminal court to remove the no-contact order, on CYFD's request. *Id*. at ¶¶ 111-112. The motion was based on the false claim that Plaintiffs' father had complied with his treatment plan. *Id*. That false information came from Liggett. *Id*. at ¶¶ 113. She directed another CYFD lawyer to pass it along to the criminal defense attorney. *Id*. at ¶¶ 111. The court granted the motion, and in April 2020 Plaintiffs were sent to live at their biological father's home on a trial home visit. *Id*. at ¶¶ 114. Plaintiffs mother was also released from jail in April 2020. *Id*. at ¶¶ 119.

By the start of May 2020, Plaintiffs had been kidnapped by their parents. However, the CYFD employees used their custodial rights to prevent the Hobbs Police Department from issuing an Amber Alert. *Id*. at ¶¶ 123. Liggett refused to tell Hobbs Police Department officers that CYFD even wanted Plaintiffs found. *Id*. at ¶¶ 125. Eventually, Hobbs Police Department officers served a search warrant on CYFD's Hobbs office seeking information that could help locate Plaintiffs. *Id*. at ¶¶ 123. Responsive documents were withheld by CYFD employees including Garza. *Id*. Liggett was aware that documents had been withheld but took no action to provide them to the police. *Id*. at ¶¶ 124.

Plaintiffs were not located until months after the kidnapping. By that point the youngest child, M.B. had suffered catastrophic brain injuries. *Id*. ¶ 131.

### III.  LEGAL STANDARD

A motion for judgment on the pleadings under Rule 12(c) is evaluated under the same legal standard as Rule 12(b)(6) motion to dismiss. *Mock v. T.G. & Y. Stores Co*., 971 F.2d 522, 528 (10th Cir. 1992) ("A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is treated as a motion to dismiss under Fed. R. Civ. P. 12(b)(6)"). The court "accept[s] all facts pleaded by the non-moving party as true and grant[s] all reasonable inferences from the pleadings in favor of the same." *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012) (quotations omitted). Thus, "a motion for a judgment on the pleadings 'only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court.'" *United Fire & Cas. Co. v. Caskey Drywall NM LLC*, No. CV 17-

1108 KG/JHR, 2018 WL 3429921, at *2 (D.N.M. July 16, 2018) (citing 5C Fed. Prac. & Proc. Civ. § 1367 (3d ed.).

"In determining whether particular acts of government officials are eligible for absolute [prosecutorial] immunity, [courts] apply a 'functional approach which looks to the nature of the function performed, not the identity of the actor who performed it.'" *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1314 (10th Cir.1999) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)) (ellipses omitted). The inquiry is whether the activity is "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). The defense of "absolute immunity may not apply when a prosecutor ... is instead engaged in other tasks, say, investigative or administrative tasks." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009). "The more distant a function is from the judicial process, the less likely absolute immunity will attach." *Snell v. Tunnell*, 920 F.2d 673, 687 (10th Cir.1990).

"The proponent of a claim to absolute immunity bears the burden of establishing the justification for such immunity." *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429 (1993).

**IV.    ARGUMENT**

Defendant contends she enjoys absolute immunity because her alleged misconduct "revolve[s] around her *role* as an advocate in an abuse and neglect proceeding in state court[.]" Def. Mot. at 8 (emphasis added). According to Defendant, that "*role* [is] intimately associated with the judicial process." *Id*. (emphasis added).

But absolute immunity does not apply to roles. It applies to *activities*. *See, e.g.*, *Odd v. Malone*, 538 F.3d 202, 213 (3d Cir. 2008) ("we must narrowly define the act at issue. … [A]lmost any action by a prosecutor, including the dispatch of purely administrative tasks, can be said to be in some way related to more central prosecutorial functions.").

Here, Defendant fails to identify any activities that fall within absolute immunity's narrow scope. Indeed, the only action the Motion even discusses is Defendant's March 13, 2020 phone call with Woodward (the "March 13 Call"). Yet as discussed below, even for that phone call Defendant's contention that she was engaged in "witness preparation", Def. Mem. at 12, is

unsupported by the SAC. As for the rest of the actions Defendant took in furtherance of the CYFD employees' conspiracy, Defendant's Motion simply ignores them. As the party bearing the burden of proof, that will not suffice. Accordingly, the Motion should be denied.

1. **Defendant Is Not Entitled To Absolute Immunity For The March 12 Call.**

To establish an entitlement to absolute immunity for the March 12 Call, Defendant would have to show that the call was "undertaken by a government attorney in preparation for judicial proceedings *and* … [that it] occur[ed] in the course of his or her role as an advocate for the government." *Benavidez v. Howard*, 931 F.3d 1225, 1231 (10th Cir. 2019) (emphasis original). Defendant falls short of her burden for multiple reasons.

   i. **Liggett Never Represented CYFD In The State Court Case.**

As a threshold matter, Liggett cannot claim immunity for the March 12 Call because she never appeared in the civil abuse and neglect case.

Absolute immunity "protects a public official engaged in litigation[.]" *Benavidez*, 931 F.3d at 1234. Thus, it applies to activities like "filing a motion", *id.*, and "presenting evidence on the record to the trier of fact." *Butz v. Economou*, 438 U.S. 478, 516 (1978). Put more simply, although there is no bright-line rule for determining when absolute immunity applies, "in-court activities are generally protected while out-of-court activities … are not." *Odd*, 538 F.3d at 210 (citing Erwin Chemerinsky, Federal Jurisdiction 525–26 (4th ed.2003). That distinction makes sense, as "absolute immunity is designed to free the *judicial process*[.]" *Burns v. Reed*, 500 U.S. 478, 494 (1991) (emphasis original). Thus, for example, "using fabricated evidence *at trial*—as opposed to the earlier, initial act of actually fabricating the evidence—generally is entitled to absolute immunity." *Bledsoe v. Vanderbilt*, 934 F.3d 1112, 1118 (10th Cir. 2019) (emphasis added). Moreover, the Supreme Court has recognized that "the safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct." *Benavidez*, 931 F.3d 1225 at 1232 (quoting *Butz*, 438 U.S. at 512).

Here, Liggett cannot claim absolute immunity because she was not a participant in the judicial process. She never made an appearance, and never submitted herself to the "safeguards

7

built into the judicial process", *Id.*, such as the threat of being held in contempt. A different attorney was represented CYFD in the matter. Indeed, the SAC alleges that acting as an attorney advocate was not even part of Liggett's normal job duties. Instead, she was a high-level administrator. Defendant tries to sidestep this problem by claiming that "it is undisputed that that [the March 12 Call] was related to Ms. Liggett's role as an advocate in a judicial proceeding." Def. Mot. at 12. However, that puts the cart before the horse. The SAC does not allege Defendant had any advocacy role (or any role at all) in the state court judicial proceeding. Defendant's assertion that "the conduct of Ms. Liggett" was "[u]nquestionably … that of an attorney advocate", *id*. at 10, is pure *ipse dixit*.

It is well established that "absolute immunity may not apply when a prosecutor is not acting as an officer of the court, but is instead engaged in other tasks, say, investigative or administrative tasks." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009). *See also*, *Haywood v. Moore*, No. 1:05-CV-276, 2006 WL 8442740, at *8 (E.D. Tenn. Sept. 8, 2006) ("prosecutors do not possess an unfettered right to insinuate themselves into civil or other proceedings in which they are not counsel of record."). That rule applies with full force here, and the Court should deny the Motion.

  **ii. Liggett Was Not Preparing A Witness For A Hearing.**

Even if Liggett could somehow qualify as an advocate in the state court case, Defendant's motion would still fail. That is because her characterization of the March 12 Call as "the preparation of a witness and evidence for a motion hearing," *id*. at 9, is a gross mischaracterization.

As alleged in the SAC, the call only happened because Woodward refused to agree to Garza's request that she mislead the court. Notably, Liggett asked Woodward to do the same things Garza did. The only real differences between the conversation with Garza and the conversation with Liggett were that Liggett had a law degree and held a more powerful position in the CYFD hierarchy than did Garza. *See Kalina*, 522 U.S. 118 at 127 (absolute immunity "not grounded in any special esteem for those who perform these functions").

Additionally, the thrust of the March 12 Call with Liggett was that Woodward would be fired if she did not go along with the scheme. That is not witness preparation.

8

The Sixth Circuit dealt with a similar situation in *Rouse v. Stacy*, 478 F. App'x 945 (6th Cir. 2012). There, a prosecutor allegedly arranged for jail employees to beat a criminal defendant to encourage him to plead guilty. *Id*. at 946. The prosecutor claimed absolute immunity from suit because his actions were "part of plea bargaining, a recognized prosecutorial function." *Id*. at 951. The court rejected the prosecutor's argument because:

> [M]erely attaching the label of "plea bargaining" to a prosecutor's actions does not by itself end the immunity inquiry. There are established limits to the application of prosecutorial immunity, and these limits are pertinent to plea bargaining as well as other prosecutorial functions. The Supreme Court has long recognized that such immunity does not protect a prosecutor for actions clearly beyond his authority. … Otherwise, a prosecutor could immunize himself from suit for any manner of wrongdoing by merely claiming that it was "related" to a legitimate prosecutorial duty.

*Id.* (collecting cases).

The same reasoning applies here. As in *Rouse*, by threatening Woodward with adverse employment action Liggett was "acting entirely outside the scope of the duties of [an attorney]." *Id*. at 950. While Liggett may have had the authority to cause Woodward to be fired, that authority was derived from her position as a high-level CYFD administrator—it was wholly beyond her jurisdiction as an attorney. Liggett may not use the label "preparation of a witness" as a Trojan Horse for actions outside her authority as an attorney. *See also*, *Doe v. Phillips*, 81 F.3d 1204, 1210 (2d Cir. 1996) (absolute immunity denied where a prosecutor "intertwined" a plea offer with a demand beyond the prosecutor's authority).

*Rouse* ultimately speaks to the larger point behind the functional analysis mandated by the Supreme Court: activities, not labels, are what matter. Drawing all reasonable inferences in Plaintiffs' favor, as the Court must at this juncture, the March 12 Call was not advocacy, and Defendant's motion should be denied

### 2. Defendant's Motion Fails To Address Any Conduct Besides the March 12 Call.

Even if Liggett were entitled to absolute immunity for the March 12 Call, the Motion should still be denied because it fails to address any of the other actions Defendant engaged in as part of the conspiracy. Defendant tries to downplay her involvement. *See, e.g.,* Def. Mot. at 10

9

(claiming that Liggett was "tasked with preparing … Woodward … for … a hearing"). But the SAC makes clear that Liggett was a central figure in the scheme from the start. Indeed, she and Garza tried to stop Woodward from taking Plaintiffs into custody. The SAC further alleges that Liggett was instrumental in tricking in the state criminal court judge into removing the biological father's no contact order, and was one of several CYFD employees who blocked the Hobbs Police Department from issuing an Amber Alert for Plaintiffs. Defendant's Motion does not even attempt to argue that any of those actions were intimately associated with the judicial process.

Tenth Circuit precedent makes clear that even if some actions undertaken by an attorney are immunized, that does not translate to a blanket grant of absolute immunity. *Bledsoe*, 934 F.3d at 1118 (no absolute immunity where a prosecutor "met with other like-minded individuals to craft a false yet detailed narrative that … implicated [the plaintiff]", even though immunity may attach for "using fabricated evidence at trial"). *See also*, *Guzman–Rivera v. Rivera–Cruz*, 55 F.3d 26, 29 (1st Cir.1995) ("The prosecutorial nature of an act does not spread backwards like an inkblot, immunizing everything it touches.").

### V. CONCLUSION

For the foregoing reasons Defendant's Motion should be denied.

Respectfully submitted,

GUBERNICK LAW P.L.L.C.

/s/ Benjamin Gubernick
Benjamin Gubernick
New Mexico Bar No. 145006
Ben@gubernicklaw.com
734-678-5169
10720 W. Indian School Rd.
Ste. 19 PMB 12
Phoenix, AZ 85037

---and---

>Todd J. Bullion
>**Law Office of Todd J. Bullion**
>4811 Hardware Dr NE
>Bldg D, Suite 5
>Albuquerque, NM  87109
>(505) 452-7674
>todd@bullionlaw.com
>
>---and---
>
>Jason Bowles
>**Bowles Law Firm**
>4811 Hardware Dr NE
>Bldg D, Suite 5
>Albuquerque, NM  87109
>(505) 217-2680
>jason@bowles-lawfirm.com
>
>*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of May, 2023, I filed the foregoing electronically through the CM/ECF system, which caused all parties' counsels of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing

>*/s/ Benjamin Gubernick*
>Benjamin Gubernick