**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**ALISON ENDICOTT-QUIÑONES,**
**Guardian ad Litem, on behalf of**
**A. D., R. B., E. B., and M. B.,**
**minor children,**

       **Plaintiffs,**

**vs.**                                        **No: 1:21-cv-00368 DHU/JMR**

**PATRICIA GARZA, in her individual**
**and official capacity; REBECCA LIGGETT,**
**in her individual and official capacity; BRENDA**
**SALDANA, in her individual and official capacity;**
**JENNIFER DE LOS SANTOS, in her individual**
**and official capacity; NEW MEXICO CHILDREN**
**YOUTH & FAMILIES DEPARTMENT;**
**and DOES 1-50,**

       **Defendants.**

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

      Alison Endicott-Quiñones, as representative of A. D., R. B., E. B., and M. B. (collectively "Plaintiffs"), through undersigned counsel, responds as follows to the New Mexico Children, Youth and Families Department ("CYFD"), Patricia Garza ("Garza"), Rebecca Liggett ("Liggett"), Jennifer De Los Santos ("De Los Santos"), and Brenda Saldana's ("Saldana") (collectively, "Defendants") Renewed Motion for Summary Judgment (Dkt. No. 91, "Def. Mot." or "Motion"). As explained below, the Motion lacks merit and should be denied in its entirety.

## I.      OVERVIEW

      Plaintiffs' biological parents were arrested by the Hobbs Police Department in June of 2019 for felony child abuse. They would later have release conditions that barred them from contact with Plaintiffs. As the Motion acknowledges, when Defendants ultimately decided to take Plaintiffs into their custody, there was "no care taker [sic] for the children." Def. Mot. at 4 (citing Def. Ex. A at p. 5). The status quo was hardly ideal—Plaintiffs were homeless in a Walmart parking lot, in the functional custody of the Hobbs Police Department ("HPD"). However, there was one

threat from which they were safe and would have remained safe had Defendants done nothing: the threat posed by their biological parents.

Once the state took custody of Plaintiffs, the law required Defendants to protect them. That was a burden Defendants did not want to shoulder. But the only way to free themselves from it was to get the state abuse and neglect court (the "State Civil Court") to transfer custody of Plaintiffs to someone else. So, in the months that followed, Defendants acted in concert to deceive the State Civil Court into reunifying Plaintiffs with their biological parents. Garza, the scheme's ringleader, was by her own admission indifferent to Plaintiffs' wellbeing—she just wanted to get rid of their case as quickly as possible. Garza even joked that she hoped the biological parents would abduct Plaintiffs and disappear.

As part of the scheme, Defendants sent Plaintiffs to live in an apartment with their biological father, Cristin Andrei Ducila ("Ducila"), on a "trial home visit." Officially, the visit would showcase Ducila's improved parenting skills to the court. Unofficially, the visit was a farce. Defendants surreptitiously continued to perform the household functions they claimed to have delegated to Ducila. Defendants' hope was that once the trial home visit ended, the State Civil Court would believe Ducila had morphed into a fit parent and sign off on reunification.

Even starting the trial home visit required Defendants to commit egregious misconduct. Saldana fed false information to a state criminal court judge (the "State Criminal Court") so Ducila's no-contact order would be lifted. Garza and Saldana withheld evidence of physical abuse by Ducila from the State Civil Court. Garza and De Los Santos forced a CYFD investigator to "unsubstantiate" credible abuse allegations.  And Garza and Liggett barred Plaintiffs' guardian ad litem from presenting evidence to the State Civil Court that showed Ducila was unfit and dangerous.

Several weeks into the trial home visit, Plaintiffs were kidnapped by their biological parents and disappeared. But even that did not shake Defendants' resolve. Saldana used her custodial rights to block HPD from issuing an Amber Alert. And then, when HPD served a search warrant on CYFD in hopes of obtaining information about Plaintiffs' location, Defendants withheld

documents. As CYFD administrators—including Liggett—explained in a Zoom meeting with HPD after the kidnapping, Defendants did not want Plaintiffs found.

The result of Defendants' actions was foreseeable and appalling. The scheme ended in November of 2020 when the youngest child, M. B., was dumped at a North Carolina hospital with catastrophic brain damage.

Now, Defendants contend they are entitled to summary judgment. But none of their arguments have merit.

*First*, Defendants claim generally that they had no special relationship with Plaintiffs. But that is plainly wrong: Defendants took Plaintiffs into involuntary custody at the Walmart parking lot. Once that happened, Defendants became constitutionally responsible for their safety. The event that would have ended the special relationship—reunification—never occurred. Thus, the special relationship has continued uninterrupted to the present day. No custodial rights *of any kind* were ever transferred to Plaintiffs' biological parents. Defendants' attempt to distinguish between "physical" and "legal" custody is a red herring—under New Mexico law, Defendants maintained full control over where and with whom Plaintiffs would live. Although Defendants' reckless misuse of that control breached the special relationship, it did not end it. And while the special relationship existed, Defendants were obligated to protect Plaintiffs from all third parties.

*Second*, even if the special relationship was extinguished at some point, Defendants' Motion would still fail on a "danger creation" theory for multiple reasons. To start with, the trial home visit did not restore the status quo. The status que was safe foster care, which Defendants disrupted by moving Plaintiffs to the home of a known abuser. Moreover, Plaintiffs were not in their biological parents' custody when the state intervened. Rather, they were in the custody of HPD. And even if the trial home visit or kidnapping could somehow be characterized as a return to the status quo ante, Defendants' state created danger arguments would still fail. That is because Defendants prevented the issuance of an Amber Alert and obstructed an HPD search warrant. In short, Defendants were not passive observers, but rather aiders and abettors who cut off avenues for aid.

3

***Third***, Defendants' actions were conscience shocking. Defendants intentionally put Plaintiffs into the path of danger and prevented evidence of violent child abuse by Ducila from reaching the State Civil Court. Defendants knew severe injury or death would likely result, and when third parties attempted to protect Plaintiffs from that danger, Defendants took affirmative steps to thwart those efforts.

***Fourth***, the constitutional rights Defendants violated were clearly established. The exception Defendants ask the Court to craft to 10th Circuit precedent, namely harm inflicted by biological parents, is unsupported.

***Fifth***, whether Defendants' misconduct was the proximate cause of Plaintiffs' injuries is a triable fact question. Defendants' contrary arguments conflate the *immediate risk* of harm (which is required) with the *immediate occurrence* of harm (which is not).

***Sixth and finally***, Defendants used the apartment of a known child abuser as *ad hoc* housing for children in their custody and care. That is worse than negligent. Accordingly, the Tort Claims Act exception applies.

The goal of Defendants' scheme was to trick the State Civil Court into ending their special relationship with Plaintiffs. The method of the scheme was to provide a known abuser with unsupervised access to Plaintiffs. The result of the scheme was catastrophic brain damage for M.B. The Motion should be denied.

## II.     STATEMENT OF FACTS

### A.  Disputed Material Facts.

Pursuant to L.R. 56.1(b), Plaintiffs do not dispute Defendant's material facts ("DMF").

### B.  Plaintiffs' Additional Material Facts.

Pursuant to L.R. 56.1(b), Plaintiffs identify the following additional material facts ("PMF" or "PAF") as relevant to the Motion's resolution:

### CYFD reluctantly takes Plaintiffs into CYFD custody from HPD on a 48 hour hold, and then files an abuse and neglect petition

**A.** CYFD employees first encountered Plaintiffs and their parents in May of 2019 while at Walmart during their lunch break. The employees, including De Los Santos, told the parents to go somewhere else so that they would not have to take Plaintiffs into custody. Garza applauded the employees for refusing to assist Plaintiffs, approving a subordinate's claim that "the office had dodged a bullet". [Ivy Woodward Declaration at ¶ 6, Exhibit A][Yvette Lucero Affidavit at pages 1-3, Exhibit B][June 3, 2019 Referral Report at pages 1-2, Exhibit C].

**B.** In May of 2019 CYFD's Hobbs office prioritized keeping the number of their cases down. [Ivy Woodward Deposition, 22:2-23:25 and 24:24-25:24, Exhibit D] (stating that CYFD is "not trying to get cases right now").

**C.** On June 3, 2019, once HPD had detained Plaintiffs' parents, Liggett refused to take Plaintiffs into CYFD custody on a 48 hour hold for approximately two hours. [Woodward Decl. ¶¶ 8-12, EX A] [June 3, 2019 Referral Report at pages 1-2, Exhibit C]. [Garza Dep. 31:16-32:14, EX E][Initial Assessment Plan at page 2, EX K]. Liggett refused even after learning Plaintiffs' biological parents were going to be arrested for felony child abuse. [Woodward Decl. ¶¶ 8-12, EX A].

**D.** CYFD eventually filed an abuse and neglect petition to extend its custody beyond the 48 hour hold. [Woodward Decl. ¶¶ 7-12, EX A][Lucero Affidavit at page 5, EX B].

**<u>Defendants decide to pursue reunification despite numerous red flags about Ducila</u>**

**E.** When Plaintiffs were eventually taken into CYFD custody, Ivy Woodward was assigned to their case. [Woodward Decl. ¶¶ 3 and 13, EX A].

**F.** From the time Plaintiffs were taken into CYFD's custody, Garza pushed Woodward to find somewhere to send them. Garza said her priority was making sure that Plaintiffs' case did not turn into "another Everhart case," referring to a case where children had been in CYFD's custody for at least ten years [Woodward Dep. 66:9-16, EX D].

**G.** Garza wanted Plaintiffs to leave CYFD custody as soon as possible because to please her supervisors in Santa Fe saying "We need to remember who signs our checks" and "I have bills to

pay and the State signs my checks, so I'm going to go with [the State]". [Woodward Dep. 66:15-67:3 and 67:10-68:7].

**H.** Ducila was wholly unable to manage Plaintiffs during supervised visitation. He often became angry, and Plaintiffs were afraid of him. [Woodward Decl. at ¶¶ 32-34, EX A].

**I.** Woodward warned coworkers that that Ducila was "a ticking time bomb" and was holding his penchant for violence inside because he knew CYFD employees were watching. [Woodward Dep at 85:6-86:2, EX D].

**J.** On two occasions, Ducila attempted to bribe CYFD workers to allow him to abscond with Plaintiffs. [Woodward Decl. ¶ 13, EX A][Lucero Affidavit at page 4, EX B][Garza Dep. 111:17-21, EX E][Saldana Dep. 103:3-7, EX F].

**K.** Plaintiffs' biological parents attempted to abscond with Plaintiffs during a supervised visit at CYFD's office. During the visit, they barricaded themselves in a room with Plaintiffs, requiring HPD officers to come and break down the door. [Woodward Decl at ¶ 33, EX A][Garza Dep. 112:23-113:25 and 142:20-144:14, EX E][Saldana Dep. 39:25-40:4 and 41:1-42:20, EX F][Initial Assessment Plan at page 2, EX K].

**L.** To prevent additional evidence of Ducila's unfitness from being collected, Garza ordered that supervised visits take place in rooms with nonfunctional surveillance equipment. [Woodward Decl. ¶ 34, EX A].

**M.** While Woodward was assigned to Ducila's case, he made no progress on his treatment plan. [Woodward Decl. ¶ 32-35 and 44].

**N.** Woodward objected to Garza's plan to start a trial home visit. [Woodward Decl at ¶ 36, EX A]. Woodward was concerned that Ducila was abusive and was likely to abscond with Plaintiffs. [*Id*., EX A] Garza replied "maybe we'll luck out and they will disappear." [*Id*., EX A][Garza Dep. 107:16-108:25, EX E]. Garza then placed her hand over her mouth, laughed, and said "I didn't say that." [*Id*., EX A].

**O.** Saldana represented to CYFD's Children's Court Attorney that Ducila had complied with his treatment plan so that the State Criminal Court to lift Ducila's no contact order. [Saldana Dep.

33:17- 36:16, EX F][Motions to Modify No Contact Orders and Orders Granting Motions, EX L][Woodward Decl. at ¶ 43, EX A].

**P.**  Saldana's representations about Ducila's treatment plan compliance were made with the express purpose of convincing the State Criminal Court to lift Ducila's no contact order. [Woodward Decl. at ¶ 43, EX A][Saldana Dep. 33:17-36:16][Motions to Modify No Contact Orders and Orders Granting Motions, EX L].

<u>**Defendants suppress disclosures of abuse by Ducila**</u>

**Q.**  Liggett and Garza directed Woodward to withhold her professional opinion at a hearing in the abuse and neglect case, and then acted in concert to prevent Woodward's testimony from reaching the State Civil Court. [Woodward Decl. ¶¶ 37-42, EX A][Woodward Dep. 86:24-87:24, EX D][Liggett Dep. 138:7-16, 141:16-142:8, 143:4-15, 143:22-144:24, 146:4-147:1, 147:4-17, 148:24-149:15, 149:18-150:7, 153:16-154:18, 154:25-156:20, 161:23-162:7, 171:12-15, 173:6-17, 175:11-23, 176:16-177:10, EX G].

**R.**  The Guardian ad Litem withdrew her emergency motion to suspend visitation when she learned that Woodward would not be permitted to testify and because Saldana and Garza had represented to her that the concerns raised in her January 28, 2020, motion to suspend visits had been addressed by the investigation conducted by Mazy and that the investigation would be unsubstantiated. [Woodward Decl. ¶¶ 41-42, EX A][Woodward Dep. 88:1-16, EX D][March 16, 2020 Permanency Hearing Transcript 32:10-33:23 and 40:13-41:12, EX T]. Following the withdrawal of the motion Garza ordered Woodward to cease communication with the Plaintiffs' Guardian ad Litem about the Plaintiffs' case. [Woodward Decl. ¶¶ 37-42, EX A].

**S.**  On February 3, 2020, Plaintiffs' therapist, Salena Evans ("Evans"), wrote a letter to CYFD concerning statements made by Plaintiffs during therapy sessions up to February 3, 2020. [Evans Feb 3, 2020 Letter, EX M]. The letter described disclosures made in play therapy that gave the therapist concerns for the Plaintiffs' safety. [*Id.*, EX M][Evans Dep. 48:7-16, 81:23-83:15, EX H].

**T.**  On February 4, 2020, R.B. told Evans that Ducila "yells and hits me" and that this happens "alot [sic]." [February 4, 2020 Therapy Note, EX N][Liggett Dep. 178:24-180:18, EX G][Evans Dep. 50:3-4, EX H].

**U.**  On February 11, 2020, R.B. disclosed to Evans that his "grumpy daddy" gets mad frequently and hits him. [February 4, 2020 Therapy Note, EX O].

**V.**  On February 18, 2020, R.B. displayed "fear of his father" during a therapy session; Evans described R.B.'s play therapy on this date as follows, "[R.B.] began by grabbing the foam locks and the large black keys on the shelves. He placed both foam locks on the doors and explained his "grumpy daddy" cannot enter this room. Therapist tracked accordingly and validated his rule. He then explained if we let him in, he will "hurt you!" [February 4, 2020 Therapy Note, EX P].

**W.**  On February 24, 2020, A.D. disclosed in therapy that Ducila hits her mother "really hard," hits R.D. in the head a lot, hurts animals, and scares her. [February 4, 2020 Therapy Note, EX Q]. A.D. and R.B. were living in different foster homes. [Woodward Decl. ¶ 18].

**X.**  On February 24, 2020, Evans submitted a Statewide Central Intake ("SCI") child abuse referral based on R.D. and A.D.'s disclosures of violence by Ducila. [S. Evans Dep. 53:12-54:4, EX H][Evans February 2020 SCI Report, EX R].

**Y.**  Evans directly confronted Garza, Saldana, and Woodward about her concerns that Ducila was physically abusive. [S. Evans Dep. 50:17-19, 51:25-52:12, 53:12-54:4, and 119:24-120:3, EX H].

**Z.**  Garza and Saldana were aware of the disclosures of abuse made to Evans. [*Id.*, EX H][Woodward Decl. at ¶¶ 20-21, EX A].

**AA.**  Garza warned Evans' employer that CYFD might stop referring cases to it because Evans was expressing concerns about Ducila. [Evans Dep. 81:23-83:15].

**BB.**  The Hobbs CYFD office opened an investigation into A.D. and R.B.'s physical abuse disclosures on February 25, 2020. Kelly Mazy ("Mazy") was assigned to investigate, with De Los Santos supervising her. [Woodward Decl. at ¶¶ 14-22 and 26, EX A].

**CC.** On March 30, 2020, Mazy was coerced by Garza and De Los Santos into unsubstantiating A.D. and R.B.'s abuse disclosures. [March 30, 2020 Disposition of Investigation, EX S][Woodward Decl. at ¶¶ 23-30, EX A][Kelly Mazy Deposition, 40:5-41:1, 41:16-42:1 and 45:1-46:4, EX J]. The stated reason to unsubstantiate the investigation was lack of credible evidence. [*Id.*, EX S].

**DD.** Mazy believed A.D. and R.B.'s abuse disclosures should have been substantiated. [Woodward Decl. at ¶¶ 23-24, EX A][Mazy Deposition, 40:5-41:1, 41:16-42:1 and 45:1-46:4, EX J].

**EE.** Under CYFD guidelines, A.D. and R.B.'s abuse disclosures should have been substantiated. [Woodward Decl. ¶¶ 14-31, EX A][NMAC 8.10.3.17(A)(1)] (identifying disclosures by children as credible evidence) [CYFD Legal Manual on Child Abuse and Neglect, EX Y] at page 8 (identifying disclosures made by children as credible evidence and stating "substantiated means that CYFD determines that there is credible evidence to support the conclusion that the child has been abused or neglected)[Mazy Deposition, 40:5-41:1, 41:16-42:1 and 45:1-46:4, EX J].

## Defendants dupe the State Civil Court into approving a permanency plan that included a trial home visit

**FF.** Prior to Plaintiffs' kidnapping, Defendants did not alert the State Civil Court to the physical abuse disclosures made after February 3, 2020, or the February 24, 2020 SCI report. During the March 16, 2020 Saldana was asked if a plan of reunification was safe and appropriate and she responded, "Yes". [March 16, 2020 Hearing, 43:16-24, EX T]. When Saldana was asked about concerns held by Evans she did not mention any of the disclosures that had occurred after Evans February 3, 2020 letter and never mentioned that Ducila had previously hit R.B. [March 16, 2020 Hearing, 32:10-33:23, EX T][Evans Feb 3, 2020 Letter, EX M].

**GG.** On March 13, 2020, Garza and Saldana filed a "Judicial Review And/Or Permanency Hearing Report" and a "Family Treatment Plan" (collectively referred to as the

"Report") in the State Civil Court. [March 13, 2020 JQ Filing, EX U]. The Report identifies Saldana as the responsible CYFD Party for the case participants. [*Id*. at page 5, EX U].

**HH.**      The Report falsely claimed that "[supervised] visits go well and the children are excited to see their father." [March 13, 2020 JQ Filing at pages 3 and 6, EX U].  Woodward Decl. Ex. A at ¶¶ 32-35.

**II.**  The Report falsely claimed that "Ducila has been compliant with his treatment plan and has done everything the Department ha[d] asked of him." [March 13, 2020 JQ Filing at page 4, EX U]. [Woodward Decl. ¶ 32-35 and 44].

**JJ.**  The Report claimed that CYFD "assessed there are no risks to the children if they are returned home," and that "the Department does not have any safety concerns with the visitation." [March 13, 2020 JQ Filing at page 3, EX U].

**KK.**      Defendants were aware that a trial home visit would likely lead to Plaintiffs being abducted by their biological parents, and that a trial home visit should not occur under such circumstances. [Garza Dep. 114:3-115:5, 115:17-116:18, 117:10-24] (admitting trial home visit should not occur if risk exists that parents will abscond with children); "There were concerns for the family fleeing once the children were back in the home as the family is transient". [Saldana May 2, 2020 SCI Report, EX V][Woodward Decl. at ¶  36, EX A][Garza Dep. 107:23-108:13 and 110:3-6, EX E]. Ms. Lucero stated in her June 5, 2019 affidavit to bring the Plaintiffs into CYFD custody, "The family is highly transient and have stated that they are leaving as soon as they get their children back". [Lucero Affidavit at page 5, EX B].

**LL.**      The Report omitted any mention of the physical abuse disclosures, the February 24, 2020 SCI report, and CYFD's internal assessment which evaluated Plaintiffs as "unsafe." [March 16, 2020 Hearing, 43:16-24, EX T][Summary of NCCD Safety and Risk Assessments in FACTS, EX W].

**MM.**      Garza and Saldana knowingly concealed facts known to them that the children would be in danger during a trial home visit because they wished to close the case as quickly as possible. [Trial Home Visit Email, EX X][Woodward decl. ¶ 36, EX A][Garza Dep. 107:16-108:25,

EX E][Liggett Dep. 70:16-71:11, 132:23-133:6, 133:25-134:14, 136:11-137:1, 178:24-180:18, 203:11-205:24, EX G][R. Gaston Dep. 37:1-42:13, EX I]. At the close of the March 16, 2020 hearing the Judge asked that Ducila keep up the good work. [March 16, 2020 Hearing, 43:16-24, EX T].

**Defendants start a sham trial home visit and continue to ignore red flags**

**NN.**     Plaintiffs were in CYFD's custody during the trial home visit, and at all other relevant times. [Saldana Dep. 99:3-100:3 and 100:17-101:9, 108:9-109:5, 115:17-117:5, 117:16-118:15, EX F][March 13, 2020 JQ Filing at page 6, EX U][CYFD Legal Manual on Child Abuse and Neglect pages 5 and 7, EX Y at page 7 (Stating there is no distinction between physical and legal custody under New Mexico law and that the term "physical custody" can cause confusion and is no longer used) at pages 2-4  (Crediting Liggett as a contributor to the Legal Manual)[Garza Depo 118:5-17, 118:24-119:22, 128:3-5, EX E][Woodward Decl., ¶¶ 45-49, EX A][R. Liggett Dep. 28:17-31:22, 33:22-35:3, 36:4-37:24, 43:16-19, 60:14-61:25, 62:17-23, EX G] at 43:16-19 (CYFD has duty to protect children from their biological parents when a child is in CYFD's legal custody) [Saldana May 2, 2020 SCI Report, EX V] (stating Child in CYFD custody currently on Trial Home Visit with Parent)[May 7, 2020 Status Conference Order, EX Z][October 28, 2020 SCI Report, EX AA] at page 2 ("The children and in CYFD custody")[May 13, 2020 Letter to DA, EX AB] page 1 (stating Saldana gave a police officer "confirmation the children were in CYFD custody")[Garza November 6, 2020 Report, EX AC] page 3 (stating Plaintiffs are currently in CYFD custody and that M.B. is currently at a hospital in North Carolina)[Hobbs Police Dept. Reports, EX AD] pages 1 and 2 (Saldana tells two different police officers that Plaintiffs were in CYFD custody at the time they went missing) [Declaration of Clifford Gilmore at paragraphs 4-6 and 11-17, EX AF].

**OO.**     During the trial home visit, Saldana improperly provided household services to Plaintiffs, gave their biological father advanced warning of "unannounced" visits, and assisted him in staging the apartment to make him look like a fit parent. [Gaston Dep. 25:24-29:15, 30:4-14, and 31:25-32:18, EX I][Garza Dep. 122:24-123:4, 124:21-125:10, 126:12-24, 127:19-129:25, EX E].

**PP.**      A disclosure of sexual abuse was made on April 27, 2020, days before Plaintiffs disappeared. [Selena April 29, 2020 email, EX AE]. CASA advocate Megan Gallegos believed that this report may have prompted Ducila and Badea to flea with Plaintiffs. [Hobbs Police Dept. Reports, EX AD] at page 4 (Megan advised she was concerned for the safety and well being of the children based on statements the children made during therapy sessions the week prior…Megan claimed the concerns were forwarded to CYFD to suggest the children be removed from the home).

**QQ.**      Defendants were obligated, without exception, to protect children in their legal custody, including during a trial home visit. [R. Liggett Dep. 34:2-35:3, 36:4-37:24, 43:16-19, and 59:9-61:25, EX G][Woodward Decl., ¶ 45-49, EX A][Gilmore Decl. ¶ 12-13, EX AF].

**RR.**      Garza, Liggett and Saldana knew that CYFD had a legal obligation to terminate a trial home visit if children are in danger. [Garza Dep. 118:24-119:22, 122:25-126:4, 124:21-125:10] [Woodward Decl., Ex. A at ¶¶ 45-49, Ex. A].

### Plaintiffs' biological parents abscond, Defendants assist their escape, and M.B. suffers horrific injuries

**SS.**      Saldana and Liggett prevented HPD from issuing an Amber Alert by claiming Plaintiffs were not in danger and prevented custodial interference charges from being issued against the parents. [Woodward Decl. at ¶¶ 50-52, EX A][Garza Dep. 134:4-135:11 and 136:4-137:5, EX E][Saldana Dep. 94:7-23, 96:19-97:10, 97:21-101:9, 104:11-105:23, 106:4-108:4, 109:19-110:14, 112:20-113:13, 113:22-24, 117:7-118:15, 120:4-121:9, EX F][Liggett Dep. 70:16-71:11, EX G][Gaston Deposition 38:13-42:13, EX I][ [Mazy Dep., 47:12-48:19 and 68:20-25, EX J].

**TT.**      Saldana did not report Plaintiffs as missing in NCIC until after M.B.'s catastrophic injuries. [Saldana Dep. 122:25-125:15 and 125:24-126:7, EX F] Saldana and Garza knew the children had not been listed as missing with the National Center for Missing and Exploited Children before October of 2020. [*Id*., EX F][November 3, 2020 CASA Report and attached email at pages 3-5, EX AG].

**UU.**       Saldana, De Los Santos, Garza, and Liggett had actual knowledge that credible reports of physical abuse had been made by the children. [Liggett Dep. 178:24-180:18, EX G][Mazy Dep. 40:5-41:1, 41:16-42:1, EX J][Evans February 2020 SCI Report, EX R][Woodward Decl. at ¶¶ 14-31, EX A].

**VV.**       Once Plaintiffs went missing, Garza ordered Saldana and Gaston to not discuss the case with anyone, including the police. [R. Gaston Dep. 50:12-51:7]

**WW.**       Garza, De Los Santos, and Liggett withheld documents responsive to a search warrant served on CYFD by the Hobbs Police Department. [Garza Dep 152:16-158:22, EX E][Liggett Dep. 114:23-117:24, EX G][Woodward Dec. at ¶¶ 54-57, EX A][K. Mazy Dep. 85:7-87:23, EX J].

**XX.**       The withheld documents may have assisted the Hobbs Police Department in locating Plaintiffs. [Woodward Decl. at ¶¶ 54-57, EX A].

**YY.**       After Plaintiffs disappeared, Garza, Liggett and Saldana held in a Zoom meeting with HPD and CASA. [Meeting Excerpt, EX AH 1]. In the meeting, Liggett, Karla Young and Marie McQueeney stated they may not actually want Plaintiffs back and may be content to leave Plaintiffs with their biological parents. [Meeting Excerpts, EXs AH 2 and AH 3]. During the meeting, Liggett said to HPD officers, "You need CYFD to say we want to enforce our custodial rights… it's not enough to say that the children are in CYFD custody?" [Meeting Excerpt, EX AH 4]. When a CASA advocate asked if CYFD would say that they actually wanted to find Plaintiffs, Karla Young responded that she was not prepared to say CYFD actually wanted the Plaintiffs back and that she wanted to attend an internal CYFD staffing to determine whether CYFD would actually state that they wanted the Plaintiffs back. [Meeting Excerpt, EX AH 5]. CASA worker Megan Gallegos found it shocking that CYFD was content not knowing where the Plaintiffs were [M. Gallegos Dep. 62:14-17, EX AI].

**ZZ.**       After M.B. suffered catastrophic brain damage, CYFD filed change of placement notices in the State Civil Court switching M.B.'s placement status from "unknown" to Novant Hospital in North Carolina. [Change of Placement Notice at page 1, EX AJ]. A change of

placement notice was filed for A.D., E.B., and R.B. from "Trial Home Visit" to non-relative foster care after they were found in Houston, Texas in November of 2020. [*Id*. at page 2, EX AJ].

**AAA.**      Change of placement notices are only filed for children who are in child protective services custody within CYFD. [R. Liggett Dep. 59:9-61:25 and 62:4-23, EX G].

**BBB.**      Liggett claimed that the trial home visit was a success despite Plaintiffs' kidnapping and M.B. life-altering injuries. [Liggett Dep. 51:2-52:24, EX G].

## III.   LEGAL STANDARD

Summary judgment may only be granted if no genuine dispute of material fact exists, and the movant is entitled to judgment as a matter of law. *Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020); Fed. R. Civ. P. 56(a). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only if the movant meets that burden is the nonmovant required to put in the record facts showing that a genuine issue exists for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248–52 (1986). Factual allegations must be supported by evidence, such as depositions, documents, and affidavits. Fed. R. Civ. P. 56(c)(1)(A). In resolving a motion for summary judgment, all evidence is viewed in the light most favorable to the nonmovant, and reasonable inferences are drawn in the nonmovant's favor.

Individual defendants in a 42 U.S.C. § 1983 action may raise qualified immunity as a defense. *Irizarry v. Yehia*, 38 F.4th 1282, 1287 (10th Cir. 2022). A qualified immunity defense must be rejected, however, if the plaintiff can show (1) that "the defendant's actions violated a constitutional or statutory right" and (2) that the "right was clearly established at the time of the defendant's complained-of conduct." *Id*. To show that a right was clearly established, "the plaintiff does not have to show that the specific action at issue had been held unlawful, but the alleged unlawfulness of the defendant's conduct must be apparent in light of preexisting law." *Armijo By & Through Chavez v. Wagon Mound Pub. Sch*., 159 F.3d 1253, 1260 (10th Cir. 1998). Although it is the plaintiff's burden to satisfy the two-part test for defeating a qualified immunity defense, the

Court must still "review the evidence in the light most favorable to the nonmoving party[.]" *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

## IV.   ARGUMENT

### A.  Special Relationship.

Defendants first contend they cannot be held responsible for their actions because they did not have a special relationship with Plaintiffs. Defendants argue they "lack[ed] the necessary ability to physically restrain the children" because Plaintiffs were "placed in the custody of their biological parents[.]" Def. Mot. at 13. That is wrong for several reasons.

To start with, Defendants' blanket assertion that "there was no special relationship," (*id.*), is obviously incorrect. CYFD (reluctantly) took Plaintiffs into foster care in June of 2019. Once that happened, Defendants became constitutionally responsible for Plaintiffs' "safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). So, Defendants really mean their special relationship with Plaintiffs ended *at some point*. But the Motion fails to specify when Defendants contend the special relationship ceased. That failure is the canary in the coal mine, alerting the Court that something is amiss.

As explained below, Defendants' special relationship with Plaintiffs has continued, uninterrupted, from the day they were taken into foster care to the present. PMFs NN-RR, YY, ZZ, AAA, BBB. The trial home visit did not break the chain. *Id.* And "an affirmative link" exists between Defendants' betrayal of that special relationship and "the injuries plaintiffs suffered." *Yvonne L., By & Through Lewis v. New Mexico Dep't of Hum. Servs.*, 959 F.2d 883, 890 (10th Cir. 1992). Accordingly, Plaintiffs have established a prima facie case that Defendants are liable for Plaintiffs' injuries.

### 1.  Plaintiffs satisfy all elements of a Section 1983 claim under a special relationship theory.

To prevail on their substantive due process claim, Plaintiffs will have to prove four elements:

> First, the plaintiff must demonstrate the existence of a special relationship, meaning that the plaintiff completely depended on the state to satisfy basic human needs. … Second, the plaintiff must show that the defendant knew that the plaintiff was in danger or failed to exercise professional judgment regarding that danger. … Third, the plaintiff must show that the defendant's conduct caused the plaintiff's injuries. … And finally, fourth, the defendant's actions must shock the conscience.

*Dahn v. Amedei*, 867 F.3d 1178, 1185–86 (10th Cir. 2017) (citations omitted). Here, the record contains sufficient evidence for a jury to find in Plaintiffs' favor on all elements.

### a. Defendants have had a special relationship with Plaintiffs since June 2019.

Although state governments have no general duty to protect people from third parties, "if the state restrains an individual's freedom to act to protect himself or herself through a restraint on that individual's personal liberty, the state may thereby enter into a 'special relationship' during such restraint to protect that individual from violent acts inflicted by others." *Armijo*, 159 F.3d at 1261. Thus, "children in the custody of a state ha[ve] a constitutional right to be reasonably safe from harm[.]" *Yvonne L.,* 959 F.2d at 893. The special relationship "extends to children in the state's legal custody." *Johnson ex rel. Cano v. Homes*, 377 F. Supp. 2d 1039, 1046 (D.N.M. 2004) ("*Cano I*"), *aff'd sub nom. Johnson ex rel. Est. of Cano v. Holmes*, 455 F.3d 1133 (10th Cir. 2006) ("*Cano II*").

In the foster child context, the duty of protection from harm includes the exercise of professional judgment in placement decisions. "Failure to exercise professional judgment … does not require actual knowledge children will be harmed[.]" *Id*. Rather, "it implies abdication of the duty to act professionally in making the placements." *Id*.

In the 10th Circuit, the special relationship continues so long as a party "retain[s] *ultimate responsibility* for [the] child's food, shelter, clothing, medical care, and reasonable safety." *Maldonado v. Josey*, 975 F.2d 727, 733 (10th Cir. 1992) (emphasis added). That is why, for example, "[a]lthough a child may well be in the 'custody' of … school authorities during school hours, th[at] custody does not amount to a [special relationship]." *Id*. at 732 (10th Cir. 1992). Because "parents decide where their children will be educated," they "retain ultimate responsibility for their child's food, shelter, clothing, medical care, and reasonable safety." *Id*. at 732-33.

16

The "ultimate responsibility" test also determines if the special relationship between the state and a foster child has ended. For that reason, courts "focus on which individual or agency society deems most responsible for a child or individual's well-being," *not* "physical presence []or day-to-day control." *A.M. ex rel. Youngers v. New Mexico Dep't of Health*, 65 F. Supp. 3d 1206, 1259 (D.N.M. 2014).

In *Cano I,* Judge Browning held that CYFD had a special relationship with a child in its legal custody, even though the child lived with a prospective adoptive parent:

> Until the adoption was finalized … Grace remained in CYFD's legal custody. … As such, state law charged CYFD with the duties to "determine where and with whom [Grace] shall live;" and to "provide [Grace] with food, shelter, education, and ordinary and emergency medical care." NMSA 1978, § 32A–1–4N.
>
> In furtherance of their legal obligations to Grace, state law required the CYFD Defendants to conduct a home visit, to interview in Bogey's home, and to determine the capacity of Bogey to shelter, to feed, and to clothe Grace. *See id.* at §§ 32A–5–12, 32A–5–13, 32A–5–14; NMAC 8.26.3.18 (requiring pre-placement study to include study of physical and social home environment). Before the adoption could go through, the CYFD Defendants were under a duty to conduct a post-placement investigation to include a number of home visits so that they could make the required post-placement statement to the state court regarding the prospective adoptive home. *See* NMSA 1978 §§ 32A–5–31; NMAC 8.26.3.32B. The CYFD Defendants were also under a duty to provide post placement services to Grace until the adoption's finalization. *See* NMAC 8.26.2.20.
>
> If any of the individual CYFD Defendants suspected child abuse or neglect in the adoptive home, she was under a duty to investigate; if the investigation substantiated the suspicion, the worker had a duty to determine the family was no longer eligible to adopt children in CYFD's custody. *See* NMAC 8.26.2.21. The relationship between the State and Grace was therefore the "special relationship" that, under *Yvonne L.*, gives rise to a duty of protection from harm.

377 F.Supp.2d 1039, 1046-47 (modifications original). The statutory provision cited by the court is the definition of "legal custody" found in the New Mexico Children's Code. *See* NMSA 1978, § 32A–1–4(T).[1]

In affirming *Cano I*, the 10th Circuit found that a special relationship existed even though prospective adoptive parents "are not considered public employees nor is their day-to-day conduct as parents regulated and controlled by the State." *Cano II*, 455 F.3d at 1140. The test is not *where*

---

[1] Since 2004, Section 32A–1–4's subsections have been re-lettered several times. As none of the alterations are relevant here, this Opposition cites to the version currently in effect.

a foster child lives, but rather who is ultimately responsible for *deciding* where the child lives. Until that responsibility is transferred to someone else, the legal duties imposed by the special relationship remain. *Id*. at 1145 (qualified immunity denied on special relationship theory where a social worker "did not investigate … and, over a two-month span, did not make a single visit to [the adoptive parent's] house"); *Smith v. D.C*., 413 F.3d 86, 94 (D.C. Cir. 2005) ("the District's control over Tron restrained his liberty against his will. … Tron had to live at Queenstown Apartments. He had no choice.") *See also*, *Yvonne L.,* 959 F.2d at 892 ("a state … [can]not avoid … responsibilities … by delegating custodial responsibility to irresponsible private persons" (citing *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846 (7th Cir.1990)).

Conversely, the special relationship terminates once another party becomes ultimately responsible for a child's wellbeing:

> [A] child alleged to be adopted … [or] living with an adult pursuant to a guardianship … is not in the custody of the State and, unlike a foster child, does not have a special relationship with the State. An adopted child is in the custody of his or her adoptive parents. Similarly, a child living in Oklahoma pursuant to a court-ordered guardianship is in the custody of his or her guardian.

*Matthews v. Bergdorf*, 889 F.3d 1136, 1146 (10th Cir. 2018). *See also*, *Dahn*, 867 F.3d at 1186 fn. 7 ("We note the importance of Dahn's adoption date. On December 11, 2008, Oklahoma, Colorado, and Adoption Alliance finalized Lovato's adoption of Dahn. This meant that after December 11, no state … had custody of Dahn."); *Smith*, 413 F.3d at 96 ("Courts have typically … treat[ed] the custody analysis as an all-or-nothing inquiry").

In the present matter, a special relationship was created on June 3, 2019, when Defendants took custody of Plaintiffs. From that point forward, Defendants were the parties ultimately responsible for Plaintiffs' care. PAFs NN-RR, YY, ZZ, AAA, BBB. That responsibility never shifted to Plaintiffs' biological parents or anyone else. *Id*. Defendants now claim they "returned the Children to their biological parents," (Def. Mot. at 3), but that is incorrect. A trial home visit is exactly what it sounds like: visitation.  During a trial home visit, a child "resides with the parent or guardian while services are provided to the child and family [by CYFD] *to ensure safety of the child*." N.M. Admin. Code 8.10.7.7(KK) (emphasis added). Moreover, a trial home visit begins

and ends at CYFD's discretion. *State of N.M. ex rel. CYFD v. Lisa A*., 2008-NMCA-087, ¶ 9, 144 N.M. 324, 327 ("Despite the trial home visit, there was no guarantee that Child would remain in Mother's care or that Mother would ultimately receive custody of Child at the conclusion of the proceedings.")

Also, the trial home visit did not relieve Defendants from their "right to determine where and with whom a child shall live" or their "duty to protect, train and discipline the child and to provide the child with food, shelter, personal care, education and ordinary and emergency medical care[.]" NMSA 1978, § 32A–1–4(T). *See also*, N.M. Admin. Code 8.10.7.7(X)(2) (same). And in its order approving CYFD's proposed permanency plan, the state court made no mention of any responsibility for Plaintiffs' care being transferred to the biological parents. Indeed, the only mention of custody in the order is that "legal custody would remain with CYFD."

Just as finalization of the adoption in *Cano I* would have ended the special relationship, so too would reunification in the present matter. But reunification never happened. PAFs NN-RR, YY, ZZ, AAA, BBB. Prior to June 3, 2019, Plaintiffs' biological parents were ultimately responsible for Plaintiffs' wellbeing. Once Plaintiffs' biological parents were detained, the baton was transferred to HPD. *See, e.g., White v. Rochford*, 592 F.2d 381 (7th Cir. 1979) (section 1983 liability where police arrested the guardian of three children but left the children on the side of the road); PAFs A-D. And then several hours later, when CYFD took Plaintiffs into custody, the special relationship with HPD ended and CYFD assumed ultimate responsibility. *Id*. It bears emphasis: no further handoffs occurred. PAFs A-D, NN-RR, YY, ZZ, AAA, BBB.

### b.  Defendants breached the duties imposed by the special relationship.

The existence of a special relationship "triggers a continuing duty which is subsequently violated if a state official knew of the asserted danger to [a foster child] or failed to exercise professional judgment with respect thereto[.]" *Schwartz*, 702 F.3d at 580 (quoting *Yvonne L.*, 959 F.2d at 890 (alterations in original) (quotations omitted). The record provides ample support for a finding that Defendants subjected Plaintiffs to known dangers and failed to exercise professional judgment.

### i.   Defendants knew their actions would endanger Plaintiffs.

Each Defendant knew that a trial home visit would put Plaintiffs' lives at risk, yet still chose to go ahead with the scheme. PAFs E-I, N, Q-Z, BB-EE, JJ-MM. Defendants also knew that by impeding HPD's efforts to locate Plaintiffs, that risk was exacerbated further. Defendants' actions were also manifestly unreasonable. PAFs SS-UU. Thus, they are liable for the harm that resulted. *See M.D. ex rel. Stukenberg v. Perry*, 294 F.R.D. 7, 34 (S.D. Tex. 2013) ("[T]he fourteenth amendment right upon which plaintiffs base their claim can be characterized as a right to be free from an unreasonable risk of harm while in the state's custody.")

Prior to the trial home visit, all Defendants were aware of the circumstances that led to the arrest of Plaintiffs' biological parents on felony child abuse charges. All Defendants were also aware of A.D. and R.B.'s disclosures of physical abuse by Ducila. PAFs S-MM. That includes A.D.'s disclosure that her father hit R.B. in the head a lot. PAF T. Defendants were also aware that Plaintiffs' biological parents were likely to abscond with Plaintiffs if given the opportunity—in fact, Garza hoped they would. PAFs Q-R and KK. Defendants also went to great lengths to keep information about these risks from the State Civil Court. *T.D. v. Patton*, 868 F.3d 1209, 1230 (10th Cir. 2017) ("Ms. Patton's intentional exclusion of her knowledge and concerns from her hearing reports showed she acted recklessly and in conscious disregard of an obvious or known risk that Mr. Duerson posed to T.D."); PAFs Q-EE.

Along the same lines, during the trial home visit started, Saldana was aware that Ducila was unable to care for Plaintiffs. PAF OO. There is no other reason to provide him with advance notice of unannounced visits. *Id*. And finally, once Plaintiffs were kidnapped, Saldana, Garza, De Los Santos, and Liggett all knew that Plaintiffs were in danger, yet took steps to prevent law enforcement from locating them. PAFs PP, SS-YY.

### ii.   Defendants failed to exercise professional judgment.

The just-described conduct also amounts to a total abdication of professional judgment. PAFs N-ZZ.

Under *Schwartz v. Booker*, 829 F. Supp. 1080, 1087 (D. Colo. 2011), aff'd, 702 F.3d 573 (10th Cir. 2012), "fail[ure] to conduct any investigation" into abuse allegations is an abdication of professional judgment. *See also*, *Cano I*, 377 F. Supp. 2d at 1047 ("If any of the individual CYFD Defendants suspected child abuse or neglect in the adoptive home, she was under a duty to investigate; if the investigation substantiated the suspicion, the worker had a duty to determine the family was no longer eligible to adopt children in CYFD's custody").

Here, Defendants' conduct was even worse: Garza and Saldana withheld A.D. and R.B.'s abuse disclosures from the abuse and neglect court and dictated the investigation's outcome to suit their goals. PAFs S-EE. Similarly, Liggett and Garza prevented Woodward's professional judgment from reaching the abuse and neglect court. PAFs Q-R.

Viewed in the light most favorable to Plaintiffs, Defendants' actions were not motivated by professional judgment *at all*. Rather, they just wanted to dispose of Plaintiffs' case as quickly as they could. *Youngberg v. Romero*, 457 U.S. 307, 323 (1982) (failure to exercise professional judgment where "the person responsible actually did not base the decision on such judgment.")

### c.  Defendants' actions caused Plaintiffs' injuries.

The causation element is satisfied where a defendant breaches the special relationship and "an affirmative link to the injuries plaintiffs suffered can be shown[.]" *Yvonne L.*, 959 F.2d at 890.

As discussed above, Defendants knew that Plaintiffs' biological parents were unfit. They were also aware that Ducila frequently struck R.B. in the head. PAFs T-Y. Moreover, Defendants were aware that Plaintiffs were likely to be kidnapped if left alone with their biological parents. PAF KK.

Thus, Plaintiffs' "representative[] allege[s] a host of risk factors ignored by [Defendants] … all of which were exacerbated by their failure to adequately monitor [Plaintiffs' biological parents]." *Hunt v. Montano*, 39 F.4th 1270, 1281 (10th Cir. 2022). "When the children were placed in [the trial home visit], these risks became real." *Id*. "That is an affirmative link under the special relationship doctrine[.]" *Id*.

### d.  Defendants' actions shock the conscience.

"To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or employed it as an instrument of oppression." *Hernandez v. Ridley*, 734 F.3d 1254, 1261 (10th Cir. 2013) (internal quotation marks & citation omitted) (alteration omitted). That requirement is satisfied where a plaintiff "demonstrate[s] a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Armijo*, 159 F.3d at 1262 (quotations omitted). Whether the state actor's conduct shocks the conscience depends on the facts of the specific case. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) ("Rules of due process are not, however, subject to mechanical application in unfamiliar territory. Deliberate indifference that shocks in one environment may not be so patently egregious in another"). The court must view the defendant's "conduct as a whole." *Uhlrig v. Harder*, 64 F.3d 567, 576 (10th Cir. 1995). Here, each Defendant's conduct, when viewed as a whole, shocks the conscience.

**Patricia Garza**. As the manager of CYFD's Hobbs office, Garza was everyone's boss except Liggett's. Unsurprisingly, she was involved in almost every bad act committed in this case. She used a room with broken surveillance equipment for visitation, so that evidence of Ducila's unfitness would not collected. PAF L. She also prevented Woodward's professional opinion from reaching the State Civil Court. PAF Q. She threatened Evans' employer in an attempt to stop the trickle of troubling therapy disclosures. PAF Y. She also forced Mazy to unsubstantiate credible allegations of abuse by Ducila, including allegations that he frequently struck one of his children in the head. PAFs Z, CC, S-X. *Patton*, 868 F.3d at 1230. ("awareness of and failure to investigate evidence of potential abuse, including T.D.'s report that Mr. Duerson had hit him with a wooden mop," shocked the conscience); *Schwartz*, 702 F.3d at 587 (conscience shocking behavior where a social working "ignored known or likely injuries and abuse to Chandler, chose not to further investigate such possible abuse, and ignored the danger posed by his continued residence in Jon Phillips's home.") She also signed off on the Report—a document that contained numerous false statements and omitted any mention of the post-February 3rd, 2020 abuse disclosures. PAFs GG-JJ, LL, MM. Garza was also responsible for withholding documents from HPD that could have

helped locate Plaintiffs. PAFs SS, UU-XX. She also ordered Woodward not to talk to the Guardian ad Litem and told other subordinates not to talk to the police. PAFs R, VV. Garza's actions are especially outrageous given that she seemingly had no concern for Plaintiffs at all. Instead, she was motivated solely by her desire to keep the office's caseload down. PAFs A, B, F, G, N.

**Brenda Saldana**. Saldana's role in the scheme was nearly as expansive as Garza's. First, Saldana convinced the State Criminal Court to remove Ducila's no-contact order by falsely claiming he had complied with his treatment plan. PAF M, O. She did that because the protection provided by the no-contact order had to be removed before Defendants could leave Plaintiffs alone with Ducila. PAF P. Next, the Report identifies Saldana as the responsible social worker. PAF GG. And as the person on the ground with regular contact with the family, the State Civil Court trusted her to be its eyes and ears. Once the trial home visit started, Saldana betrayed that trust by staging Ducila's apartment to make him look like a fit parent, and by providing him with advanced notice of unannounced visits. *See, e.g.*, *Matthews*, 889 F.3d at 1152 ("We see little distinction between the affirmative act of instructing an individual to cease reporting evidence of abuse as occurred in *Currier* and the affirmative act of warning an individual so that the latter might cover up evidence of abuse as alleged here.") Those actions were not just a fraud upon the court, they were also tantamount to aiding and abetting abuse. And finally, once Plaintiffs disappeared, Saldana refused to list them as missing in NCIC, and prevented HPD from issuing an Amber Alert or pursuing custodial interference charges. PAF SS, TT.

**Jennifer De Los Santos**. De Los Santos was Mazy's direct supervisor, an authority she abused by ordering Mazy to unsubstantiate A.D. and R.B.'s abuse disclosures as not supported by credible evidence. PAFs BB, CC. De Los Santos' order was contrary to CYFD's guidelines, which specifically identify disclosures by children as credible evidence. PAF EE. Moreover, the disclosures were especially credible given that they described the same events (Ducila striking R.B.) and were made by children living in different foster homes. PAF W. De Los Santos' actions likely doomed M.B. De Los Santos closed the investigation on March 30, 2020, approximately a month before Plaintiffs were abducted. PAFs CC, PP. Up to that point, Defendants had painted

Ducila as a changed man and caring father who had done everything asked of him. PAF II, MM. Had that illusion been dispelled, it is doubtful the State Civil Court would have allowed Ducila anywhere near Plaintiffs. Additionally, De Los Santos, along with Garza and Liggett, withheld documents that fell within the scope of HPD's search warrant, and that could have assisted the police in locating Plaintiffs. PAFs WW, XX.

**Rebecca Liggett**. Liggett directed subordinates to keep documents from HPD. PAF WW. Like Garza, Liggett instructed Woodward to withhold her professional opinion from the State Civil Court, and then kept Woodward from being called as a witness when she refused to do so. PAF Q. And also like Garza, Liggett acted with bad motives. She first refused to take Plaintiffs into custody from HPD. PAF C. To be clear, Plaintiffs do not allege that her initial indifference to Plaintiffs' wellbeing was constitutionally impermissible. The problem for Liggett, though, is her indifference persisted *even after* Plaintiffs came into CYFD custody, and she knew better. *See* PTF NN (crediting Liggett as a contributor to CYFD's policy manual); PTF QQ (admitting that Defendants are always obligated to protect children in CYFD's legal custody, including during trial home visits).

Finally, all Defendants played a part in sending Plaintiffs to live with Ducila on the trial home visit, and all bear responsibility for the harm that resulted. *Patton*, 868 F.3d at 1230 (defendant's conduct shocked the conscience due to "her responsibility for T.D. being placed and remaining in Mr. Duerson's home"); *Currier v. Doran*, 242 F.3d 905, 920 (10th Cir. 2001) (allegations sufficient to survive dismissal where social working failed to investigate signs of abuse and was responsible for court order granting custody to caretaker).

Viewing the record in the light most favorable to Plaintiffs, as the Court must at this juncture, each Defendant knowingly disregarded Plaintiffs' safety. Defendants' actions were likely criminal. Regardless, they shock the conscience.

**2. Defendants' special relationship arguments lack merit.**

The crux of Defendants' special relationship arguments is that although they created an opportunity for Plaintiffs' biological parents to cause Plaintiffs harm, Defendants did not directly harm Plaintiffs. That argument takes two forms, neither of which have merit.

*First*, Defendants claim they "had no control over the location of the Plaintiffs" after the trial home visit started, and thus "could not exercise any restraint over Plaintiffs." Def. Mot. at 14. But that argument relies on an incorrect understanding of the term "restraint."

*Second*, Defendants argue that although they had legal custody of Plaintiffs, they "were placed in the physical custody of their biological parents." Def. Mot. at 17. Defendants' argument fails, however, because Plaintiffs' parents had no custodial rights whatsoever.

### a. Defendants' "Restraint" Argument Misunderstands and Misapplies the Law.

Defendants first insist that Plaintiffs were "in the physical control of their parents once placed on the trial home visit." Def. Mot at 14. Defendants reason that "if they were not under the parents' control, the Children could not have been removed from the state." *Id*. But that is pure equivocation—for sure, a person exercises "control" over someone whenever they cause them physical harm. That is not, however, how terms like "custody," "control," and "restraint" are used in 10th Circuit special relationship case law. The whole point of the special relationship doctrine is to identify the circumstances where state actors are liable for the violent acts of third parties. *Armijo*, 159 F.3d at 1260.

Once CYFD takes children into custody, it assumes complete control over their lives. CYFD "determines where and with whom" the children live. NMSA 1978, § 32A–1–4(T). Consequently, Plaintiffs were deprived of any ability to protect themselves. *Ruiz v. McDonnell*, 299 F.3d 1173, 1182 (10th Cir. 2002) ("liability may attach to a state actor for the violence of a third party if the state restrained the plaintiff's personal liberty and that restraint hindered the plaintiff's freedom to act to protect himself from the third party."); *Cf. Liebson v. New Mexico Corr. Dep't*, 73 F.3d 274, 276 (10th Cir. 1996) (no special relationship because an inmate's

"presence in the prison library … was completely voluntary. … [S]he was free to come and go each day of her employment. Through this employment relationship, she was not taken into state custody and held against her will."); *Smith*, 413 F.3d at 95 ("Like [foster] children, Tron not only looked to the government as primary guardian of his needs, but, absent District approval, also lacked freedom to seek alternate arrangements—precisely the two circumstances courts have found create *DeShaney* custody in the foster care situation."); *R. F. J. v. Fla. Dep't of Child. & Fams*., 398 F. Supp. 3d 1268, 1276 (M.D. Fla. 2019) ("a closer look at the cases reveals that the decisive factor is not who has custody of the children, but the state's action (or lack thereof) in placing them there.")

Notably, Defendants make no attempt to harmonize their position with NMSA 1978, § 32A–1–4(T), which vested Defendants with exclusive authority over "where and with whom" Plaintiffs lived and imposed on them a "duty to protect" Plaintiffs. *Id*. Instead, Defendants merely drop a footnote to remind the Court that "a violation of state law does not, in itself, give rise to a § 1983 claim." Def. Mot. at 15, fn. 4. What Defendants ignore, though, is that state law is highly relevant in determining who society deems ultimately responsible for a person's wellbeing. *See Cano I*, 377 F.Supp.2d 1039, 1046-47 (finding special relationship based on NMSA 1978, § 32A–1–4(T); Smith, 413 F.3d at 94 ("the District's legal custody over Tron is a good indicator that it had a duty to look after him. Because the District, rather than Tron's family, had primary legal control over him, the District had legal responsibility for his daily care."); *Matthews*, 889 F.3d at 1146 (special relationship where an Oklahoma state statute "impos[es] on [child protective services] the duty to provide for the care and treatment of a child placed in [child protective services] custody").

Consider the absurdity of Defendants' claim that no special relationship existed because "placing the children on a trial home visit with their parents does not constitute a restraint on the Children, but rather a lack of restraint on their biological parents." Def. Mot. at 14. If accepted, Defendant's argument would create a truck-sized loophole in the special relationship doctrine. By Defendants' logic, CYFD could simply leave a foster child on the side of the road in a dangerous

26

neighborhood and drive off. From that point on, CYFD would "ha[ve] no control over the [child's] location[.]" Def. Mot. at 14.

Equally distressing, the way Defendants define "restraint" would essentially pause the special relationship whenever a third party has access to a child in the state's custody. For example, consider the supervised visit in late 2019 at CYFD's Hobbs office, when Plaintiffs' biological parents barricaded themselves and the children in a visitation room. PAF K. By Defendants' logic, the special relationship was paused until the police arrived and broke down the door.

But there is nothing in 10th Circuit precedent—or anywhere else—that would lead a reasonable social worker to believe that the special relationship flicks on and off like a light depending on who happens to be in the room. To the contrary, the "focus [is] on which individual or agency society deems most responsible for a child or individual's well-being." *Youngers*, 65 F. Supp. 3d at 1259. Plaintiffs were restrained because they "could not have gone elsewhere even if, for example, [they] felt threatened by [a] roommate or [a] neighbor[]. For *DeShaney* purposes, [they were] thus in the [state's] custody[.]" *Smith*, 413 F.3d at 95. *See also*, *Camp v. Gregory*, 67 F.3d 1286, 1295 (7th Cir. 1995) ("to the extent Gregory and the DCFS bore a duty for Anthony's safety when it was appointed guardian, that duty did not terminate when Anthony was placed again with Camp.")

### b. Defendants' legal custody/physical custody dichotomy is a red herring.

Defendants next contend that there was no special relationship because once the trial home visit started, they lost "physical custody" of Plaintiffs. Def. Mot. at 15. But close inspection reveals that Defendants' argument is built on a foundation of equivocation and lacks merit.

The first red flag is Defendants' failure to explain what they mean by "physical custody." Defendants contend that "CYFD retained legal custody of [Plaintiffs], but … they were placed in the physical custody of their biological parents[.]" Def. Mot. at 17. In the same paragraph, Defendants claim "[t]he dispositive factor is the *physical control* and restraint exercised by CYFD." *Id*. (emphasis added). But Judge Browning rejected Defendants' "physical control" test

in distinguishing *Briggs v. Oklahoma ex rel. Oklahoma Dep't of Hum. Servs.*, 472 F. Supp. 2d 1294

(W.D. Okla. 2007), another case relied on by Defendants:

> Notably, Judge Miles–Lagrange did not define "physical custody." By noting that foster children are in the state's legal and physical custody, however, Judge Miles–Lagrange indicated that *physical custody neither turns on physical presence nor day-to-day control*. Foster parents certainly have the ability to tell children where to go and what to do. Instead, her standard follows the Supreme Court's analyses in *Youngberg v. Romeo* and *DeShaney*, and the United States Courts of Appeals decisions interpreting those cases. As explained previously, *those cases focus on which individual or agency society deems most responsible for a child or individual's well-being*.

*Youngers*, 65 F. Supp. 3d at 1259 (emphasis added).

Defendants' argument fails because Plaintiffs' biological parents were never granted

ultimate responsibility (or any responsibility) for Plaintiffs' safety and wellbeing. Rather,

Defendants merely allowed them unsupervised access. Plaintiffs were still in Defendants' care and

custody; the only thing that changed was where and with whom Defendants decided Plaintiffs

would live. *Maldonado*, 975 F.2d at 733 (special relationship exists where a party "retain[s]

ultimate responsibility for [the] child's food, shelter, clothing, medical care, and reasonable

safety.") As discussed earlier, New Mexico's statutory definition of "legal custody" is expansive.

It vests CYFD with exclusive authority over every aspect of a child's life:

> Additionally, legal custody is a legal status created by court order that vests in a person or agency the right to determine where and with whom a child will live. ... Thus, we conclude that, once legal custody was in the Department, the children's court had no authority to prohibit the Department from placing physical custody of the child with any particular person. Although granting such authority to the children's court might serve a useful purpose, the present statute does not do so.

*State ex rel. Hum. Servs. Dep't*, 1988-NMCA-100, ¶ 9, 107 N.M. 769, 771. Tellingly, CYFD's own

employee handbook, which has been in place since 2018 and lists Liggett as a contributor, states

that the term "physical custody" is meaningless given New Mexico state law:

> The term "legal custody" is defined in the Children's Code. It should be read in harmony with the definitions of "guardian" and "parent." Whoever has legal custody of a child is empowered to make decisions regarding, among other things, where and with whom the child shall live, that is, the physical placement of that child. If legal custody is given to CYFD, placement is in the discretion of CYFD and not the court; CYFD's placement decisions are reviewable by the courts under the abuse of discretion standard. *The term "physical custody" can confuse the two concepts and is no longer used*.

*See* Bullion Decl. Ex. Y at section 3.5 (emphasis added); PAF NN.

In an attempt to salvage their claim that physical control is dispositive (or even relevant), Defendants point out that a "foster parent is licensed and controlled by CYFD. The child, whether placed voluntarily or involuntarily, is dependent on the state, by means of its agent foster parent, for basic needs." Def. Mot. at 18. But that argument is crossways with *Cano II*, where a special relationship existed even though "[a]doptive parents are … not considered public employees nor is their day-to-day conduct as parents regulated and controlled by the State." 455 F.3d at 1140. *See also*, *Currier*, 242 F.3d at 918 ("just because 'the child is placed with a parent as opposed to a foster parent should not change the standards by which social agencies and their employees conduct their investigations.'" (Citing *Ford v. Johnson*, 899 F.Supp. 227, 233 (E.D. Pa. 1995)).

The case law Defendants cite is unpersuasive. Defendants rely on *Hernandez v. Rapp*, No. CV 00-1456 MCA/WDS, 2003 WL 27385396 (D.N.M. Mar. 31, 2003), an unpublished case that no courts appear to have followed, or even cited. Although the circumstances of the underlying children's court case are murky, *Hernandez* describes a court order "awarding legal and physical custody" to CYFD, "subject to review every six months." *Id.* at *2. The opinion later says the state "relinquish[ed] the physical custody of a child to a parent[.]" *Id.* at 10. *Hernandez* makes no mention of Section 32A–1–4(T)'s definition of legal custody. Indeed, the court characterized CYFD's duties as "more akin" to the "limited custodial responsibilities imposed by state compulsory school-attendance statutes[.]" *Id.* at 10. And like *Briggs*, the *Hernandez* court did not define physical custody.

In contrast to *Hernandez*, the permanency plan approved by the State Civil Court does not mention physical custody or any responsibilities being transferred to Plaintiffs' parents. That is a far cry from the "relinquishing [of] physical custody" in *Hernandez*. And even after the trial home visit started, CYFD continued to surreptitiously provide basic household services to Plaintiffs.

Along the same lines, in *Wooten v. Campbell*, 49 F.3d 696 (11th Cir. 1995), "[b]oth of [a child's] parents consented to [a] custody arrangement" where child protective services would have legal custody, while the child would live with his mother, and would have visits with his father. *Id.*

at 698. The court made clear that the "public agency [was] awarded legal custody of a child, but *d[id] not control that child's physical custody except to arrange court-ordered visitation with the non-custodial parent*." *Id*. at 699 (emphasis added). That is plainly distinguishable from the present matter, where Defendants retained full control over Plaintiffs.[2]

## B. State Created Danger.

Even if the special relationship between Defendants and Plaintiffs terminated at some point, the Motion would still warrant denial under the state created danger exception.

### 1. Plaintiffs can satisfy all requirements for a state created danger claim.

To establish a substantive due process claim under a state created danger theory, a plaintiff must first show that two "preconditions" are satisfied: "first, the state actor took an affirmative action, and, second, that action led to private violence injuring the plaintiff." *Est. of Reat v. Rodriguez*, 824 F.3d 960, 965 (10th Cir. 2016), as amended on reh'g in part (Aug. 12, 2016). Assuming those preconditions are met, a state created danger claim has six elements:

> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendant['s] conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

*Est. of B.I.C. v. Gillen*, 761 F.3d 1099, 1105 (10th Cir. 2014). In the present matter, the two preconditions and all six elements are satisfied.

#### a. Defendants engaged in affirmative conduct.

The affirmative conduct prerequisite is satisfied where the "defendant actors created the danger or increased the plaintiff's vulnerability to the danger in some way[.]" *Armijo*, 159 F.3d at

---

[2] Defendants suggest at several points in their brief that Plaintiffs' kidnapping somehow terminated the special relationship. *See, e.g.*, Def. Mot. at 14 ("Defendants had no control over the location of the Plaintiffs after April 2020… and, therefore, there can be no special relationship.") Defendants cite no legal authority to support that proposition, and Plaintiffs cannot find any. Plaintiffs note, however, that even after the kidnapping, Defendants used the custodial rights they now disclaim to block an Amber Alert. Moreover, the kidnapping and injuries to M.B. were the foreseeable result of Defendants' actions. Allowing dangerous adults access to vulnerable children breaches the special relationship; it does not end the special relationship.

1263. "Post-placement conduct may be considered for a danger-creation claim provided it is 'affirmative.'" *Patton*, 868 F.3d at 1226.

Here, Defendants' misconduct was almost entirely affirmative. For example, prior to the trial home visit De Los Santos and Garza ordered Mazy to unsubstantiate credible disclosures of physical abuse. PAFs S-EE.  Garza and Liggett also prevented Woodward from providing the children's court with her professional opinion and suborned perjury. PAF Q. Garza barred Woodward from communicating with the Guardian ad Litem. PAF R. Saldana repeatedly misled the State Criminal Court and State Criminal Court. PAFs FF-MM. All these actions were taken with the express purpose of providing Ducila with unsupervised access to Plaintiffs. And after the trial home visit started, Saldana staged Ducila's apartment and provided him with advance notice of unannounced visits so that the State Civil Court would incorrectly believe Plaintiffs were not in danger. Finally, after Plaintiffs were kidnapped, Defendants worked together to hinder HPD's search efforts.

Defendants claim the present matter is akin to *DeShaney*, where a child protective services officer observed abuse and did nothing. But while *DeShaney* is a case about inaction, this case is about action. "This is not a 'positive liberties' case, like *DeShaney*, where the question was whether the Constitution entitles a child to governmental protection[.]" *K.H.*, 914 F.2d at 848. Rather, the evidence obtained to this point shows an unmistakable and damning pattern. Time and again, third parties attempted to protect Plaintiffs from their biological parents. And time and again, Defendants took affirmative steps to thwart those efforts.

### b.  Defendants' actions led to private violence against Plaintiffs.

The second prerequisite, private violence, is satisfied for the same reasons as the causation element is met in Plaintiffs' special relationship claim. Plaintiffs were traumatized, and M.B. suffered catastrophic brain damage. These injuries were likely inflicted by Plaintiffs' biological parents and were imminently foreseeable. Thus, the private violence prerequisite is satisfied.

### c.  The six elements of a state created danger claim are satisfied.

#### i.    Defendants created or increased the danger posed to Plaintiffs.

The central thesis of Defendants' state created danger arguments is that "[t]he trial home visit did not expose Plaintiffs to any greater danger than they would have been exposed but for the interactions of Defendants." Def. Mot. at 22. In other words, Defendants contend that they are constitutionally privileged to expose children to the risk of grievous harm, so long as they faced that risk prior to the state's intervention. That argument fails for at least three reasons.

### a. Defendants knowingly placed Plaintiffs at great risk of harm.

More than 30 years ago Judge Posner wrote that "[i]f the fire department rescues you from a fire that would have killed you, this does not give the department a constitutional license to kill you, on the ground that you will be no worse off than if there were no fire department." *K.H.,* 914 F.2d at 849.

Now, though, Defendants claim to have discovered a loophole that *does* allow the fire department to kill you. According to Defendants, the fire department must use the right instrumentality: while the Constitution bars the fire department from shooting you or running you over, it may pick you up and toss you into the *same fire it rescued you from*. As Defendants see it, liability in that situation is "explicitly rejected by *DeShaney*." Def. Mot. at 20.

Not so. To continue the fire rescue analogy, a *DeShaney* situation occurs where the fire department pulls you out of a fire and then later finds you trapped, again, in a fire. The fire department is under no constitutional obligation to rescue you the second time because "the State does not become the permanent guarantor of [your] safety by having once offered [you] shelter." 489 U.S. at 201. That is, plainly, distinguishable from tossing someone into a fire. *K.H.,* 914 F.2d at 848 ("One of the less controversial aspects of the due process clause is its implicit prohibition against a public officer's intentionally killing a person, or seriously impairing the person's health, without any justification.")

Unsurprisingly then, case law establishes that social workers may not place children back with their parents when they know that doing so will expose the children to great risk of injury. In *Ford*, 899 F. Supp. at 227, the court held that a viable danger creation claim existed where child protective services returned a child to his father's custody. The social workers withheld

disqualifying information about the father to get the placement approved. *Id*. at 232. The court stated that "[i]t is important to remember that in the case at bar, Shawntee had not been in the custody of her father, but, rather, had been in the custody of CYS and was placed with her father by the court after a CYS investigation and recommendation." *Id*. at 233.

Likewise, in *Tazioly v. City of Philadelphia*, No. CIV.A. 97-CV-1219, 1998 WL 633747 (E.D. Pa. Sept. 10, 1998), as amended (Sept. 10, 1998), the court held that a "state-created danger theory may apply in cases where a state actor has rendered a minor more vulnerable to injury at the hands of the minor's biological parent." *Id*. at *11. Key to the court's ruling was that "the evidence, viewed in a light most favorable to the Plaintiffs, indicates that the decision to return Michael to his biological mother was made with *actual knowledge* that she was unfit and dangerous." *Id*. at 12 (emphasis original). *See also*, *Camp*, 67 F.3d at 1295 ("Gregory shouldered a responsibility to provide Anthony with a safe environment. When he returned Anthony to an environment he allegedly knew to be inadequate, Gregory might be said to have resurrected the danger that had motivated Camp to surrender guardianship in the first place."); *Cox v. Dep't of Soc. & Health Servs*., 913 F.3d 831, 838 (9th Cir. 2019) ("entitlement to qualified immunity turns on whether the facts known at the time reasonably revealed this terrible risk.")

The 10th Circuit in *Currier* cited favorably to *Ford* and *Tazioly*. *Currier*, 242 F.3d at 918. *See also*, *id* at 920 (agreeing with the dissent in *S.S. v. McMullen*, 225 F.3d 960, 968 (8th Cir. 2000) that "distinctions ... between foster parents and natural parents … are arbitrary"); *Bank of Ill. v. Over*, 65 F.3d 76, 78 (7th Cir.1995) ("[i]f the [social workers] knowingly placed [plaintiff] in a position of danger, they would not be shielded from liability by the decision in *DeShaney*.") (cited by *Currier*, 242 F.3d at 918).

The result is the same when children are placed back with their biological parents. In *Hubbard v. Oklahoma ex rel. Oklahoma Dep't of Hum. Servs*., the 10th Circuit flatly stated that "[s]tate-created danger claims can apply to placement with a biological parent as well as a foster parent." 759 F. App'x 693, 709 at fn. 9 (10th Cir. 2018). The *Hubbard* court further suggested that *Tazioly* applies if the child "experience[s] an immediate increase of vulnerability to private danger

when placed with his biological [parent]" and the social worker "ha[s] significant pre-placement warning signs of the [parent's] behavior." *Id*.

Here, Defendants had actual knowledge that Plaintiffs' biological parents were unfit and dangerous. Defendants also knew they would likely abscond with Plaintiffs if given the opportunity. Nonetheless, Defendants went to great lengths to "resurrect[] the danger" they posed. *Camp*, 67 F.3d at 1295.

### b. Defendants did not restore the status quo ante.

The Motion asserts that "[i]f the Defendants had done nothing, [Plaintiffs] would have always been in the custody of their parents." Def. Mot. at 20. But that is revisionist history. Defendants took custody of Plaintiffs from HPD, two hours after HPD detained Plaintiffs' parents and informed Liggett that felony child abuse charges were being filed. Plaintiffs lived at foster homes for months after that. The status quo ante was either Plaintiffs standing around in a parking lot while Liggett refused to take them into custody, or Plaintiffs in foster homes. Either way, Plaintiffs "would not have been exposed to the dangers from their [biological parents] but for the affirmative acts of the state[.]" *Currier*, 242 F.3d at 918. Defendants did not restore the status quo ante by working to remove the no-contact order and then leaving Plaintiffs unattended at the apartment of their abusive father.

Additionally, prior to the state's intervention, Plaintiffs' biological parents were not faced with the possibility of losing their children. The pending abuse and neglect proceeding gave them motivation to abscond and evade law enforcement, a departure from the status quo ante:

> Although … Will … [was] placed in the care of his mother, the significance of the distinction between a brief visit and a permanent return of custody is illustrated by the facts alleged in the complaint. The complaint alleges that Arkisha was despondent and hopeless because she feared she would never regain custody of Will and expressed the view that if she could not have Will, then no one could. Based upon these alleged facts, it is reasonable to infer that a temporary visit posed a particular heightened danger to Will that was distinct from any danger Will would have faced had he been permanently returned to Arkisha.

*Est. of Johnson v. La Causa Inc.*, No. 10-C-953, 2011 WL 5319909, at *9 (E.D. Wis. June 24, 2011) (citations omitted). That reasoning applies equally well here, so Defendant's Motion should be denied.

**Third**, Defendants do not even attempt to justify blocking the Amber Alert, withholding documents from HPD, or telling people not talk to the police. Those actions "increased [Plaintiffs'] vulnerability to … danger in some way[.]" *Currier*, 242 F.3d at 918 (10th Cir. 2001). The same is true for providing Ducila with advance notice of unannounced visits after the trial home visit started and barring Woodward from speaking to the Guardian ad Litem. All these actions cut Plaintiffs off from potential sources of aid. *Armijo*, 159 F.3d at 1263 (state created danger claim where a state actor "cut[s] off potential sources of private aid."); *Currier*, 242 F.3d at 921 ("Medina can be liable for danger creation because she instructed Juarez to stop making allegations of abuse."); *Ross v. United States*, 910 F.2d 1422, 1431 (7th Cir. 1990) ("constitutional wrong" where the state "cut[] off private sources of rescue").

Defendants' actions "significantly changed the nature of [Plaintiffs'] custody." *Horton v. Flenory*, 889 F.2d 454, 458 (3d Cir. 1989). And as "participant[s] in the custody which led to [Plaintiffs' injuries]," *id.*, Defendants may not escape liability.

### ii.   Plaintiffs were members of a limited and identifiable group.

Here, Plaintiffs plainly satisfy the second element of the state created danger test, in that they are the four children the state took into custody at the Walmart parking lot in Hobbs on June 3, 2019. *See, e.g., Armijo*, 159 F.3d at 1264 ("Armijo was a member of a limited and specifically definable group—special education students who have expressed threats of suicide.")

### iii.   Defendants' conduct put Plaintiffs at substantial risk of imminent harm.

According to Defendants, "[a] six-month gap between an alleged act and the harm caused by that act cannot reasonably be considered 'an immediate, and proximate harm[.]'" Def. Mot. at 22, citing *Currier*, 242 F.3d at 918. But Defendants' quote omits key language. *Currier* held that this element is satisfied if "defendants' conduct put plaintiff at *substantial risk* of serious,

immediate, and proximate harm[.]" 242 F.3d at 918 (emphasis added). Defendants granted Ducila unsupervised access to Plaintiffs knowing that he was unfit and likely to physically abuse Plaintiffs. More specifically, Defendants "contributed to putting [Plaintiffs] at risk of serious, immediate, and proximate harm by withholding relevant information and recommending [they] be placed with [their] father." *Patton*, 868 F.3d at 1229. The harm Plaintiffs suffered could have materialized at any time. That six months passed before M.B. suffered catastrophic brain damage is irrelevant. *See, e.g., Est. of Hebert by & through Bourgeois v. Marinelli*, No. 122CV02582CNSSTV, 2023 WL 4744927, at *7 (D. Colo. July 25, 2023) ("Defendants' argument that their alleged conduct did not place Mr. Hebert at a risk of serious, immediate, and proximate cause simply because he died *after* he encountered them … fails to persuade" (Emphasis original)).

### iv.    The risk was obvious or known.

As already discussed, numerous warning signs were obvious or known to Defendants. Indeed, most of the actions Defendants took were designed to hide damaging information about Ducila from the State Civil Court. For example, Saldana "warn[ed] [Plaintiffs' father] when an investigator was scheduled to arrive at the home to inspect the property and speak with the children[.]" *Matthews*, 889 F.3d 1151–52. That "conduct put Plaintiffs at substantial risk of serious, immediate, and proximate harm, the risk was obvious or known (otherwise why the warnings?)" *Id*. Similarly, Defendants were aware of the physical abuse disclosures made by A.D. and R.B.

### v.    Defendants acted recklessly in conscious disregard of that risk.

As just discussed, Defendants consciously disregarded the risks their plan posed to Plaintiffs. *See, e.g., Patton*, 868 F.3d at 1230 (element satisfied where a social worker "intentionally withheld her concerns that she feared for T.D.'s safety and her professional judgment that T.D. should be removed from his father's home.")

### vi.    Defendants' actions shock the conscience.

As already discussed, Defendants' actions were conscience shocking. Many of them standing alone would be sufficient to satisfy this element. Taken together, this final element of a state created danger claim is easily met.

### C.  Clearly Established Law.

In addition to establishing a violation of constitutional rights, to defeat a qualified immunity defense a plaintiff must also show that the right "was clearly established at the time of the conduct in question[.]" *Dahn*, 867 F.3d at 1185. "[T]o show that a right is clearly established, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (citations omitted).

However, "a plaintiff need not show the very act in question previously was held unlawful in order to establish an absence of qualified immunity." *Id.* (citations omitted). That is because "general statements of the law are not inherently incapable of giving fair and clear warning[.]" *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Rather, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful[.]" *United States v. Lanier*, 520 U.S. 259, 271, 117 S. Ct. 1219, 1227, 137 L. Ed. 2d 432 (1997) (quotations omitted) (modification original). *See also*, *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) ("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.") So, for example, although "[t]here has never been a section 1983 case accusing welfare officials of selling foster children into slavery … it does not follow that if such a case arose, the officials would be immune from damages liability[.]" *K.H.*, 914 F.2d at 851. *See also*, *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (qualified immunity unavailable where conduct "was unreasonable in light of clearly established law.")

Here, the rights Defendants violated were clearly established under a special relationship theory or a danger creation theory.

1.  **Special Relationship.**

Starting with special relationship:

> As of 1999, Supreme Court and Tenth Circuit authority clearly alerted persons in the positions held by Defendants that a child in state custody had a constitutional right to be reasonably safe from harm and that if Defendants placed such a child in known danger, or failed to exercise professional judgment by abdicating their duty to act professionally, thereby causing injury to the child, they would violate the child's constitutional rights.

*Whitley v. New Mexico Child., Youth & Fams. Dep't*, 184 F. Supp. 2d 1146, 1157 (D.N.M. 2001).

*See also*, *Yvonne L.*, 959 F.2d at 893 ("children in the custody of a state ha[ve] a constitutional right to be reasonably safe from harm; and … if the persons responsible place children in a foster home or institution that they know or suspect to be dangerous to the children they incur liability if the harm occurs."); *Schwartz*, 702 F.3d at 581 ("As our case law makes clear, the special relationship exists between the State and foster child, which triggers an accompanying, continuing duty imposed on state custodial officials thereafter."); *Cano I*, 377 F. Supp. 2d 1039, 1046 ("children in the state's legal custody have a clearly established constitutional right to be reasonably safe from harm").

As outlined in section IV(A)(1)(b) *supra*, each Defendant intentionally and unreasonably endangered Plaintiffs. Likewise, each Defendant failed to exercise professional judgment. In the Motion, Defendants argue the rights they violated were not clearly established because "case authority does not support a finding that CYFD's retention of legal custody is sufficient to establish a special relationship." Def. Mot. at 23. But legal custody and physical custody are synonymous under New Mexico law and CYFD's own employee manual. Defendants' "singular argument regarding the construction of the special relationship doctrine does not negate that the contours of foster children's constitutional rights were clearly delineated in this circuit as well as other circuits[.]" *Schwartz*, 702 F.3d at 588.

Defendants cite *Hernandez* for the claim that "it was not clear that the children plaintiffs' rights were violated by virtue of a breach of the special relationship." Def. Mot. at 23. But Defendants' reliance on *Hernandez* is misplaced. The court held only that the plaintiff's special

relationship theory "was not sufficiently well-established *in the 1989-1992 time frame*[.]" 2003 WL 27385396 at *11 (emphasis added). By its own terms, *Hernandez* does not consider subsequent 10th Circuit precedent. *See also*, *Brosseau v. Haugen*, 543 U.S. at 200 n.4 (2004) ("The parties point us to a number of other cases … that postdate the conduct in question. … These decisions, of course, could not have given fair notice to Brosseau and are of no use in the clearly established inquiry."); *Bishop v. Szuba*, 739 F. App'x 941, 945 (10th Cir. 2018) (holding that *Schwartz* could not be used to "establish the contours of the constitutional right at issue" because it was "decided more than 13 years after [the social worker's] investigation.")

### 2. State Created Danger.

Defendants also breached clearly established rights under a state created danger theory. "[T]he law [is] established that 'a reasonable state official would … [know] that reckless, conscience shocking conduct that altered the status quo and placed a child at substantial risk of serious, immediate, and proximate harm [is] unconstitutional.'" *T.D. v. Patton*, 868 F.3d 1209, 1225 (10th Cir. 2017) (citing *Currier* at 924).

As discussed in IV(B)(1)(c)(i) *supra*, those requirements are satisfied by Defendants' placement of Plaintiffs on a trial home visit. And that is true regardless of how the Court defines the status quo ante. Defendants also broke clearly established law by taking affirmative actions that "cut[] off potential sources of private aid[.]" *Armijo*, 159 F.3d at 1263. For example, Defendants withheld documents from HPD and blocked an Amber Alert. Saldana provided Ducila with advanced warning of unannounced visits. Garza ordered multiple employees not to talk to the police. These actions have only one discernable purpose: to prevent third parties from assisting Plaintiffs. Any reasonable social worker would understand that at "actions allegedly designed to shield and protect [an abuser] … could give rise to constitutional liability under the state-created danger exception." In *Matthews*, 889 F.3d at 1152. That is exactly what happened here. *Cf. DeShaney*, 489 U.S. at 201 at 192-193 ("the caseworker … observed a number of suspicious injuries … but she did nothing more.") Defendants have failed to cite, and Plaintiffs cannot find,

any authority that would even suggest to a reasonable social worker that it is permissible to help biological parents harm their children.

**3. This is an Obvious Case.**

Even if the facts in the present matter were distinguishable from existing precedent, this would still be an "obvious case, where the unlawfulness of the officer's conduct is sufficiently clear" to deny Defendants' qualified immunity claim. *D.C. v. Wesby*, 583 U.S. 48, 64 (2018) (quotations omitted).

"Cases featuring obvious constitutional violations typically involve unlawful conduct that is obviously egregious." *Rosales v. Bradshaw*, 72 F.4th 1145, 1157 (10th Cir. 2023) (quotations omitted). Hallmarks of obvious constitutional violations include a "mental state of conscious wrongdoing" and "malicious criminal behavior." *Id.* at 1158. That is because "[q]ualified immunity exists to protect mistaken but reasonable decisions, not purposeful criminal conduct." *Id. See also, Hardwick v. Cnty. of Orange*, 844 F.3d 1112, 1120 (9th Cir. 2017) ("Try as we might, we cannot conceive of circumstances in which social workers would not know and understand that they could not use criminal behavior in *any* court setting to interfere with a person's fundamental constitutional liberty interest" (emphasis original)). Courts are also more likely to find a case is obvious when the defendants "were not asked to make any split-second decisions[.]" *Ortiz v. New Mexico*, 550 F. Supp. 3d 1020, 1175 (D.N.M. 2021).

Multiple indicia of an obvious case are present here. Liggett and Garza suborned perjury by ordering Woodward to present inaccurate testimony to the State Civil Court. Saldana presented false information to multiple courts. Defendants also obstructed justice by withholding documents that were responsive to the HPD search warrant. Garza prohibited CYFD employees from talking to the cops. That is criminal activity, made worse by the fact that it endangered children that Defendants were constitutionally obligated to protect. Moreover, essentially all the misconduct underlying this action was intentional—this is not a case where reasonable mistakes were made. That is underscored by the complete lack of split-second decisions at issue. Every Defendant had ample time to realize what they were doing was wrong, and ample time to stop. The misconduct

here occurred over months, not minutes. "Confronted with the particularly egregious facts of this case," any reasonable social worker would have realized their actions "offended the Constitution." *Taylor v. Riojas*, 592 U.S. 7, 9 (2020)

### 4. Defendants' proposed exceptions to constitutional principles either do not clearly exist or do not exist at all.

Defendants argue that the law is not clearly established for essentially one reason: the hypothetical possibility that exceptions exist to the general principles underlying Plaintiffs' claims. As explained below, Defendants misunderstand and misapply the law.

To illustrate the mistake, start with Defendants' state created danger arguments. Defendants point to *Currier*, which they contend "require[s] a finding that Defendants did not create a danger to the Children by returning them to the parents from whom they were removed." Def. Mot. at 24. Defendant extrapolates that rule from the case's facts—the child in *Currier* was removed from one parent and placed with another. But that is not how *Currier* arrived at its holding. Rather, the court started with the general principle of law, "reckless, conscience shocking conduct that alter[s] the status quo and place[s] a child at substantial risk of serious, immediate, and proximate harm [is] unconstitutional," 242 F.3d at 924, and applied it to the narrow facts of the case. Defendants, by starting with the rule's narrow application, have the analysis backwards. The 10th Circuit recently rejected an analogous argument in a qualified immunity case:

> Nor is such a finding precluded by the fact that Rosales is not a child. To be sure, we noted in *Holland* that "[p]ointing a firearm directly at a child calls for even greater sensitivity to what may be justified or what may be excessive under all the circumstances." *But* Holland's *overall discussion was not limited to children; it discussed general principles about the pointing of firearms and then applied those general principles to the pointing of firearms at children*."

*Rosales*, 72 F.4th at 1155–56 (citations omitted).

Indeed, if the individual facts are subsumed by a sufficiently clear general principle of law, the defendant is only entitled to qualified immunity if "an *exception* to bedrock constitutional principles *clearly exists*." *Mascorro v. Billings*, 656 F.3d 1198, 1209 (10th Cir. 2011) (emphasis added). And the "clearly exists" test for exceptions is strict. Unreported opinions and dicta do not

suffice. *See, e.g.*, *Hope v. Pelzer*, 536 U.S. at 747 (2002) ("The unreported District Court opinions cited by the officers are distinguishable on their own terms. But regardless, they would be no match for the Circuit precedents."); *Taylor*, 592 U.S. at 13 (Alito, J. concurring) ("Although this Court stated in *Hutto* that holding a prisoner in a 'filthy' cell for 'a few days' 'might be tolerable,' that equivocal and unspecific dictum does not justify what petitioner alleges." (citations omitted)) And *Currier* itself cautions social workers *against* assuming exceptions exist to the state created danger rule's general principles as they relate to injuries caused by biological parents:

> Our conclusion that danger creation law was clearly established at the time of the events underlying this suit is not undermined by the Seventh Circuit's dicta in *K.H. v. Morgan* suggesting that placing a child with a family member might insulate the state from all constitutional liability. Never before has this court indicated that state employees would be justified in relying on the isolated dicta of another circuit court to create an exception to a general theory of liability established by Tenth Circuit and Supreme Court cases, and it will not do so now. Such a rule would make state employees immune from constitutional obligations determined to exist by this court or the Supreme Court, based on the non-binding musings of other circuit courts."

242 F.3d at 924 (citations omitted).

Defendants' special relationship arguments are equally deficient. As discussed, it is undisputed that Plaintiffs were taken into Defendants' custody on June 3, 2019. So, Defendant is either arguing that there is ambiguity about when the special relationship ends, or what the special relationship obligates social workers to do. But no 10th Circuit precedent supports any relevant exceptions to the general rule that "children in the custody of a state ha[ve] a constitutional right to be reasonably safe from harm[.]" *Yvonne L.,* 959 F.2d at 893. The 10th Circuit has never suggested that social workers are obligated to protect children from everyone *except* their biological parents. Likewise, no precedent exists to support the belief that the duty to protect always applies *except* during a trial home visit. *See Ortiz v. New Mexico*, 550 F. Supp. 3d 1020, 1173 (D.N.M. 2021) (qualified immunity rejected where a defendant's proposed distinction "has no basis in the Tenth Circuit's caselaw.") Defendant Liggett admitted that CYFD must protect children even from their biological parents when children are in the custody of the State. PAF QQ at R. Liggett Dep. 43:16-19.

The Court's "focus must be on whether an exception to bedrock constitutional principles clearly exists." *Mascorro*, 656 F.3d at 1209. As "[t]here appears to be no relevant precedent announcing such an exception in cases such as this," *id.*, Defendants' clearly established law arguments fail.

### D. Tort Claims Act.

In *Quevedo v. New Mexico Child. Youth & Fams. Dep't* the New Mexico Court of Appeals "conclude[d] that the waiver of immunity in Section 41–4–6(A) permits suit against CYFD" under the Tort Claims Act because "CYFD has an obligation to house children in its care in homes or facilities that meet certain minimum health and safety standards. This obligation may create a relationship between CYFD, the homes or facilities in which children are placed, and the children." 2016-NMCA-101, ¶ 17. That is especially true where CYFD is "in some respects, 'driving the bus[.]'" *Young v. Van Duyne*, 2004-NMCA-074, ¶ 21 (citing *Cobos v. Dona Ana County Housing Authority*, 1998–NMSC–049, ¶¶ 7, 9).

Applying *Quevedo* and *Young*, CYFD was obligated to provide safe housing to Plaintiffs. CYFD failed to do that when it decided to house Plaintiffs, often unsupervised, in the home of their biological father, a person they knew to be abusive and unfit. That conclusion is further warranted because CYFD's can fairly be said to have "driv[en] the bus" during the trial home visit. Saldana, CYFD's employee, performed basic household functions, and staged the apartment to make Plaintiff's biological father appear competent.

None of CYFD's counterarguments succeed. First, CYFD points out that as Plaintiffs were kidnapped and subsequently injured, "the harm that allegedly occurred did not happen in a building controlled or operated by Defendants, but necessarily occurred somewhere other than a place in CYFD control." Def. Mot. at 26. What CYFD overlooks, though, is that Defendants' failure to provide safe housing is what allowed the kidnapping to occur in the first place. The resulting harm proximately resulted from CYFD's Tort Claims Act violation. Second, CYFD's claim that the Tort Claims Waiver does not apply because "Plaintiffs were in the physical custody of their biological parents," (*id*. at 27), is wholly without merit. As mentioned earlier, CYFD's own employee

handbook acknowledges that the concept of "physical custody" is meaningless given the broad definition of legal custody under the Children's Code. And Liggett, CYFD's chief children's court attorney, admitted in deposition that the trial home visit had no impact whatsoever on CYFD's obligation to protect Plaintiffs.

### V.      CONCLUSION

For the foregoing reasons, Defendants' summary judgment motion should be denied.

Respectfully submitted,

GUBERNICK LAW P.L.L.C.

*/s/ Benjamin Gubernick*
Benjamin Gubernick
 New Mexico Bar No. 145006
Ben@gubernicklaw.com
623-252-6961
10720 W. Indian School Rd.
Ste.19 PMB 12
Phoenix, AZ 85037

-and-

Todd J. Bullion
Law Office of Todd J. Bullion
4811 Hardware Dr NE
Bldg D, Suite 5
Albuquerque, NM 87109
(505) 494-4656

todd@bullionlaw.com

*-and-*

Jason Bowles
Bowles Law Firm
4811 Hardware Dr NE

Bldg D, Suite 5
Albuquerque, NM 87109
505-217-2680
jason@bowles-lawfirm.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

       I HEREBY CERTIFY that on the 8th day of March 2023, I filed the foregoing electronically through the Court's CM/ECF system, which caused the following counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Alfred Park
James Grubel
apark@parklawnm.com
jgrubel@parklawnm.com

*Counsel for Defendants*


*/s/ Todd J. Bullion*
Todd J. Bullion