## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ALISON ENDICOTT-QUIÑONES,**
**Guardian ad Litem, on behalf of**
**A. D., R. B., E. B., and M. B.,**
**minor children,**

        **Plaintiffs,**

**vs.**                             **No: 21-cv-00368 DHU/JMR**

**PATRICIA GARZA, in her individual**
**and official capacity; REBECCA LIGGETT,**
**in her individual and official capacity; BRENDA**
**SALDANA, in her individual and official capacity;**
**JENNIFER DE LOS SANTOS in her individual and**
**official capacity; NEW MEXICO CHILDREN YOUTH**
** & FAMILIES DEPARTMENT; and DOES 1-50,**

        **Defendants.**

### DEFENDANT'S REPLY IN SUPPORT OF RENEWED MOTION FOR SUMMARY JUDGMENT

      COME NOW New Mexico Children, Youth and Families Department ("CYFD"), Patricia

Garza, Rebecca Liggett, Jennifer De Los Santos, and Brenda Saldana (collectively "Defendants"),

by and through their attorneys, Park & Associates, LLC (Alfred A. Park and James J. Grubel), and

for their Reply in Support of Motion for Summary Judgment (Doc. 91) and in opposition to

Plaintiffs' Response (Doc. 97) state as follows:

### I.      INTRODUCTION

      Plaintiffs' Response adds fifty-four additional facts, none of which are relevant to the core

and dispositive issue of whether placing Plaintiffs in the care and control of their parents for a

trial home visit can constitute a violation of their constitutional rights pursuant to the doctrines of

danger creation or special relationship. Rather, Plaintiff attempts to confuse the record with

inuendo, unsupported argument, and immaterial facts.

Once the Plaintiffs were back in the home of their parents, Defendants no longer exercised control over Plaintiffs' daily lives.  Case authority is clear, a special relationship only exists <u>while</u> an individual is <u>wholly</u> dependent on the state for all of his or her needs.  When Plaintiffs were retuned to their parents, it was the parents' responsibility to provide, food, shelter, healthcare, and other necessities of life, not withstanding any supported offered by CYFD.  Accordingly, as a matter of law, there was no special relationship between Plaintiffs and Defendants.  Therefore, there can be no finding of a constitutional violation based on this doctrine.

In addition, because Plaintiffs were removed from the home of their parents, and then returned to those same parents, claims of danger creation also fail as a matter of law.  Binding authority, including <u>DeShaney v. Winnebago County Department of Social Services</u>, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) and its progeny, hold that a state is not responsible for injuries sustained by a child unless the state actors did something to create or increase the danger to that child.  Unless a Plaintiff can show "but for" causation, returning a child to the *status quo ante* places a child in no greater danger than if the state actors had never intervened in the first place.  Here, Plaintiffs were with their parents in June of 2019 and were in their parents' care again in April of 2020.  They were in no worse of a position than if Defendants have never acted.  Plaintiffs' claims, therefore, fail.

Moreover, even if Plaintiffs could demonstrate that the actions of Defendants constituted a violation of their constitutional rights, which they cannot, they have failed to identify that those rights were clearly established.  Rather, the authority cited by Plaintiffs is distinguishable as either a situation dealing with a foster parent, moving a child from one parent to a non-custodial parent, or placing a child who was born addicted to drugs with a mother with whom he never resided.  It is Plaintiffs' burden to establish their rights were clearly established, otherwise Defendants are

entitled to qualified immunity.  Plaintiffs have failed to identify any authority that would clearly establish the rights they claim to have been violated.

Moreover, Plaintiffs fail to identify that the actions of Defendants were the proximate cause of a constitutional injury.  Instead, the rely on the presumption that an injury sustained by the youngest Plaintiff nearly six months later in North Carolina, was caused by the parents and was foreseeable.  Plaintiff have offered no evidence of the cause of the injury to the child, let alone proof that it was an immediate consequence of any identifiable actions by the Defendants.  As a result, summary judgment in Defendants' favor is appropriate because they did not violate Plaintiffs' constitutional rights or because those rights were not clearly established, thus entitling Defendants to qualified immunity.

## II.    RESPONSE TO PLAINTIFFS' COUNTERSTATEMENT OF MATERIAL FACTS

Plaintiffs do not dispute Defendants material facts.  They are accordingly Undisputed Material Facts.  Plaintiffs' Response contains a counterstatement of facts that lists 54 additional factual paragraphs.  Defendants respond to each of Plaintiffs' additional facts ("PAFS")as follows:

A.  Immaterial.   Whether staff within CYFD was initially reluctant to take Plaintiffs into custody is not relevant to whether Defendants breached duties to Plaintiffs when they were eventually taken into CYFD custody and placed on a trial home visit with their parents.

B.  Immaterial.   Whether staff within CYFD was initially reluctant to take Plaintiffs into custody is not relevant to whether Defendants breached duties to Plaintiff when they were eventually taken into CYFD custody and placed on a trial home visit with their parents.

C. Immaterial.   Whether staff within CYFD was initially reluctant to take Plaintiffs into custody is not relevant to whether Defendants breached duties to Plaintiff when they were eventually taken into CYFD custody and placed on a trial home visit with their parents.

D. Undisputed, but immaterial.

E. Undisputed, but immaterial.

F. Immaterial.   Whether some staff within CYFD wanted to resolve Plaintiffs' custody quickly is not relevant to whether Defendants breached duties to Plaintiffs when they placed on a trial home visit with their parents.

G.  Disputed as unsupported by the evidence cited, but immaterial to this motion.

H. Disputed and immaterial.  Ivy Woodward was removed as supervisor of Plaintiffs' case no later than November 2019.   See Ex. A. Dep. of Brenda Saldana, 133:14-17. Accordingly, Woodward's opinions and observations regarding the father related to visits in 2019 were not pertinent to a decision to return the Plaintiffs to their parents for a trial home visit in April of 2020.

I. Immaterial.  Ivy Woodward testified that she believed the father was a "ticking time bomb" and that she would advocate against reunification if asked to testify.  (Doc. 98-4 at 5).  However, Ms. Woodward also admitted that she "sees things according to humanity and feelings, its not all black and white for me."  <u>Id</u>.  Woodward's conclusions on whether reunification was appropriate are not relevant to whether placing the children on a trial home visit with their parents can constitute a constitutional violation.

4

J.  Immaterial.   The father's actions to regain his children, particularly at the beginning of the abuse and neglect proceedings, were not unknown.  However, it is not material to whether Defendants breached their duty to Plaintiffs pursuant to a theory of danger creation or special relationship.

K.  Immaterial.   The father's actions to regain his children, particularly at the beginning of the abuse and neglect proceedings, were known.  However, it is not material to whether Defendants breached their duty to Plaintiffs pursuant to a theory of danger creation or special relationship, when Plaintiffs were returned to their parents for a trial home visit.

L.  Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

M.  Immaterial and disputed.  Ivy Woodward was removed as a supervisor of Plaintiffs' case prior to the decision to place Plaintiffs on a trial home visit.  *See* H above. Whether Ivy Woodward later disagreed with the decision by CYFD to proceed with a trial home visit is immaterial to whether Plaintiffs' constitutional rights were violated by being returned to their parents.

N.   Immaterial and disputed.  Ivy Woodward was removed as a supervisor of Plaintiffs' case prior to the decision to place Plaintiffs on a trial home visit.  *See* H above. Whether Ivy Woodward disagreed with the decision to place Plaintiffs on a trial home visit is immaterial to whether Plaintiffs' constitutional rights were violated by being returned to their parents.

O.  Immaterial and disputed as not supported by the cited evidence.  The cited motions and orders speak for themselves.  Ivy Woodward had no direct knowledge of the parents'

compliance with parenting plans because she had been removed from the case.  Her opinions regarding the suitability of the parents were known to CYFD.  It was the court presiding over the abuse and neglect proceeding that had the responsibility to monitor the parents progress with parenting plans and, therefore, the state criminal judge, to the extent the no-contact order was based on safety concerns for the children, should and did defer to the court and agency overseeing the children.  It is also immaterial to whether returning Plaintiffs to their parents for a trial home visit violated their constitutional rights.

P.  Immaterial.  It was the court presiding over the abuse and neglect proceeding that had the responsibility to monitor the parents progress with parenting plans and, therefore, the state criminal judge, to the extent the no-contact order was based on safety concerns for the children, should and did defer to the court and agency overseeing the children. It is also immaterial to whether returning Plaintiffs to their parents for a trial home visit violated their constitutional rights.

Q.  Disputed and immaterial.   Liggett prepared  Ms. Woodward  as a witness to refrain from offering her individual opinions if called to testify and instead testify as to the collective decision of CYFD. *See* Ex. B. Dep of Liggett, 146:4-147:15 However, Ms. Woodward never testified.  Moreover, this witness preparation is not relevant to whether a trial home visit with parents from whom the Plaintiffs were removed, as a matter of law, constitutes a violation of their constitutional rights.

R.  Disputed, immaterial, and unsupported by the cited evidence.   The Guardian ad Litem ("GAL") withdrew the relevant motion and stated that "the Department addressed my concerns within my motion, by launching an investigation.  My understanding that an

Unsbstantited Letter is soon to be issued." Doc. 98-20 at 4. Ms. Woodward's assertion that the motion was withdrawn because she was not permitted to testify is unsupported. Indeed, Woodward testified that she did not know why the relative motion was withdrawn. She stated, "[t]o my knowledge the motion had been withdrawn prior to that [day of hearing] and it was all done electronically, so I wasn't privy to that. The only thing the judge said was it had been taken off the docket." <u>See</u> Ex. D., Dep. of Woodward, 89:2-8.

S.   Immaterial. Moreover, the issues asserted in Ms. Evans' letter were addressed in the questioning by Plaintiffs' GAL Laura Castillo during the hearing of March 16, 2020. Doc. 98-20 at 3.

T.  Immaterial. Moreover, the issues asserted in Ms. Evans' letter were addressed in the questioning by Plaintiffs' GAL Laura Castillo during the hearing of March 16, 2020. Doc. 98-20 at 3.

U.  Immaterial. Moreover, the issues regarding potential violence were addressed in the questioning by Plaintiffs' GAL Laura Castillo during the hearing of March 16, 2020. Doc. 98-20 at 3.

V.  Immaterial. Issues regarding the fitness of the father were available to the GAL Laura Castillo prior to the hearing of March 16, 2020 and the GAL asked questions regarding alleged domestic violence. Doc. 98-20 at 3.

W.  Immaterial. Issues regarding the fitness of the father were available to the GAL Laura Castillo prior to the hearing of March 16, 2020 and the GAL asked questions regarding alleged domestic violence. Doc. 98-20 at 3.

X.  Immaterial.  Issues regarding the fitness of the father were available to the  GAL Laura Castillo prior to the hearing of March 16, 2020 and the GAL asked questions regarding alleged domestic violence.  Doc. 98-20  at 3.

Y.  Immaterial.  Issues regarding the fitness of the father were available to the  GAL Laura Castillo prior to the hearing of March 16, 2020 and the GAL asked questions regarding alleged domestic violence.  Doc. 98-20  at 3.

Z.  Immaterial.  Issues regarding the fitness of the father were considered at the hearing of March 16, 2020.

AA.  Immaterial.  Issues regarding the allegations of potential physical abuse were considered at the hearing of March 16, 2020.    See Doc 98-20.

BB.  Immaterial.  Issues regarding the fitness of the father were considered at the hearing of March 16, 2020.

CC.  Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

DD.  Immaterial.  Mazy made a finding that the allegations were unsubstantiated.  The document making that finding speaks for itself. See Doc 98-19.  It is also not material to whether placing Plaintiffs back in the physical custody of their parents violated their constitutional rights as they were returned to the *status quo ante*.  .

EE.  Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

FF.  Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.  Ms. Saldana specifically testified in response to a question whether concerns raised by the therapist were addressed that "Yes they have been."  She was asked if the

concerns regarding a kissing game and the killing of a puppy were addressed and she clarified, "yes, and also regarding domestic violence."   Doc. 98-20 at 3.

GG.   Undisputed, but immaterial.

HH.   Disputed and immaterial.  Ivy Woodward was removed from the abuse and neglect case in October or November 2019.  See Ex. A. Dep. of Brenda Saldana, 133:14-17. Woodward's opinions are not based in concurrent firsthand knowledge.

II.   Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.  Ivy Woodward's statements are based on observations made prior to her being removed in November 2019.  *See* H above.

JJ.  Undisputed.

KK.   Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

LL. Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

MM.   Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

NN.   Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

OO.   Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

PP. Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence. The referenced letter addresses allegations that one of the Plaintiffs was

kissing another.  Plaintiffs' classification of this email as a report of sexual abuse is wholly without support and is hyperbole intended to distract.

QQ.　Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence. It is for the Court to determine whether, as a matter of law, Plaintiffs can sustain a claim that their constitutional rights were violated when they were returned to the parents from whom they were removed.

RR.　Immaterial and disputed as lawyer argument.

SS.　Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.  Megan Gallegos testified that "We were pushing, pushing for an Amber Alert.  But even—we did find out that even if CYFD had reported the way that HPD and the DA needed them to, that they could not do an Amber Alert."  *See* Ex. C, Dep. of Meghan Gallegos 68:4-17.

TT.　Disputed and immaterial.  Saldana reported the Plaintiff's Missing on May 2, 2020 per the Police Report cited by Plaintiffs.  Doc 98-30 at 1.

UU.　Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

VV.　Undisputed, but immaterial.

WW.　Disputed and immaterial.  The Plaintiffs were already missing by the time the search warrant was served and compliance with a state search warrant is not relevant to whether placing Plaintiffs in the physical custody of their parents violated Plaintiffs' constitutional rights.

XX.　Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

YY.    Disputed as Plaintiff take statements out of context.  The allegations are also immaterial to whether the trial home visit violated Plaintiffs rights.  Plaintiffs were brought into CYFD custody because of allegations of medical neglect. The Plaintiffs were determined to be safe in the home and the parents leaving with the Plaintiffs did not necessarily lead to the conclusion that the children were unsafe.  *See* Ex. B, Dep of Ligget, 205:9-24.

ZZ. Undisputed.

AAA.   Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

BBB.   Immaterial and disputed as lawyer argument.

### III.    ARGUMENT

**1.   <u>There was no special relationship between the Plaintiffs and Defendants once they were placed under the physical control of their biological parents.</u>**

Significantly, Plaintiff's Response fails to fully address the relevant and binding Tenth Circuit precedent on the elements of a special relationship, as articulated in <u>Armijo v. Wagon Mound Pub. Schs.</u>, 159 F.3d 1253, (10th Cir. 1998).  Instead, Plaintiffs cite to authority that are based upon easily distinguishable facts.

The fundamental element that establishes a special relationship is whether the state restrains an individual's freedom to protect himself.  <u>Armijo</u> held that "if the state restrains an individual's freedom to act to protect himself or herself through a restraint on that individual's personal liberty, the state may thereby enter into a 'special relationship' during such restraint to protect that individual from violent acts inflicted by others." <u>Armijo</u> at 1261.  Of note, none of the undisputed facts support the conclusion that Plaintiffs were restrained  by Defendants or that any

restraint rose "to the same level of involuntary restraint as arresting, incarcerating, or institutionalizing an individual." Armijo at 1261.

Here, it is undisputed that during the trial home visit, Defendants did not have day-to-day physical control of the Children's ability to satisfy their basic needs; that was the role of the biological parents.   It is undisputed that once they were placed in the trial home visit, which is undisputably at the home of the biological parents, that CYFD was not monitoring Plaintiffs twenty-four hours a day.  Pursuant to Armijo,  the relevant question is the restraint at the time of the alleged injury.  Here, Plaintiffs are asserting that the parents were allowed to flee, that the state did not exercise restraint.

Armijo involved a special education student who, after being suspended and driven home without parental notification, committed suicide. The Tenth Circuit found no special relationship existed. The tenth Circuit reasoned

> At most, Armijo was a student in a public school confined in Herrera's car during the drive home from school. Even if such circumstances constituted a custodial relationship, that relationship ended once Armijo exited the car and ran to his house because at that point he was no longer under any involuntary restraint by a school official. Armijo at 1261.  "The only 'restraint' imposed upon Armijo after his removal from school was Schutz' directive that he not return to school that day. Otherwise, Armijo was free to do whatever he wanted, including voluntarily leaving his house. Banning a student from the school grounds does not rise to the same level of involuntary restraint as arresting, incarcerating, or institutionalizing an individual. The fact that Armijo ended his life after he was "released" by Herrera bars any liability under the special relationship doctrine. Thus, the district court erred as a matter of law by denying qualified immunity to the Individual Defendants on the special relationship claim.

Armijo at 1262-1263.

Similarly, Plaintiffs' assertions do not constitute a restraint on the children, but rather a lack of restraint on their biological parents.  It is undisputed that one of the Plaintiffs was harmed in North Carolina by unknown means.  Because Defendants had no control over the location of

the Plaintiffs after April 2020, Defendants could not exercise any restraint over Plaintiffs and, therefore, there no special relationship could exist.

Plaintiffs' allegation is a futile attempt to avoid the implications between legal and physical custody. Even read in a light most favorable to Plaintiffs, they were transferred to the home of their parents. There is no legally sustainable argument that they were not in the physical control of their parents once placed on the trial home visit. Indeed, if they were not under the parents' control, the Children could not have been removed from the state.

In Wooten v. Campbell, 49 F.3d 696, 699 (11th Cir. 1995), a child was in the physical custody of a mother as a result of actions of the Georgia Department of Human Resources ("DHR"). In addition, DHR initially monitored visitation with the non-custodial father. During an unsupervised visit, the father murdered the child and then killed himself. The mother sued DHR. The key inquiry, according the Eleventh Circuit, was whether the county caseworkers controlled the child's life to such an extent that the mother could not be expected to protect him. Wooten at 701.

The Eleventh Circuit rejected the district court's comparison of the situation to one involving foster care. Id. at 699. The Circuit found the distinction that the child was in his mother's physical custody, and not a third-party foster home, to be dispositive. In foster care, the state chooses to place a child into the care of someone of the state's choosing. The Eleventh Circuit found that the facts were more analogous to DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Wooten emphasized that "[t]he purpose of the Due Process Clause is to protect the people from the state, not to ensure that the state protect the people from each other." Wooten at 700 (quoting DeShaney at 196).

Wooten specifically found "[t]here is no special relationship here: Daniel was in the physical custody of his natural mother when his natural father took him; Daniel did not rely solely upon the state for his physical needs and safety; Wooten had access to the courts if she was displeased with the unsupervised visitation; Wooten could have intervened to stop the unsupervised visitation; and Wooten was able to protect Daniel because she had physical custody of Daniel." Wooten at 700.

Here, the facts are more akin to Wooten and DeShanney. Plaintiffs were not solely reliant on Defendants for their physical needs and safety. For example, if there had been a fire in the home in which Plaintiffs resided with their parents, it would not have been the role of Defendants to remove the children from the burning home. Rather, it would be the responsibility of the parents to immediately act. The parents had the same responsibility to provide food and other immediate needs to Plaintiffs during the trial home visit. Significantly, the children were not in a home owned or operated by Defendants, but one that was operated, and presumably leased, by the parents.

Plaintiffs assert in their Response that Defendants are creating a false distinction between physical and legal custody. However, that distinction is recognized by multiple courts. Plaintiffs assert that Wooten is distinguishable because the state actors' only role was to monitor visitation of the father and CYFD had a greater role in this case. Plaintiffs claim that in Wooten "[t]he court made clear that the 'public agency [was] awarded legal custody of a child, but d[id] not control that child's physical custody except to arrange court-ordered visitation with the non-custodial parent.' Id. at 699 (emphasis added). That is plainly distinguishable from the present matter, where Defendants retained full control over Plaintiffs." Doc. 97 at 30.

14

Plaintiffs recognize that control is the key to the analysis in determining whether a special relationship exists.   Nonetheless, Plaintiffs misapply the facts to the analysis to come to their faulty conclusion that there was a continuing special relationship while the children resided in the home of their parents.   Plaintiffs assert that Defendants contend that the kidnapping ended the special relationship.   Id. at n. 2   However, the kidnapping just emphasizes the lack of control the state had over the Plaintiff.   Once the children were placed in the home of their parents, the special relationship ended as a matter of law.

In DeShanney there was no violation of due process because the child was harmed by his father in the father's home.   In Armijo, the special relationship terminated the moment the child left the automobile of the school official driving him home, and in Wooten, there was no special relationship because the child was in the physical custody of his mother.   The key in all of these cases is control and physical custody.   Plaintiffs are simply incorrect when they assert that there is no distinction between physical and legal custody.

A.S. By & Through Blalock v. Tellus, 22 F. Supp. 2d 1217, 1221 (D. Kan. 1998) is analogous to the facts here.   There, a court order provided in part, that the Kansas Social and Rehabilitation Services ("SRS") was "granted permission to continue placement of said children in the home of Brenda Summers, mother, if such action is deemed to be appropriate." A.S. remained in the temporary custody of SRS until June 12, 1989." A.S at 1219.   The child was abused by her father and subsequently by the boyfriend of her mother while residing with the mother.

The court in A.S reasoned that "[t]his case lies somewhere between DeShaney and Yvonne L. In this case, the state had legal custody of the plaintiff, but physical custody remained with her mother. The questions before the court, then, are whether this situation constitutes a special

relationship entitling A.S. to state protection from harm by third parties and, if so, whether this right was clearly established in 1988 and 1989, when the alleged abuse occurred, so as to defeat the defense of qualified immunity." Id. at 1221. The court held that "legal custody without physical custody is insufficient to create a special relationship." Id. It further stated that the Tenth Circuit has stressed that it is the state's taking and holding a person against her will which creates a special relationship. Id.

Of note, the Plaintiffs here were represented by a GAL during the state court proceedings. The GAL for the Plaintiffs agreed to the permanency plan proposed by CYFD, which included a trial home visit. See state court's order of March 23, 2020 Doc 69-4 at 5. Moreover, CYFD filed a change in placement notice prior to the beginning of the trial home visit. See Doc. 69-5 Pursuant to NMSA 32A-4-14, the Plaintiffs, through their GAL, could have objected to such a placement. Accordingly, Plaintiffs were not involuntarily returned back in the physical custody of their parents. They accepted this change in placement through an affirmative approval of the permanency plan, via their GAL, and the failure to object to the notice in change in placement.

Plaintiffs' reliance on Judge Browning's opinion in A.M. ex rel. Youngers v. New Mexico Dep't of Health, 65 F. Supp. 3d 1206, 1259 (D.N.M. 2014), to reject the "physical control test," is misplaced.[1] Notably, Judge Browning recognized that "although the state has no substantive due-process obligations to protect children from their biological parents, such obligations arise when the state assumes the role of guardian—as with children in foster care, prisoners, and developmentally disabled individuals." A.M. at 1599 (emphasis supplied). A.M. specifically recognizes that placement with biological parents is legally distinct from foster children or, as in

---

[1] Plaintiffs' citation omits the specific language that contradicts their position. "This reading is reinforced by the fact that all of the cases that Judge Miles–Lagrange cites—A.S. v. Tellus; Wooten v. Campbell; and Clark v. City of Philadelphia—involved state actors failing to intervene when children suffered abuse in their biological parents' homes. Accordingly, Briggs is also inapposite."

16

the case of A.M., placement of individuals with developmental disabilities.   Accordingly, Plaintiffs have failed to offer any contrary authority to the proposition that a special relationship requires that the state actor have <u>both</u> physical and legal custody. Once Plaintiffs were placed on the trial home visit in the home of their parents, Defendants lost physical custody/control.   As a matter of law, the special relationship ceased.  In addition, Plaintiffs were not involuntarily placed in the home of their parents.

Moreover, to the extent that Plaintiffs assert that Defendants knew that the parents would abscond with the children, that is not relevant to whether a special relationship existed.  The Tenth Circuit has held that the defendants' knowledge of a risk of harm to the plaintiff was "not relevant to the determination of whether a special relationship existed." <u>Armijo</u>, 159 F.3d 1253, 1262 n.5. Plaintiffs cannot sustain a claim for violation of Due Process because there was no special relationship as a matter of law.

**2.** **<u>Defendants did not create or enhance the danger to Plaintiffs, as they were returned to their parents and Plaintiff cite to no authority that would require a different conclusion.</u>**

Plaintiffs cannot meet at least two elements required to prove danger creation. In order for the state created danger exception to apply, the Plaintiffs must show:

> (1) [T]he charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscious shocking.

<u>Currier v. Doran</u>, 242 F.3d 905, 915–20 (10th Cir. 2001), 242 F.3d at 918.

First, and most importantly, there can be no danger creation because the Defendants did not create the danger.  The children were returned to the *status quo ante*.  <u>DeShaney</u> specifically forecloses Plaintiffs' claims. Indeed, while the Tenth Circuit has found that removing a child from

one parent and placing that child with a non-custodial parent who injures that child can sustain a claim for danger creation, returning a child to the custody to the parent(s) from whom the child was removed will not support a claim of danger creation.  In T.D. v. Patton, 868 F.3d 1209, 1238–39 (10th Cir. 2017), Judge Briscoe in a concurrence found, "We attempted to avoid the controlling precedent in DeShaney by drawing a distinction that returning a child to the same parent did not increase the child's vulnerability to danger from violence at the hands of that parent, but returning a child to a different parent did."  The facts here are similar to DeShanney and not Patton or Currier v. Doran, 242 F.3d 905, 915–20 (10th Cir. 2001) as Plaintiffs were not removed from a custodial parent and returned to a non-custodial parent.

Plaintiffs attempt to distinguish the facts here from DeShanney by focusing on the affirmative action requirement under Currier and Patton.  Plaintiffs claim that in DeShanney, a child protective services officer observed and did nothing.  Doc. 97 at 31.  In contrast, Plaintiffs argue that Defendants here engaged in the affirmative action of ignoring warning signs that the parents posed a danger and actively sought to return the children to the parents.  This allegation fails to create danger creation on multiple levels.   Because the children were returned to the parents from whom they were taken, the *status quo ante* was restored.  The United States Supreme Court held that because "the State once took temporary custody of [the child] does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect [the child]."  DeShaney 489 U.S. 189, 201, 109 S. Ct. 998, 1006, 103 L. Ed. 2d 249 (1989).

Plaintiffs assert that in <u>Hubbard v Oklahoma ex rel. Oklahoma Dep't of Hum. Servs</u>. 759 Fed.Appx, 693, that the Tenth Circuit "flatly stated that "[s]tate created danger theory can apply to placement with a biological parent as well as a foster parent." Doc. 97 at 33.    However, Plaintiffs fail to include the parenthetical citation to <u>Currier</u>, which states, "When the state affirmatively acts to remove a child from the custody of one parent and then places the child with another parent, <u>DeShaney</u> does not foreclose constitutional liability."   Plaintiffs conveniently ignore this clarifying statement because it precludes recovery under a theory of danger creation, as the Plaintiffs were not taken from one parent and placed with another non-custodial parent.

Plaintiffs aver that the Tenth Circuit in <u>Currier</u> cited favorably to <u>Tazioly v. City of Philadelphia</u>, No. CIV.A. 97-CV-1219, 1998 WL 633747(E.D. Pa. Sept. 10, 1998), as amended (Sept. 10, 1998).  However, the Tenth Circuit in <u>Hubbard</u>, which was decided nearly two decades later, distinguished the relevance of <u>Tazioly</u>.   <u>Hubbard</u> found that "[t]his case is not binding and is readily distinguishable. In <u>Tazioly</u>, the child was born addicted to cocaine. At birth, the child was taken from his mother (who herself remained addicted to cocaine) and placed with another caretaker. <u>Id</u>. at *3-*4. The mother appeared 'hostile, abusive, ... paranoid' and 'bizarre' to social workers."  <u>Hubbard</u> at 709. Critically, the Tenth Circuit found the "child in <u>Tazioly</u> experienced an immediate increase of vulnerability to private danger when placed with his biological mother (<u>with whom he had never previously lived</u>)."  <u>Id</u>. (emphasis supplied).

Plaintiff cite to no authority standing for the proposition that state actors can be liable for danger creation when those state actors return a child to the parent from whom that child was initially removed.  Plaintiffs' focus on what Defendants knew and when they knew it is simply not relevant.  There can be no danger creation under the circumstances here. Plaintiffs were taken

from their parents in June of 2019 and returned in April of 2020.  They were in no worse position

in 2020 than they were in 2019.

   3.   **Plaintiffs' assertion that they were not returned to the *status quo ante* is unsupported.**

   Plaintiffs unsuccessfully attempt to establish that the *status quo ante* was state custody,

but their position is patently contradictory.  Plaintiffs assert that "the status quo ante was either

Plaintiffs standing around in a parking lot waiting while Liggett refused to take them into custody

or Plaintiffs in foster homes." Doc 97 at 34.   Plaintiffs' assertion is inflammatory, yet,

meaningless.  It is undisputed that Plaintiffs were in the custody of their parents while in the Wal-

Mart parking lot on June 3, 2019.  Undisputed Material Fact "UMF" 1.   It is also undisputed that

Plaintiffs were placed into foster care because of the actions of CYFD.  UMF 4, 5.

   Accordingly, before they were taken into CYFD custody, Plaintiffs were under the

physical control of their parents.  Once they were placed on a trial home visit, Plaintiffs were

again in the physical control of their parents.  Plaintiffs insinuate that there is difference between

being in the control of CYFD or the Hobbs Police Department.  Plaintiffs offer no support for this

novel claim.

   Plaintiffs also assert that prior to the state's intervention, "Plaintiffs' biological parents

were not faced with the possibility of losing their children."[2]  Doc. 97 at 34.  Plaintiffs claim that

"the pending abuse and neglect proceeding gave them motivation to abscond and evade law

enforcement, a departure from the status quo ante." Doc 97 at 34.   Plaintiffs' position is

contradictory.  Plaintiffs are simultaneously claiming that CYFD resisted taking Plaintiffs into

custody, while also complaining that, by taking them into custody, they provided a reason for the

---

[2] It is ironic that Plaintiffs are claiming that Defendants created incentives for their parents to flee New Mexico
while relying on the testimony and opinions of individuals such as Ivy Woodward.  Multiple individuals helped to
create an environment within Hobbs, including a media frenzy, that was openly hostile to the parents.   The parents
and the Plaintiffs were essentially used as pawns for political purposes because of their immigration status.

parents to flee.  This is also not relevant to the danger creation based on the facts here.  It is undisputed that on June 3, 2019 the Plaintiffs were in the physical control of their parents traveling through, as there is no evidence they resided in, Hobbs, New Mexico.  There is no evidence that that parents ever intended to stay in New Mexico.  They had no apparent ties to this state and were facing federal immigration issues.  See Complaint, Doc. 53 at ¶44.  Indeed, the mother was in federal custody for the majority of the time between June 2019 until April 2020.  Doc 53. Plaintiffs cannot point to any actions that Defendants took that increased the risk that their parents posed to their safety.

Plaintiffs rely on Est. of Johnson v. La Causa Inc., No. 10-C-953, 2011 WL 5319909, at *9 (E.D. Wis. June 24, 2011) for the proposition that there is a distinction between a short visit and a permanent return to custody.  However, this authority is not helpful to Plaintiffs.  First, Est. of Johnson was a decision on a motion to dismiss and, therefore, it only addressed whether the claim was properly pled – not whether it was successful.  Second, there were private entities involved.  Third, the issue of qualified immunity was not addressed.

Est. of Johnson involved arranging a visit with a mentally ill mother and her infant child. A case worker spent a half hour with both in the mother's home and then left.  The mother placed the child in a bathtub, left the child un unattended, and returned to find the child unresponsive. The child apparently drowned.  The facts here are readily distinguishable.  First, in Est of Johnson, the child was only to visit with the mother for a short time. That case found "the complaint indicates that Will resided with a person chosen by the state under circumstances akin to a foster care arrangement. Will was with his mother only for the limited purpose of a visit that was scheduled to last only a few hours."  Id. at C.I.A. *7.

Therefore, because the state was still responsible for meeting the daily needs of the child, such as food, shelter, medical care, etc., a special relationship could exist. Here, as discussed above, there was no special relationship because the parents were responsible for providing the necessities of life to the Plaintiffs.

Est. of Johnson also addressed the issue of danger creation. However, the facts are again distinguishable. Est. of Johnson held that it was legally significant that the complaint in that case did not allege that the state actors returned the child to his mother full-time, thus restoring the *status quo ante.* Id. at *9. Rather, she only was permitted to have a brief visit with her son. Here, Plaintiffs were placed with their parents for more than just a brief visit. They were fully responsible for their children during a trial home visit during which Plaintiffs resided with their parents.

Moreover, from the outset, the visit was not intended to be brief. Per New Mexico regulations, a "'Trial home visit' is the period of time, not to exceed six months, in which a child with a plan of reunification resides with their parent or guardian while services are provided to the child and family to address risk factors and ensure safety of the child." 8.10.8.7 HH NMAC.

4. **Plaintiffs' focus on an Amber Alert is immaterial and unfounded.**

Plaintiffs make assertions that Defendants interfered with issuing an Amber Alert. This is not only irrelevant to danger creation; it is not supported by the evidence. Megan Gallegos[3] testified that "We were pushing, pushing for an Amber Alert. But even—we did find out that even if CYFD had reported the way that HPD and the DA needed them to, that they could not do an Amber Alert." Response to Plaintiffs' additional Fact SS *supra*. This is an allegation that

---

[3] Ms. Gallegos served as the CASA, Court Appointed Special Advocate. She was not aligned with CYFD or with the parents in the abuse and neglect proceedings. *See* NMSA 1978, 32A-1-4 F, ""court-appointed special advocate" means a person appointed pursuant to the provisions of the Children's Court Rules to assist the court in determining the best interests of the child by investigating the case and submitting a report to the court

Defendants failed to act.  This assertion is demonstrably inaccurate and does not form the basis for danger creation.  Multiple cases  have found that a refusal to act is not affirmative conduct to support a state created danger claim.  See, e.g., Est. of B.I.C. v. Gillen, 761 F.3d 1099, 1107 (10th Cir. 2014) (finding allegations regarding refusals to act were only "failures to act," including refusal by the defendant-social worker to accept a CD with pictures of abuse, refusal to return phone calls from the police, and refusal to substantiate allegations of abuse); see also Price-Cornelison v. Garvin Cnty., Oklahoma, No. CIV-04-241-W, 2004 WL 7338331, at *3 (W.D. Okla. Apr. 27, 2004) ("A failure to act by refusing to enforce an order is not affirmative conduct").

In addition, the Response asserts that there were other examples of cutting off Plaintiffs from sources of aid, including alleged advance notice of visits or barring Woodward from speaking with the GAL.  Of note, these are  unsupported allegations that took place before the family fled and do not connect the actions to any injuries sustained by Plaintiffs.  Moreover, this is mere argument of counsel and does not defeat summary judgment.

   5. **Plaintiffs' alleged injuries were not immediate and proximately caused by Defendants.**

As a preliminary matter, Plaintiffs fail to clearly define the injury they sustained.  It is not disputed that ML suffered a serious brain injury, but that was almost six months after she was placed in the physical custody of her parents and that injury occurred in North Carolina.  Moreover, Plaintiffs do not provide any information about the cause of those injuries.  All Plaintiffs can muster are conclusory statements when they assert that the "injuries were likely inflicted by Plaintiffs' biological parents and were immediately foreseeable."  Doc. 97 at 31.   The injuries to ML could have been caused by an intentional act by one of the parents, a failure to monitor, or an unavoidable accident.  At its base, Plaintiffs' argument fails to establish that the parents, let alone

the Defendants, caused harm.  They also fails to explain how the time span of six months could qualify as "immediate"

Plaintiffs also appear to be alleging that simply placing the children in the custody of their parents created a danger in and of itself.  Returning the children to their parents resulted in a return to the *status quo ante* and, therefore, could not be considered an injury as a matter of law. Moreover, Plaintiffs have failed to show how they were injured by being removed from New Mexico.  Rather, they seek to tie injuries sustained by ML to the Defendants because the Defendants failed to stop them leaving.

Plaintiffs cite to <u>Est. of Hebert by & through Bourgeois v. Marinelli</u>, No. 122CV02582CNSSTV, 2023 WL 4744927, at *2 (D. Colo. July 25, 2023) for the proposition that an injured party was placed at risk of serious, immediate, and proximate harm because he died after he encountered the defendants and they affirmatively acted to dissuade him from getting necessary medical care. In that case the decedent was a mentally disabled individual who lived at Berry House, a brain injury assisted living residence.  The decedent experienced a psychiatric emergency was seen by two law enforcement officers after he had left Berry House and wandered to a lake. <u>Id</u>. at *1.  The officers allegedly discouraged the decedent from going to a hospital and instead encouraged him to return to Berry House.  "In crisis, Mr. Hebert [decedent] left Berry House later that afternoon. At approximately 2:17 p.m., he walked onto the partially frozen reservoir at Blue Heron Park, fell into the reservoir, and drowned.  <u>Id</u>. at *2 (internal citations omitted).

Here, in contrast, the alleged injuries did not occur the same day, the same week, or even the same month.  Rather, the injuries to ML occurred many months later.  <u>Est. of Herbert</u> does not stand for the proposition that there is no temporal link to the alleged injuries and the alleged actions

of a defendant.  That case does not contemplate a nearly sixth month gap between the alleged acts and the alleged injuries as occurred here.  Accordingly, it is unhelpful to Plaintiffs' position.[4]

6. **The actions of Defendants were not conscience shocking**.

Despite the tragic outcome for one of the Plaintiffs, the allegations asserted against the Defendants, even when viewed in a light most favorable to Plaintiffs, do not rise to the level of conscience shocking.  Under either the special relationship or danger creation exceptions to the DeShaney rule, the plaintiff must show that the defendant's conduct "shocks the conscience." Hubbard at 708.   "Conduct that shocks the judicial conscience ... is deliberate government action that is 'arbitrary' and 'unrestrained by the established principles of private right and distributive justice.' " Seegmiller v. LaVerkin City, 528 F.3d 762, 767 (10th Cir. 2008) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). "To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or employ[ed] it as an instrument of oppression. The behavior complained of must be egregious and outrageous." Hernandez v. Ridley, 734 F.3d 1254, 1261 (10th Cir. 2013) (alteration in original) (quotations omitted). A defendant's "conduct as a whole"—including "both action and inaction"—are relevant in evaluating whether it "shocks the conscience." Estate of B.I.C., 710 F.3d at 1174. The Tenth Circuit considers the following principles when evaluating substantive due process claims in this context: "(1) the general need for restraint; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policy decisions impacting public safety." Currier, 242 F.3d at 920.

"Conscience-shocking" is often defined by what it is not, or what it exceeds. See, e.g., County of Sacramento v. Lewis, 523 U.S. at 849, 118 S.Ct. 1708 ("[L]iability for negligently

---

[4] Of note, Est. of Herbert was decided at the 12(b)(6) stage and is not directly applicable here.

inflicted harm is categorically beneath the threshold of constitutional due process."); Gutteridge v. Oklahoma, 878 F.3d 1233,1238-43 (10th Cir. 2018) ("[A] social worker who simply makes a mistake of judgment under what are admittedly complex and difficult conditions will not find herself liable in damages under § 1983." (quoting to Schwartz v Booker, 702 F.3d at 583)); DeAnzona v. City & Cty. of Denver, 222 F.3d 1229, 1235 (10th Cir. 2000) ("Even knowingly permitting unreasonable risks to continue does not necessarily rise to the level of conscience shocking."); Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 528 (10th Cir. 1998) ("[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." (quotations omitted)).

In Hubbard, the Tenth Circuit found that the allegations against various social workers, while very likely negligent, were not so egregious to violate constitutional requirements. The allegations against the defendants included vague assertions such as employees "took no action to protect or safeguard the children." Hubbard at 710. More specifically, the state defendants allegedly failed to ensure that foster parents ensured that the children were taken to therapy. The Tenth Circuit found that the failure to confirm therapy attendance was poor job performance, but not conscience shocking. Id. at 711. Further, the Tenth Circuit concluded that a social worker was not informed that the foster parents spanked the children. This lack of information, and perhaps even if the worker had known, did not lead to the conclusion that one of the children would be killed months later. Id.

In Hubbard, the facts included indications of drug abuse, inappropriate sexual interaction among the children, mental health issues, a filthy home, and corporal punishment. Corporal punishment can be more easily extrapolated to lead to physical child abuse than failing to provide dental services and living a transient lifestyle. Plaintiffs in this case have the benefit of hindsight.

26

However, at the time, the decision to allow a trial home visit was made, Defendants did not have knowledge of what would occur in North Carolina, assuming that is causally linked, which Defendants assert it is not. The circumstances here are tragic, but they do not shock the judicial conscience as a matter of law.

Here, the allegations are that "Defendants engineered a scheme to remove Plaintiffs from an appropriate foster home and leave them with their wholly unfit biological parents on a trial home visit..." Doc. 53 at ¶ 3. Of note, CYFD requested the state court grant it custody based on allegations that, "Mr. Ducila and Ms. Badea are failing to provide for the children's basic needs including shelter, clothing, and medical/mental treatment for the children. Mr. Ducila and Ms. Badea are going to be arrested for felony credit card fraud leaving no care taker for the children." SMF 3. Importantly, there were no allegations of physical abuse. Moreover, investigations into subsequent allegations of potential abuse were not substantiated. Doc. 98-19 at 2. Contrary to Plaintiffs' conclusory statements, there was simply no evidence that the children were subjected to physical abuse by their parents. See Johnson ex rel. Est. of Cano v. Holmes, 455 F.3d 1133, 1145 (10th Cir. 2006)(When a state agent relied upon a determination that the abuse allegation was unsubstantiated, and where there was no proof of the existence of a "obvious or known" risk, such as the uninvestigated abuse allegation in Currier, a danger creation claim cannot survive.) It is simply not conscience shocking to rely on a determination that a claim of abuse was unsubstantiated.

Specifically, in June of 2019, Plaintiffs were suffering from tooth decay, urinary tract infection, a first-degree sunburn, malnourishment, and tuberculosis. The fact that the parents fled and that one of the children suffered a skull fracture months later, does not flow from allegations of medical neglect. There is no evidence that while Plaintiffs were in New Mexico, there was any

evidence that they were being physically abused.  At worst, Defendants simply made a mistake of judgment under what are admittedly complex and difficult conditions. See Schwartz v Booker.

**7.  Defendants are entitled to qualified immunity.**

Plaintiffs misapprehend their burden in responding to a motion for summary judgment asserting qualified immunity.  When a defendant asserts qualified immunity at the summary judgment stage, it is the plaintiff's burden to prove (1) the defendant violated his constitutional rights; and (2) the law was clearly established at the time of the alleged violation. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *overruled on other grounds* by Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)(emphasis supplied).

"The dispositive question is 'whether the violative nature of particular conduct is 'clearly established,' " which means courts may not "'define clearly established law at a high level of generality.'" Mullenix v. Luna, 577 U.S. 7, 11, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (quoting al-Kidd, 563 U.S. at 742, 131 S.Ct. 2074). "The plaintiff bears the burden of citing to us what he thinks constitutes clearly established law." Thomas v. Durastanti, 607 F.3d 655, 669 (10th Cir. 2010).

Plaintiffs are trying to flip the burden of proof.  Plaintiffs assert that "if the individual facts are subsumed by a sufficiently clear general principle of law, the defendant is only entitled to qualified immunity if 'an *exception* to bedrock constitutional principles *clearly exists*.'" relying on Mascorrow v Billings, 656 F.3d 1198 (10th Cir. 2011). Doc. 97 at 41(emphasis is original).

Plaintiffs' reliance on Mascorrow is misplaced.  That case involved determining whether an officer had made an unlawful warrantless entry based on a traffic offense coupled with the exigent circumstances necessarily attending the pursuit of a fleeing suspect. Mascorro at 1204

(10th Cir. 2011) .  There, the Tenth Circuit held that "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Id. at 1204–05.  If, however, police have probable cause for an arrest, the existence of certain exigent circumstances may "overcome the presumption of unreasonableness that attaches to all warrantless home entries." Id. at 1205.

Contrary to Plaintiffs' assertions, Moscorrow does not stand for the proposition that Defendants have the burden of proof of establishing an exception.  In Mascorrow, it was undisputed that officers were seeking to enter a home as the result of a traffic offense and that it was clearly established that such entry was not permitted.  The issue was whether there was a clear exception based on exigency that could apply.  Here, Plaintiffs cannot meet the threshold issue of whether the act of returning the Plaintiffs to their parents, and when one of the Plaintiffs was somehow injured six months later, can support a constitutional violation.  Accordingly, Plaintiffs have the burden of establishing that such actions were violative of their constitutional rights and that those rights are clearly established.

Plaintiffs assert that it is a bedrock principle that "children in the custody of the state have a constitutional right to be reasonably safe from harm."  Doc. 97 at 42. That however, is an overly broad general principle that is insufficient upon which to find that the principle is clearly established pursuant to Mullenix.

Plaintiffs misunderstand Defendants' argument.  Defendants assert that the case authority cited by Defendants, including DeShaney v. Winnebago County Department of Social Services,, Wooten v. Campbell, and Hernandez v. Rapp, No. CV 00-1456 MCA/WDS, 2003 WL 27385396, at *1 (D.N.M. Mar. 31, 2003), establishes that returning the children to their biological parents terminated any special relationship and returned the Plaintiffs to the *status quo ante,* thereby

precluding claims pursuant to danger creation.  Accordingly, as a matter of law there was no constitutional violation.

Plaintiffs fail to cite to any contrary authority.  Indeed, none of the authority cited by Plaintiffs is analogous to the issues here.  Plaintiffs' cited authority concerns foster parents (Schwartz v Booker), placing a child with a non-custodial parent (T.D. v Patton and Currier v Dornan), or unique circumstances (Tazioly v. City of Philadelphia).

 In contrast, as discussed *supra*, Defendants have cited to multiple cases that hold, as a matter of law, returning a child to a previously custodial parent cannot support claims pursuant to the doctrines of danger creation or special relationship.  Plaintiffs have failed to provide any authority that the actions of Defendants, based on the undisputed facts, can support viable claims for constitutional violations.  The failure to identify well-established authority providing that placing children in the physical custody of their parents on a trial home visit, or something remotely similar, and where one child is injured six months later, constitutes a constitutional violation is fatal to Plaintiffs' claims.   Accordingly, summary judgment is appropriate.

## 8. **Plaintiffs' Tort Claims fail**

Plaintiffs cite to Quevedo v. New Mexico Child. Youth & Fams. Dep't, 2016-NMCA-101, 385 P.3d 657 for the proposition that CYFD may be sued under the Tort Claims Act waiver of immunity for operation and maintenance of a building.  Plaintiffs rely on the portion of Quevado that provides "CYFD has an obligation to house children in its care in homes or facilities that meet certain minimum health and safety standards. This obligation may create a relationship between CYFD, the homes or facilities in which children are placed, and the children."  Id. at ¶17. However, that finding does not apply to the facts here.  In Quevado, the focus was on the regulation of facilities in which children were placed.  Quevado noted that:

30

> CYFD has promulgated extensive licensing requirements and regulations
> governing residential shelter-care facilities for children, including crisis shelters,
> multi-service homes, community homes, and "[n]ew or [i]nnovative programs" that
> provide children's services, as well as foster homes. 7.8.3.2 NMAC7.8.3.2 NMAC
> (09/15/1975, as amended through 08/15/2011) (licensing requirements for shelter-
> care homes); 8.26.4 NMAC8.26.4 NMAC (licensing requirements for foster and
> adoptive homes)

Id. at ¶15

However, here the undisputed facts are that the Plaintiffs were not harmed in the home of their parents while in New Mexico. Moreover, and critically, the parents' home was not subject to any regulations, unlike the building in Quevado. Quevado found "that the building waiver may apply when an agency undertakes to provide housing for clients when permitted or required to do so under specific statutory authority. Id. at ¶13. Here, CYFD did not undertake to provide housing to the Plaintiffs when they were put on a trial home visit. At that time, they were not placed in the home of shelter care facility, foster home, or non-custodial relative. Plaintiffs have not asserted that they were harmed while in foster homes.

Despite the Plaintiffs' claims, the injury is not that the parents fled or that Defendants somehow allowed them to flee. If there was no physical injury to ML there is no question that this lawsuit would not have been filed. Plaintiffs were not harmed by the fact that CYFD allowed them to return to their parents for a trial home visit. Moreover, there is no demonstrable injury simply because the parents fled New Mexico. Plaintiff had no constitutional right to stay in state care indefinitely. The only conceivable harm is when the youngest child suffered a brain injury.

However, Plaintiffs cannot connect that injury to any specific action, let alone one that flows from the actions of the Defendants. While the building operation waiver may apply more broadly than its plain text would suggest, it is a bridge too far to assert that CYFD is responsible for injuries that occurred six months later and on the other side of the country.

31

The same reasoning applies to the constitutional claims.  "[E]ven though it rarely is mentioned in reported decisions, causation is an essential element of a section 1983 cause of action." Morton v. Becker, 793 F.2d 185, 187 (8th Cir.1986). "A plaintiff must prove his or her damages, or basis for entitlement to equitable relief. Monetary damages are governed by the same basic principles that prevail in tort law generally, and normally will be satisfied by showing that a defendant's conduct caused some actual harm." Greffey v. State of Ala. Dept. of Corrections, 996 F. Supp. 1368, 1377 (N.D. Ala. 1998) Plaintiffs provide no contrary authority for this position. Accordingly, summary judgment is appropriate on the Plaintiffs' state law claims.

WHEREFORE, Defendants respectfully request that the Court enter summary judgment in Defendants' favor as to all claims asserted in  Plaintiff's Corrected Second Amended Complaint for failure to identify a constitutional violation, or alternatively, based on qualified immunity; to dismiss the state tort claims based on sovereign immunity and for such further relief as the Court deems appropriate.

Respectfully Submitted:

PARK & ASSOCIATES, LLC

By  /s/ James J. Grubel
Alfred A. Park
James J. Grubel
3840 Masthead Street, N.E.
Albuquerque, NM 87109
505-246-2805 ext. 104
jgrubel@parklawnm.com
*Counsel for Defendants*

I hereby certify that a true and correct
copy of the foregoing was served via
CM/ECF filing system to all counsel
of record on this 22nd day of March, 2024.
*/s/ James J. Grubel*
James J Grubel