# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ALISON ENDICOTT-QUIÑONES,
*guardian ad litem* on behalf of
A.D., R.B., E.B., and M.B., minor children,

     Plaintiff,


vs.                                                          No. 1:21-cv-00368-DHU-JMR


PATRICIA GARZA, *in her individual and
official capacity,* REBECCA LIGGETT
*in her individual and official capacity*,
BRENDA SALDANA, *in her individual and
official capacity* NEW MEXICO CHILDREN
YOUTH & FAMILIES DEPARTMENT,
Does 1-50 and JENNIFER DE LOS SANTOS,

     Defendants.


## <u>MEMORANDUM OPINION AND ORDER</u>

     Alison Endicott-Quiñones ("Plaintiff") is the guardian *ad litem* on behalf of four minor children, A.D., R.B., E.B., and M.B. ("the Children"). Plaintiff has sued numerous employees of the New Mexico Children Youth & Families Department ("CYFD") under 42 U.S.C. § 1983 for violations of the Children's substantive due process rights under the Fourteenth Amendment. In addition, she brings claims under the New Mexico Tort Claims Act ("NMTCA") N.M. Stat. Ann. §§ 41–4–1 to –30 against CYFD and individual CYFD employees. Defendants filed their Renewed Motion for Summary Judgment that is now before the Court. Doc. 91. After carefully considering Defendants' motion, the attendant briefs, the parties' oral arguments, and being fully advised of the premises, the Court concludes that the motion will be **DENIED**.

## I. BACKGROUND

The Court considers the evidence in the light most favorable to Plaintiff. *See Wise v. Caffey*, 72 F.4th 1199, 1205 (10th Cir. 2023). Children and their parents, A. D. ("Mother") and L.B. ("Father") are nationals of Romania who were seeking political asylum in the United States during the events in question. Defs.' UMF ¶ 2, Doc. 91. In the summer of 2019, Children and their parents had been sleeping in a van at night and panhandling by day at the Hobbs, New Mexico Walmart, prompting numerous calls to CYFD's abuse and neglect hotline. Compl. ¶¶ 19, 21 Doc. 53.

CYFD employees first encountered the family at the Walmart in May 2019. Pl.'s AMF ¶ A, Doc. 97. They approached the parents and informally warned them to go somewhere else or the Children would be taken into custody. *Id*. The employees then reported back to Defendant Patricia Garza, the Hobbs CYFD manager, about the incident. Compl. ¶¶ 13, 24. One employee told Garza that CYFD had "dodged a bullet" by telling the family to leave. Pl.'s AMF ¶ A. Garza "applauded the employees for refusing to assist [the Children]" and she approved the employee's "dodged a bullet" remark. *Id*.; Compl. ¶ 24.

However, on June 3, 2019, Hobbs Police Department ("HPD") officers spotted the family back at the Walmart. Defs.' UMF ¶ 1. The Children were observed outside sitting in 91-degree weather as their parents held signs asking for rent, money, gas, food, and formula. *Id*. At this point police officers arrested the parents and charged them with felony child abuse. Compl. ¶ 26. Even though the parents had been arrested, Defendant Rebecca Liggett, a high-ranking CYFD employee, "refused to take [the Children] into CYFD custody." Pl.'s AMF ¶ C. Liggett "only relented and agreed to take the children into custody when a state court judge called and asked when CYFD would be filing an abuse and neglect petition." Woodward Decl. ¶ 12, Doc. 98-1.

CYFD did eventually file an abuse and neglect petition and the Children were taken into custody in June 2019. Pl.'s AMF ¶ D. On August 20, 2019, the Children were adjudicated as "neglected" by a state court and the Children were ordered to remain in foster care. Defs.' UMF ¶¶ 4, 5.

Ivy Woodward was assigned to the Children's case. Pl.'s AMF ¶ E. According to Woodward, Garza "pushed Woodward to find somewhere to send" the Children quickly. *Id.* ¶ F. Garza's "priority was making sure that [the Children's] case did not turn into 'another Everhart case,' referring to a case where children had been in CYFD's custody for at least ten years." *Id.*[1]

Plaintiff alleges numerous "red flags" arose about the parents, and especially the Father. Doc. 97 at 5. For example, during supervised visitations, he often became angry, and the Children were afraid of him. Pl.'s AMF ¶ H. Woodward believed he was "a ticking time bomb." *Id.* ¶ I. While she was assigned to the case, he made no progress on his treatment plan. *Id.* ¶ M. On two occasions, Father "attempted to bribe CYFD workers to allow him to abscond" with the Children. *Id.* ¶ J. On another occasion both parents "attempted to abscond with [the Children] during a supervised visit" and "barricaded themselves in a room with [the Children], requiring HPD officers to come and break down the door." *Id.* ¶ K.

Despite the alleged red flags, Garza wanted to start a trial home visit. *Id.* ¶ N. Woodward objected to Garza's plan, and in a meeting Woodward "voiced her concern that, were [Father] given unsupervised access to the [C]hildren, he would likely abscond with them, and that the [C]hildren would be in danger." Woodward Decl. ¶ 36. Garza responded, "maybe we'll luck out

---

[1] Defendants object that Woodward lacks personal knowledge about many of her statements because she no longer worked on Children's case after November 2019. However, there is a genuine dispute of material fact concerning Woodward's personal knowledge because she expressly stated in her declaration that she has "personal knowledge of the facts contained" therein. Woodward Decl. ¶ 3. Viewing the evidence in Plaintiff's favor, the Court assumes that Woodward had personal knowledge of the events she described. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986) (in determining whether a genuine issue of material fact exists, "[t]he evidence of a non-movant is to be believed").

and they will disappear." *Id*. Garza then put her hand over her mouth, laughed, and said, "I didn't say that." *Id*.

In addition to the alleged red flags, Plaintiff also alleges that CYFD "suppressed disclosures of abuse" by Father so that a home trial visit would go forward. Doc. 97 at 7. For example, CYFD inaccurately represented that Father "had been compliant with his treatment plan." Woodward Decl. ¶ 44. However, Father "had never complied with his treatment plan: he did not obtain and maintain employment, he had missed several of his immigration hearings, he did not attend parenting classes, [he] no-showed for his psychological evaluation on two occasions, and refused to attend required therapy sessions." *Id*. Because of the inaccurate representation that Father was complying with the treatment plan, a motion "was filed in [Father's] criminal case in March of 2020 to remove the no contact order [between Father and the Children] to facilitate a trial home visit." *Id*. ¶ 43.

On January 28, 2020, the Children's guardian *ad litem* ("GAL") filed an emergency motion to suspend supervised visitations between the Children and Father. Defs.' Ex. C. The GAL wrote in her motion that A.D, then five-years old, disclosed "emotional trauma caused by [F]ather's direct actions," and that A.D. had "exhibited sexualized behaviors in [A.D.'s] foster home with other children in the home." *Id*. The GAL asked Ivy Woodward to be a witness at the motion hearing. Woodward Decl. ¶ 37.

However, "Liggett and Garza … prevent[ed]" Woodward from testifying. Pl.'s AMF ¶ E. Garza and Liggett "instructed [Woodward] to lie" at the hearing by providing false testimony about the appropriateness of unsupervised visits. Woodward Decl. ¶ 39. When Woodward refused, Liggett said that Garza would testify in Woodward's place in order to represent CYFD's position. *Id*. ¶ 40. "Had the hearing gone forward [Woodward] would have testified that in [her] professional

opinion that the father was unfit and likely to be neglectful and physically abusive if he were to gain unsupervised access to the children." *Id.* ¶ 38. Woodward feared that her job would be in jeopardy if she testified truthfully. *Id.* ¶ 39.

The GAL did not want to put Woodward's job at risk, so the GAL withdrew the motion. *Id.* ¶ 41.[2] Garza then ordered Woodward to stop communicating with the GAL about the case, even though Woodward's job was to provide the GAL case information. *Id.* ¶ 42. Woodward "understood that [she] would be subject to discipline or termination if [she] disobeyed this directive." *Id*.

Throughout February 2020, A.D. and R.B. made several disclosures of Father's alleged violence to therapist Salena Evans. Pl.'s AMF ¶¶ S, T, U, V, W. Several of Evans' notes from the therapy sessions are in the summary judgment record. In a February 3, 2020, letter, Evans wrote that A.D. had described Father as "mean daddy" and that A.D. had "exhibited sexual play therapy themes." Pl.'s Ex. M, Doc. 98-13. On February 4, 2020, R.B. disclosed to Evans that Father "yells and hits" him "alot [sic]." Pl.'s Ex. N, Doc. 98-14. In entries from February 11 and 18, 2020, Evans reported that R.B. "has displayed some fear of his father." Pl.'s Exs. O, P, Docs. 98-15, 98-16. And on February 24, 2020, A.D. disclosed to Evans that Father would hit her mother "really hard," hit her brother R.D. in the head a lot, hurt animals, and that Father scared her. Pl.'s Ex. Q, Doc, 98-17.

On February 24, 2020, Evans submitted a child abuse referral based on R.D. and A.D.'s disclosures of violence by Father. Pl.'s AMF ¶ X. Evans also "directly confronted Garza, Saldana, and Woodward about her concerns that [Father] was physically abusive." *Id*. ¶ Y. Garza and

---

[2] There is a genuine dispute of material fact concerning the GAL's reason for withdrawing the motion. However, the Court views the evidence in the light most favorable to Plaintiff and therefore assumes that the GAL withdrew the motion because Woodward was prevented from testifying.

Saldana were aware of R.D. and A.D.'s disclosures to Evans. *Id*. ¶ Z. Evans testified in a later deposition that she was concerned about the Children being alone with their parents and she believed the Children were in danger. Evans Depo. 80:14-21, Doc. 98-8. She also testified that after she wrote the February 3, 2020, letter, she "felt pressure" from CYFD. *Id*. 82:2-5. CYFD officials apparently told Evans' superiors "that [CYFD] would have to limit or decrease therapy referrals" to Evans. *Id*. at 82:10-25–83:1-3.

On February 25, 2020, the Hobbs CYFD office opened an investigation into A.D. and R.B.'s disclosures. Pl.'s AMF ¶ BB. The investigation was assigned to Kelly Mazy. *Id*. After concluding the investigation, Mazy wrote in a March 30, 2020, report that "no credible evidence" supported A.D. and R.D's allegations. Pl.'s Ex. S, Doc. 98-19. However, in a later deposition Mazy indicated that she wanted to substantiate the allegations, but that Garza and De Los Santos ultimately decided to find the allegations unsubstantiated. Mazy Depo. 40:23-25–41:1, Doc. 98-10. Woodward also indicated that Mazy believed "the abuse disclosures were credible and should be deemed substantiated." Woodward Decl. ¶¶ 23, 24. But Mazy was ultimately "coerced by Garza and De Los Santos into unsubstantiating A.D. and R.B.'s abuse disclosures." Pl.'s AMF ¶ CC.

On March 13, 2020, Garza and Saldana filed a "Judicial Review And/Or Permanency Hearing Report" and a "Family Treatment Plan" (collectively referred to as the "Report") in state court. *Id*. ¶ GG. According to Plaintiff, the Report contained misleading statements or omissions. For example, the Report claimed that "the [supervised] visits [between Father and Children] [went] well" and the [C]hildren [were] excited to see their dad" Report, 3, Doc. 98-21, even though Ivy Woodward claimed the visits were a "disaster." Woodward Decl. ¶ 32. The Report also claimed that "[Father] ha[d] been compliant with his treatment plan and has done everything the Department ha[d] asked of him." Report at 3. However, the Report did not mention the fact that

Evans had submitted a child abuse referral. Nor did it contain any mention of A.D. and R.B.'s numerous disclosures made to Evans during the February 2020 therapy sessions. CYFD ultimately concluded in the Report that "there are no risks to the [C]hildren if they are returned home," and stated, "the Department does not have any safety concerns with the visitation." *Id.*

On March 16, 2020, a state court held an initial permanency hearing. Defs.' Ex. D, Doc. 69-4. During the hearing, Saldana represented that reunification was safe and appropriate. Pl.'s AMF ¶ FF. She testified that CYFD had "addressed via an investigation" the "concerns raised by the therapist and [R.B.'s] foster mother as to whether the kids are afraid of their father" and allegations "regarding domestic violence." Mar. 16, 2020, Hr'g. Tr. 33:1-8, Doc. 19-20. However, according to Plaintiff, Defendants did not alert the court to the details of A.D. and R.B.'s disclosures to the therapist. Pl.'s AMF ¶ FF. Nor did they inform the court that Evans made a child abuse referral based on those disclosures or that Father had previously hit R.B. *Id.* The court stated that "it sounds like [Father] has made great progress … in his treatment plant." Mar. 16, 2020, Hr'g. Tr. 27:17-19.

On March 23, 2020, the court issued an "Initial Permanency Order" that placed the Children at home with Father. Doc. 69-4. About a week later, the three older children were placed back with Father for the trial home visit, while the youngest child was to be placed with the parents on or after April 20, 2020. Defs.' UMF ¶ 12. According to Plaintiff, during the trial home visit, Saldana provided household services to the Children, gave Father advanced warning of "unannounced" visits, and assisted him in "staging" the apartment to make him look like a fit parent. Pl.'s AMF ¶ OO. Mother was released from detention during this same period. Defs.' UMF ¶ 13.

In late April or early May 2020, the parents fled New Mexico with the Children during the trial home visit. *Id.* ¶ 14. "Saldana and Liggett prevented HPD from issuing an Amber Alert by claiming Plaintiffs were not in danger and prevented custodial interference charges from being issued against the parents." Pl.'s AMF ¶¶ SS.[3] Once the Children went missing, "Garza ordered Saldana and [another employee] to not discuss the case with anyone, including the police." *Id.* ¶¶ VV. And "Garza, De Los Santos, and Liggett withheld documents responsive to a search warrant served on CYFD by the Hobbs Police Department" that could have helped HPD locate the Children. *Id.* ¶¶ WW, XX.

In October 2020, one of the children, M.B., was abandoned at a hospital in North Carolina with serious injuries. Defs.' UMF ¶ 15. M.B. had skull fractures, healing skull fractures, an orbital fracture, subdural hematomas, blood pooling on the brain, and several burns on her legs. Pl.'s Ex. AG, 2 Doc. 98-33. The child is now blind. *Id.* After the injuries, CYFD filed change of placement notices in state court switching the Children's placement statuses. Pl.'s AMF ¶¶ ZZ. According to Plaintiff, "[c]hange of placement notices are only filed for children who are in child protective services custody within CYFD," suggesting the agency believed the Children were its custodial responsibility. *Id.* ¶¶ AAA.

On March 14, 2023, the Children's Guardian *ad litem* filed this action against CYFD, Garza, Liggett, Saldana De Los Santos, in their individual and official capacities, and "Does 1-50." Compl. at 1. She asserts two 42 U.S.C. § 1983 claims against the individual Defendants for violations of the Children's substantive due process rights, and one state law claim against CYFD, Garza and Saldana. *Id.* at 19-26. Liggett, by separate motion, sought absolute immunity, which the

---

[3] There is a genuine dispute over whether CYFD officials prevented HPD from issuing an Amber Alert. For purposes of deciding the motion for summary judgment, however, the Court views the evidence in the light most favorable to the Plaintiff, and therefore assumes that officials prevented the issuing of an Amber Alert.

Court denied. Doc. 105. In the motion now before the Court, Defendants move for summary judgment on Plaintiff's § 1983 claims based on qualified immunity. They also argue that Plaintiff's state law claim fails as a matter of law.

## II. LEGAL STANDARD

42 U.S.C. § 1983 "allows an injured person to seek damages against an individual who has violated his or her federal rights while acting under color of state law." *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 459 (10th Cir. 2013). "Section 1983 creates no substantive civil rights, only a procedural mechanism for enforcing them." *Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "In defending against § 1983 claims like the ones at issue here, an official may plead an affirmative defense of qualified immunity." *Maresca v. Bernalillo Cty.*, 804 F.3d 1301, 1307 (10th Cir. 2015).

In reviewing a summary judgment motion based on qualified immunity, the court views the evidence "in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 657, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (per curiam) (citation omitted). "Because of the underlying purposes of qualified immunity, [courts] review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in order to defeat the defendant's motion." *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). That burden requires a plaintiff to show that the state official "(1) [] violated a federal statutory or constitutional right, and (2) the unlawfulness of [the official's] conduct was clearly established at the time." *D.C.*

*v. Wesby*, 583 U.S. 48, 62–63, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018) (citation and quotation marks omitted).

"[The court] may decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case.'" *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). "[I]f the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense." *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016) (citing *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 877–78 (10th Cir. 2014) ("[T]he record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.") (internal quotation marks and citation omitted).

## III. DISCUSSION

### Substantive Due Process Claims (Counts 1 and 2)

The Due Process Clause of the Fourteenth Amendment provides, "No State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. As the Supreme Court has explained, "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Thus, "[a]s a general matter, ... a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197; *see also Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995) ("[S]tate actors are generally only liable under the Due Process Clause for their own acts and not for private violence.").

"However, there are two exceptions to this general rule"—the "special relationship" and "danger creation" exceptions. *Armijo By & Through Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1260 (10th Cir. 1998). Plaintiff relies on both exceptions to the general rule. The Court first addresses the state-created danger exception before turning to the special relationship exception.

### A. <u>State-Created Danger Analysis</u>

#### 1) Constitutional Violation

The Court begins with the first prong of the qualified immunity defense, whether the Defendants' actions violated a federal constitutional or statutory right. *See Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016). Under the state-created danger exception "a state official may be liable when a state actor affirmatively acts to create, or increase[ ] a plaintiff's vulnerability to, danger from private violence." *T.D. v. Patton*, 868 F.3d 1209, 1221 (10th Cir. 2017) (alterations in original) (citation and quotation marks omitted). "The state-created danger exception is a means by which a state actor, *absent a special or custodial relationship between the victim and the State*, might be held liable for an act of private violence." *Matthews v. Bergdorf*, 889 F.3d 1136, 1150 (10th Cir. 2018) (emphases in original).

"To invoke the danger-creation theory, a plaintiff must show a state actor affirmatively act[ed] to create or increases a plaintiff's vulnerability to, danger from private violence." *Patton*, 868 F.3d at 1222; *see also Est. of Reat v. Rodriguez*, 824 F.3d 960, 965 (10th Cir. 2016) (describing a state actor's "affirmative action … that action led to private violence" as "[t]wo preconditions" to state a claim). If a plaintiff meets those two preconditions, a plaintiff must next show:

> (1) the state actor created the danger or increased the plaintiff's vulnerability to the danger in some way, (2) plaintiff was a member of a limited and specifically definable group, (3) the state actor's conduct put plaintiff at substantial risk of serious, immediate, and proximate harm, (4) the risk was obvious or known, (5) the state actor acted recklessly in conscious disregard of the risk, and (6) such conduct, when viewed in total, was conscience shocking.

*Matthews*, 889 F.3d at 1150.

  a. <u>Affirmative Conduct</u>

  As noted, a plaintiff must first show a state actor affirmatively acted to create or increase a plaintiff's vulnerability to danger from private violence. *Patton*, 868 F.3d at 1222.

  Defendants, relying on *DeShaney*, argue they did not act affirmatively because they returned the Children to their Father and merely restored the status quo. In *DeShaney*, Joshua DeShaney was a young boy whose father continually beat him. *DeShaney*, 489 U.S. at 191. After multiple visits to Joshua's home, county caseworkers observed signs of abuse and Joshua was temporarily removed him from his father's custody. *Id.* at 192. However, he was returned home to his violent father a short while later. *Id.* After his return, a caseworker made monthly visits to the home and observed signs of abuse, but the caseworker did nothing more than take notes. *Id*. at 192–93. Joshua's father finally beat him so badly that he fell into a coma and suffered permanent brain damage. *Id.* at 193. Joshua and his mother filed an action under 42 U.S.C. § 1983, alleging that the county officials violated the Substantive Due Process of the Fourteenth Amendment by failing to protect him from the father's violence. *Id.* at 193, 195.

  The Supreme Court rejected their claims. Even though the Court described the case as "undeniably tragic" and called the officials' actions "calamitous," the Court concluded that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," so "the State had no constitutional duty to protect Joshua against his father's violence." *Id*. at 191, 197, 202. The Court explained:

> [Joshua and his mother] concede that the harms Joshua suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor. While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once

> took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter.

*Id.*

However, while *DeShaney* establishes that state actors have no general affirmative duty to protect private citizens from each other, even if an official knows abuse is occurring, Plaintiff's complaint is distinguishable because the Defendants here took affirmative action to place them in a position of danger rather than merely failing to act on their behalf. In *DeShaney*, the plaintiffs never alleged that state workers violated his due process rights by returning him to his father. Rather, they alleged the officials "fail[ed] to intervene to protect [Joshua] against a risk of violence at his father's hands of which they knew or should have known." 489 U.S. at 193. And the *DeShaney* plaintiffs conceded the state played no part in creating the danger that Joshua faced. *See id.* at 197. In contrast, Plaintiff here alleges Defendants created a dangerous situation because the Children "were in a good foster home and their essential needs were being met" but "Defendants modified this status quo by removing the Plaintiffs from a place of safety, foster care, and starting a trial home visit with a person they knew was dangerous." Compl. ¶¶ 160, 161. In other words, Plaintiff does not allege that Defendants failed to act as in *DeShaney*, but that Defendants acted in a harmful manner by exposing the Children to known dangers.

*DeShaney* does not foreclose claims against social workers who fail to alert the court of facts undermining the father's fitness as a caretaker. *See Currier v. Doran*, 242 F.3d 905 (10th Cir. 2001); *see also K.H. Through Murphy v. Morgan*, 914 F.2d 846, 849 (7th Cir. 1990) (distinguishing *DeShaney* from situations where the "state removed a child from the custody of her parents; and having done so, it could no more place her in a position of danger, deliberately and without justification, without thereby violating her rights under the due process clause of the

Fourteenth Amendment"). Defendants acted affirmatively. They made the status-quo changing decision to take the Children into custody, initiate custody proceedings, and then recommend Children be placed with Father on a trial home visit, despite evidence of potential harm. These affirmative acts then either created or increased the Children's vulnerability to danger from private violence because CYFD employees knew that Father posed a danger to Children and yet they placed them with him anyway. *See Patton*, 868 F.3d at 1222. The Court next evaluates the remaining six elements of Plaintiff's claim.

b. Elements One through Six of Plaintiff's State-Created Danger Claim

*i. Whether Defendants Created Danger or Increased the Children's Vulnerability to Danger*

Plaintiff must next prove that Defendants "created the danger or increased the [Children's] vulnerability to the danger in some way." *Matthews*, 889 F.3d at 1150. As explained below, the Tenth Circuit's decision in *Patton*—a case about a child service worker's withholding of facts about a custodial father's pattern of abuse—shows that Plaintiff's evidence raises a sufficient jury question on the issue.

In *Patton*, T.D., a 14-year-old male, was living with his mother. *Patton*, 868 F.3d at 1214. T.D.'s father, Tiercel Duerson, did not live in the home. *Id.* In 2009 through 2010, T.D. was removed from his mother's custody and placed in temporary residential centers. *Id.* at 1214–15. The Denver Department of Human Services ("DDHS") filed a "Petition in Dependency of Neglect," and assigned Defendant Kelcey Patton as the caseworker to explore options for T.D.'s placement into housing. *Id.* at 1214.

One option was to place T.D. with his father, Mr. Duerson. But Ms. Patton knew that Mr. Duerson was a registered sex offender stemming from a 2005 conviction of attempted sexual assault of a minor for attempting to sodomize his minor stepdaughter, P.G. *Id.* at 1215. Ms. Patton

also knew that Mr. Duerson had violated a restraining order by attempting to contact P.G., and that Mr. Duerson's probation was revoked because he had failed to complete his sex offender registration and was unwilling to comply with probation conditions. *Id*. Apart from the 2005 conviction, there had been "multiple other incidents" involving Mr. Duerson sexual abuse of P.G. that did not result in a conviction. *Id.*

Before an approaching court hearing on T.D.'s placement options, Ms. Patton submitted a report to the court that mentioned only the bare fact of Mr. Duerson's 2005 conviction, but otherwise omitted several facts, including Mr. Duerson's complete criminal history, the details of the 2005 conviction, his failure to fulfill his sex offender treatment and his violation of the restraining order, and the other multiple incidents of sexual abuse involving P.G. *Id.* at 1216. At the hearing, Ms. Patton again failed to bring these issues up, and instead recommended T.D.'s transfer to Mr. Duerson's custody, which the juvenile court did. *Id.* at 1216–17.

A few months into T.D.'s placement in Mr. Duerson's home, Ms. Patton had concerns regarding T.D.'s safety in the home after T.D. disclosed that his father hit him with a mop handle. *Id.* at 1217. School officials had told her that in the last few months, T.D. had spent a lot of time at the nurse's office complaining of sickness and body aches, appeared to be afraid of his father, and at times did not want to go home. *Id*. at 1218. Yet in her report to the juvenile court, Ms. Patton did not mention these issues, even though she personally "wanted to remove T.D. from [his father's] home because she was afraid for T.D.'s safety." *Id.* (alternation in original). She did not divulge the information because she feared she would be fired. *Id*. The court ordered T.D. to remain with his father. *Id*.

DDHS eventually received a report of sexual contact between T.D. and his minor half-brother, prompting T.D.'s removal from his father's home. *Id.* After an investigation DHS

ultimately found that Mr. Duerson had repeatedly sexually assaulted T.D. both alone and with T.D.'s minor half-brother. *Id.* at 1218–19.

The Tenth Circuit held that Ms. Patton "violated T.D.'s substantive due process right to be free from state-created danger." *Id.* at 1225. Addressing the first element, the court found Ms. Patton liable in three ways. First, she failed to inform the juvenile court that she knew of Mr. Duerson's troubling criminal history and therefore made "incomplete and therefore misleading statements," that "influenced the juvenile court's placement decision, making Ms. Patton responsible for T.D.s placement in Mr. Duerson's home—a place of danger." *Id.* at 1227.

Second, over multiple hearings she continued to recommend that T.D. remain in Mr. Duerson's custody, "despite having evidence that he was physically abusing T.D." *Id.* She knew that T.D. claimed his father hit him with a mop handle, that school officials reported about T.D. being sick and afraid of his father, and she had her own concerns for T.D.'s safety in his father's home. *Id.* at 1228. Yet she continually recommended T.D. remain with his father. "Her decision to withhold her safety concerns, coupled with her recommendations to keep T.D. in his father's home in the face of evidence of potential abuse, made her one of those responsible for the juvenile court's decision to keep T.D. in Mr. Duerson's temporary custody. *Id.* at 1228.

Third, even though she received T.D.'s allegation that father had hit him with a wooden mop and the school officials' troubling information, she failed to follow up on these allegations, thereby "help[ing] create or increase T.D.'s vulnerability to the danger posed by Mr. Duerson." *Id.* at 1229.

Here, this case is factually and legally similar to *Patton*.[4]  Like Ms. Patton who "withheld certain facts undermining Mr. Duerson's fitness as a caretaker" from the juvenile court, a jury

---

[4] In oral argument, Defendants maintained that CYFD did not create a danger to the Children because CYFD simply returned the Children to their parents, thereby restoring the status quo.  *See* July 16, 2024 Motion Hearing Transcript

could find that Garza and Saldana's March 13, 2020 Report omitted material facts that undermined Father's fitness as a caretaker. *Id.* at 1227. The Report contained no mention of A.D. and R.B.'s numerous disclosures made throughout February 2020 to a therapist that Father yelled at and hit R.B., that he hit Mother, hurt animals, and that Father scared A.D and R.B. The Report also did not mention that Evans, a therapist with professional training, had submitted a child abuse referral based on these disclosures. In the face of evidence of potential abuse, the Report instead affirmatively represented to the court that "[supervised] visits [between Father and Children] [went] well", "there are no risks to the [C]hildren if they are returned home" and that CYFD "did not have any safety concerns." Report at 3. Significantly, based on the current record, there is no evidence that A.D. and R.B.'s disclosures reached the state court.

The Report also claimed that "[Father] ha[d] been compliant with his treatment plan and has done everything the Department ha[d] asked of him," *id.*, even though Plaintiff submitted evidence that Father "never complied with his treatment plan" and refused to attend required therapy sessions. Woodward Decl. ¶ 44. Just as Ms. Patton failed "to inform the juvenile court of her knowledge and concerns" a reasonable jury could find that Garza and Saldana's Report contributed to the Children being placed in "a place of danger" with their Father. *Patton*, 868 F.3d at 1227.

Beyond the Report, a reasonable jury could also conclude Saldana's testimony at the March 16, 2020, initial permanency hearing influenced the court's placement decision. Although Saldana had informed the court that CYFD had "addressed" and investigated the "concerns by the therapist and [R.B.'s] foster mother as to whether the kids are afraid of their father" and allegations of

---

("Mot. Hr'g Tr.") at 14:10-15:15 (this Memorandum Opinion and Order cites to the court reporter's unofficial transcript. All page citations are subject to change on the official, edited version of the transcript.) *See also id.* at 18:17-22. For all of the reasons explained herein, the Court rejects Defendants' argument and finds that the principles applied in *Patton* apply here.

domestic violence, this was essentially the extent of her testimony. Mar. 16, 2020 Hr'g. Tr. 33:1-8, Doc. 19-20. She did not include her particular knowledge that roughly a month earlier A.D. and R.B. had made several disclosures of abuse by Father that cast doubt on his fitness as a caretaker. Therefore, a fact question exists whether Saldana's testimony at the March 16, 2020, hearing influenced the court's placement decision.

Turning to De Los Santos and Liggett, a reasonable jury could likewise conclude that they also played a role in the Children being placed in danger. Viewing the evidence in the light most favorable to Plaintiff, Mazy, the investigator believed that A.D. and R.B.'s disclosures should have been substantiated. But De Los Santos worked with Garza to coerce Mazy to unsubstantiate the disclosures to portray Father in a false light. As for Defendant Liggett, she and Garza feared that Woodward would testify unfavorably about Father, so they allegedly thwarted Woodard's professional opinion from reaching the court. This apparently had an effect because the judge remarked that "[Father] ha[d] made great progress … in his treatment plan," even though Plaintiff has submitted evidence to the contrary. Mar. 16, 2020 Hr'g. Tr. 27:17-19. Plaintiff has therefore submitted sufficient evidence on whether De Los Santos and Liggett played a role in exposing the Children to danger.

In summary, Plaintiff's evidence raises a sufficient fact question on the first element of her state-created danger claim.

### ii. Whether the Children Are Part of a Limited and Specifically Definable Group

The second element requires Plaintiff to show that Children are members of a "limited and specifically definable group." *Matthews*, 889 F.3d at 1150. Plaintiff argues the Children meet this element because they are "four children the state took into custody at the Walmart parking lot in Hobbs on June 3, 2019." Doc. 97 at 35. *See Patton*, 868 F.3d at 1229 ("T.D. was a member of a

limited and specifically definable group" specifically "children the state has removed from their natural parent and taken into state custody"); *Armijo*, 159 F.3d at 1264 ("Armijo was a member of a limited and specifically definable group—special education students who have expressed threats of suicide"). The Court agrees, and notes that Defendants do not appear to dispute this element. Plaintiff's evidence satisfies the second element.

> *iii. Whether the Defendants Put the Children at Substantial Risk of Serious, Immediate, and Proximate Harm*

The third element of Plaintiff's state-created danger claim requires her to show that "the state actor's conduct put [the Children] at substantial risk of serious, immediate, and proximate harm." *Matthews*, 889 F.3d at 1150. Defendants argue that this element is not met because other events cut off the chain of liability, including the Mother's participation in the kidnapping and the six-month gap between the kidnapping and M.B.'s injury in North Carolina. Doc. 91 at 21-22.

However, Defendants' argument focuses too much on the parents' role in the ordeal when the real focus of this element is on government actions that create "a high probability of a serious and substantial harm." *Uhlrig*, 64 F.3d at 575. In *Patton*, the court held this element was met because the father's prior pattern of sexual offenses showed a probability of reoffending, so the fact that the social worker withheld this information "contributed to putting T.D. at risk of serious, immediate, and proximate harm." *Patton*, 868 F.3d at 1229. Here, too, Plaintiff's evidence raises a jury question whether Defendants' alleged withholding of relevant information about Father and placing the Children in his home put them at risk of serious, immediate, and proximate harm. Plaintiff's evidence therefore satisfies the third element.

> *iv-v. Whether Defendants Acted Recklessly and In Conscious Disregard of an Obvious or Known Risk*

The fourth and fifth elements of Plaintiff's claim, which the Court analyzes together, require Plaintiff to show that Defendants acted recklessly and in conscious disregard of an obvious or known risk. *Matthews*, 889 F.3d at 1150. In *Patton*, the Tenth Circuit held that these elements were met because "Ms. Patton's intentional exclusion of her knowledge and concerns from her hearing reports showed she acted recklessly and in conscious disregard of an obvious or known risk that Mr. Duerson posed to T.D." *Patton*, 868 F.3d at 1230. Here, too, Plaintiff's evidence raises a triable issue of fact whether the Defendants intentionally omitted key information about Father's fitness as a caretaker from the Report and the initial permanency hearing. Plaintiff's evidence also raises a fact issue about whether Mazy, the CYFD investigator, was coerced to unsubstantiate disclosures of abuse and whether Ivy Woodward's damaging testimony about Father was intentionally blocked by De Los Santos and Liggett. Plaintiff's evidence therefore satisfies this element.

> *vi. Whether Defendants' Conduct, When Viewed in Total, was Conscience Shocking*

Finally, Plaintiff must demonstrate that Defendants' conduct, when viewed in total, was conscience shocking. *Matthews*, 889 F.3d at 1150. Conscious-shocking conduct means "deliberate government action that is 'arbitrary' and 'unrestrained by the established principles of private right and distributive justice.'" *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). "[M]ere negligence does not shock the conscience." *DeAnzona v. City & Cnty. of Denver*, 222 F.3d 1229, 1236 (10th Cir. 2000). "Rather, a plaintiff must demonstrate a degree of outrageousness

and a magnitude of potential or actual harm that is truly conscience shocking." *Ruiz v. McDonnell*, 299 F.3d 1173, 1184 (10th Cir. 2002).

In *Patton*, the Tenth Circuit held that the social worker's conduct—withholding information from the court about the father's fitness as a caretaker, her awareness of and failure to investigate evidence of abuse, and her responsibility in placing the child with his father—was conscious shocking and exceeded mere negligence. *Patton*, 868 F.3d at 1230; *see also Currier*, 242 F.3d at 920 (holding that caseworker's failure to investigate bruises and continued allegations of abuse and responsibility for court order granting custody to caretaker could be conscience-shocking behavior sufficient to survive dismissal).

Plaintiff's evidence similarly meets this standard. Before the trial home visit De Los Santos and Garza allegedly ordered an investigator to unsubstantiate credible disclosures of physical abuse. Garza and Liggett allegedly prevented Woodward from providing the children's court with her professional opinion, and Garza allegedly prevented Woodward from communicating with the Guardian ad Litem. Garza and Saldana allegedly submit a report to the court that was incomplete, and Saldana provided incomplete testimony about Father's fitness as a caretaker. After the trial home visit started, Saldana allegedly staged Father's apartment and provided him with advance notice of unannounced visits so that it would appear the Children were not in a place of danger.

Plaintiff's evidence is sufficient on the sixth element to withstand Defendants' summary judgment motion.

### 2) Clearly Established Law

Having raised a triable issue on the constitutionality of Defendants' conduct, the Plaintiff must next demonstrate that "the right was clearly established at the time of the defendant's unlawful conduct." *Gutierrez*, 841 F.3d at 900. "A right is clearly established when a Supreme

Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021) (citation omitted).

Two cases—*T.D. v. Patton* and *Currier v. Doran*—are sufficiently analogous to this case. In both cases, social workers failed to alert the court of relevant facts undermining the fathers' fitness as caretakers and recommended placing the children in the fathers' homes.

In *Currier*, CYFD investigated a report of neglect regarding two minors, Latasha and Anthony, who were in their mother's custody. *Id*. at 909. A CYFD worker found the minors in the care of a cousin who was also a minor. *Id*. Their mother had left the state. *Id*.

CYFD petitioned the court to transfer legal custody of Latasha and Anthony to CYFD. *Id*. A hearing on the petition was held. *Id*. One of the defendants, CYFD social worker Tom Doran, had learned that the children's father had a "history of financial irresponsibility" and had made only a few child support payments over the years. *Id*. Doran attended the court hearing, but he did not alert the court to the father's failure to pay child support. *Id*. The court granted legal custody of the children to CYFD, but physical custody to the children's father. *Id*.

Doran visited the father's home and noticed a small bruise on Anthony's cheek. *Id*. A few months later, Anthony had another bruise when he arrived at CYFD for an office visit. *Id*. The children's mother eventually returned. *Id.* She reported that the father and his fiancée were physically abusing the children. *Id*. Doran was aware of at least one of these reports but did not investigate. *Id*. The mother also alleged that the father's fiancée punished the children by dunking them in a bathtub full of water. *Id*. Doran again did not investigate. *Id*.

During this period, the father gained legal custody of the children in addition to physical custody. *Id.* About a month after legal custody was transferred, the children came to CYFD for an

office visit. *Id.* at 910. Bruises were visible on Anthony's face and Latasha had two visible bruises on her back. *Id.* When asked who gave them to her, she replied, "Da Da." *Id*.

At this point, CYFD temporarily removed the children from their father's home and placed them with relatives. *Id*. Doran met with a CYFD supervisor and told her that the children would be abused if they returned to their father. *Id*. But in the meeting Doran "failed to strongly advocate" against the return, so the CYFD supervisor concluded the children had to be placed with the father. *Id.*

About five months later, the father poured boiling water on Anthony. *Id*. Anthony later died from his injuries. *Id*. The Tenth Circuit affirmed the denial of qualified immunity to Doran under a state-created danger theory. *Id*. at 919. According to the Tenth Circuit, Doran "created the danger or increased the plaintiff[s'] vulnerability to the danger through his failure to investigate the numerous bruises and allegations of abuse and his responsibility for the court order granting legal custody" to the father. *Id*. at 919–20 (alteration in original). And "[b]y failing to investigate the allegations of child abuse and by recommending that [the father] assume legal custody, Doran's conduct put Anthony and Latasha at obvious risk of serious, immediate, and proximate harm, a harm that Doran recklessly and consciously disregarded." *Id*.

Based on *Currier* and *Patton*, Defendants were on notice they placed the Children in danger by minimizing or concealing facts touching on Father's fitness as a caretaker. In *Currier*, the social worker withheld the father's history of not paying child support, which the Tenth Circuit determined influenced the children court's placement of the children with the father. *Currier*, 242 F.3d 919. And in *Patton*, the Circuit determined the social worker placed a child in danger by not informing the court of the father's criminal history. *Patton*, 868 F.3d at 1227–29. These cases put Defendants on notice that allegedly withholding information from the court—A.D. and R.D.'s

disclosures, the therapist's child abuse referral, and Woodward's testimony, among other things—that undermined Father's fitness as a caretaker would violate the Children's "clearly established substantive due process constitutional right to be free of a state official's creation of danger from a private actor." *Id*. at 1212.

In summary, Plaintiff has satisfied the second prong of the qualified immunity defense to show that Defendants violated a right that "was clearly established at the time of the defendant's unlawful conduct." *Gutierrez*, 841 F.3d at 900. Defendants' motion for summary judgment on Plaintiff's state-created danger claim is denied. The Court next turns the special relationship exception.

## B. <u>Special Relationship Analysis</u>

### 1) Constitutional Violation

Under this exception, state officials "can be held liable for harm done by third parties if the state has a special relationship with the harmed individual," that is, "when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual." *Johnson ex rel. Estate of Cano v. Holmes*, 455 F.3d 1133, 1142–43 (10th Cir. 2006) (quotation marks omitted). "[F]oster care is recognized as one of the custodial relationships that creates a special relationship." *Schwartz v. Booker*, 702 F.3d 573, 580 (10th Cir. 2012). "This special relationship triggers a continuing duty that is subsequently violated if a state official knew of the asserted danger to [a foster child] or failed to exercise professional judgment with respect thereto, ... and if an affirmative link to the injuries [the child] suffered can be shown." *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1238–39 (10th Cir. 2018) (alterations in original; quotation marks omitted) (quoting *Schwartz*, 702 F.3d at 580).

"Due-process claims built on the special-relationship doctrine have four elements." *Dahn v. Amedei*, 867 F.3d 1178, 1185 (10th Cir. 2017). The plaintiff must demonstrate: (1) "the existence of a special relationship, meaning that the plaintiff completely depended on the state to satisfy basic human needs" (2) "the defendant knew that the plaintiff was in danger or failed to exercise professional judgment regarding that danger; (3) "the defendant's conduct caused the plaintiff's injuries" and (4) "the defendant's actions must shock the conscience." *Est. of Angel Place v. Anderson*, No. 19-1269, 2022 WL 1467645, at *5 (10th Cir. May 10, 2022), *cert. denied sub nom. Place v. Anderson*, 143 S. Ct. 373, 214 L. Ed. 2d 182 (2022) (quoting *Dahn v.* 867 F.3d at 1185–86).

### a.   Whether a Special Relationship Existed

"The existence of the special relationship is the pivotal issue: if none exists, a state cannot be held liable for a person's injuries at the hands of a private third party as opposed to a state actor." *Dahn*, 867 F.3d at 1186.

Defendants concede that a special relationship existed when the Children were taken into custody in June 2019. But "[o]nce the children were placed in the home of their parents, the special relationship ended as a matter of law," according to Defendants. Doc. 103, 15. Analogizing to *DeShaney*, Defendants argue that the exception does not apply because the Children were in the custody of their biological parents when the harm occurred. *See Yvonne L.*, 959 F.2d at 891 ("[T]here is no affirmative duty of the state to protect a child who is in his *parents'* custody.") (emphasis in original).

Plaintiff focuses her arguments on legal custody. She argues that the Children were in CYFD's legal custody—not the parents'—when the harm occurred, so "a special relationship was created on June 3, 2019, when Defendants took custody of [the Children]," and "has continued,

uninterrupted … to the present." Doc. 97 at 15, 18. According to Plaintiff, "a trial home visit is exactly what it sounds like: visitation"—not a transfer of custody from the parents to CYFD. *Id*. at 18.

Defendants' argument that "there is no special relationship when children in the legal custody of the state are placed in the physical custody of the biological parents" is without merit. Their argument assumes the foster care relationship ended during the trial home visit even though the record does not support this conclusion. After the Walmart episode, the Children were removed from their biological parents' legal and physical custody and placed in the legal and physical custody of the CYFD, which in turn placed them in foster care homes to provide for the Children's physical needs on the State's behalf. As the Children's legal custodian CYFD had certain statutory rights and duties concerning the Children. It retained "the right to determine where and with whom" the Children would live. N.M. Stat. Ann. § 32A–1–4(T) (Children's Code definition of "legal custody"). And it had "the right and duty to protect, train and discipline the [Children] and to provide the [Children] with food, shelter, personal care, education and ordinary and emergency medical care[.]" *Id*. As the custodial official responsible for overseeing the Children, CYFD "owed [the Children] the affirmative duty of protection while they were in foster care." *J.W. v. Utah*, 647 F.3d 1006, 1011 (10th Cir. 2011).

The Children were "in foster care" during the trial home visit at their father's home. A "trial home visit" is a period "in which a child with a plan of reunification resides with the parent or guardian while services are provided to the child and family to address risk factors and ensure safety of the child." N.M. Admin. Code 8.10.7.7(KK). CYFD maintained legal custody of the Children and had a certain amount of discretion when it came to the trial home visit. *See State of N.M. ex rel. CYFD v. Lisa A.*,144 N.M. 324, 327, 187 P.3d 189, 192 (N.M. Ct. App. 2008) (holding

that CYFD could remove a child in its legal custody from a trial home visit because "despite the trial home visit, there was no guarantee that Child would remain in Mother's care or that Mother would ultimately receive custody of Child at the conclusion of the proceedings"). And, as Plaintiff correctly points out, the state court's March 2020 order never mentioned a transfer of physical custody to the parents.

Therefore, the Children remained in the legal custody of CYFD, not the biological parents' custody. Tenth Circuit law "makes clear" that when a special relationship exists between the State and foster child, that relationship "triggers an accompanying, continuing duty imposed on state custodial officials thereafter," to protect foster children from known dangers. *Schwartz*, 702 F.3d at 581. As discussed previously, Plaintiff's evidence raises a triable issue of fact whether officials were aware of known dangers by placing Children with their father, necessitating resolution by the factfinder.

Defendants mistakenly compare this case to *Wooten v. Campbell,* 49 F.3d 696, 699–700 (11th Cir. 1995), which held that no special relationship existed when state had legal custody over a child for the sole purpose of arranging visitation for the noncustodial father, but where the mother retained physical custody. However, *Wooten* is inapplicable because the child was never in foster care to begin with; the state agency simply arranged visitation schedules. *Id.* at 699. Here, in contrast, the Children undoubtedly were in foster care and therefore in the custody of the State when the trial home visit occurred, triggering CYFD's affirmative duty to protect them from known dangers. *See J.W.*, 647 F.3d at 1011; *Schwartz*, 702 F.3d at 581.

In summary, Plaintiff has satisfied the first element of her special relationship claim.

b. Whether Defendants Knew the Children Were in Danger or
<u>Failed to Exercise Professional Judgment</u>

Plaintiff must next show "the defendant knew that the plaintiff was in danger or failed to exercise professional judgment regarding that danger." *Est. of Angel Place,* 2022 WL 1467645, at *5. To show a state official failed to exercise professional judgment, a plaintiff must show "more than mere negligence; the official must have abdicated her professional duty sufficient to shock the conscience." *Schwartz*, 702 F.3d at 585–86. The Court concludes that Plaintiff's evidence raises a fact issue on this element. As explained previously, there is a fact issue whether Garza and Saldana withheld A.D. and R.B.'s disclosures of abuse from reaching the court. There are further fact questions about whether Garza and De Los Santos were responsible for painting Father in a false light, and whether Liggett aided in preventing Woodward's damaging testimony about Father from reaching the court. At this stage, Plaintiff's evidence raises a fact issue whether Defendants abdicated their "duty to act professionally in making the placement[]" of Children with their father. *Yvonne L.*, 959 F.2d at 894. Plaintiff has therefore met the second element of her special relationship claim.

c. <u>Whether the Defendants Caused the Children's Injuries</u>

Plaintiff must next establish that the Defendants' conduct caused the plaintiff's injuries. *Est. of Angel Place*, 2022 WL 1467645, at *5. There must be "an 'affirmative link' between the state actor's conduct and 'the injuries ... suffered' to impose special relationship liability." *Hunt v. Montano*, 39 F.4th 1270, 1281 (10th Cir. 2022) (quoting *Yvonne L.*, 959 F.2d at 890). This standard "calls for something more than mere but-for causation or coincidence …." *Id*. The Court concludes that Plaintiff's evidence raises a triable issue of fact on this element. As the Court has previously explained, Plaintiff has put forward evidence that each Defendant was allegedly involved in minimizing or downplaying Father's fitness as a caretaker, which is sufficient to survive summary

28

judgment at this stage. *See id.* (holding that the plaintiffs met this element where they alleged "a host of risk factors ignored [by CFYD officials]").

d. <u>Whether Defendants' Actions Shocked the Conscious</u>

Lastly, Plaintiff must demonstrate that Defendants' actions "shock the conscience." *Est. of Angel Place*, 2022 WL 1467645, at *5. The same "shocks the conscience" test applies to both state-created danger claims and special relationship claims. *See Johnson*, 455 F.3d at 1142; *Radecki v. Barela*, 146 F.3d 1227, 1230 (10th Cir. 1998). As the Court previously explained when analyzing this element as part of Plaintiff's danger-creation claim, Plaintiff's evidence, accepted as true, shows that each Defendant had a role in knowingly placing the Children in a potentially dangerous environment and ignoring, minimizing, or downplaying problems with Father's fitness as a caretaker. Plaintiff has met the final element of her special relationship claim.

**2) Clearly Established Law**

It is clearly established that foster care creates a special relationship. *See Schwartz*, 702 F.3d at 580. Since 1985, caselaw has further established "that state officials could violate foster children's substantive due process rights if they knew of an asserted danger to a foster child." *Id.* at 588; *J.W.*, 647 F.3d at 1011 ("the constitutional right of foster children to be kept reasonably safe from harm has been clearly established since at least 1985"). And, it is clearly established that the special relationship between the State and foster child "triggers a continuing duty that is subsequently violated if a state official knew of the asserted danger to [a foster child] or failed to exercise professional judgment with respect thereto, ... and if an affirmative link to the injuries [the child] suffered can be shown." *Gutteridge*, 878 F.3d at 1238–39 (quoting *Schwartz*, 702 F.3d at 580).

29

Reasonable officials in Defendants' shoes would have known that undermining or downplaying information on the Father's fitness as a caretaker would violate the Children's substantive due process rights to be reasonably safe from harm. Defendants owed the Children an affirmative duty of protection. *See J.W.*, 647 F.3d at 1011. Given Plaintiff's evidence that each individual Defendant played an alleged role in painting the Children's father in a false light, caselaw establishes ignoring an asserted danger or failing to exercise professional judgment with respect thereto would violate the Children's substantive due process rights. *See Schwartz*, 702 F.3d at 588. The Court concludes that the individual Defendants are therefore not entitled to qualified immunity on Plaintiff's special relationship claim.

### New Mexico Tort Claims Act (Count 3)

Lastly, Defendants move for summary judgment on Count 3 of Plaintiff's operative complaint, which pleads a claim under the NMTCA against CYFD and Saldana and Garza in their individual and official capacities. *See* Pl.'s Compl. ¶¶ 172–78. The essence of Plaintiff's NMCTA claim is that these Defendants breached their duty to provide the Children "a reasonably safe living space … while the [C]hildren were in CYFD's legal custody." *Id*. ¶¶ 173, 176.

The NMTCA provides a mechanism to "compensate those injured by the negligence of public employees and to impose duties of reasonable care[,] while at the same time limiting governmental liability so that government should not have the duty to do everything that might be done." *Rayos v. State ex rel. New Mexico Dep't of Corr.*, 336 P.3d 428, 430 (N.M. Ct. App. 2014) (quoting *Cobos v. Doña Ana Cnty. Hous. Auth.,* 126 N.M. 418, 970 P.2d 1143 (N.M. 1998)) (quotation marks omitted; alteration in original). The NMTCA achieves this by creating a general immunity from tort liability for the State and State employees with certain, limited exceptions. *Id*.

One exception is the "building waiver" exception, which provides:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings.

N.M. Stat. Ann. § 41–4–6(A).

Defendants argue this waiver does not apply because they did not "operate" the biological parents' private home. The Court recounts some general principals regarding the builder waiver before addressing the parties' specific arguments. The New Mexico Supreme Court has interpreted the building waiver broadly. *See Upton v. Clovis Mun. Sch. Dist.*, 140 N.M. 205, 207, 141 P.3d 1259, 1261 (N.M. 2006). It is not limited to injuries occurring only on government-owned property. *Cobos,* 970 P.2d at 1146–47. Nor is it limited to injuries resulting from a physical defect on the premises. *Encinias v. Whitener L. Firm, P.A.*, 310 P.3d 611, 616 (N.M. 2013). Instead, Section 41–4–6(A) applies "where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government." *Id.* at 616–17. Courts must examine the "scope of the duties" performed by public employees to operate or maintain the building in question. *Cobos*, 970 P.2d at 1146–47. "Scope of duty" means "performing any duties that a public employee is requested, required or authorized to perform by the governmental entity, *regardless of the time and place of performance*." N.M. Stat. Ann. § 41–4–3(G) (emphasis added).

New Mexico courts have considered the building waiver in the context of foster care on at least three occasions. In *M.D.R. v. State ex rel. Hum. Servs. Dep't*, 114 N.M. 187, 188, 836 P.2d 106, 107 (N.M. Ct. App. 1992), the Court of Appeals held that CYFD did not "operate" the plaintiffs' private foster home by placing a child in their home knowing that the child had a history of sexual abuse with other children. Judge Minzner wrote a concurrence. She agreed CYFD did

31

not operate the foster home by making the placement decision. But her concurrence suggested that CYFD might operate a foster home if it engages in "supervision of actual day-to-day operation." *Id*. at 111 (Minzner, J., specially concurring).

Then in *Young v. Van Duyne*, 135 N.M. 695, 696, 92 P.3d 1269, 1270 (N.M. Ct. App. 2004), the Court of Appeals held that the building waiver exception applied when CYFD placed a child with violent tendencies into a foster home and the child killed the foster mother. Highlighting Judge Minzer's *M.D.R.* concurrence, the court found that the waiver could apply because the plaintiff asserted that CYFD exercised "detailed control" over the foster parents' home and that this control constituted CYFD's "operation" of the foster home. *Id.* at 1271. The court remanded to allow the plaintiff to "prove a regulatory scheme or conduct from which a fact finder" could conclude that "CYFD's regulatory duties and conduct in regard to [the foster parents'] home during foster placement constituted operation of the home as contemplated under Section 41–4–6." *Id.* at 1280.

Finally, in *Quevedo v. New Mexico Child. Youth & Fams. Dep't*, 385 P.3d 657, 659, 662 (N.M. Ct. App. 2016), the Court of Appeals held that the building waiver applied when CYFD knowingly placed adolescents in a private, non-profit treatment facility that abused them, and that CYFD failed to properly license and regulate the facility. Once again citing Judge Minzner's *M.D.R.* concurrence, the holding in *Quevedo* rested heavily on the State's extensive role in regulating and operating foster homes. *See id.* at 662–63. Because of this extensive regulation, the court explained that "CYFD has an obligation to house children in its care in homes or facilities that meet certain minimum health and safety standards" and "[t]his obligation may create a relationship between CYFD, the homes or facilities in which children are placed, and the children." *Id.* at 663.

Here, the parties have barely discussed the State's alleged role in regulating and operating the biological parents' home. But even if the parties had more fully discussed what duty of care, if any, CYFD owed the Children, there would still be questions of material fact to be answered, such as the individual Defendants' alleged actions in minimizing Father's fitness as a caretaker and questions about the Defendants' knowledge of the circumstances. The Court therefore concludes that questions of material fact preclude summary judgment on the builder waiver issue. *See id.* at 664 (holding that genuine issues of material fact about the building waiver's application existed where the plaintiffs alleged that "CYFD failed to exercise ordinary care 'to provide for the care, protection, and wholesome mental and physical development of children' under statutory or regulatory circumstances requiring CYFD to do so"); *Young*, 135 N.M. at 696 (remanding to allow the plaintiff to "prove a regulatory scheme or conduct from which a fact finder" could conclude that "CYFD's regulatory duties and conduct in regard to [the foster parents'] home during foster placement constituted operation of the home as contemplated under Section 41–4–6"). Defendants' motion for summary judgment on Plaintiff's NMTCA claim, Count 3, is denied.

## IV. CONCLUSION

For the reasons explained here, it is therefore **ORDERED** that Defendants' Renewed Motion for Summary Judgment **(Doc. 91)** is **DENIED**.

**IT IS SO ORDERED.**

_____
DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE